NORMAN C. BAY
Director, Office of Enforcement

WESLEY J. HEATH
TODD L. BRECHER
EMILY C. SCRUGGS
Office of Enforcement
Federal Energy Regulatory Commission
888 1st Street, N.E.
Washington, DC 20426
Telephone:  202-502-8100
Wesley.Heath@ferc.gov
Todd.Brecher@ferc.gov
Emily.Scruggs@ferc.gov

Attorneys for Petitioner

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL ENERGY REGULATORY COMMISSION, <br><br> Petitioner, <br><br> vs. <br><br> BARCLAYS BANK PLC; DANIEL BRIN; SCOTT CONNELLY; KAREN LEVINE; and RYAN SMITH, <br><br> Respondents. | CASE NO. <br><br> PETITION FOR AN ORDER AFFIRMING THE FEDERAL ENERGY REGULATORY COMMISSION'S JULY 16, 2013 ORDER ASSESSING CIVIL PENALTIES AGAINST BARCLAYS BANK PLC, DANIEL BRIN, SCOTT CONNELLY, KAREN LEVINE, AND RYAN SMITH <br><br> **JURY TRIAL DEMANDED** |

Petitioner Federal Energy Regulatory Commission ("FERC" or "Commission"), pursuant to the Federal Power Act ("FPA") Section 31(d), 16 U.S.C. § 823b (2006), petitions this Court for an Order Affirming the Commission's Order Assessing Civil Penalties against Barclays Bank PLC ("Barclays"), Daniel Brin, Scott Connelly, Karen Levine, and Ryan Smith, which the Commission entered on July 16, 2013.

## JURISDICTION

1.      This Court has subject matter jurisdiction over this action pursuant to FPA Section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B).  Respondents have sufficient contacts with the United States such that they are each subject to personal jurisdiction in this Court pursuant to FPA Section 317, 16 U.S.C. § 825p, which provides for nationwide service of process.

**VENUE**

2.       Venue properly lies within the Eastern District of California pursuant to FPA Section 31(d)(3)(B), 16 U.S.C. § 823b, and Section 317, 16 U.S.C. § 825p.  Respondents engaged in an unlawful scheme to manipulate electricity prices in and around California, including in this District, from November 2006 to December 2008.  Respondents' unlawful scheme included the trading of physical electricity at four electricity trading locations or hubs in and around California, including North Path 15, an electricity trading zone that encompasses northern California and this District.

**SUMMARY OF THE ACTION**

3.       This matter involves judicial review of civil penalties assessed by the Commission against Barclays and its energy traders Daniel Brin, Scott Connelly, Karen Levine, and Ryan Smith, for engaging in a fraudulent scheme to manipulate electricity prices in and around California, including in this District, during the time period 2006 to 2008.

4.       Following an extensive investigation by the Commission's Office of Enforcement ("Enforcement"), and briefing of the issues by Respondents and Enforcement before the Commission, the Commission on July 16, 2013, issued an order finding that Barclays and its traders engaged in an unlawful, manipulative scheme to trade physical electricity uneconomically to benefit related financial positions in violation of the FPA's prohibition of energy market manipulation, 16 U.S.C. § 824v(a), and the corresponding prohibition in the Commission's regulations, 18 C.F.R. § 1c.2 (2013).  The Commission's Order Assessing Civil Penalties, 144 FERC ¶ 61,041 (2013) ("Order Assessing Civil Penalties"), is attached as Exhibit 1.

5.       Prior to the Commission issuing the Order Assessing Civil Penalties, Respondents each elected the procedures of FPA Section 31(d)(3), 16 U.S.C. § 823b(d)(3), in which the Commission may assess a civil penalty without an agency hearing and then, if the penalty is not paid, the Commission may institute an action in federal district court to affirm the penalty.  Pursuant to Respondents' elections, the Commission assessed penalties as set forth in the Order Assessing Civil Penalties.  Respondents did not pay those penalties within the 60 days the Commission must wait before filing an enforcement action under FPA Section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B).   The Commission now files this petition for an order from this Court affirming the Order Assessing Civil Penalties.  Under FPA Section

31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B), this Court "shall have authority to review de novo the law and the facts involved, and jurisdiction to enter a judgment enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part" the Commission's Order Assessing Civil Penalties.

6.     The Commission seeks, pursuant to FPA Section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B), an order from this Court affirming the Commission's Order Assessing Civil Penalties against Respondents with a corresponding judgment, and disgorgement by Respondent Barclays of unjust profits.

**PARTIES**

**A.     Petitioner**

7.     FERC is an administrative agency of the United States, organized and existing pursuant to the FPA, 16 U.S.C. § 791a *et seq.*

**B.     Respondents**

8.     Respondent Barclays is a publicly-traded global financial-services provider headquartered in London, England, with operations throughout the U.S., including in California.  During the relevant time, Barclays operated a West Power Desk out of New York City, headed by Respondent Scott Connelly.  The West Power Desk traded physical and financial electricity products in the western U.S., including in this District.

9.     Respondent Daniel Brin resides in Brooklyn, New York.  Brin was employed by Barclays as an energy trader on Barclays' West Power Desk in New York City from July 2006 to 2011.  During the relevant time, Brin reported to Respondent Connelly.

10.     Respondent Scott Connelly resides in Canada.  Connelly was employed by Barclays as Managing Director of North American Power and personally headed the West Power Desk in New York City from May 2006 to August 2009.  During the relevant time, Connelly directly supervised Respondents Brin, Levine, and Smith.

11.     Respondent Karen Levine resides in Canada.  Levine was employed by Barclays as an energy trader on Barclays' West Power Desk in New York City from March 2006 to April 2009.  During the relevant time, Levine reported to Respondent Connelly.

1    12.    Respondent Ryan Smith resides in Schenectady, New York.  Smith was employed by

2    Barclays as an energy trader on Barclays' West Power Desk in New York City from April 2006 to

3    March 2007.  During his employment at Barclays, Smith reported to Respondent Connelly.

4    **THE COMMISSION'S ANTI-MANIPULATION AUTHORITY**

5    13.    In the wake of Enron Corporation's manipulative schemes in the western U.S. electricity

6    markets, Congress, through the Energy Policy Act of 2005, amended the FPA to give the Commission

7    broad authority to prohibit energy market manipulation.  In relevant part, FPA Section 222, 16 U.S.C. §

8    824v(a), makes it "unlawful for any entity . . . directly or indirectly, to use or employ, in connection with

9    the purchase or sale of electric energy . . . any manipulative or deceptive device or contrivance . . . in

10   contravention of such rules and regulations as the Commission may prescribe as necessary and

11   appropriate in the public interest or for the protection of electric ratepayers."

12   14.    The Commission implemented this statute in 2006 by promulgating the Anti-

13   Manipulation Rule, which prohibits an entity from: (1) using a fraudulent device, scheme, or artifice, or

14   making a material misrepresentation or a material omission as to which there is a duty to speak under a

15   Commission-filed tariff, Commission order, rule, or regulation, or engaging in any act, practice, or

16   course of business that operates or would operate as a fraud or deceit upon any entity, (2) with the

17   requisite scienter, (3) in connection with the purchase or sale of electricity subject to the jurisdiction of

18   the Commission.  18 C.F.R. § 1c.2 ("Anti-Manipulation Rule").  For purposes of this rule, "[t]he

19   Commission defines fraud generally, that is, to include any action, transaction, or conspiracy for the

20   purpose of impairing, obstructing, or defeating a well-functioning market.  Fraud is a question of fact

21   that is to be determined by all the circumstances of a case."  *Prohibition of Energy Market*

22   *Manipulation*, Order No. 670, 114 FERC ¶ 61,047, at P 50, *reh'g denied*, 114 FERC ¶ 61,300 (2006)

23   (internal citation omitted).

24   15.    The Energy Policy Act of 2005 also provided the Commission with increased civil

25   penalty authority.  FPA Section 316A, 16 U.S.C. § 825o-1, authorizes the Commission to assess civil

26   penalties against violators of up to $1 million for each day that a violation occurs.  The Commission has

27   found that each separate transaction that constitutes a violation is subject to a $1 million per day penalty.

28   Order Assessing Civil Penalties at P 120 n.347; *see also Energy Transfer Partners, L.P.*, 120 FERC ¶

61,086, at P 69 (2007).  In assessing penalties, the Commission must consider "the seriousness of the violation and the efforts of such person to remedy the violation in a timely manner."  FPA Section 316A, 16 U.S.C. § 825o-1.

## BACKGROUND ON THE RELEVANT MARKETS

16.    The October 31, 2012 Enforcement Staff Report and Recommendation ("Staff Report"), attached as Exhibit 2 and discussed below at ¶¶ 40-41, includes a detailed description of the relevant markets and products.  *See* Staff Report at 6-10.

17.    In the western U.S. during the relevant time, electricity was traded at different geographical trading locations.  Four of the most significant trading locations in the western U.S. were Mid-Columbia ("MIDC"), Palo Verde ("PV"), South Path 15 ("SP"), and North Path 15 ("NP").

18.    MIDC is a trading location in Washington located around hydroelectric facilities in the Columbia River Basin.  PV is a trading location in Arizona that has a substantial amount of nuclear generation.  NP is a trading zone that encompasses most of northern California, and SP is a trading zone that encompasses most of southern California.

19.    Electricity at these locations traded as "peak" and "off-peak" products.  Peak products included electricity delivered during the hours 7:00 a.m. to 10:00 p.m. Monday through Saturday but excluding holidays.  Off-peak products included electricity delivered all of Sunday, the hours 10:00 p.m. to 7:00 a.m. Monday through Saturday, and all holidays.

20.    Peak electricity was also referred to as "heavy" or "heavy load" and could be abbreviated as "HL" or "hl."  Off-peak electricity was also referred to as "light" or "light load" and could be abbreviated as "LL" or "ll."

21.    Electricity products could also be either physical or financial.  Physical products involved the obligation to deliver or receive physical electricity at a particular location during a particular time. Physical electricity was typically measured in megawatts-per-hour ("MW/h"), i.e., the number of megawatts of electricity delivered during a given hour.  For example, a person with a "long" physical position (i.e., a net buyer) of 100 MW/h of peak electricity at MIDC for April 2007 had purchased a net volume of 100 MW/h of electricity at MIDC during each peak hour during April 2007, and thus had an obligation to take delivery of (i.e., receive) 100 MW/h at MIDC for each such hour.  Physical products

could be priced at either a fixed price agreed to by the counterparties (e.g., $50 per MW/h) or at a published index price, that typically reflected the volume-weighted average price ("VWAP") of certain transactions made by electricity market participants (as determined by the compiler and publisher of the index).

22.     One of the most commonly used indices and the relevant one for this case was the Intercontinental Exchange ("ICE") daily index.  During the relevant time, much of the electricity trading in the western U.S. occurred on ICE.  ICE is an electronic trading platform frequently used by market participants, including Respondents during the relevant time, to trade electricity products.

23.     The ICE daily index was an index published by ICE each trading day based on the VWAP of all day-ahead fixed-price physical electricity transactions at a particular trading location.  ICE published a separate daily index price for peak electricity and off-peak electricity at each trading location.  Many physical electricity transactions and related financial products during the relevant time priced off of or settled against the ICE daily index.

24.     The ICE daily index was set by a methodology that calculates an index price based on the VWAP of all contributing volumes and prices traded on ICE.   The volumes and prices that ICE used to calculate the daily index price were those trades that occurred in the day-ahead fixed-price physical market, a market commonly referred to as the "cash" or "dailies" market.  In the dailies market, traders bought and sold electricity for physical delivery the following day at fixed prices (e.g., 25 MW/h of peak MIDC electricity for delivery the following day priced at $50 per MW/h).

25.     A physical position at index was physical electricity transacted at an index price as opposed to a fixed price (e.g., 25 MW/h of peak MIDC electricity priced at the ICE daily index).  Index transactions could be for different lengths of time.  For example, a trader could buy physical index electricity for a day (known as "daily index"), for the remaining trading days in a month (known as "balance of the month" or "BOM" index), for a month (known as "monthly index"), or for longer periods.  Physical index transactions for lengths greater than a day still settled against the applicable daily index but did so each day as the index was set by the VWAP in the dailies.  For example, a monthly index product settled against the daily index each trading day during the applicable month.  Therefore, the product lasted for a full month, but the profitability was determined on a daily basis.

26.     Unlike physical positions, financial positions did not entail physical obligations to deliver or receive electricity.  Rather, financial positions, including the fixed-for-floating financial swap ("financial swap") commonly traded by Barclays, were financially settled through an exchange of payments.  A net buyer of a financial swap was said to be "long" the swap (or have a "long" financial position) and a net seller was said to be "short" the swap (or have a "short" financial position).  A financial swap buyer paid a fixed price and received a floating price.  For example, a buyer of a financial swap for MIDC peak electricity during April 2007 would pay a fixed price (e.g., $50 per MW/h) and receive the floating payment of the ICE daily index settlement for MIDC peak electricity for each day of the month.

27.     Market participants also traded "term" fixed-price physical products which were transactions to buy or sell physical power for a period of more than a day (e.g., 200 MW/h of peak MIDC electricity for April 2007 priced at $50 per MW/h).  Fixed-price term positions had price risk that was equivalent to a financial swap because they established a position at a fixed price (e.g., $50) that could be measured against the ICE daily index settlement.  However, they also had the physical obligation to make or receive delivery of physical power when those positions went to delivery each day.  Therefore, it was common for market participants, including Barclays, to disaggregate the financial and physical components of a fixed-price term position and combine those components with their existing financial and physical positions to determine their total net positions on any given day.

28.     Electricity traders who primarily traded the dailies market and positions less than a month in length were known in the electricity trading industry as "cash traders."  Electricity traders who traded longer-dated positions were known as "term" traders.

29.     Market participants frequently traded the difference— known as a "spread"—between two locations by using a combination of financial swaps and/or physical positions.  This was done by taking a net long position at one location and a net short position at the other location.  Each location was known as a "leg" of the spread.

30.     In a spread, the location with a generally higher price was called the "premium" market in relation to the lower priced location.  A trader was "long" the spread when he or she had a net long position in the premium market and a net short position in the other leg of the spread.  If a trader had a

net short position in the premium market and a net long position in the other leg, he or she was "short" the spread.

31.     Generally, the trading zones in California had higher prices than the locations outside California in the western U.S., and power generally flowed from PV and Northwestern states to the California zones.

32.     SP was generally a premium location over MIDC, NP, and PV.  NP was generally a premium location over MIDC.

33.     For example, a trader holding a 100 MW/h long financial swap position at SP and a 100 MW/h short financial swap position at NP for a particular month would have a "long" SP to NP (frequently expressed as "SP/NP") spread position because the long leg of the spread (SP) generally traded at a premium to the short leg of the spread (NP).

## ENFORCEMENT'S INVESTIGATION OF RESPONDENTS

34.     In 2007, multiple market participants independently called the Commission's Enforcement Hotline to report potentially manipulative trading by Barclays in physical electricity markets in the western U.S.  The Hotline callers alleged Barclays may have been trading electricity uneconomically in physical markets to affect the ICE daily index settlement prices to benefit related financial positions, the profitability of which were determined by the settlement prices from the ICE indices.

35.     Enforcement commenced an investigation of Barclays in July 2007.  During the investigation, Enforcement obtained and reviewed in excess of one million pages of documents and analyzed hundreds of thousands of electricity trades.  The documents reviewed included emails, instant message communications ("IMs"), voice-recordings, and other relevant information.  Enforcement also conducted 25 days of investigative depositions of Barclays' current and former employees, including Brin, Connelly, Levine, and Smith, and of certain third parties.

36.     Enforcement determined from its investigation that Respondents engaged in an unlawful scheme to manipulate the electricity markets in and around California from November 2006 to December 2008 in violation of the Anti-Manipulation Rule.  Enforcement determined that Respondents manipulated electricity markets during 35 product months (i.e., trading of a specific product at a specific

1 | location for a specific calendar month, such as the cash and index markets for peak electricity at MIDC

2 | for April 2007). Enforcement determined Respondents engaged in a coordinated scheme during those

3 | product months to take the physical positions they had built and liquidate them in the cash markets—

4 | generally at a loss—to impact the ICE daily index settlements to benefit Barclays' related financial

5 | positions that settled against those indices.

6 | 37. Enforcement determined Respondents executed their manipulative scheme at the primary

7 | electricity trading points in the western U.S. at the time: MIDC, SP, NP, and PV.

8 | 38. Enforcement's determination that Respondents engaged in a manipulative scheme was

9 | based on extensive review and analysis of the data, documents, and testimony obtained in the

10 | investigation. This included, among other things, trading data from Barclays as well as from ICE

11 | reflecting the scheme, and communications of Respondents, discussed below, in which they openly

12 | discussed their manipulative trading.

13 | 39. Enforcement preliminarily estimated that Barclays unjustly profited by at least $34.9

14 | million and caused pecuniary losses to other market participants of at least $139.3 million.

15 | 40. After Enforcement and Respondents were unable to reach a settlement, Enforcement,

16 | pursuant to Commission procedures, provided its Staff Report to the Commission detailing

17 | Enforcement's findings and recommending the Commission issue an Order to Show Cause against

18 | Respondents. The Staff Report, detailing the allegations at length, is expressly adopted and incorporated

19 | by reference in this petition and attached as Exhibit 2.

20 | 41. On October 31, 2012, the Commission issued the Order to Show Cause, pursuant to FPA

21 | Section 31(d)(1), 16 U.S.C. § 823b(d)(1), attaching the Staff Report. *Barclays Bank PLC, Daniel Brin,*

22 | *Scott Connelly, Karen Levine, Ryan Smith*, 141 FERC ¶ 61,084 (2012). In the Order to Show Cause, the

23 | Commission ordered Respondents to show cause why they should not be found to have violated FPA

24 | Section 222, 16 U.S.C. § 824v, and the Anti-Manipulation Rule, assessed civil penalties of $435 million

25 | for Barclays, $1 million for Brin, $15 million for Connelly, $1 million for Levine, $1 million for Smith,

26 | and, in the case of Barclays, ordered to disgorge $34.9 million in unjust profits.

27 | 42. The Order to Show Cause also ordered Respondents to elect either an administrative

28 | hearing before an Administrative Law Judge pursuant to FPA Section 31(d)(2), 16 U.S.C. § 823b(d)(2)

1   or, alternatively, the procedures of FPA Section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B), pursuant to

2   which the Commission may assess civil penalties without an agency hearing and then institute an action

3   in federal district court to affirm the penalty assessments.  On November 29, 2012, Respondents each

4   elected the procedures of FPA Section 31(d)(3)(B).

5   **AFTER BRIEFING OF THE ISSUES, THE COMMISSION FOUND**
    **RESPONDENTS VIOLATED THE ANTI-MANIPULATION RULE**

6

7   43.   On December 14, 2012, Respondents each submitted a separate Answer to the Order to

8   Show Cause.  The individual traders also explicitly incorporated or otherwise relied upon the Answer

9   filed by Barclays.  On January 28, 2013, Enforcement filed a Reply in opposition to Respondents'

10  Answers.

11  44.   The Commission reviewed the extensive record and on July 16, 2013, issued the Order

12  Assessing Civil Penalties against Respondents, ordering Barclays to disgorge unjust profits, and

13  explaining in detail why Respondents were liable for violating FPA Section 222 and the Anti-

14  Manipulation Rule.  The Order Assessing Civil Penalties, attached as Exhibit 1, is expressly adopted and

15  incorporated by reference in this petition.

16  45.   In the Order Assessing Civil Penalties, the Commission assessed civil penalties against

17  Respondents: a $435 million civil penalty for Barclays, a $1 million civil penalty for Brin, a $15 million

18  civil penalty for Connelly, a $1 million civil penalty for Levine, and a $1 million civil penalty for Smith.

19  The Commission also ordered Barclays to disgorge $34.9 million in unjust profits from the manipulative

20  scheme.  Order Assessing Civil Penalties at PP 118-146.

21  46.   The Commission found that "Respondents violated the Commission's Anti-Manipulation

22  Rule from November 2006 to December 2008 by manipulating the energy markets in and around

23  California through the use of a coordinated, fraudulent scheme."  *Id*. at P 2.

24  **A.   Background on Barclays' West Power Desk and Trading**

25  47.   The West Power Desk focused on trading physical and financial electricity products in

26  western U.S. and Canadian markets.  Staff Report at 3-10.

27  48.   The West Power Desk consisted of two rows of desks without partitions on the Barclays

28  Commodities Group trading floor.  *Id*. at 22-23.

49.  The West Power Desk was headed by Connelly.  *Id*. at 5.  Connelly held the title of Managing Director of North American Power at Barclays and was a member of senior management.  *Id*. In addition to his managerial and supervisory responsibilities, Connelly was also a term trader on the West Power Desk, focusing on term products in western U.S. and Canadian financial and physical electricity markets.  *Id*. at 5-6.

50.  Brin, Levine, and Smith worked on the West Power Desk under Connelly's direction and supervision.  *Id*. at 5.  Brin, Levine, and Smith primarily served as cash traders, focusing on dailies trading and other products of short duration.  *Id*.

51.  Brin, Levine, and Smith all had relationships with Connelly prior to their employment at Barclays, having each worked previously with Connelly at Mirant Corporation.  *Id*. at 4-5.  Levine had also worked with Connelly at Powerex Corporation.

52.  Connelly was instrumental in recruiting Brin, Levine, and Smith to Barclays.  *Id*.

53.  Barclays' western U.S. power trading during the alleged manipulation months focused on four of the most significant western U.S. trading locations, discussed above: MIDC, PV, SP, and NP. Order Assessing Civil Penalties at P 2; Staff Report at 1, 8.

**B.  The Commission Found Respondents Engaged in a Manipulative Scheme**

54.  The Commission found Respondents intentionally engaged in an unlawful scheme from 2006 to 2008 to manipulate electricity prices during 35 product months in Commission-regulated physical markets at four of the most significant trading points in the western U.S. at the time: MIDC, NP, SP and PV.  Order Assessing Civil Penalties at P 2.

55.  The Commission determined that Respondents' manipulative scheme involved three parts for each month of manipulation:  (1) setting up a financial position, (2) building a physical position that was in the opposite direction to the financial position and (3) flattening the physical position through trading dailies to benefit the financial positions.  *Id*. at PP 2-4.

56.  Because Barclays did not own electricity generation resources or serve customer load, Barclays' physical day-ahead positions had to be liquidated prior to delivery or receipt of the electricity by buying (in the case of a short physical day-ahead position) or selling (in the case of a long physical

1   day-ahead position) an equal volume of electricity.   The process of purchasing or selling electricity to

2   liquidate the physical day-ahead position is called "flattening" the position.

3        57.     Respondents' physical positions thus enabled Respondents to trade large volumes of

4   dailies as a means of flattening the physical positions Barclays had built through physical index or term

5   electricity. *Id*. at P 3.  For example, a short physical position of 500 MW/h of a particular product going

6   into the day-ahead market allowed Barclays to buy 500 MW/h in the dailies to flatten the physical

7   position it had built.

8        58.     Because the VWAP of the dailies-market trades set the ICE index, Respondents'

9   flattening of their physical positions in the dailies market allowed Respondents to impact ICE index

10  settlements and benefit their related financial positions, which either paid or received the ICE daily

11  index at settlement.

12       59.     Respondents flattened their physical positions by trading dailies in order to increase or

13  lower the ICE daily indices at those points.  *Id*. at PP 2, 4.  Put simply, Respondents traded dailies not in

14  an attempt to profit from the relationship between the market fundamentals of supply and demand, but

15  rather for the manipulative purpose of impacting the ICE daily-index price at particular points so that

16  Barclays' financial positions at those points would benefit.  *Id*.

17       60.     Respondents' flattening of its physical positions in the dailies was uneconomic,

18  consistently losing money on a stand-alone basis.  Order Assessing Civil Penalties at PP 42-44; Staff

19  Report at 28-35.  Respondents' dailies trading during months of manipulation lost money at an average

20  of $117,404 per month, and total net losses from dailies trading in months Respondents manipulated

21  exceeded $4 million.  Staff Report at 31.

22       61.     Respondents knew their dailies trading was losing money, but they were willing to accept

23  such losses because the uneconomic dailies trading was part of their manipulative scheme to benefit

24  their related financial positions.

25       62.     Respondents' unlawful scheme was coordinated, and each Respondent individually

26  participated in the scheme and took actions to advance the scheme.  Order Assessing Civil Penalties at P

27  2.  The coordination among Respondents is apparent in Respondents' communications.  *Id*. at PP 33-35.

28  Respondents' individual roles in the scheme are described in detail in the Staff Report.

63.     As the primary term trader, Connelly controlled trading books that held the majority of the financial swaps that benefitted from Respondents' manipulative scheme.  Staff Report at 60 n.221.  Connelly, Brin, Levine, and Smith participated in building the physical positions that were opposite to Barclays' financial positions.  Brin, Levine, and Smith, as the cash traders, were the traders primarily responsible for flattening Barclays' physical positions through dailies trading, a process which affected the ICE daily indices and benefitted the financial positions.  *Id.* at 21-22.

64.     Flattening the physical positions was coordinated among Respondents.  Order Assessing Civil Penalties at P 33; Staff Report at 21-22.

65.     The cash traders generally had a discussion at or around the West Power Desk most mornings to coordinate the day's flattening of physical positions in the dailies trading.  Staff Report at 21-22.

66.     Brin was responsible for informing Levine and Smith of Connelly's physical positions that were to be traded that day.  *Id.* at 22.  The cash traders would aggregate the West Power Desk's physical positions by location with each cash trader taking one or more locations to flatten.  *Id.* at 22.

67.     Respondents' trade and position data in the manipulation months reflects the manipulative scheme.  Order Assessing Civil Penalties at PP 38-41; Staff Report at 13-34.  As described in detail in the Order Assessing Civil Penalties and in the Staff Report, during the manipulation months, Respondents generally entered the product month with a financial position and a physical position in the opposite direction (e.g., long financial position and short physical position).

68.     Because Barclays had to be physically flat each day, this setup was an essential element of the scheme: it positioned Respondents to trade dailies in a direction which benefitted the financial position by impacting the ICE daily index settlement.   If Barclays held a long financial position and a short physical position for a particular month, Barclays could flatten its short physical position by buying dailies and influencing the ICE daily index settlement to benefit its long financial position.  Conversely, if Barclays held a short financial position and a long physical position for a particular month, Barclays could flatten its long physical position by selling dailies and impacting the ICE daily index settlement to benefit its short financial position.

C.       **The Commission Found Respondents Acted with Scienter**

69.      The Commission found Respondents acted with scienter in executing their manipulative scheme.  Respondents' scienter is demonstrated through direct evidence of manipulative intent, such as emails and IMs, suspicious timing or repetition of transactions, execution of transactions benefiting derivative positions, and trading which would be economically irrational but for the manipulative scheme.  Order Assessing Civil Penalties at P 62.  The Commission also found that Respondents coordinated their individual and collective actions in furtherance of the manipulative scheme.  *Id.* at P 63.

70.      There are numerous written communications demonstrating Respondents' knowing participation in the manipulative scheme.   These communications are described in detail in the Order Assessing Civil Penalties and in the Staff Report.  *See* Order Assessing Civil Penalties at PP 34, 76-109; Staff Report at 39-58.  The communications "not only describe and substantiate the scheme, but also demonstrate the affirmative, coordinated, concerted, and intentional effort among the Respondents" individually and collectively to carry out the scheme.  Order Assessing Civil Penalties at P 2.

71.      On November 3, 2006, Smith bragged in an IM to a colleague about how he successfully traded dailies on ICE to move the PV peak index up: "I totally fuckked [sic] with the Palo [i.e., PV] m[a]rk[e]t today . . . look at my deals on ICE[.]"  His colleague subsequently asked Smith "how far did you move the index," to which Smith replied "not too far.  it had already t[ra]ded about 1200 mws   . . . shoulda started earlier.  but my goal was to keep the sp/palo tighter[.]"   Smith's colleague responded "its [sic] trading way in now," to which Smith responded "I know. I just started lifting the piss out of the palo."  Order Assessing Civil Penalties at PP 83, 145; Staff Report at 39.

72.      Smith's statement that he "totally fuckked [sic] with" the PV market referred to his dailies trading in the PV peak market that day.  Smith, along with Levine, "added significant buying pressure to the PV peak market this day by purchasing a net of 325 MW/h at escalating prices."  Staff Report at 40.  Barclays' dailies trading of PV peak electricity this day lost $2,388.  Staff Report at 39-40.  Smith's statement that his "goal was to keep the sp/palo tighter" reveals that the purpose of his dailies trading was to benefit a financial spread position held by Barclays by compressing prices between SP and PV.

73.     On November 9, 2006, Smith told Brin that he "sold a bunch of index cause I'm long palo and that sp/palo keeps getting wider, so I was trying to prop up the palo index.  I think it worked well too[.]"  Order Assessing Civil Penalties at P 34; Staff Report at 40.

74.     Smith's statement that the "sp/palo keeps getting wider" refers to the SP/PV spread widening and adversely affecting Barclays' long PV financial position.  Smith's statement that he "sold a bunch of index [be]cause [he was] long palo" reveals that the intent of his index sales was to enable Smith to flatten the index position with dailies purchased at PV to benefit Barclays' long financial position at PV, i.e., by "prop[ping] up the [PV] index" through purchases in the PV dailies market.

75.     On November 30, 2006, Brin, in a discussion with a friend at another company, explained that Connelly set up physical positions opposite to his financial positions so that Barclays could trade dailies to benefit the financial positions.  Brin told his friend "its [sic] weird b[e]c[ause] some hubs [Connelly] is oppiste [sic] fin[ancial] /phys[ical], im [sic] doing phys[ical] so i [sic] am trying to drive price in fin[ancial] direction[.]"  Brin explained that Connelly's benefitting financial positions were "much bigger" than the physical positions Brin was flattening.  Order Assessing Civil Penalties at P 77; Staff Report at 47-48.

76.     In this IM, Brin summarizes Barclays' manipulative scheme of setting up opposite financial and physical positions and then trading dailies to benefit the financial positions, i.e., "im [sic] doing phys[ical] so i [sic] am trying to drive price in fin[ancial] direction."

77.     On October 11, 2006, a broker who did work for Connelly and Levine asked Levine "why do you guys trade this stuff."  Levine interpreted "stuff" to mean physical index products.  She responded by saying "we were just having the same conversation."  The broker then posited two reasons for trading physical index:  "to just flatten out next day ahead positions . . . or to try and beat the index."  Levine later responded by agreeing with those two reasons and offering a third:  "here's my take . . . yes on the flattening a big position, yes on the try to beat index, and also to try to protect a position, either bom or prompt."  Order Assessing Civil Penalties at P 88; Staff Report at 49-50.

78.     Levine's statement to the broker about trading to "protect a position" referred to Barclays' manipulative scheme.  BOM and prompt positions are financial positions that respectively refer to the remainder of the month and the following month.  Both settled off the ICE index.  Trading

1    index when Barclays held such financial positions allowed Barclays to establish a physical position and

2    then flatten the physical position by trading dailies in the direction of the financial position.  The dailies

3    trading was intended to impact ICE index settlements and benefit, or "protect," Barclays' financial

4    positions.

5          79.    On December 7, 2006, Smith told Brin "don't buy any sp light index . . . I'm gonna [sic]

6    try to crap on the NP light and it should drive the SP light lower."  Brin replied "that is fine."  Order

7    Assessing Civil Penalties at P 145; Staff Report at 41.

8          80.    Smith told Brin not to buy SP off-peak because Smith intended to manipulate the NP off-

9    peak market, which would affect SP off-peak prices.  Barclays had financial positions that benefitted

10   from a lower NP off-peak ICE index settlement.  Smith sought to "crap on" the NP off-peak by selling

11   NP off-peak in the dailies to lower the index and benefit Barclays' financial positions.

12         81.    On December 21, 2006, Smith asked a friend at another company to sell him NP off-peak

13   index.   Smith then told his friend "if you're long NP light I suggest selling it ea[r]ly."  Later in the

14   exchange, Smith's friend asked "why you buy index if its [sic] gonna [sic] tank?" to which Smith replied

15   "my lil secret" and "tell you about it later."  Smith then agreed to call his friend on the "bat line," which

16   was a reference to an unrecorded cell phone as opposed to the recorded lines used on trading desks.

17   Staff Report at 41.

18         82.    In this IM, Smith sought to buy NP off-peak index so that he would be able to sell more

19   NP off-peak in the dailies market to benefit Barclays' short financial position that benefitted from a

20   lower NP off-peak index price.  Smith advised his friend to sell NP off-peak early if his friend was long

21   because Smith intended his selling activity in the NP off-peak dailies market to lower prices.

22         83.    Later that day, Smith's friend checked in to see if Smith "cash[ed] in on NP l[igh]t."

23   Smith responded "not too much. did decent vol[ume] and beat [index settlement] by .10 . . . but my goal

24   was more for my B[]OM position . . . didn't want the [off-peak two-day package traded for Christmas]

25   to settle higher than the BOM marks."  Smith then stated "that was pretty low for a [Christmas package]

26   though.  I thought . . . I ran out of NP light [physical power] to sell . . . should [have] done a few more

27   hund[red MW/h of selling in dailies]."  *Id.* at 42.

28

84.     In this IM, Smith again reveals the manipulative intent of his dailies trading.  The "BOM" position Smith referenced was Barclays' financial position that benefitted from Smith's trading in the NP off-peak market.  In stating that his "goal" was for his "BOM position," Smith reveals that he intended his NP off-peak dailies trading to benefit Barclays' financial position.

85.     On January 31, 2007, Levine sent an email to the five main traders on the West Power Desk, including Connelly, Brin, and Smith, about how she would like her positions to be traded while she was out of the office.  In her email, Levine recited a financial position for February 2007 of short 175 MW/h at SP peak and long 200 MW/h at PV peak and stated  that "[i]f we can keep the PV index up and the SP daily index down somehow that will be good to keep the BOM in."  Order Assessing Civil Penalties at P 90; Staff Report at 50-51.

86.     In this email, Levine asked her colleagues to trade dailies to benefit financial positions.  "[K]eep[ing] the BOM in," refers to keeping the BOM spread between SP and PV from expanding so that Levine's short financial position in the SP to PV spread referenced in her email would be more valuable.

87.     Prior to this email, Barclays had short physical and financial positions for SP peak for February 2007.  Before and after the month's trading began, however, Barclays reversed its short physical position in SP peak electricity to a long physical position through daily and BOM index transactions.  This reversal changed the physical position for SP peak from being aligned with Barclays' financial position to being opposite its financial position, which enabled Barclays to sell dailies to "keep . . . the SP daily index down" as Levine requested.  Similarly, Barclays also reversed its physical position at PV from being aligned with its financial position to being opposite on two days around this time to enable Barclays to buy dailies to "keep the PV index up."

88.     On February 28, 2007, Connelly personally traded MIDC peak dailies, an event which was unusual given his role as a term trader and desk head and which required him to arrive at work earlier than usual.  Connelly's trading engendered commentary in the market.   A former colleague remarked to Connelly that the market was a "shitshow[.]"  Connelly replied "crazy – i love it . . . your boy started crying this morning . . . he sent me an ice message – said he wass [sic] calling FERC . . . lol [laughing out loud]."  Order Assessing Civil Penalties at PP 101-102; Staff Report at 54-55.  On this

1  day, Connelly had a financial position that was opposite to the physical position he was flattening in the
2  dailies.  The flattening of that physical position in the dailies generated losses exceeding $40,000.  Order
3  Assessing Civil Penalties at P 105 n.308.

4       89.     Later that day, the same former colleague again contacted Connelly.  Connelly revealed
5  he was aware that his trading could move the daily index settlement.  After the former colleague asked
6  Connelly if he was "going to have fun with the index all month[,]" Connelly replied "no – it isn't going
7  to affect much."  Order Assessing Civil Penalties at P 102; Staff Report at 55.

8       90.     On March 8, 2007, Brin observed what he believed to be manipulative trading by another
9  market participant.  Brin told a friend in an IM conversation that the trading he witnessed "has to be
10 someone wanting to push down index [settlement] tomorw [sic], loading up today to sell it in the
11 mor[n]ing?"  Staff Report at 48.  Brin was familiar with such a manipulative strategy because it was the
12 same manipulative strategy employed by Barclays.

13      91.     On March 21, 2007, Smith told Brin in an IM that he "think[s] [Levine] wants you to run
14 the off peak up (she's long [financially]) not sure why she doesn't do more [dailies].  prob[ably] doesn't
15 want to take the loss daily and pay all the bro[kerage fees.]"  Staff Report at 44-45.  In this IM, Smith
16 discussed Barclays' manipulation of the MIDC off-peak index in March 2007 to benefit a long financial
17 position at MIDC.  Smith's statement about "tak[ing] the loss daily" recognized that Barclays' dailies
18 trading was uneconomic.

19      92.     Later that day, Brin and Smith continued their IM conversation about how Levine wanted
20 their help in manipulating the MIDC off-peak market with Brin saying "she is getting killed on that
21 midc ll, she really wanted someone to try and prop it up."  *Id*. at 45.  Brin's statement about Levine
22 "getting killed" referred to Levine's long financial position losing value when the MIDC off-peak index
23 settled lower as the month progressed.  Brin's statement that Levine "wanted someone to try and prop it
24 up" referred to Levine wanting Barclays' traders to purchase large volumes in the MIDC off-peak
25 dailies market to impact the index and benefit Levine's financial position.

26      93.     On the following day, March 22, 2007, Brin and Smith continued to discuss by IM
27 Levine's intent to manipulate the MIDC off-peak market.  In response to Smith's question of "why does
28 [Levine] tell me to do stuff," Brin responded "b[e]c[ause] she wants to marks [sic] on trades but doesnt

[sic] want them herself . . . just like she didnt [sic] want daily loss trading midc [off-peak] in her book so wanted us to trade it." *Id.* at 45-46. Brin's statement about Levine not wanting a "daily loss" trading MIDC off-peak again referred to the flattening of physical positions in the dailies market losing money.

94.     On April 2, 2007, Levine emailed a colleague, Monal Dhabliawala, about how to trade her positions while she was out of the office. Levine told her colleague that "[i]f you can sell a bunch of [PV] index that would be good to keep the price up." Order Assessing Civil Penalties at P 92; Staff Report at 52. Levine's statement about selling index to keep the price up referred to Barclays' flattening of index sales with dailies purchases to impact the index settlement and benefit Barclays' financial position.

95.     In response to Levine's April 2, 2007 email or other conversations with Levine, traders other than Dhabliwala, who was in the process of leaving Barclays, acted on Levine's request to sell index and buy it back in the dailies to keep the PV index settlement price up. Order Assessing Civil Penalties at P 92; Staff Report at 52.

96.     On July 6, 2007, a trade publication produced by the Western Power Traders Forum called "The Friday Burrito" published a piece stating that "there is a specter haunting the daily screens for those trading physical power in the West. . . . [I]t's clear that people were wondering about large physical positions in the [dailies] market. What the hell is going on out there? I don't know what is going on, and the worst thing possible would be one party trying to move the financial markets with large physical positions." Order Assessing Civil Penalties at P 106; Staff Report at 56.

97.     On July 8, 2007 at 7:20 PM, a Sunday night, Connelly sent a lengthy email to the author of "The Friday Burrito" providing numerous purported explanations for the large physical trading volumes. Order Assessing Civil Penalties at P 106; Staff Report at 56-57.

98.     Connelly's purported explanations for the reasons behind the increase in cash trading volumes were false. Connelly knew that Barclays was responsible for the increase in cash trading volumes and that it was engaged in the manipulative scheme mentioned in "The Friday Burrito" of "trying to move the financial markets with large physical positions." Connelly knew the explanations he provided to the author were false, knew that people were talking about him and Barclays manipulating the western U.S. electricity markets, and knew that Barclays had been notified days before that FERC

1    was beginning an investigation.  In his email, Connelly requested that the author of "The Friday Burrito"

2    publish his explanation anonymously.

3          99.    Respondents' scienter is also demonstrated by the repeated and avoidable cash trading

4    losses Respondents incurred by flattening the physical positions they had built.

5          100.    During the months Respondents employed the manipulative scheme, Respondents

6    consistently incurred losses in the dailies trading to flatten their physical positions, net losses which

7    totaled over $4 million.

8          101.    Respondents individually recognized and accepted that the loss-generating flattening of

9    their physical positions in the dailies was part of the manipulative scheme.

10         102.    On certain mornings before cash trading began, Respondents increased their physical

11   positions by buying or selling BOM or daily index so that they could trade even larger volumes of

12   dailies.  These BOM or daily index transactions added to the size of Barclays' existing physical position

13   and increased the difficulty of flattening that position profitably.  Order Assessing Civil Penalties at P

14   39.

15         103.    Respondents at times also reversed existing physical positions to create new physical

16   positions opposite to Barclays' financial positions, thus allowing Respondents to trade dailies in the

17   direction to benefit those financial positions.

18         104.    Respondents' flattening of the physical positions through dailies trading was

19   economically irrational but for Respondents' manipulative scheme and thus also demonstrates scienter.

20         105.    Connelly frequently allowed Brin, Levine, and Smith to transfer the losses from

21   flattening physical positions in the dailies to trading books controlled by him.  Brin, Levine, and Smith

22   transferred or caused to be transferred over $1.4 million of these losses to books controlled by Connelly.

23   Order Assessing Civil Penalties at P 63 n.203; Staff Report at 59.

24         106.    Brin, Levine, and Smith would not have traded in or transferred losses to books

25   controlled by Connelly without his permission.  Rather, Connelly authorized Brin, Levine, and Smith to

26   transfer the losses incurred from flattening the physical positions in the dailies market to his books or to

27   trade directly in his books.

28         107.    Respondents knew their scheme was unlawful.

108.     Barclays' compliance documents and training presentations emphasized the need to avoid uneconomic trading to benefit another position, whether physical or financial in nature.

109.     One document summarized uneconomic trading by saying "Uneconomic trading or other market activities (*i.e.* trades or market conduct that viewed in isolation appear to lack economic sense) may be alleged to evidence intent to manipulate market prices."  The first example provided of uneconomic trading was "Intentionally entering into unprofitable trades in order to affect the price of larger volumes of positions held by the firm in the same commodity or derivative."  Another compliance document, in explaining a "Prohibited Activity," warned traders to "not intentionally create a loss in one position to generate a greater benefit in another position in the same or correlated commodities."

110.     Respondents also had been warned by Joseph Gold, Managing Director and Head of Commodities, Americas, that uneconomic trading was unacceptable.  Mr. Gold stated that "Uneconomic trading activity was something which I tried to make sure was very clear to all the traders . . . .  The golden rule was always, under no circumstances, lose money on a transaction for the intention of making money on another transaction . . . ."  Order Assessing Civil Penalties at P 66; Staff Report at 2.

111.     Under the Anti-Manipulation Rule, scienter can also be established through reckless conduct.  In the Order Assessing Civil Penalties, the Commission found that Respondents' conduct satisfied any definition of "recklessness" because Respondents' conduct in this case was intentional and not merely reckless.  Order Assessing Civil Penalties at PP 66-68.

### D.      The Commission Found Respondents' Manipulative Scheme Involved Jurisdictional Transactions

112.     The Commission found Respondents' manipulative scheme involved physical electricity transactions subject to the Commission's jurisdiction under the FPA.  Order Assessing Civil Penalties at PP 112-116.  FPA Section 201 grants the Commission jurisdiction over "the sale of electric energy at wholesale in interstate commerce."  16 U.S.C. § 824(b).  Barclays' physical electricity transactions, both in the cash market and in the index market, were transactions for the sale of electricity for resale in interstate commerce.

113.     These transactions were tagged from an electrical generation source to their respective physical delivery points and were physically scheduled by employees of Barclays with the appropriate

physical electric grid operators.  The physical transactions at both index price and fixed price resulted in electricity being physically delivered the following day at locations in this District and elsewhere in the western U.S.

114.    Accordingly, Respondents' physical index and fixed-price transactions were sales of electricity for resale in interstate commerce and thus are subject to the Commission's jurisdiction under FPA Section 201, 16 U.S.C. §§ 824(b), (d).

115.    Respondents' transactions in the cash market are also subject to the Commission's jurisdiction under FPA Section 222, 16 U.S.C. § 824v, as Respondents' manipulative scheme sought to affect daily index settlements that set the price of jurisdictional transactions by other market participants. Thus, Respondents' transactions were also "in connection with" transactions subject to the Commission's authority under FPA Section 222, 16 U.S.C. § 824v.

**E.    The Commission Determined Appropriate Civil Penalties**

116.    Having concluded that Respondents manipulated the western U.S. electricity markets, the Commission assessed penalties of $435 million for Barclays, $1 million for Brin, $15 million for Connelly, $1 million for Levine, and $1 million for Smith.

117.    The Commission found these penalties to be statutorily authorized under the FPA and appropriate in this case.  Order Assessing Civil Penalties at PP 118-146.  The Commission determined the penalty amounts recommended by Enforcement were well below the maximum penalty amounts authorized by the FPA.  *Id*. at P 120.

118.    The Commission further determined the $435 million civil penalty assessment against Barclays was within the penalty range provided by the Commission's Penalty Guidelines, a framework based on the corporate fine provisions of the U.S. Sentencing Guidelines that the Commission uses in determining potential civil penalty amounts for organizations (but not individuals).  *See Enforcement of Statutes, Orders, Rules, and Regulations*, 132 FERC ¶ 61,216 (2010).

119.    The Commission also undertook an independent assessment of the civil penalty amounts, outside of the Penalty Guidelines but pursuant to the statutory requirement that the Commission consider "the seriousness of the violation and the efforts of such person to remedy the violation in a timely manner."  FPA Section 316A, 16 U.S.C. § 825o-1.

120.     The Commission concluded Respondents' manipulative scheme was serious and complex, requiring the coordinated trading of multiple products over long periods of time.  Order Assessing Civil Penalties at P 130.  The Commission also concluded the manipulative scheme was widespread, involving trading of more than 35 monthly products on more than 655 product days at four of the most significant electricity trading points in the western U.S. at the time.  *Id.*

121.     The Commission concluded that the manipulative scheme was also significant because Respondents manipulatively traded large volumes of electricity to affect index settlements.  *Id.*  Because large volumes of electricity are traded at index prices, Respondents' manipulative trading affected the wholesale price of electricity in the western U.S.  *Id.*  Moreover, by affecting prices paid by load-serving entities such as public utilities, the scheme affected the ultimate retail price paid by tens of millions of consumers in California and elsewhere in the western U.S.  *Id.*

122.     The Commission further found that Respondents were aware of the seriousness of their conduct even as they engaged in manipulation, and that they made no efforts to remedy their violations. *Id.* at 130-31.

123.     The Commission found the civil penalties assessed to be well within the statutory authorization and appropriate.  *Id.* at 132.

124.     Although the Commission has included a demand for a jury trial, the Commission respectfully submits that this Court can and should affirm the penalty assessment without modification following a review of the Commission's Order Assessing Civil Penalties and the materials presented to the Commission during the penalty assessment process.

## CLAIM FOR RELIEF
(Against All Respondents for Violating FPA Section 222, 16 U.S.C. § 824v, and the Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2)

125.     The Commission repeats each and every allegation set forth in Paragraphs 1 through 124, inclusive, as if set forth fully herein.

126.     Respondents used or employed a fraudulent device, scheme, or artifice, or engaged in an act, practice, or course of business that operates or would operate as a fraud or deceit, with scienter, in connection with electric energy subject to the jurisdiction of the Commission in contravention of FPA Section 222, 16 U.S.C. § 824v, and the Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2

promulgated to implement that section of the FPA.  Respondents' manipulative scheme involved 35

product months from 2006 to 2008.  Each of these product months, and each manipulative trade during

such months, constitutes a separate violation of FPA Section 222, 16 U.S.C. § 824v, and the

Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2.

127.    Accordingly, the Commission is entitled to an Order from this Court affirming its

assessment of civil penalties against Respondents under FPA Section 31, 18 U.S.C. § 823b(d)(3)(B), and

ordering Respondent Barclays to disgorge its unjust profits.

## **REQUESTED RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

(A)     Enter an order and judgment affirming the Commission's assessment of a $435 million civil penalty against Respondent Barclays.

(B)     Enter an order and judgment affirming the Commission's assessment of a $1 million civil penalty against Respondent Brin.

(C)     Enter an order and judgment affirming the Commission's assessment of a $15 million civil penalty against Respondent Connelly.

(D)     Enter an order and judgment affirming the Commission's assessment of a $1 million civil penalty against Respondent Levine.

(E)     Enter an order and judgment affirming the Commission's assessment of a $1 million civil penalty against Respondent Smith.

(F)     Enter an order requiring Respondent Barclays to disgorge the unjust profits it obtained as a result of its illegal manipulative scheme.

(G)     Order such other and further relief as may be necessary and appropriate.

DATED:  October 9, 2013                          FEDERAL ENERGY REGULATORY COMMISSION

                                                                 NORMAN C. BAY
                                                                 Director, Office of Enforcement

                                            By:     */s/ Wesley Heath*
                                                                 WESLEY J. HEATH
                                                                 TODD L. BRECHER
                                                                 EMILY C. SCRUGGS
                                                                 Office of Enforcement
                                                                 Federal Energy Regulatory Commission
                                                                 888 1st Street, N.E.
                                                                 Washington, DC 20426
                                                                 Telephone:  202-502-8100
                                                                 Wesley.Heath@ferc.gov
                                                                 Todd.Brecher@ferc.gov
                                                                 Emily.Scruggs@ferc.gov

                                                                 Attorneys for Petitioner