THOMAS J. NOLAN (SBN 66992)
Thomas.Nolan@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Facsimile:  (213) 687-5600

*Please see continuation page for a complete
list of Defendants and their counsel.*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL ENERGY REGULATORY COMMISSION, | CASE NO.: 2:13-cv-02093-TLN-DAD |
| Petitioner, | **NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION:** |
| v. | |
| BARCLAYS BANK PLC; DANIEL BRIN; SCOTT CONNELLY; KAREN LEVINE; and RYAN SMITH, | **(A) TO DISMISS FOR IMPROPER VENUE OR, IN THE ALTERNATIVE, TO TRANSFER TO THE SOUTHERN DISTRICT OF NEW YORK; AND** |
| Respondents. | **(B) TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED** |
| | **[FILED CONCURRENTLY WITH DECLARATIONS OF THOMAS J. NOLAN, CHRISTOPHER EVANS, DANIEL BRIN, SCOTT CONNELLY, KAREN LEVINE, AND RYAN SMITH IN SUPPORT THEREOF]** |
| | Date:          April 24, 2014 |
| | Time:          2:00 p.m. |
| | Courtroom:  2 |
| | Presiding:    Hon. Troy L. Nunley |

## <u>CONTINUATION SHEET: COUNSEL FOR DEFENDANTS</u>

JAY B. KASNER (Admitted *Pro Hac Vice*)
Jay.Kasner@skadden.com
STEVEN R. GLASER (Admitted *Pro Hac Vice*)
Steven.Glaser@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Telephone:       (212) 735-3000
Facsimile:       (212) 735-2000

PATRICK FITZGERALD (Admitted *Pro Hac Vice*)
Patrick.Fitzgerald@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
Telephone:       (312) 407-0700
Facsimile:       (312) 407-0411

JOHN N. ESTES III (Admitted *Pro Hac Vice*)
John.Estes@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone:       (202) 371-7000
Facsimile:       (202) 393-5760

GREGORY A. MARKEL (Admitted *Pro Hac Vice*)
Greg.Markel@cwt.com
JASON M. HALPER (Admitted *Pro Hac Vice*)
Jason.Halper@cwt.com
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone:       (212) 504-6000
Facsimile:       (212) 504-6666

PAUL J. PANTANO JR. (Admitted *Pro Hac Vice*)
Paul.Pantano@cwt.com
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, N.W.
Washington, D.C. 20001
Telephone:       (202) 862-2410
Facsimile:       (202) 862-2400

**<u>CONTINUATION SHEET: COUNSEL FOR DEFENDANTS</u>**

SETH P. WAXMAN (*Pro Hac Vice* Admission pending)
Seth.Waxman@wilmerhale.com
DAN M. BERKOVITZ (*Pro Hac Vice* Admission pending)
Dan.Berkovitz@wilmerhale.com
JONATHAN G. CEDARBAUM (*Pro Hac Vice* Admission pending)
Jonathan.Cedarbaum@wilmerhale.com
HEATHER M. ZACHARY (*Pro Hac Vice* Admission pending)
Heather.Zachary@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone:    (202) 663-6000
Facsimile:    (202) 663-6363

MARK C. KALPIN (*Pro Hac Vice* Admission pending)
Mark.Kalpin@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone:    (617) 526-6000
Facsimile:    (617) 526-5000

Attorneys for Defendant BARCLAYS BANK PLC

SUSAN L. GERMAISE (SBN 176595)
sgermaise@mcguirewoods.com
McGUIREWOODS LLP
1800 Century Park East, 8th Floor
Los Angeles, California 90067
Telephone:    (310) 315-8200
Facsimile:    (310) 315-8210

TODD MULLINS (Admitted *Pro Hac Vice*)
tmullins@mcguirewoods.com
McGUIREWOODS LLP
2001 K Street, N.W.
Washington, D.C. 20006-1040
Telephone:    (202) 857-1752
Facsimile:    (202) 828-3320

ALLISON D. CHARNEY (Admitted *Pro Hac Vice*)
acharney@mcguirewoods.com
McGUIREWOODS LLP
1345 Avenue of the Americas, 7th Floor
New York, New York 10105
Telephone:    (212) 548-2166
Facsimile:    (212) 715-6279

Attorneys for Defendants DANIEL BRIN
and SCOTT CONNELLY

1

**CONTINUATION SHEET: COUNSEL FOR DEFENDANTS**

2

KRYSTAL N. BOWEN (SBN 163972)
Krystal.Bowen@bingham.com
3   BINGHAM McCUTCHEN LLP
Three Embarcadero Center
4   San Francisco, California 94111
Telephone:    (415) 393-2760
5   Facsimile:    (415) 393-2286

6   MICHAEL L. SPAFFORD (Admitted *Pro Hac Vice*)
Michael.Spafford@bingham.com
7   J. BUB WINDLE (Admitted *Pro Hac Vice*)
Bub.Windle@bingham.com
8   BINGHAM McCUTCHEN LLP
2020 K Street, N.W.
9   Washington, D.C. 20006
Telephone:    (202) 373-6000
10  Facsimile:    (202) 373-6001

11  Attorneys for Defendants KAREN LEVINE
and RYAN SMITH

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TO THE CLERK OF THE ABOVE-ENTITLED COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on April 24, 2014 at 2:00 p.m., or as soon thereafter as the parties may be heard, in the Courtroom of the Honorable Troy L. Nunley, located at 501 I Street, Sacramento, California 95814, Defendants Barclays Bank PLC ("Barclays"), Daniel Brin, Scott Connelly, Karen Levine, and Ryan Smith (collectively, the "Traders" and together with Barclays, "Defendants") will, and hereby do, move this Court to dismiss the Complaint of Plaintiff Federal Energy Regulatory Commission ("FERC") in its entirety pursuant to Rules 12(b)(3), 12(b)(6), and 9(b) of the Federal Rules of Civil Procedure.[1]   In the alternative, Defendants move, pursuant to 28 U.S.C. § 1404(a), to transfer this action to the Southern District of New York.  The motion is based on the following grounds:

*First*, venue is not proper in this District under section 317 of the Federal Power Act, 16 U.S.C. § 825p.  Alternatively, transfer to the Southern District of New York would promote: (1) the convenience of the parties, (2) the convenience of the witnesses, and (3) the interests of justice.

*Second*, FERC has no jurisdiction to pursue manipulation claims against Defendants.

*Third*, FERC has failed to adequately plead a manipulation claim.

*Fourth*, FERC's allegations based on conduct prior to December 26, 2007 are not actionable under the governing statute of limitations.

DATED:  December 16, 2013

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: */s/  Thomas J. Nolan*  
Thomas J. Nolan  
Attorneys for BARCLAYS BANK PLC

---

[1]   The pleading filed by FERC that commenced this proceeding was styled as a "Petition," and the parties were denominated as "Petitioner" and "Respondents."  This terminology is incorrect.  As discussed more fully in the accompanying Memorandum of Points and Authorities, this Court must assess the factual and legal issues raised by FERC's allegations *de novo*. *See* 16 U.S.C. § 823b(d)(3)(B).  Thus, FERC's pleading was in fact a complaint, FERC is the plaintiff, and Barclays and the Traders are the defendants.

1  DATED:  December 16, 2013

2                                              CADWALADER, WICKERSHAM & TAFT LLP

3
                                               By:  /s/ Gregory A. Markel (as authorized on 12/16/2013)
4                                                   Gregory A. Markel
                                                   Attorneys for BARCLAYS BANK PLC
5

6  DATED:  December 16, 2013

7                                              WILMER CUTLER PICKERING HALE AND DORR LLP

8
                                               By:  /s/ Seth Waxman (as authorized on 12/16/2013)
9                                                   Seth P. Waxman
                                                   Attorneys for BARCLAYS BANK PLC
10

11 DATED:  December 16, 2013

12                                             McGUIREWOODS LLP

13
                                               By:  /s/ Todd Mullins (as authorized on 12/16/2013)
14                                                  Todd Mullins
                                                   Attorneys for DANIEL BRIN and SCOTT
15                                                 CONNELLY

16
   DATED:  December 16, 2013
17
                                               BINGHAM McCUTCHEN LLP
18
                                               By:  /s/ Michael L. Spafford (as authorized on 12/16/2013)
19                                                  Michael L. Spafford
                                                   Attorneys for KAREN LEVINE
20                                                 and RYAN SMITH

21

22

23

24

25

26

27

28

TABLE of CONTENTS

PAGE

GLOSSARY OF DEFINED TERMS ................................................................. xii

PRELIMINARY STATEMENT ....................................................................... 1

STATEMENT OF FACTS AND SUMMARY OF ALLEGATIONS ............................ 6

I.    THE PARTIES ................................................................................. 6

    A.    FERC .................................................................................. 6

    B.    The Defendants ................................................................ 6

II.    BARCLAYS' POWER TRADING .................................................... 7

III.    FERC'S INVESTIGATION ........................................................... 8

IV.    FERC'S ALLEGATIONS ............................................................. 9

ARGUMENT ......................................................................................... 10

I.    STANDARD OF REVIEW ............................................................. 10

    A.    Issues of Law and Fact Are Subject to *De Novo* Review by This Court ............................................................................ 10

    B.    Burden of Proof Under Rules 12(b)(3) and 12(b)(6) ................. 10

II.    VENUE IN THIS DISTRICT IS IMPROPER OR, IN THE ALTERNATIVE, THIS ACTION SHOULD BE TRANSFERRED TO THE SDNY ........................................................................................ 11

    A.    Venue in This District Is Improper ...................................... 11

        1.    None of the Defendants is an inhabitant of this District ................. 12

        2.    FERC does not allege that "any act or transaction constituting the violation occurred" in this District ............................... 12

    B.    Alternatively, the Court Should Transfer This Action ................ 16

        1.    The convenience of the Parties favors transfer ...................... 17

        2.    The convenience of the witnesses favors transfer ................... 19

        3.    The interests of justice favor transfer ................................ 20

III.    THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF ............. 22

    A.    FERC Has No Jurisdiction to Pursue Its Manipulation Claims ........ 22

1.     The CFTC has exclusive jurisdiction over the entire alleged scheme.......................................................................... 22

2.     FERC has no jurisdiction under the FPA over Barclays' contracts ......................................................................... 27

3.     The FPA does not authorize FERC to bring manipulation claims against individuals .............................................. 31

B.    The Complaint Does Not State a Claim for a Manipulation Violation......... 33

C.    The Statute of Limitations Precludes FERC From Bringing an Enforcement Action for Many of the Alleged Violations ........................... 39

IV.    CONCLUSION.................................................................................. 43

# TABLE OF AUTHORITIES

## CASES

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)..................................................................................31, 35

*Abbate v. Wells Fargo Bank, N.A.*,
    No. CV 10-651,
    2011 WL 9698215 (C.D. Cal. Nov. 17, 2011)..........................................................38

*Akhtar v. Mesa*,
    698 F.3d 1202 (9th Cir. 2012) ...................................................................................11

*America Dental Association v. Shalala*,
    3 F.3d 445 (D.C. Cir. 1993) ......................................................................................32

*Argueta v. Banco Mexicano, S.A.*,
    87 F.3d 320 (9th Cir. 1996) .......................................................................................11

*Atlantic City Electric Co. v. Federal Energy Regulatory Commission*,
    295 F.3d 1 (D.C. Cir. 2002) ......................................................................................27

*In re Bank of America Corp.*,
    No. 09–md–02014,
    2011 WL 740902 (N.D. Cal. Feb. 24, 2011) .............................................................31

*Board of Trade of the City of Chicago v. SEC*,
    677 F.2d 1137 (7th Cir.), *vacated as moot*, 459 U.S. 1026 (1982)......................24, 26, 27

*Bonneville Power Admin. v. FERC*,
    422 F.3d 908 (9th Cir. 2005) .....................................................................................33

*Burnett v. New York Central Railroad Co.*,
    380 U.S. 424 (1965) ...................................................................................................43

*Cambridge Filter Corp. v. International Filter Co.*,
    548 F. Supp. 1308 (D. Nev. 1982)............................................................................42

*Chemical Bank v. Arthur Andersen & Co.*,
    726 F.2d 930 (2d Cir. 1984).................................................................................5, 30

*Chicago Mercantile Exchange v. SEC*,
    883 F.2d 537 (7th Cir. 1989) .....................................................................................24

*Cho v. UCBH Holdings, Inc.*,
    No. C 09-4208,
    2011 WL 3809903 (N.D. Cal. May 17, 2011) ..........................................................38

*Commodity Futures Trading Commission v. Co Petro Marketing Group, Inc.*,
    680 F.2d 573 (9th Cir. 1982) ................................................................................25, 26

*C.R.A. Realty Corp. v. Gold Reserve Corp.*,
    No. 88 CIV. 4297,
    1988 WL 144752 (S.D.N.Y. Sept. 14, 1988).............................................................15

*Davis v. Social Service Coordinators, Inc.*,
    No. 1:10–cv–02372,
    2013 WL 4483067 (E.D. Cal. Aug. 19, 2013) ............................................3, 17, 19, 20, 21

*Desai v. Deutsche Bank Securities Ltd.*,
    573 F.3d 931 (9th Cir. 2009) ...................................................................................5, 34

*Desaigoudar v. Meyercord*,
    223 F.3d 1020 (9th Cir. 2000) ........................................................................................31

*Express Cos. v. Mitel Technology, Inc.*,
    No. 12–CV–2818,
    2013 WL 5462301 (S.D. Cal. Sept. 30, 2013) ................................................................11

*Federal Election Commission v. National Republican Senatorial Committee*,
    877 F. Supp. 15 (D.D.C. 1995) ...................................................................................40, 41

*Federal Election Commission v. National Right to Work Committee, Inc.*,
    916 F. Supp. 10 (D.D.C. 1996) ......................................................................................41

*FERC v. MacDonald*,
    862 F. Supp. 667 (D.N.H. 1994) ....................................................................................10

*FieldTurf USA, Inc. v. Blue Sky International, Inc.*,
    No. CIV S–11–2035,
    2012 WL 4510671 (E.D. Cal. Sept. 30, 2012) ................................................................20

*Financial Management Services, Inc. v. Coburn Supply Co.*,
    No. 02 C 8928,
    2003 WL 255232 (N.D. Ill. Feb. 5, 2003) ......................................................................16

*Gates Learjet Corp. v. Jensen*,
    743 F.2d 1325 (9th Cir. 1984) ........................................................................................19

*Gavin v. AT&T Corp.*,
    464 F.3d 634 (7th Cir. 2006) ..........................................................................................30

*GFL Advantage Fund, Ltd. v. Colkitt*,
    272 F.3d 189 (3d Cir. 2001)......................................................................................35, 36

*Helmer v. Bank of America*,
    No. 2:12–CV–00733,
    2013 WL 4546285 (E.D. Cal. Aug. 27, 2013) ................................................................11

*Hunter v. FERC*,
    711 F.3d 155 (D.C. Cir. 2013) .......................................................................4, 23, 24, 25

*Jamba Juice Co. v. Jamba Group, Inc.*,
    No. C–01–4846,
    2002 WL 1034040 (N.D. Cal. May 15, 2002) ................................................................16

*Jarvis v. Marietta Corp.*,
    C 98-4951,
    1999 WL 638231 (N.D. Cal. Aug. 12, 1999) ..................................................................19

*Johns v. Panera Bread Co.*,
   No. 08-1071,
   2008 WL 2811827 (N.D. Cal. July 21, 2008)....................................................21

*Jones v. GNC Franchising, Inc.*,
   211 F.3d 495 (9th Cir. 2000) ........................................................................20

*King v. Russell*,
   963 F.2d 1301 (9th Cir. 1992) .......................................................................11

*Koshman v. Vilsack*,
   865 F. Supp. 2d 1083 (E.D. Cal. 2012)............................................................32

*Lorenz v. Watson*,
   258 F. Supp. 724 (E.D. Pa. 1966) ..................................................................15

*Madden v. Cowen & Co.*,
   576 F.3d 957 (9th Cir. 2009) ..........................................................................4

*McDonald's Corp. v. Watson*,
   69 F.3d 36 (5th Cir. 1995) ...........................................................................41

*Michigan v. EPA*,
   268 F.3d 1075 (D.C. Cir. 2001) .....................................................................27

*Miller v. Asensio*,
   101 F. Supp. 2d 395 (D.S.C. 2000)................................................................15

*Mississippi Power & Light Co. v. Federal Power Commission*,
   131 F.2d 148 (5th Cir. 1942) ........................................................................12

*Morrison-Knudsen Construction Co. v. Director, Office of Workers' Compensation Programs, United States Department of Labor*,
   461 U.S. 624 (1983)....................................................................................32

*Myers v. Bennett Law Offices*,
   238 F.3d 1068 (9th Cir. 2001) .......................................................................16

*In re National Presto Industries, Inc.*,
   347 F.3d 662 (7th Cir. 2003) ........................................................................21

*Neubronner v. Milken*,
   6 F.3d 666 (9th Cir. 1993) ...........................................................................31

*Ohio Bell Telegraph Co. v. Public Utilities Commission of Ohio*,
   301 U.S. 292 (1937)......................................................................................2

*Oil, Chemical & Atomic Workers International Union v. American Maize Products Co.*,
   492 F.2d 409 (7th Cir. 1974) ........................................................................41

*Osborne v. National Truck Funding, LLC*,
   No. 2:12–cv–02510,
   2013 WL 3892946 (E.D. Cal. July 26, 2013) ............................................10, 11

*Page v. United States,*
    51 Fed. Cl. 328 (Fed. Cl. 2001),
    *aff'd,* 50 F. App'x 409 (Fed. Cir. 2002) ........................................................30

*Piedmont Label Co. v. Sun Garden Packing Co.,*
    598 F.2d 491(9th Cir.1979) ........................................................................11

*Piper Aircraft Co. v. Reyno,*
    454 U.S. 235 (1981) ....................................................................................18

*Premium Plus Partners, L.P. v. Davis,*
    No. 04 C 1851,
    2005 WL 711591 (N.D. Ill. Mar. 28, 2005) ..............................3, 13, 14, 15

*Royal Foods Co. v. RJR Holdings, Inc.,*
    252 F.3d 1102 (9th Cir. 2001) ....................................................................32

*SEC v. Fraser,*
    No. CV-09-00443,
    2009 WL 2450508 (D. Ariz. Aug. 11, 2009) ............................................37

*SEC v. Gabelli,*
    133 S. Ct. 1216 (2013) ................................................................................40

*SEC. v. Lowrance,*
    No. 11-CV-03451,
    2012 WL 2599127 (N.D. Cal. July 5, 2012) ..............................................37

*SEC v. Roanoke Technologies Corp.,*
    No. 6:05-cv-1880,
    2006 WL 3813755 (M.D. Fla. Dec. 26, 2006) ....................................30, 31

*SEC v. Sells,*
    No. C 11-4941,
    2012 WL 3242551 (N.D. Cal. Aug. 10, 2012) ..........................................37

*SEC v. Zandford,*
    535 U.S. 813 (2002) ....................................................................................30

*Saleh v. Titan Corp.,*
    361 F. Supp. 2d 1152 (S.D. Cal. 2005) ......................................................19

*Samantar v. Yousuf,*
    560 U.S. 305 (2010) ....................................................................................31

*Santa Fe Industries, Inc. v. Green,*
    430 U.S. 462 (1977) ........................................................................5, 33, 34, 37

*Sebelius v. Cloer,*
    133 S. Ct. 1886 (2013) ................................................................................31

*Selznick v. Turner Entertainment Co.,*
    990 F. Supp. 1180 (C.D. Cal. 1997) ..........................................................41

*Shapiro v. Santa Fe Gaming Corp.*,
  No. 97 C 6117,
  1998 WL 102677 (N.D. Ill. Feb. 27, 1998) ......................................................15

*Simpson v. AOL Time Warner Inc.*,
  452 F.3d 1040 (9th Cir. 2006), *vacated on other grounds sub nom. Avis Budget
  Group, Inc. v. California State Teachers' Retirement System*, 552 U.S. 1162 (2008) ......37

*Simpson v. Homestore.com, Inc.*,
  519 F.3d 1041 (9th Cir. 2008) ......................................................................37

*Sinochem International Co. v. Malaysia International Shipping Corp.*,
  549 U.S. 422 (2007)..................................................................................20

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir.), *amended on other grounds and reh'g denied*, 275 F.3d
  1187 (9th Cir. 2001)..................................................................................11

*Stewart Organization, Inc. v. Ricoh Corp.*,
  487 U.S. 22 (1988)....................................................................................16

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008) ..................................................................................37

*Sullivan & Long, Inc. v. Scattered Corp.*,
  47 F.3d 857 (7th Cir. 1995) ..............................................................34, 35, 36

*Swartz v. KPMG*,
  476 F.3d 756 (9th Cir. 2007) ......................................................................37

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..................................................................................11

*Thune v. United States*,
  41 Fed. Cl. 49 (1998) ................................................................................30

*United States v. Approximately $15,630.00 in US Currency*,
  No. CIV. 07-0452,
  2007 WL 1831143 (E.D. Cal. June 25, 2007) ................................................20

*United States v. Core Laboratories*, *Inc.*,
  759 F.2d 480 (5th Cir. 1985) ......................................................................41

*United States v. Radley*,
  632 F.3d 177 (5th Cir. 2011) ......................................................................35

*Van Slyke v. Capital One Bank*,
  503 F. Supp. 2d 1353 (N.D. Cal. 2007) ........................................................17

*Washington ex rel. Raya v. Taser International, Inc.*,
  No. 2:05–CV–00881,
  2011 WL 5320982 (E.D. Cal. 2011 June 17, 2011) ........................................42

*Western Digital Technologies, Inc. v. Board of Regents of the University of Texas System*,
    No. C 10–3595,
    2011 WL 97785 (N.D. Cal. Jan. 12, 2011) ...................................................................16

*Wilson v. Merrill Lynch & Co.*,
    671 F.3d 120 (2d Cir. 2011)...........................................................................................36

*Wolverine Power Co. v. FERC*,
    963 F.2d 446 (D.C. Cir. 1992) .......................................................................................33

*Woodke v. Dahm*,
    70 F.3d 983 (8th Cir. 1995) .....................................................................................15, 16

**FERC ORDERS**

*California Pacific Electric Co., LLC*,
    133 FERC ¶ 61,018 (2010) .......................................................................................4, 28

*DC Energy, LLC v. PJM Interconnection, LLC*,
    138 FERC ¶ 61,165 (2012), *reh'g denied*, 144 FERC ¶ 61,024 (2013) ....................14, 29

*Detroit Edison Co.*,
    95 FERC ¶ 61,415, *order on reh'g*, 96 FERC ¶ 61,309 (2001)....................................4, 28

*Morgan Stanley Capital Group, Inc.*,
    69 FERC ¶ 61,175 (1994), *reh'g denied*, 72 FERC ¶ 61,082 (1995) ...............................28

*Northeast Utilities Service Co.*,
    107 FERC ¶ 61,246 (2004) .......................................................................................4, 28

*Order on Requests for Rehearing and Clarification of Order Authorizing Secretary to Issue
    Staff's Preliminary Notice of Violations ("NAV Order")*,
    134 FERC ¶ 61,054 (2011) ............................................................................................42

*Prohibition of Energy Market Manipulation*,
    114 FERC ¶ 61,300 (2006) ............................................................................................40

*Prohibition of Energy Market Manipulation*,
    Order No. 670, FERC Stats. & Regs. ¶ 31,202, *reh'g denied*, 114 FERC ¶ 61,300
    (2006)..........................................................................................................................33, 40

*Puget Sound Energy, Inc. v. All Jurisdictional Sellers of Energy and/or Capacity at
    Wholesale into Electric Energy and/or Capacity Markets in the Pacific Northwest*,
    96 FERC ¶ 63,044 (2001) ..............................................................................................28

**STATUTES, RULES & REGULATIONS**

Commodities Exchange Act (CEA)
    7 U.S.C. § 1a...................................................................................................................22
    7 U.S.C. § 2......................................................................................................4, 7, 22, 23
    7 U.S.C. § 6.......................................................................................................................7
    7 U.S.C. § 9.....................................................................................................................23
    7 U.S.C. § 25...................................................................................................................14

Federal Power Act (FPA)
    16 U.S.C. § 796 .......................................................................................32
    16 U.S.C. § 823b ...................................................................1,9, 10, 12, 41
    16 U.S.C. § 824 .......................................................................................27
    16 U.S.C. § 824j ......................................................................................32
    16 U.S.C. § 824o .....................................................................................32
    16 U.S.C. § 824v ...........................................................................5, 31, 34
    16 U.S.C. § 825f ......................................................................................41
    16 U.S.C. § 825p ..........................................................3, 12, 13, 16, 17
    16 U.S.C. § 825w .....................................................................................24

Judiciary and Judicial Procedure
    28 U.S.C. § 1391 ...............................................................................15, 16
    28 U.S.C. § 1404 ...............................................................................16, 17
    28 U.S.C. § 1406 .....................................................................................12
    28 U.S.C. § 2462 .................................................................................5, 40

Energy Policy Act (EPA)
    42 U.S.C. § 1831 .....................................................................................32
    42 U.S.C. § 2169 .....................................................................................32
    42 U.S.C. § 7545(b) ................................................................................32
    42 U.S.C. § 16051 ...................................................................................32
    42 U.S.C. § 16131 ...................................................................................32
    42 U.S.C. § 16251 ...................................................................................32
    42 U.S.C. § 16253 ...................................................................................32
    42 U.S.C. § 16254 ...................................................................................32
    42 U.S.C. § 16292 ...................................................................................32
    42 U.S.C. § 16294 ...................................................................................32
    42 U.S.C. § 16353 ...................................................................................32
    42 U.S.C. §§ 16371-16378 .....................................................................32
    42 U.S.C. § 16392 ...................................................................................32

18 C.F.R. Part 1b...........................................................................................41

Fed. R. Civ. P. 12 .........................................................................................10

Pub. L. No. 106-554, § 106, 114 Stat. 2763 (2001) (amending 7 U.S.C. § 2(h)(4)) ....................23

Exempt Commercial Markets, 69 Fed. Reg. 43,285 (July 20, 2004) ......................................23, 25

**OTHER AUTHORITIES**

5C Charles Alan Wright, et al., *Federal Practice and Procedure* § 1363 (3d ed. 2004 & Supp. 2013).................................................................................................30

14D Charles Alan Wright, et al., *Fed. Prac. & Proc. Juris.* § 3806.1 (3d ed. 2004) ....................16

Black's Law Dictionary (9th ed. 2009)..........................................................................31

## GLOSSARY OF DEFINED TERMS

| Term | Definition |
|------|------------|
| Anti-Manipulation Rule | FERC Rule 1c.2, 18 C.F.R. § 1c.2, promulgated under section 222 of the FPA |
| Barclays | Barclays Bank PLC |
| CAISO | California Independent System Operator |
| CEA | Commodity Exchange Act, as amended, 7 U.S.C. § 1 *et seq.* |
| CFTC | Commodity Futures Trading Commission |
| Defendants | Barclays, Daniel Brin, Scott Connelly, Karen Levine, and Ryan Smith |
| Dodd-Frank Act | Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 |
| ECM | Exempt Commercial Market operated pursuant to section 2(h) of the CEA |
| FRCP | Federal Rules of Civil Procedure |
| FERC | Federal Energy Regulatory Commission |
| FPA | Federal Power Act, 16 U.S.C. § 791a *et seq.* |
| ICE | IntercontinentalExchange, Inc., the parent of ICE ECM and ICE Futures |
| ICE Daily Index Price | ICE ECM index price |
| ICE Day-Ahead Contracts | Contracts for the purchase or sale of electricity for the "next day" as defined by the trading calendar executed on ICE ECM |
| ICE ECM | ICE U.S. OTC Commodity Markets, LLC |
| ICE ECM Swap Contracts | Swap Contracts executed by Barclays on ICE ECM |
| ICE Futures | ICE Futures U.S., Inc. |
| July 16 Order | Order Assessing Civil Penalties, 144 FERC ¶ 61,041 (2013) as Exhibit 1 to Complaint, ECF No. 1 |
| NAV | Staff's Notice of Alleged Violations published by FERC on April 5, 2012 attached as Exhibit F to the Declaration of Thomas J. Nolan in Support of Defendants' Request for Judicial Notice |
| NAV Order | Order on Requests for Rehearing and Clarification of Order Authorizing Secretary to Issue Staff's Preliminary Notice of Violations, 134 FERC ¶ 61, 054 (2011) |
| NYMEX | New York Mercantile Exchange, Inc. |
| OTC | Over-The-Counter, which refers to a market in which contracts are negotiated directly (bilaterally) between two parties outside of an organized, central market |
| Parties | FERC and Defendants collectively |
| Relevant Period | November 2006 to December 2008 |

| Term | Definition |
|---|---|
| SDNY | United States District Court for the Southern District of New York |
| Order to Show Cause | Order to Show Cause and Notice of Proposed Penalty, 141 FERC ¶ 61,084 (2013) attached as Exhibit 2 to Complaint, ECF No. 1 |
| Staff | FERC's Office of Enforcement Staff |
| Staff Report | October 31, 2012 Enforcement Staff Report and Recommendation attached as Appendix A to Exhibit 2 to Complaint, ECF. No. 1. |
| Swap Contracts | The swap contracts executed by Barclays on ICE ECM and in the OTC market |
| Tolling Agreements | The identical tolling agreements that Barclays and the Traders entered into with FERC on June 22, 2011 attached as Exhibits A-E to the Declaration of Thomas J. Nolan in Support of Defendants' Request for Judicial Notice |
| Traders | Daniel Brin, Scott Connelly, Karen Levine, and Ryan Smith |
| West Power Desk | Desk operated by Barclays in New York, New York that was responsible for the trading of electric energy contracts at the four identified trading hubs |
| 35 Manipulation Periods | The 35 "product months" in the period from November 2006 through December 2008 |

1  Defendants respectfully submit this memorandum of points and authorities in support of

2  their motion, pursuant to Rules 12(b)(3), 12(b)(6), and 9(b) of the Federal Rules, for an order

3  dismissing the Complaint filed by FERC on October 9, 2013.[1]   Alternatively, Defendants request

4  that the Court transfer this action to the SDNY pursuant to 28 U.S.C. § 1404(a).

5  FERC's Complaint arises out of electricity trading Defendants executed on Barclays'

6  trading floor in New York City between November 2006 and December 2008.  FERC alleges that

7  certain trades by the Defendants during this time period manipulated prices for electricity at four

8  trading hubs in the western United States in violation of FERC's Anti-Manipulation Rule.  As

9  demonstrated below, FERC's allegations are patently deficient and do not establish either that

10  venue is appropriate in this District or that FERC is entitled to the relief that it seeks.

11  Consequently, FERC's Complaint should be dismissed.

12  **PRELIMINARY STATEMENT**

13  In its Complaint, FERC takes the unprecedented position that Defendants should never

14  receive any opportunity to have the claims raised in this case adjudicated.  Instead, FERC asserts

15  that this Court should "affirm" the agency's prior penalty assessment "without modification,"

16  acting as a perfunctory rubber stamp.  (Compl. ¶ 124.)   FERC's assertion ignores both the

17  applicable statutory scheme and due process, and seeks to deprive Defendants of the most basic

18  rights the law gives to parties in litigation.

19  The FPA provides Defendants with the statutory right to require FERC to file an "action" in

20  a "district court of the United States" for *de novo* determinations of both the facts and the legal

21  basis for FERC's case.  *See* 16 U.S.C. § 823b(d)(3)(B).  FERC did not employ any adjudicative

22  process prior to filing its Complaint.  Defendants had no opportunity for discovery of any kind,

23  either from FERC or third parties, or to examine any of the witnesses on whom FERC relies.  The

24  factual "findings" and legal "conclusions" described in the Complaint are nothing more than

25  allegations.  And those allegations were not based on the preponderance of evidence adduced

26  during a contested evidentiary hearing before a neutral trier of fact, or on a reasoned, objective

27

28

---

[1]     *See supra*, Notice of Motion n.1.

analysis of applicable legal precedent.  Instead, as provided in the FPA, the entire administrative process was a prelude to adjudication of the case in federal district court.

The Complaint nevertheless appears to suggest that neither Defendants nor this Court should ever learn the factual basis for FERC's case.  FERC would have this Court simply order Defendants to pay the unprecedented amount demanded without discovery, a trial, or *de novo* determinations of the facts and the law by this Court.  (Compl. ¶ 124.)  FERC even asks this Court to endorse – without ever seeing – a "preliminary econometric model" that FERC has refused to produce to Defendants.  That "preliminary model" provides the foundation for the Complaint – not only for FERC's allegations that Defendants violated the law, but also for its calculation of $487.9 million in penalties and disgorgement.  (*See* July 16 Order, at PP 59 n.189, 122 n.353, 150; Staff Report at 62-63.)  Yet that "model" has remained secret and never been provided to Defendants and, as a result, has never been subject to challenge or scrutiny.

As the Supreme Court has held, a reviewing court cannot simply "take the word of the Commission as to the outcome of a secret investigation, and let it go at that.  'A hearing is not judicial, at least in any adequate sense, unless the evidence can be known.'"  *Ohio Bell Tel. Co. v. Pub. Utils. Comm'n of Ohio*, 301 U.S. 292, 304 (1937) (Cardozo, J.) (A court cannot allow an agency to "'repor[t] its conclusion, but not the underlying proofs. . . .  This is not the fair hearing essential to due process.  It is condemnation without trial.").  The law leaves no room for FERC's effort to serve as investigator, judge, and jury, resolving this case based on *ex parte* evidence no one else gets to see – not to mention challenge.

To the contrary, the law gives Defendants the right to a neutral evaluation, in federal district court, of the fatal flaws in FERC's Complaint, as raised in this Motion to Dismiss.  If FERC's Complaint is not dismissed, the law gives Defendants the ability to dispute FERC's allegations, learn the basis of FERC's penalty calculations (which are not binding on the Court), and avail themselves of their rights under the Federal Rules.  And the law allows Defendants to exercise these rights in a federal district court, where FERC will have the burden of proving its case from the beginning, and the court will take a fresh look at the facts and the law.

1    As explained below, FERC's Complaint should be dismissed, as a matter of law, on four

2    separate and independent grounds.   In the alternative, this action should be transferred to the

3    SDNY.

4    *(1)    Venue is improper in the Eastern District of California.*   Under the FPA, venue for

5    actions brought by FERC to enforce its orders is appropriate only in districts where (1) an "act or

6    transaction constituting the violation occurred" or (2) in the district "wherein the defendant is an

7    inhabitant." 16 U.S.C. § 825p.  FERC has not alleged that any of the Defendants is an inhabitant of

8    this District.  Further, all of the acts alleged by FERC to constitute manipulation consist of trades

9    made by Defendants on computers at Barclays' West Power Desk located in New York City.

10   FERC alleges that unspecified transactions "resulted in" the delivery of electricity by unspecified

11   persons (Compl. ¶ 113), but nowhere alleges that any of the allegedly manipulative conduct

12   occurred in this District or at any of the other specified market trading hubs.   Indeed, FERC's

13   theory is predicated on its allegations that Barclays always "flattened" its positions to *avoid* any

14   obligation to deliver electricity, in this District or anywhere else.  (Compl. ¶ 59.)  Moreover, to the

15   extent FERC asserts that the allegedly manipulative trades all of which were executed outside of

16   this District, ultimately had consequences or effects within this District, such consequences are not

17   "acts or transactions constituting the violation" sufficient to make venue proper.  *See Premium Plus*

18   *Partners, L.P. v. Davis*, No. 04 C 1851, 2005 WL 711591, at *10 (N.D. Ill. Mar. 28, 2005)

19   (holding with respect to the venue provisions of the CEA, which are identical to the FPA venue

20   provisions, "the impact of a CEA violation is not a part of the illegal events that constitute the

21   violation").

22   Even if this District were a proper venue (and it is not), this Court should nevertheless

23   transfer this action pursuant to 28 U.S.C. § 1404(a).  The three primary considerations in a transfer

24   analysis are:  (1) the convenience of the parties, (2) the convenience of the witnesses, and (3) the

25   interests of justice.  *See Davis v. Soc. Serv. Coordinators, Inc.*, No. 1:10-cv-02372, 2013 WL

26   4483067, at *2 (E.D. Cal. Aug. 19, 2013).  If this action is not otherwise dismissed, all of these

27   factors strongly favor transfer to the SDNY.

28

1    (2)    *FERC lacks jurisdiction to assert its claims.*  FERC has no statutory authority to

2  assert the claims pled in this action for two reasons:

3    (a)    First, the exclusive jurisdiction of another federal agency, the CFTC,

4  precludes FERC's claims.  The CEA grants the CFTC exclusive jurisdiction "with respect to . . .

5  transactions involving" commodity futures contracts.  7 U.S.C. § 2(a)(1)(A).  Based on this

6  statutory language, in *Hunter v. FERC*, 711 F.3d 155 (D.C. Cir. 2013), the D.C. Circuit dismissed a

7  FERC manipulation action because the FERC-alleged scheme encompassed transactions involving

8  commodity futures contracts and, therefore, came within the CFTC's exclusive jurisdiction.  *Id.*

9  at 156.  Here, the core of FERC's claim is that the benefit of the alleged manipulative scheme

10  accrued solely to Barclays' Swap Contracts, including those traded on ICE ECM, which were

11  futures contracts.  Thus, as in *Hunter*, because the FERC alleges the manipulation of transactions

12  involving futures contracts, FERC does not have jurisdiction to bring this action.

13    (b)    Second, FERC does not have jurisdiction because Barclays is not alleged to

14  have actually received or delivered electricity with respect to any specific contracts on which

15  FERC's allegations are based.  FERC has held on numerous occasions that the physical delivery or

16  transmission of electricity at wholesale is an essential element to its jurisdiction.  *See*, *e.g.*, *Cal.*

17  *Pac. Elec. Co., LLC*, 133 FERC ¶ 61,018, at P 37 (2010); *Detroit Edison Co.*, 95 FERC ¶ 61,415,

18  at pp. 62,535-62,536, *order on reh'g*, 96 FERC ¶ 61,309 (2001); *Ne. Utils. Serv. Co.*, 107 FERC

19  ¶ 61,246, at P 22 (2004).  FERC alleges throughout its Complaint that Barclays consistently

20  structured the allegedly manipulative transactions to *avoid* physical delivery.  (Compl. ¶¶ 55-60,

21  63-66, 68, 88, 93-94, 99-106.)  Although FERC does allege that electricity was delivered by an

22  unspecified entity, nowhere does it allege that any deliveries of electricity were made by Barclays.

23  (Compl. ¶ 113.)  Consequently, FERC has not adequately alleged that it has jurisdiction over the

24  transactions that it asserts were part of the manipulative scheme.

25    (c)    Similarly, FERC has not adequately alleged that it has jurisdiction over

26  Defendants' conduct because it occurred "in connection with" jurisdictional transactions.  For

27  FERC to have jurisdiction, the allegedly manipulative activity must be "more than tangentially

28  related" to a jurisdictional transaction.  *See Madden v. Cowen & Co.*, 576 F.3d 957, 965-66 (9th

1  Cir. 2009); *Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984).  FERC has

2  not alleged such a connection with the specificity required by Rule 9(b).

3           (d)     The FPA does not authorize FERC to bring manipulation claims against the

4  Traders.   The FPA prohibits "any entity" from using a "manipulative or deceptive device or

5  contrivance" in connection with the purchase or sale of wholesale electric energy or transmission

6  services.   16 U.S.C. § 824v(a). The plain meaning of "entity" does not include natural persons.

7  Congress' statutory authorization defines the limits of FERC's authority to regulate manipulation,

8  and the use of "entity" elsewhere in the FPA confirms that Congress intended that term to have its

9  ordinary meaning.

10      *(3)    The Complaint should be dismissed on the additional ground that it does not*

11  *adequately state a claim for manipulation under the FPA*.  Under Supreme Court and Ninth Circuit

12  precedent, manipulation "is virtually a term of art" referring to inherently misleading practices such

13  as "wash sales, matched orders, or rigged prices" which artificially affect the market.  *Santa Fe*

14  *Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977); *see also Desai v. Deutsche Bank Sec. Ltd.*, 573

15  F.3d 931, 939 (9th Cir. 2009).  The Complaint acknowledges that Defendants' transactions were

16  trades with willing counterparties who accepted the risk of entering into trading contracts opposite

17  Barclays and pursuant to which Barclays performed its obligations.  As a matter of law, such open-

18  market transactions cannot constitute the predicate for a manipulation claim.  The Complaint does

19  not state a claim for manipulation against the Traders for the additional reason that the Complaint

20  does not allege deceptive trading practices by any particular individual.

21      *(4)    FERC's allegations based on conduct prior to December 26, 2007 are precluded by*

22  *the governing statute of limitations.*  FERC's claim is governed by a five-year statute of limitations

23  that is keyed off the date when the allegedly manipulative conduct occurred.  28 U.S.C. § 2462.

24  Although Defendants entered into agreements with FERC tolling the statute of limitations, those

25  agreements were terminated on April 5, 2012 when FERC Staff issued the NAV.  (RJN Decl.

26  Ex. F.)  Consistent with FERC policy, the NAV is issued only after an investigation is concluded,

27  and such issuance therefore terminated the Tolling Agreements by their terms.  As a consequence,

28  any allegations predicated on conduct pre-dating December 26, 2007 (based on the applicable five-

1  year statute of limitations as extended by 288 days pursuant to the Parties' Tolling Agreements) are

2  barred by the statute of limitations and are not actionable as a matter of law.

## STATEMENT OF FACTS AND SUMMARY OF ALLEGATIONS

**I.     THE PARTIES**

    **A.     FERC**

        FERC is an administrative agency of the United States, organized and existing pursuant to the FPA, and headquartered in Washington, D.C.[2]  (Compl. ¶ 7.)

    **B.     The Defendants**

        Barclays is a publicly traded financial-services provider headquartered in London, England. (Compl. ¶ 8.)  Barclays' headquarters for the Americas is located in New York, New York. (Declaration of Christopher Evans in Support of Defendants' Motion To Dismiss For Improper Venue or, in the Alternative, to Transfer to the Southern District of New York ("Evans Decl.") ¶ 2.)  In California, Barclays has subsidiaries with offices in California, but none in this District. (Evans Decl. ¶ 10.)

        Barclays operated the West Power Desk out of New York City.  The West Power Desk was responsible for Barclays' trading of electric energy contracts at the four trading hubs named in FERC's Complaint.  (Compl. ¶ 8; Evans Decl. ¶ 6.)  Mr. Connelly was the head of Barclays North American Power Desk in New York, New York from May 2006 to August 2009 and conducted power trading while employed at Barclays from Barclays' West Power Desk also located in New York, New York.  (Compl. ¶¶ 10, 49.)  The other three Traders were employed as traders on the West Power Desk in New York and reported to Mr. Connelly.[3]  (*Id.* ¶ 10.)  None of the Traders is, or during the relevant time period was, an inhabitant of this District.  (*Id.* ¶¶ 9-11.)

---

[2]     *See* Declaration of Thomas J. Nolan in Support of Defendants' Motion to Dismiss for Improper Venue or, in the Alternative, to Transfer to the Southern District of New York ("Nolan Decl.") Ex. 1, http://www.ferc.gov/contact-us/contact-us.asp.  FERC also has regional offices in New York, New York; Atlanta, Georgia; Chicago, Illinois; San Francisco, California; and Portland, Oregon.  *Id.*

[3]     Mr. Brin was employed by Barclays from July 2006 through December 2011, Mr. Smith from April 2006 through March 2007, and Ms. Levine from March 2006 through April 2009.  (Compl. ¶¶ 9, 11, 12; Declaration of Daniel Brin in Support of Defendants' Motion To Dismiss For Improper Venue or, in the Alternative, to Transfer to the Southern District of New York ("Brin Decl.") ¶ 3.)

## II.    BARCLAYS' POWER TRADING

The trades that are the subject of FERC's Complaint were all executed by the West Power Desk in New York.  (Compl. ¶ 8; Evans Decl. ¶ 5.)  Most of these trades were executed on ICE ECM, which provided an electronic platform for commodity and derivatives trading, including trading in electricity at various hubs nationwide.[4]  (Compl. ¶ 22.)  ICE is headquartered in Atlanta, Georgia, and does not appear to have any physical presence in California.[5]  (*See* Nolan Decl. Ex. 4, ICE 2008 Annual Report on U.S. Securities and Exchange Commission Form 10-K. at 23, 49.)

Barclays' traders accessed ICE ECM through computers located on the West Power Desk. (Evans Decl. ¶ 6.)  Using those computers, the traders posted bids and offers on ICE ECM to buy or sell various products, including the products that are the subject of FERC's Complaint, which then could be accepted by other market participants.  (*Id.*)  Alternatively, Barclays' traders could accept bids or offers that were posted on ICE ECM by other market participants.  (*Id.*)

Barclays' traders on the West Power Desk also entered into bilateral transactions with other market participants without using ICE ECM.  (*Id.* ¶ 7.)  All of these transactions were arranged through telephone calls or electronic communications made from the West Power Desk.  (*Id.*)

Barclays did not own or operate electrical generation facilities or otherwise serve customers' electrical usage or "load."  (Compl. ¶ 56.)  As a result, FERC repeatedly has found that Barclays had no market power.[6]  Barclays thus had no ability to control the supply of or demand for electric energy, force other market participants to transact with it, or dictate electric energy prices that did not reflect supply and demand.  Instead, Barclays operated as an intermediary, purchasing and selling equal and offsetting amounts of electricity to other market participants, in

---

[4]    Under the CEA, futures contracts must be traded on CFTC-approved exchanges unless exempted. 7 U.S.C. § 6a.  One available exemption is for futures trading conducted electronically on an ECM that complies with the conditions in section 2(h)(3) of the CEA, 7 U.S.C. § 2(h)(3).  ICE ECM was an ECM qualifying under section 2(h)(3).

[5]    ICE has additional offices in Amsterdam, Calgary, Chicago, Houston, London, New York, Singapore, Winnipeg, Washington, D.C., and ICE servers are located in Atlanta, Georgia, and Chicago, Illinois.  (Nolan Decl. Ex. 4 at 23, 49.)

[6]    *See, e.g.,* Nolan Decl. Ex. 3, FERC Letter Order dated August 8, 2008 accepting Barclays filing of an "Updated Market Power Analysis, Request for Treatment as Category 1 Seller and Tariff Revisions," in Docket No. ER04-734-003.

order to avoid any obligation to physically deliver or receive electricity.  (*Id.*)  This is a commonplace method of trading in these markets.  Barclays also engaged in "financial" transactions, which are settled based on the price of electricity, but do not involve any obligation to actually deliver or receive electricity.  (*Id.* ¶ 26.)

Throughout the Relevant Period, the West Power Desk traded a number of different electric energy products of varying durations in order to build its business and establish credibility with customers.  (*Id.* ¶ 47.)  Messrs. Brin and Smith and Ms. Levine primarily traded electric energy products for periods ranging from the following day through the following month.  (*Id.* ¶ 50.)  In addition to his managerial responsibilities, Mr. Connelly primarily traded "term" electric energy products for periods beyond the end of the following month.  (*Id.* ¶¶ 27, 49, 50.)

## III.   FERC'S INVESTIGATION

In July 2007, Staff initiated an investigation into electric energy trading by the West Power Desk.  (Compl. ¶ 34.)  On June 22, 2011, Barclays and the Traders, respectively, entered into identical Tolling Agreements with FERC to temporarily suspend the statute of limitations until FERC "provides written notice to [Barclays and the Traders] that the investigation is terminated."[7] On April 5, 2012, FERC published Staff's NAV, which terminated Staff's investigation and publicly announced Staff's allegations of manipulation by Barclays and the Traders.  *See* NAV Order, 134 FERC ¶ 61,054 at P 17 (2011).

On October 31, 2012, FERC issued the Order to Show Cause to Barclays and the Traders relying solely on the Staff Report (attached to FERC's Complaint as Ex. 2).  (Compl. ¶ 41.)  The Order to Show Cause was not the result of an adversarial process or an evidentiary hearing where the Defendants were given any rights to discovery or an opportunity to examine witnesses.  Rather, it reflected FERC's position that there may have been a violation of the Anti-Manipulation Rule solely based on the Staff Report.

---

[7]     (*See* Declaration of Thomas J. Nolan in Support of Defendants' Request for Judicial Notice in Support of Defendants' Motion:  (A) To Dismiss for Improper Venue or, in the Alternative, to Transfer to the Southern District of New York; and (B) To Dismiss for Failure to State A Claim Upon Which Relief Can Be Granted, ("RJN Decl."), Exs. A-E.)

1   FPA section 31(d)(3) gives parties alleged to have committed market manipulation the

2   option of defending themselves against such claims in one of two ways:  (1) an administrative

3   proceeding conducted at FERC, or (2) in a *de novo* merits adjudication by an appropriate federal

4   district court.  16 U.S.C. § 823b(d)(3)(B).  Defendants elected to proceed in federal court, and on

5   October 9, 2013, FERC filed the Complaint.

6   **IV.   FERC'S ALLEGATIONS**

7   FERC alleges that Defendants violated FERC's Anti-Manipulation Rule during the 35

8   Manipulation Periods.  The alleged 35 Manipulation Periods represent less than 18% of the 208

9   total product months that FERC investigated.[8]

10   FERC alleges that Defendants' manipulation was conducted in three steps.  (Compl. ¶ 55.)

11   Each of these steps on its own involved *bona fide*, open-market transactions with sophisticated

12   counterparties.  First, FERC alleges that Barclays entered into Swap Contracts.  These Swap

13   Contracts do not impose an obligation to deliver or receive electricity, but rather are financially

14   settled based on the ICE Daily Index Price.[9]  Second, FERC alleges that Barclays entered into

15   "physical" positions in the "opposite" direction of the financial position in the Swap Contracts that

16   obligated Barclays to purchase or sell electricity at the same ICE trading hub referenced in the

17   Swap Contracts.[10]  (*Id.* ¶¶ 55, 57, 67.)   Finally, because Barclays had no electrical load or

18   generating assets, FERC alleges that Barclays offset or "flattened" its physical positions built in

19   step two by purchasing or selling ICE Day-Ahead Contracts.  (*Id.* ¶¶ 56, 59.)  Flattening involved

20   _____

21   [8]   FERC defines a "product month" as "trading of a specific product at a specific location for a
     specific calendar month."  (Compl. ¶ 36.)  For example, FERC defines transactions related to sales of peak

22   electricity at the Mid-C trading hub for April 2007 as one "product month," and transactions related to sales
     of peak electricity at the NP-15 trading hub for that same month as a separate "product month."  (*Id.*)  Using

23   this definition, FERC's investigation of Barclays' transactions encompassed four trading hubs (Mid-C, Palo
     Verde, NP, and SP) and two products (peak energy and off-peak energy) or eight "product months" for each

24   calendar month investigated.  (*Id.* ¶¶ 19, 36-37.)  Given that FERC's investigation covered 26 calendar
     months, this equals a total of 208 product months that were investigated.  (*Id.* ¶ 36.)

25

26   [9]   A financial swap buyer, known as a long position holder, would pay a fixed price and receive a
     floating price.  (*Id.* ¶ 26.)  A financial swap seller, known as a short position holder, would receive a fixed

27   price and pay a floating price.  (*Id.*)

28   [10]   The "opposite" position means that if Barclays' financial position in a Swap Contract at a trading
     hub was long and would benefit from a higher ICE Daily Index Price, Barclays sold physical electricity to
     establish a short position at that trading hub, and vice versa.  (*Id.* ¶ 68.)

1  entering into an offsetting transaction in order to eliminate any obligation to physically deliver or

2  receive electricity.[11]  Thus, under FERC's allegations, at the end of every trading day Barclays had

3  eliminated any obligations to deliver, receive or transmit physical electricity on the following day

4  with respect to the allegedly manipulative acts set forth in the Complaint.[12]  (*Id.* ¶¶ 55, 56, 57, 59.)

5  FERC alleges that the building of physical positions opposite the Swap Contracts enabled

6  the Defendants to enter into transactions that allegedly "influenced" the ICE Daily Index Price in a

7  direction that benefited Barclays' Swap Contracts.  (*Id.* ¶ 68.)  Importantly, FERC does not allege

8  that either the trading to establish the Swap Contracts and physical positions or the trading to offset

9  the physical positions is fraudulent.  To the contrary, FERC stated:  "[s]imply buying jurisdictional

10  day-ahead power at the same location where swap positions would be benefitted from higher prices

11  will not in and of itself violate the Anti-Manipulation Rule."  (July 16 Order, at P 45.)

12  <u>ARGUMENT</u>

13  **FERC'S COMPLAINT SHOULD BE DISMISSED;
    IN THE ALTERNATIVE, THIS ACTION SHOULD BE TRANSFERRED
14  TO THE SDNY**

15  **I.  STANDARD OF REVIEW**

16  **A.  Issues of Law and Fact Are Subject to *De Novo* Review by This Court**

17  Congress has specified the standard of review that applies to issues of law and fact in this

18  case.  Under FPA section 31(d)(3)(B), "[t]he court shall have authority to review *de novo* the law

19  and the facts involved."  16 U.S.C. § 823b(d)(3)(B); *see FERC v. MacDonald*, 862 F. Supp. 667,

20  672 (D.N.H. 1994) (holding that when FERC brings an action in district court to enforce a civil

21  penalty assessment, the court must make a *de novo* review of the assessment).

22  **B.  Burden of Proof Under Rules 12(b)(3) and 12(b)(6)**

23  A court may dismiss a complaint for improper venue pursuant to Rule 12(b)(3).  *See* FRCP

24  12(b)(3); *Osborne v. Nat'l Truck Funding, LLC*, No. 2:12-cv-02510, 2013 WL 3892946, at *4

25

---

26  [11]      For example, if Barclays had entered into a contract to *sell* 100 MWh of electricity in step two, it

27  would offset any obligation to deliver electricity by entering into one or more ICE Day-Ahead Contracts to *purchase* 100 MWh of electricity for the same trading point.  (*Id.* ¶ 56.)

28  [12]      FERC does not allege that any specific allegedly manipulative transaction ever resulted in physical delivery or receipt of electricity by Barclays.  (*Id.* ¶¶ 36, 55-60, 68, 112, 113.)

1   (E.D. Cal. July 26, 2013). "Once venue is challenged, the burden is on *the plaintiff* to show that

2   venue is properly laid." *Express Cos., v. Mitel Techs., Inc.*, No. 12-CV-2818, 2013 WL 5462301,

3   at *2 (S.D. Cal. Sept. 30, 2013) (emphasis added) (citing *Piedmont Label Co. v. Sun Garden*

4   *Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979)). "[U]nlike motions to dismiss under Rule

5   12(b)(6), the court hearing the Rule 12(b)(3) motion need not accept the allegations of the

6   pleadings as true." *Id.* (citing *Argueta v. Banco Mexicano, S.A.*, 87 F.3d 320, 324 (9th Cir. 1996));

7   *Osborne*, 2013 WL 3892946, at *4. Thus, the Court can consider "facts outside the pleadings"

8   when considering a motion to dismiss for improper venue pursuant to FRCP 12(b)(3). *Argueta*, 87

9   F.3d at 324. Pursuant to 28 U.S.C. § 1406(a), if the Court determines that venue is improper, it

10   either must dismiss the action or, in the interests of justice, transfer the case to a district in which it

11   could have been brought. Whether to dismiss for improper venue or, alternatively, transfer venue

12   to a proper district is within the sound discretion of the court. *King v. Russell*, 963 F.2d 1301, 1304

13   (9th Cir. 1992).

14        By contrast, under Rule 12(b)(6), the Court must accept the allegations of the Complaint as

15   true. However, "[t]he court need not . . . accept as true allegations that contradict matters properly

16   subject to judicial notice or by exhibit. . . . Nor is the court required to accept as true allegations

17   that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell*

18   *v. Golden State Warriors*, 266 F.3d 979, 988, *amended on other grounds*, *reh'g denied*, 275 F.3d

19   1187 (9th Cir. 2001) (internal citations omitted). In addition to the Complaint, the Court may

20   consider documents that are referenced in the Complaint and matters of which the Court may take

21   judicial notice, which include matters of public record. *See Tellabs, Inc. v. Makor Issues & Rights,*

22   *Ltd.*, 551 U.S. 308, 322 (2007); *Helmer v. Bank of Am.*, No. 2:12-CV-00733, 2013 WL 4546285, at

23   *2 (E.D. Cal. Aug. 27, 2013) (citing *Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012)).

24

25   **II.    VENUE IN THIS DISTRICT IS IMPROPER OR, IN THE ALTERNATIVE, THIS ACTION SHOULD BE TRANSFERRED TO THE SDNY**

26        **A.    Venue in This District Is Improper**

27        Section 31(d)(3)(B) of the FPA states in relevant part that "the Commission shall institute

28   an action *in the appropriate district court* of the United States for an order affirming the

1  assessment of [a] civil penalty."  16 U.S.C. § 823b(d)(3)(B) (emphasis added).  Under section 317

2  of the FPA, venue is appropriate only (1) in districts where an "act or transaction constituting the

3  violation occurred" or (2) "in the district wherein the defendant is an inhabitant."  16 U.S.C.

4  § 825p; *see Miss. Power & Light Co. v. Fed. Power Comm'n*, 131 F.2d 148, 150 (5th Cir. 1942).

5  As described below, FERC does not allege facts sufficient to establish that venue is proper in this

6  District.

### 1. None of the Defendants is an inhabitant of this District

8  FERC does not – and cannot – allege that any Defendant is an "inhabitant" of this

9  District.[13]  Instead, FERC alleges that (i) Barclays has "operations . . . in California," although

10  FERC does not – and cannot – allege that Barclays has operations in this District, and (ii) the

11  Traders are residents of Brooklyn, New York;[14] Schenectady, New York;[15] and Canada.  (Compl.

12  ¶¶ 8-12.)[16]

### 2. FERC does not allege that "any act or transaction constituting the violation occurred" in this District

#### (a) The alleged manipulative trading did not occur here

16  FERC has not alleged any facts in the Complaint establishing that Defendants engaged in

17  "any act or transaction constituting the violation" that "occurred" in the Eastern District of

---

[13]  The term "inhabitant" is not specifically defined in the FPA and we have not found case law construing the term in the context of the FPA.  The term "inhabitant" likely derives from language found in a prior version of the general federal venue statute.  *See* 28 U.S.C. § 1391 (noting in revision notes and legislative reports that the "[w]ord 'reside' was substituted for 'whereof he is an inhabitant' for clarity inasmuch as 'inhabitant' and 'resident' are synonymous").

[14]  Since the end of FERC's investigation, Mr. Brin has moved from New York to South Carolina. (Brin Decl. ¶ 9.)

[15]  Since the end of FERC's investigation, Mr. Smith has moved from New York to Denver, Colorado. (Declaration of Ryan Smith in Support of Defendants' Motion to Dismiss For Improper Venue or, in the Alternative, to Transfer to the Southern District of New York ("Smith Decl.) ¶ 7.)

[16]  Indeed, none of the Traders has ever resided in this District, other than Brin as a teenager.  (Brin Decl. ¶ 10; Declaration of Scott Connelly in Support of Defendants' Motion To Dismiss For Improper Venue or, in the Alternative, to Transfer to the Southern District of New York ("Connelly Decl.") ¶ 10; Declaration of Karen Levine in Support of Defendants' Motion To Dismiss For Improper Venue or, in the Alternative, to Transfer to the Southern District of New York ("Levine Decl.") ¶ 9; Smith Decl. ¶ 9.) Moreover, in the Americas, Barclays is headquartered in New York, with no offices in this District.  (Evans Decl. ¶¶ 4, 10.)

California.  16 U.S.C. § 825p.  Rather, FERC alleges that Barclays "operated a West Power Desk out of New York City" and that the Traders were Barclays' employees on the "West Power Desk." (Compl. ¶¶ 8-12.)  FERC does not allege that any of the Traders' alleged misconduct actually "occurred" within California, let alone the Eastern District of California.

First, the Swap Contracts were purely financial transactions that were entered into and executed by the Traders who, as FERC acknowledges, worked at Barclays' trading desks in New York.  (*See* Compl. ¶¶ 8-12.)  The Traders are not alleged to have traveled to or visited this District for any purpose related to or concerning the Swap Contracts, and no element of any transaction is alleged to have occurred in this District.

Similarly, the Traders allegedly built monthly physical positions from Barclays' West Power Desk in New York, and executed the associated transactions on ICE ECM, which is headquartered in Atlanta, Georgia, with servers in Atlanta and Chicago.[17]  (Evans Decl. ¶ 6.)  ICE ECM allowed the Traders to access the market from New York City and enter into transactions with counterparties who also accessed the exchange.  (*Id.*)

Finally, the third "flattening" step of Barclays' supposed scheme also did not occur in this District.   (See Compl. ¶¶ 8-12, 56.)  As with the other transactions, these transactions occurred on the Barclays' West Power Desk located in New York City.  (Evans Decl. ¶ 6.)

While FERC contends that Defendants "trad[ed] [] physical electricity at four electricity trading locations or hubs in and around California" and this District (Compl. ¶ 2), this bare allegation is insufficient to make venue proper in this District.  Indeed, the Complaint contains only a single, ambiguous allegation that some unspecified Barclays trades "resulted in electricity being physically delivered the following day at locations in this District and elsewhere in the western U.S." (Compl. ¶ 113.)  That vague allegation directly contradicts FERC's other, more specific, allegations that Barclays *did not* deliver or receive electricity within this District (or anywhere

---

[17]     *See* Nolan Decl. Ex. 4  at 23-24 (explaining that ICE established a hosting center in Chicago, Illinois and maintains a disaster recovery site in Atlanta, Georgia); *see also* Nolan Decl. Ex. 2 a screenshot of: https://www.theice.com/offices.jhtml; Nolan Decl. Ex. 5, ICE 2005 Annual Report on U.S. Securities and Exchange Commission Form 10-K at 45 (Mar. 10, 2006).  While Barclays also engaged in off-ICE trading of electric power during the Relevant Period, the Complaint does not contain a single allegation that such transactions took place within this District or how they would render venue proper here.

1  else).  (*See* Compl. ¶ 56 ("Because Barclays did not own electricity generation resources or serve

2  customer load, Barclays' physical day-ahead positions *had to be liquidated prior to delivery or*

3  *receipt of the electricity* by buying (in the case of a short physical day-ahead position) or selling (in

4  the case of a long physical day-ahead position) an equal volume of electricity.") (emphasis added);

5  *see also id.* ¶ 68.)   As such, FERC implicitly acknowledges that the allegedly manipulative

6  transactions necessarily *avoided* any obligation for Barclays to deliver electricity.   (*See* Compl.

7  ¶¶ 56-60, 68.)  In other words, under FERC's theory of the case, Barclays merely "move[d] money,

8  not electrons."  *See DC Energy, LLC v. PJM Interconnection, LLC*, 138 FERC ¶ 61,165, at P 69

9  (2012) (concluding that transactions "do not contemplate the physical transfer of energy" because,

10  among other things, "[c]omplainants have no capability to handle physical performance"), *reh'g*

11  *denied*, 144 FERC ¶ 61,024 (2013).[18]

12       An "act or transaction constituting the violation" refers to the "illegal events that constitute

13  the violation."  *Premium Plus Partners*, 2005 WL 711591, at *10 (analyzing analogous venue

14  provision of the CEA, and holding venue was proper only where acts comprising the alleged

15  violation actually took place).[19]  Even if FERC alleged that Barclays itself delivered electricity

16  (and it does not), such delivery is not the act or transaction constituting the violation.  Rather, as

17  FERC specifically alleges, the allegedly unlawful conduct involves Defendants' trading activities

18  on ICE via electronic terminals located on Barclays' West Power Desk in New York, New York.

19  (*See* Compl. ¶¶ 8-12.)

20                **(b)      The alleged effects of Barclays' trading are irrelevant to
                            the consideration of whether venue is proper**

21

22       FERC's allegation that Defendants' alleged manipulative trading "affected the ultimate

23  retail price paid by tens of millions of consumers in California and elsewhere in the western U.S."

24  (Compl. ¶ 121) is insufficient to make venue proper in this District.  Such a theory conflates the

25  _____

26  [18]     Likewise, electric energy was not delivered in connection with Barclays' Swap Contracts which, by
        definition, were settled financially – meaning that they also involved the movement of money and not
27      electrons.

28  [19]     Using almost identical language as the FPA venue provision, the CEA venue provision states that an
        action "may be brought . . . in the judicial district where any act or transaction constituting the violation
        occurs."  7 U.S.C. § 25(c).

1    Defendants' alleged *acts* with those acts' alleged *effects*. *See Premium Plus*, 2005 WL 711591, at

2    *10.  Under the plain terms of the FPA's venue provision, the ultimate effects of Barclays' alleged

3    trading are not "acts or transactions constituting [the] violation" in California.  *Id.*

4          Numerous decisions have rejected the theory advanced by FERC in analogous contexts.

5    For example, in *Premium Plus Partners*, the plaintiff alleged that defendants manipulated prices

6    for Treasury bonds, futures and options in violation of the CEA, causing plaintiff to incur

7    substantial losses in the 30-year Treasury options market.  *Id.* at *1, *7-8.  Citing the materially

8    identical CEA venue provision for private actions, plaintiff contended that the provision was

9    satisfied "because [p]laintiff felt the 'impact' of [defendant's] alleged CEA violation in the

10   Northern District of Illinois."  *Id.* at *7, *9.  The court rejected this argument, holding "that the

11   impact of a CEA violation *is not a part of the illegal events that constitute the violation*, but rather

12   it is a purported consequence of the alleged violation."  *Id.* at *10 (emphasis added).

13          Numerous other decisions interpreting similar venue statutes support the same conclusion.

14   *See, e.g.*, *Shapiro v. Santa Fe Gaming Corp.*, No. 97 C 6117, 1998 WL 102677, at *1-2 (N.D. Ill.

15   Feb. 27, 1998) (applying the Exchange Act's substantially similar venue provision,[20] and holding

16   that the defendant's trading violation did not "occur" in the location of the plaintiff's purported

17   harm, but in the district where (1) the defendant was located, or (2) the trading exchange was

18   located).[21]  Similarly, numerous courts, including within this Circuit, have held that eventual

19   economic harm is irrelevant in determining venue under the broader general federal venue statute,

20   28 U.S.C. § 1391.  *See, e.g.*, *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995) ("[W]hile damages

21   or potential adverse economic effect are a necessary part of a Lanham Act claim, if Congress had

22

---

23   [20]     The venue provision of the Exchange Act "provides that a civil action may be brought in any district
where:  (1) 'any act or transaction constituting the violation occurred . . . .'"  *Shapiro*, 1998 WL 102677 at

24   *1 (citation omitted).

25   [21]     *See also C.R.A. Realty Corp. v. Gold Reserve Corp.*, No. 88 Civ. 4297, 1988 WL 144752, at *1
(S.D.N.Y. Sept. 14, 1988) (finding that trading violation "took place in Spokane Washington" where the

26   Spokane Stock Exchange was located); *accord Miller v. Asensio*, 101 F. Supp. 2d 395, 401 (D.S.C. 2000)
(holding venue improper under substantively similar Exchange Act provision even though plaintiff

27   shareholders alleged that defendants "made misrepresentations regarding the viability and thus the value of
the company, which would evidently – and did – affect the value of the company's stock on the market,
thereby defrauding the market and causing Plaintiffs to sell their shares in the company at a great loss");

28   *Lorenz v. Watson*, 258 F. Supp. 724, 729 (E.D. Pa. 1966) ("[A]ny omission on the part of the Exchange took
place in New York where it conducts its affairs.").

1   wanted to lay venue where the plaintiff was residing when he was injured, it could have said so

2   expressly"); *see also W. Digital Techs., Inc. v. Bd. of Regents of Univ. of Tex. Sys.*, No. C10-3595,

3   2011 WL 97785, at *6 (N.D. Cal. Jan. 12, 2011); *Jamba Juice Co. v. Jamba Grp., Inc.*, No. C-01-

4   4846, 2002 WL 1034040, at *2 (N.D. Cal. May 15, 2002).[22]

5       Allowing FERC to sue in *any* district where the economic effects of Defendants' trading

6   allegedly were felt would not only eviscerate the venue provision's plain language, but it would

7   also subject Defendants to potential liability in every district in which an alleged victim resides – a

8   result Congress could not have intended.  *Fin. Mgmt. Servs., Inc. v. Coburn Supply Co.,* 2003 WL

9   255232, at *2 (N.D. Ill. Feb. 5, 2003); *see also Woodke*, 70 F.3d at 985 ("[A]ccepting [plaintiff's]

10  argument would work a transformation of the venue statute that Congress could not have

11  intended").  Accordingly, pursuant to Rule 12(b)(3), this Court should dismiss FERC's Complaint

12  for improper venue.

13           **B.       Alternatively, the Court Should Transfer This Action**

14      Even if this District was a proper forum (and it is not), this Court should nevertheless

15  transfer this action pursuant to section § 1404(a), which provides that "[f]or the convenience of

16  parties and witnesses, in the interest of justice, a district court may transfer any civil action to any

17  other district or division where it might have been brought or to any district or division to which all

18  parties have consented."  28 U.S.C. § 1404(a).  Section 1404(a) gives courts broad discretion "to

19  adjudicate motions for transfer according to an 'individualized, case-by-case consideration of

20  convenience and fairness.'"  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 30 (1988) (citation

21  omitted).  The Court can consider facts outside the pleadings when considering a motion for

22

23

_____

24  [22]      In the context of analyzing the general venue statute, the Ninth Circuit has held that "in a tort action,

25  the locus of the injury was a relevant factor."  *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1076 (9th Cir.
    2001).  However, the plain language of the general venue statute (which by its terms permits consideration

26  of the location where any "events . . . giving rise to the claim occurred") is considerably broader than the
    FPA venue statue.  *Compare* 28 U.S.C. § 1391(b)(2) *with* 16 U.S.C. § 825p.  Furthermore, the holding in

27  *Myers* was limited to cases alleging "tort" damages and thus is not applicable to claims of alleged economic
    harm.  *See* 14D Charles Alan Wright, et al., *Fed. Prac. & Proc. Juris.* § 3806.1 (3d ed. 2004) (unlike tort

28  cases, "[m]ost courts have found that the suffering of economic harm within a district is not sufficient
    without more to warrant transactional venue in that district"); *W. Digital Techs.*, 2011 WL 97785, at *6 n.5
    (distinguishing *Myers* as applying only to tort damages within the proposed venue).

1   transfer.  *Davis*, 2013 WL 4483067, at *3-4 (considering declarations and evidence in ruling on

2   motion to transfer).

3       A foundational question in any motion for transfer under section 1404(a) is whether the

4   transferee venue is a proper forum.  *See* 28 U.S.C. § 1404(a).  The facts alleged in the Complaint

5   demonstrate that if the conduct at issue were in fact manipulative, the appropriate venue would be

6   the SDNY.  Under the FPA, an action such as this may be brought "in the district wherein any act

7   or transaction constituting the violation occurred" or "wherein the defendant is an inhabitant."

8   16 U.S.C. § 825p.  As FERC concedes, this action concerns trading on Barclays' West Power

9   Desk, which was "operated . . . out of New York City."  (Compl. ¶¶ 8-12.)  In addition, Barclays is

10  an inhabitant of New York City.  (Evans Decl. ¶ 4.)  Each of the traders also consents to venue and

11  personal jurisdiction in the SDNY.  (Brin Decl. ¶ 2; Connelly Decl. ¶ 2; Levine Decl. ¶ 2; Smith

12  Decl. ¶ 2.)  Accordingly, the SDNY is an appropriate transferee district.

13      In determining whether transfer is appropriate, the three primary considerations are the:

14  (1) convenience of the parties, (2) convenience of the witnesses, and (3) interests of justice.  *See*

15  *Davis*, 2013 WL 4483067, at *2.  All of these factors strongly favor transfer to the SDNY.

16          **1.      The convenience of the Parties favors transfer**

17      The SDNY is a more convenient venue for all of the Parties in this action.  First, the SDNY

18  is a more convenient venue for Barclays itself.  (Evans Decl. ¶¶ 12-13.)  The conduct at issue

19  occurred in Barclays' New York City headquarters (*supra* 6; Compl. ¶ 8), and the vast majority, if

20  not all, of Barclays' current employees with knowledge of that conduct are in New York City.

21  (Evans Decl. ¶ 12.)  The only current Barclays employee mentioned in the Complaint is Joe Gold,

22  who currently works at Barclays' offices in New York City.  (Compl. ¶ 110; Evans Decl. ¶ 11.)

23      Moreover, the corporate officers responsible for managing this litigation are located in New

24  York City, which also weighs in favor of transfer.  (Evans Decl. ¶ 13); *see Van Slyke v. Cap. One*

25  *Bank*, 503 F. Supp. 2d 1353, 1363 (N.D. Cal. 2007) ("A corporation is a legal fiction and does not

26  travel, but its corporate officer responsible for managing the litigation counts for this purpose" and

27

28

1   where, as here, they are located in the transferee district, they will "find it more convenient to

2   attend hearings, trial and settlement conferences" in the transferee district.).[23]

3        Second, the SDNY is also a more convenient venue for the Traders.  Significantly, none of

4   the Traders currently lives in California, nor has any ever lived in California with the exception of

5   Mr. Brin for a short time period when he was a teenager.  (Connelly Decl. ¶ 10; Brin Decl. ¶ 10;

6   Levine Decl. ¶ 9; Smith Decl. ¶ 9.)  Further, all of the Traders have significant ties to New York

7   City due to, among other things, their prior residences while employed by Barclays.  (Brin Decl.

8   ¶¶ 6-8; Connelly Decl. ¶¶ 6-8; Levine Decl. ¶¶ 6-7; Smith Decl. ¶¶ 6-8.)

9        Finally, the SDNY also is likely a more convenient venue for FERC itself, which is a

10  federal agency headquartered and principally located in Washington, D.C.[24]  FERC's Office of

11  Enforcement – which brought this action – is located in Washington, D.C., as are the attorneys of

12  record listed in the Complaint.  (Compl. at p. 25).[25]  Although FERC has several regional offices,

13  including one in New York City, it *does not* have such an office located in this District.[26]

14

15

16

_____

17  [23]   FERC alleges in the Complaint that Barclays has offices in California.  (Compl. ¶ 8.)  Although
18  located in California, these offices (which are offices of subsidiaries of Barclays) are not located within this
    District and, more importantly, none of the officers had any involvement with, or connection to, the
19  allegations in the Complaint.  (Evans Decl. ¶¶ 10, 12.)

20  [24]   *See* Nolan Decl. Ex. 6, a screenshot of http://www.ferc.gov/contact-us/directions.asp.  As discussed
    more fully below, Plaintiff's choice of venue here is entitled to little, if any, deference because it has not
21  chosen to bring this action in a forum that is, by any measure, its home forum.  *See Piper Aircraft Co. v.
    Reyno*, 454 U.S. 235, 256 (1981) (stating that when a plaintiff is foreign, the presumption of favor for its
22  choice of forum is "much less reasonable").

23  [25]   *See* Nolan Decl. Ex 7, a screenshot of http://www.ferc.gov/about/offices/oe.asp; Compl. 1
    (indicating Washington, D.C. addresses for all of FERC's counsel in this matter).

24  [26]   *See* Nolan Decl. Exs. 1 & 8, screenshots of http://www.ferc.gov/contact-us/contact-us.asp and
25  http://www.ferc.gov/contact-us/tel-num/regional/newyork.asp.  In its directory, FERC does list what it calls
    a "satellite office" at the offices of the CAISO in Folsom, California, which is in this District.  *See* Nolan
26  Decl. Ex. 9, a PDF printout of http://www.ferc.gov/contact-us/tel-num/key-contacts.asp.  But it does not
    appear that any member of its Office of Enforcement is based in Folsom or that this "satellite office"
27  represents anything more than a small space within the CAISO's offices, which does not suggest that this is
    a convenient forum for FERC.  Plaintiff's closest regional office is located in San Francisco.  *See* Nolan
28  Decl. Ex. 1.  These "offices" are not FERC's home forum with respect to this action brought by FERC's
    Washington,     D.C.     based     Office     of     Enforcement.     *See*     Nolan     Decl.     Ex.     7,
    http://www.ferc.gov/about/offices/oe.asp.

NOTICE OF MOTION AND MOTION TO DISMISS        18

## 2.      The convenience of the witnesses favors transfer

"'The relative convenience to the witnesses is often recognized as the most important factor to be considered in ruling on a motion under § 1404(a).'"  *Davis*, 2013 WL 4483067, at *3 (quoting *Saleh v. Titan Corp.*, 361 F. Supp. 2d 1152, 1160 (S.D. Cal. 2005)).  "In considering how to weigh this factor, courts must assess not simply how many witnesses each side has and their respective locations, but also the importance of the witnesses."  *Davis*, 2013 WL 4483067, at *3 (citing *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1335-36 (9th Cir. 1984)).   In determining whether a given forum is more convenient, courts consider what district the witnesses "live and reside in or near."  *Saleh*, 361 F. Supp. 2d at 1162 ("because the[ witnesses] live and reside in or near the Eastern District of Virginia, the Eastern District of Virginia would be a more convenient forum"); *accord Jarvis v. Marietta Corp.*, C 98-4951, 1999 WL 638231, at *5 (N.D. Cal. Aug. 12, 1999) (finding that the convenience of the witnesses favors transfer because "a majority of the witnesses are located in or near the [the transferee district]").

Here, several significant potential witnesses that may be called to testify are in or near New York City.  (*See* Nolan Decl. ¶ 11.)  By contrast, Defendants are not aware of a single witness that is located within the District whom is likely to be called.  (*See* Evans Decl. ¶ 12; Brin Decl. ¶ 4; Connelly Decl. ¶ 4; Levine Decl. ¶4; Smith Decl. ¶4.)

Indeed, FERC's own allegations and its own regulatory investigation indicates that there are no material witnesses in this District.  While FERC claims that it has performed "an extensive investigation" of this matter involving "25 days of investigative depositions" (*see* Compl. ¶¶ 4, 35-40), and as a result proposed penalties and disgorgement of nearly $500 million, none of the third-party witnesses that Defendants are aware FERC deposed as part of its investigation is located within this District.  (Nolan Decl. ¶ 11.)  In fact, it appears that none of these witnesses even resides in California.  (*Id.*)  By contrast, it is the Defendants' understanding that at least three of the nonparty witnesses that FERC did depose are currently located in or near New York City: Michael Gerome, Jeffrey Rainess and Jake Thomas.  (*Id.*)[27]

---

[27]      This includes witnesses who were Barclays employees at the time of their deposition but who have since left and thus are now third-party former employees.  Barclays reserves the right to depose other witnesses, beyond those deposed by FERC, but given the one-sided nature of discovery to date, addresses

1    Accordingly, the "most important factor" – the convenience of the nonparty witnesses –

2 weighs strongly in favor of transfer to the SDNY.

3              **3.      The interests of justice favor transfer**

4    In order to assist courts in determining where the "interests of justice" lie for the purposes

5 of a motion to transfer pursuant to section 1404(a), the Ninth Circuit has recommended

6 consideration of multiple factors, including: the plaintiff's choice of forum, the contacts relating to

7 the plaintiff's cause of action in the chosen forum, the differences in the costs of litigation in the

8 two forums and the ease of access to sources of proof. *Jones v. GNC Franchising, Inc.*, 211 F.3d

9 495, 498-99 (9th Cir. 2000).   An additional factor to be considered is "'the relative court

10 congestion in the two forums.'"   *Davis*, 2013 WL 4483067, at *2 (citation omitted).   Here, the

11 interests of justice strongly favor transfer.

12    •   FERC's choice of forum is entitled to little deference.  FERC does not reside in this
         District.[28]   The fact that FERC is a federal agency does not affect the analysis.[29]
13       FERC's headquarters and principal office is located in Washington, D.C.,[30] FERC's
         attorneys of record for this action are located in Washington, D.C., and FERC does not
14       have an office of enforcement in this District.[31]

15    •   The Parties have greater contacts with New York City than with this District and those
         New York contacts relate to this matter.  As discussed above, all of the Parties have
16       minimal, if any, contacts with this District and all Defendants have significant contacts
         with New York City, which are directly related to the conduct at issue.  (Compl. ¶¶ 8-
17       12; Evans Decl. ¶¶ 10-13.)

18

19

---

20 the non-party witnesses deposed by FERC for purposes of this analysis.  In any event, Barclays is not aware
21 of any additional material witnesses in this District.  (Nolan Decl. ¶ 11.)

22 [28]    *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007) (holding that
when a plaintiff files suit outside of its home forum the presumption in favor of its choice has "less force");
23 *FieldTurf USA Inc. v. Blue Sky Int'l, Inc.*, No. CIV S-11-2035, 2012 WL 4510671, at *3 (E.D. Cal. Sept. 30,
2012) (holding that a "foreign plaintiff's choice of forum is entitled to substantially less deference")
24 (citation omitted).

25 [29]    *United States v. Approximately $15,630.00 in U.S. Currency*, No. Civ. 07-0452, 2007 WL 1831143,
at *4 (E.D. Cal. June 25, 2007) (refusing to transfer action where, unlike here, agency's office that had
26 investigated and brought the action was a resident of the district and noting that government agency's choice
of forum is entitled to same deference "as a private party").

27 [30]    *See* Nolan Decl. Ex. 1, http://www.ferc.gov/contact-us/directions.asp (indicating headquarters in
Washington, D.C.).

28 [31]    *See supra*, n.26.

NOTICE OF MOTION AND MOTION TO DISMISS          20

- The cost of litigation will be lower in New York City. As discussed above, (a) the relevant sources of proof, the Parties and the witnesses are primarily located in or near New York City and (b) the majority of counsel for both FERC and the Defendants are located in New York City or Washington, D.C. (*See* ECF Nos. 5-11, 15-17, 19-20, 39-43 (*Pro Hac Vice Applications* filed on behalf of counsel for Barclays and the Traders); Compl. 1 (FERC's counsel's address).)[32]

- The SDNY has greater ability to compel attendance of witnesses. Although Defendants are not aware of any material witnesses within this Court's subpoena power, there are numerous potential witnesses within the SDNY's subpoena power. (*See supra* 19.)[33]

- The relevant sources of proof are located in New York City. Defendants' corporate and individual trading records, communications and related data, all were created in and are currently located at Barclays' offices in New York City. (*See* Evans Decl. ¶ 8.)[34]

- The relative congestion of the courts favors transfer. This District has more than double the number of filings per judge than the SDNY and civil actions take over 73% longer to complete in this District than in the SDNY.[35] As Senator Feinstein recently noted, this Court "has the most overburdened federal judges in the country . . . [and] has suffered from unsustainable caseloads for years."[36]

---

[32]     *See Cambridge Filter Corp. v. Int'l Filter Co.*, 548 F. Supp. 1308, 1311 (D. Nev. 1982) (granting motion to transfer and noting that "the cost of counsels' transportation to the place of trial and their living expenses there) . . . has a direct bearing on the factors of convenience and cost"). Here, the trans-continental travel costs to Defendants, witnesses and *the taxpayers* will be allayed by transfer to the SDNY. *See In re Nat'l Presto Indus., Inc.*, 347 F.3d 662, 665 (7th Cir. 2003) ("When government lawyers and investigators incur time and travel cost to litigate in a remote forum, the burden falls on the taxpayer, who finances the federal government and who is no less worthy of protection of the law than corporate officers, shareholders and employees").

[33]     Pursuant to FRCP 45(c)(1)(A)(ii), federal district courts only have the power to compel attendance of nonparty witnesses that live, work or regularly transact business in person within the state in which the district lies within 100 miles of the courthouse.

[34]     As numerous courts have noted, "although access to electronic documents diminished the importance of the ease of access factor," courts should remain "mindful that 'litigation should proceed where the case finds its center of gravity.'" *Davis*, 2013 WL 4483067, at *9 (citing *Johns v. Panera Bread Co.*, No. 08-1071, 2008 WL 2811827, at *5 (N.D. Cal. July 21, 2008)).

[35]     *See* Nolan Decl. Ex. 10, Table X-1A – U.S. District Courts—Weighted and Unweighted Filings per Authorized Judgeship During the 12-Month Period Ending September 30, 2012 *available at* http://www.uscourts.gov/uscourts/Statistics/JudicialBusiness/2012/appendices/X01ASep12.pdf    (reporting that during the twelve-month period ending September 30, 2012 the SDNY had 525 weighted filings per authorized judgeship, whereas this District had 1,132 filings); *see* Nolan Decl. Ex. 11, Table T-3. U.S. District Courts—Median Time Intervals from Filing to Trial for Civil Cases in Which Trials Were Completed, by District, During the 12-Month Period Ending September 30, 2012, *available at* http://www.uscourts.gov/uscourts/Statistics/JudicialBusiness/2012/appendices/T03Sep12.pdf    (indicating that the median time interval for civil cases where trials were completed during the 12-month period ending September 30, 2012 was 27.2 months in the SDNY, as compared to 47.2 months in this District).

[36]     *See* Nolan Decl. Ex. 12, a copy of the March 25, 2013 Press Release from United States Senator Dianne     Feinstein     *available     at*     http://www.feinstein.senate.gov/public/index.cfm/press-releases?ID=f000ce79-1d68-4270-8ebd-eb2cb1cb79c5.

1  As shown above, all of the pertinent factors demonstrate that the interests of justice weigh

2  in favor of transferring this matter to the SDNY.

3  **III.    THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF**

4  **A.    FERC Has No Jurisdiction to Pursue Its Manipulation Claims**

5  FERC's manipulation allegations against Defendants suffer from two fatal jurisdictional

6  flaws.  First, the CFTC has exclusive jurisdiction over the alleged manipulative scheme because it

7  encompassed transactions involving commodity futures contracts.  Second, FERC has no authority

8  under the FPA to pursue manipulation claims based upon transactions that did not result in the

9  actual delivery of electric energy by Defendants, and has not adequately alleged that it otherwise

10 has jurisdiction over Defendants' conduct on the grounds it occurred "in connection with"

11 jurisdictional transactions.  Furthermore, the FPA does not authorize FERC to bring manipulation

12 claims against the Traders.

13  **1.    The CFTC has exclusive jurisdiction over the entire alleged scheme**

14 During the period relevant to FERC's Complaint, section 2(a)(1)(A) of the CEA provided

15 the CFTC with "*exclusive jurisdiction* . . . with respect to accounts, agreements (including

16 [options] . . . ), and transactions *involving* contracts of sale of a commodity for future delivery . . .

17 traded or executed on a contract market. . . or *any* other board of trade, exchange, or *market* . . . ."

18 7 U.S.C. § 2(a)(1)(A) (emphasis added).[37]  The statutory phrase "contracts of sale of a commodity

19 for future delivery" describes what are commonly known as "commodity futures contracts."[38]

20 Under the CEA's exclusive jurisdiction provision, if a transaction "involv[ed]" a futures contract

21 "traded or executed" on "any . . . market," the CFTC had exclusive jurisdiction over the

22

23 _____

24 [37]    All references to the CFTC's exclusive jurisdiction in this Motion to Dismiss refer to section
    2(a)(1)(A) of the CEA as it existed during the time period relevant to FERC's Complaint.  In the Dodd-

25 Frank Act, Congress extended the CFTC's exclusive jurisdiction to all swaps.

26 [38]    Electricity is a "commodity" as defined in the CEA ("commodity" means "all . . . goods and
    articles . . . and all services, rights, and interests in which contracts for future delivery are presently or in the

27 future dealt in").  7 U.S.C. § 1a(9) (2006).  From 2006 to 2008, the NYMEX listed four trading futures
    contracts in electricity.  (*See* RJN Decl. Ex. G, "NYMEX Submission 04.66:  Addition of Four Electricity

28 Futures Contracts to NYMEX ClearPort Trading and Related Amendments.")  Futures contracts in exempt
    commodities (*i.e.*, non-financial or non-agricultural commodities) such as electricity, were permitted to be
    traded on an ECM such as ICE ECM.  *See* 7 U.S.C. §§ 1a(14) and 2(h)(3) (2006).

1  transaction.  *Id.*[39]  The CFTC's exclusive jurisdiction includes the exclusive authority to pursue any

2  claim of price manipulation involving a futures contract.  *See* CEA §§ 2(a)(1)(A), 6(c)(1), 7 U.S.C.

3  §§ 2(a)(1)(A), 9(1) (Supp. 2007-2012).

4       Trading on ECMs, like ICE ECM, was subject to a unique "multi-tiered spectrum of

5  regulation" with a particular focus on activity "where manipulation can be a concern."[40]  For this

6  reason, in 2000 Congress amended the CEA to preserve the CFTC's preexisting exclusive anti-

7  fraud and anti-manipulation authority with respect to futures contracts executed on an ECM.[41]

8  Pursuant to this authority, the CFTC enhanced its market surveillance capabilities in 2004 by

9  adopting rules that required all ECMs, including ICE ECM, to provide the CFTC with information

10  about futures contracts traded on those markets.  *See* 69 Fed. Reg. 43,285 (July 20, 2004).  In

11  adopting those rules, the CFTC emphasized that contracts traded on ECMs in reliance on section

12  2(h)(3) of the CEA that were not forward or spot contracts were futures contracts.  *See id.* at 43,287

13  n.5, 43,289 ("[The ECM] rules were directed only to those instruments that are traded in reliance

14  on the section 2(h)(3) exemption and are otherwise subject to the Commission's exclusive

15  jurisdiction.").

16       As the court of appeals made clear in *Hunter*, the CFTC's anti-manipulation authority over

17  futures contracts is exclusive.  "[I]f a scheme, such as manipulation, involves buying or selling

18  commodity futures contracts, CEA section 2(a)(1)(A) vests the CFTC with jurisdiction to the

19  exclusion of other agencies."  *Hunter*, 711 F.3d at 159.[42]  Other federal courts of appeals similarly

20  and repeatedly have held that the CFTC's exclusive jurisdiction over transactions "involving"

---

22  [39]     *See Exempt Commercial Markets,* 69 Fed. Reg. 43,285 at 43,286 (July 20, 2004) and discussion

23  below at pages 23-24.

24  [40]     *See* RJN Decl. Ex. H, "CFTC, Report on the Oversight of Trading on Regulated Futures Exchanges

25  and Exempt Commercial Markets," (Oct. 2007).  The CFTC explained that the Commodity Futures Modernization Act of 2000, 7 U.S.C. §§ 2(h)(3)-(4) (2006), "amended the [CEA] to replace the historical 'one-size-fits-all' supervisory framework *for futures trading* with a risk-based statutory structure in which

26  the level of regulation is tailored to the type of market and the risks associated with that market."  *Id.* at 6.

27  [41]     *See* Pub. L. No. 106-554, § 106, 114 Stat. 2763 (2001) (amending 7 U.S.C. § 2(h)(4)).

28  [42]     Because CEA section 2(h)(4) preserved the CFTC's anti-manipulation authority over futures contracts, that authority does not fall within any of the exceptions to the CFTC's exclusive jurisdiction referenced in section 2(a)(1)(A).  7 U.S.C. §§ 2(a)(1)(A), 2(h)(3)-(4)(2006).

futures contracts supersedes the regulatory authority of other agencies. *Chicago Mercantile Exch. v. SEC*, 883 F.2d 537, 550 (7th Cir. 1989) (the CFTC had exclusive jurisdiction over new financial instruments called stock "index participations" that were both futures contracts and securities); *Bd. of Trade of the City of Chicago v. SEC*, 677 F.2d 1137, 1154 (7th Cir. 1982) ("*GNMA Options*") (the CFTC had exclusive jurisdiction over option contracts on GNMA securities because they involved futures contracts on GNMA securities), *vacated as moot*, 459 U.S. 1026 (1982).

The *Hunter* case explains why FERC has no jurisdiction to pursue its claims against Defendants in this case.[43]  In *Hunter*, a former trader for Amaranth Advisors sought review of a FERC decision finding that he had engaged in a manipulative scheme by trading NYMEX Natural Gas Futures Contracts for the purpose of driving down the settlement price to benefit the significantly larger short swap and option positions maintained by Amaranth, the value of which increased as the Natural Gas Futures Contract settlement price declined.   711 F.3d at 156. Observing that the "CFTC's jurisdiction is exclusive with regards to . . . transactions involving commodity futures contracts," the D.C. Circuit held that FERC had no jurisdiction over the alleged manipulative scheme because that scheme encompassed transactions involving futures contracts. *Id.* at 159.  *Hunter* makes clear that "once a [manipulative] scheme crosses [the CEA's] event horizon" – that is, by encompassing transactions involving futures contracts – the CFTC has exclusive jurisdiction over the entire scheme.  *Id.*

As in *Hunter*, FERC's alleged manipulative scheme here encompassed transactions "involving" futures contracts.  The Swap Contracts that Barclays traded on ICE ECM and that FERC alleges were integral to the manipulative scheme were transactions "involving" futures contracts for two independent reasons:  (a) they were futures contracts; and (b) they were related to, and served the same purpose as, NYMEX futures contracts.  Accordingly, FERC cannot exercise jurisdiction over any part of the alleged manipulative scheme because "CEA section

---

[43]      *Hunter* applies with equal force to FERC's manipulation claims in this case under FPA section 222(a), 16 U.S.C. § 824w(a) which, in language substantially identical to section 4A of the Natural Gas Act (with the exception of just the commodity type), prohibits the use of manipulative or deceptive devices in connection with "the purchase or sale of electric energy."

2(a)(1)(A) vests the CFTC with jurisdiction [over the scheme] to the exclusion of [FERC]." *See Hunter*, 711 F.3d at 159.

(a)    **The Swap Contracts traded on ICE ECM were futures contracts**

A transaction "involving" a futures contract includes the buying or selling of a futures contract.  *See Hunter*, 711 F.3d at 156 (petitioner engaged in transactions "involving" futures contracts by selling NYMEX natural gas futures contracts).  The contracts at the core of FERC's Complaint – *i.e.*, the Swap Contracts traded by Barclays on ICE ECM – were futures contracts as a matter of law.[44]

The CFTC has recognized that contracts traded on ECMs in reliance on CEA section 2(h)(3) that were not forward or spot contracts are futures contracts.  In the 2004 rulemaking, the CFTC stated that its ECM requirements would not apply to agreements, contracts, or transactions "that are not contracts for future delivery of a commodity, or options, and are, therefore not subject to the CFTC's exclusive jurisdiction."  69 Fed. Reg. at 43,287.  This distinction between forward contracts outside the CFTC's jurisdiction and futures contracts within the CFTC's exclusive jurisdiction is well recognized.  Under long-standing precedent in this Circuit, contracts that are designed to speculate on, or hedge against the risks of, future changes in the price of a commodity, such as the ICE ECM Swap Contracts, were futures contracts under the CEA.  *See CFTC v. Co Petro Mktg. Grp., Inc.*, 680 F.2d 573, 577-79 (9th Cir. 1982).  Because the ICE ECM Swap Contracts were used to speculate on, or hedge against the risks of, future changes in the price of a particular commodity – electricity – they fall squarely within this definition of futures contract.

In 2012, ICE determined to offer its ICE ECM Swap Contracts for trading as futures contracts on its futures exchange, thereby confirming that in fact they were futures contracts.  In August 2012, ICE informed the CFTC that the ICE ECM Swap Contracts encompassed by FERC's allegations were, among other energy contracts, on its futures exchange and thus that those

---

[44]    The ICE Day-Ahead Contracts also were futures contracts. However, for purposes of this Motion to Dismiss, Defendants need only show that one type of contract encompassed by FERC's alleged scheme, *i.e.*, ICE ECM Swap Contracts, were transactions "involving" futures contracts.

NOTICE OF MOTION AND MOTION TO DISMISS          25

1   contracts should be traded and regulated as "futures."[45]   The CFTC authorized ICE to change the

2   label on the contracts from "swaps" to "futures" as long as the rights and obligations of the parties

3   to those contracts did not change.[46]   *See* RJN Decl. Ex. K, ICE Press Release, ICE Completes

4   Transition of Energy Swaps to Futures, Oct. 16, 2012 (announcing that the open electric energy

5   swap contracts traded on ICE ECM were now "*identical* futures contracts") (emphasis added).

6   Even though ICE previously had affixed the swap label to these contracts, the Ninth Circuit

7   long ago ruled that the form of, or label given to, a commodity contract does not affect its legal

8   status as a futures contract.   *See Co Petro*, 680 F.2d at 580-81 ("[d]isregarding form for substance"

9   in concluding that a commodity contract designed for speculation was a futures contract).

10   Accordingly, FERC cannot reasonably dispute that Barclays' ICE ECM Swap Contracts were

11   futures contracts and that, by trading those contracts, Barclays entered into transactions "involving"

12   futures contracts within the CFTC's exclusive jurisdiction.

13        (b)        **Transactions in ICE ECM Swap Contracts "involved" futures contracts**

14

15   Barclays' transactions in ICE ECM Swap Contracts also meet the "transactions 'involving'

16   futures contracts" requirement for CFTC exclusive jurisdiction because they served the same

17   purpose, and settled based upon prices at the same hubs, as certain NYMEX futures contracts.   In

18   *GNMA Options*, the Seventh Circuit held that, because GNMA option contracts to be traded on one

19   exchange "involved" GNMA futures contracts, which were already trading on another exchange,

20   the GNMA option contracts were within the CFTC's exclusive jurisdiction.   677 F.2d at 1154.   The

21   court reasoned that the GNMA options were transactions "involving" futures contracts because

22   GNMA options and GNMA futures "serve[d] more or less the same purposes [*i.e.*, hedging and

23

---

24   [45]        *See* RJN Decl. Ex. I, ICE Futures U.S. Inc.'s Submission No. 12-45 to CFTC, Entitled "Listing of
25   New Cash Settled Energy Contracts and Related Rules and Rule Amendments – Submission Pursuant to
     section 5(c)(c)(1) of the Act and Regulations 40.2 and 40.6" (dated August 15, 2012).

26   [46]        *See* RJN Decl. Ex. J., Order of the Commodity Futures Trading Commission Concerning the
27   Transfer of Energy Contracts from ICE U.S. OTC Commodity Markets, LLC to ICE Futures U.S., Inc.,
     October 9, 2012, (conditioning the CFTC's approval of ICE's request to list the swaps as futures contracts
28   on a requirement that "[t]he rights and obligations of participants under the terms and conditions of the
     Energy Contracts *will not be affected* by the transfer of the open interest associated with the Energy
     Contracts from ICE [ECM] to [ICE Futures]") (emphasis added).

price discovery functions], and the prices in each market assumedly would affect one another." *Id.* at 1151.

Just as in *GNMA Options*, ICE ECM Swap Contracts entered into as part of Defendants' alleged manipulative scheme:  1) served the same purposes as certain electricity futures contracts listed at the time by NYMEX because both were trading instruments used to move money (not electrons) for hedging or price discovery, *and* 2) settled based upon prices of physical transactions for delivery at one of the same four hubs used to determine the settlement price of the NYMEX futures contracts.[47]  Accordingly, Barclays' transactions in ICE ECM Swap Contracts "involved" futures contracts within the CFTC's exclusive jurisdiction.

### 2. FERC has no jurisdiction under the FPA over Barclays' contracts

#### (a) The FPA expressly limits FERC's jurisdiction

The D.C. Circuit has explained that, "[a]s a federal agency, FERC is a 'creature of statute,' having 'no constitutional or common law existence or authority, but *only* those authorities conferred upon it by Congress.'"  *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002) (quoting *Mich. v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001)).  As a result, "if there is no statute conferring authority, FERC has none." *Id.*

Section 201 of the FPA provides FERC with narrow jurisdiction over "the transmission of electric energy and . . . the sale of electric energy at wholesale in interstate commerce."  16 U.S.C. § 824(b)(1) .[48]  It further provides that "electric energy shall be held to be transmitted in interstate commerce *if transmitted* from a State *and consumed* at any point outside thereof; but only insofar as such transmission takes place within the United States."  16 U.S.C. § 824(c) (emphasis added).  Therefore, FERC has jurisdiction only over those wholesale electric energy transactions that result

---

[47]    From 2006-2008, NYMEX listed four futures contracts: the Dow Jones Palo Verde Electricity Price Index Swap Futures; Dow Jones Mid-Columbia Electricity Price Index Swap Futures; Dow Jones NP15 Electricity Price Index Swap Futures; and Dow Jones SP15 Electricity Price Index Swap Futures. *See* RJN Ex. G.  Each NYMEX futures contract settled based on the price of electricity at one of the same four hubs, as published by Dow Jones, that were used to price the Swap Contracts.

[48]    FPA section 201(b)(1) limits FERC's jurisdiction over "facilities" only to those for "such transmission or sale of electric energy." 16 U.S.C. § 824(b)(1).

1   in the physical delivery of electric energy in interstate commerce.   Conversely, FERC lacks

2   jurisdiction over transactions that do not result in such delivery.

3          Consistent with the plain language of the FPA, FERC has held repeatedly that the physical

4   delivery of electricity is an essential element to its jurisdiction over a transaction.  *See*, *e.g.*, *Cal.*

5   *Pac.*, 133 FERC ¶ 61,018, at P 37 ("when a public utility *delivers electricity at wholesale* to a

6   supplier for the purpose of resale, section 201 gives us unqualified authority to assert jurisdiction

7   over that transaction") (emphasis added); *Detroit Edison*, 95 FERC ¶ 61,415, at p. 62,535 ("to the

8   extent that any facilities, regardless of their original nominal classification, in fact, prove to be used

9   by public utilities to provide transmission service in interstate commerce *in order to deliver power*

10  *and energy to wholesale purchasers*, such facilities are subject to this Commission's jurisdiction

11  and review") (emphasis added), *accord Ne. Utils.*, 107 FERC ¶ 61,246, at P 22.   Consequently,

12  when a transaction does not result in the delivery of electricity, FERC has no jurisdiction.   *See*,

13  *e.g.*, *Puget Sound Energy, Inc. v. All Jurisdictional Sellers of Energy and/or Capacity at Wholesale*

14  *into Elec. Energy and/or Capacity Mkts. in Pac. Nw.*, 96 FERC ¶ 63,044, at n.318 (2001)

15  ("Commission precedent on this issue is clear – the Commission has asserted jurisdiction only over

16  those transactions that result in the physical delivery of electricity"); *Morgan Stanley Cap. Grp.,*

17  *Inc.*, 69 FERC ¶ 61,175, at p. 61,696 (1994) (holding that transactions "in which the actual delivery

18  of electricity, while contemplated in the contract, is not undertaken" need not be included in

19  quarterly reports of jurisdictional transactions, which instead are limited to "those transactions that

20  result in the actual delivery of electricity"), *reh'g denied*, 72 FERC ¶ 61,082 (1995).

21          **(b)      FERC has not pled that any of the allegedly manipulative energy**
                      **transactions resulted in physical delivery by Barclays**
22

23         The Complaint alleges that Defendants manipulated the ICE Daily Index Price using ICE

24  Day-Ahead Contracts that did not result in the delivery of physical electric energy by Barclays.

25  The Complaint does not identify any specific Barclays transaction that resulted in actual delivery,

26  "moved" electric energy in interstate commerce, or was "for" anything but financial settlement

27  through an offsetting contract that eliminated any obligation to deliver or receive electricity the

28  next day.  (Compl. ¶¶ 36, 55–60, 68.)  On the contrary, FERC repeatedly alleges in its Complaint
    that Barclays owned no electric generation or other physical assets and, therefore, "flattened" all of

1  its contracts by entering into offsetting contracts before delivery by Barclays occurred.  (Compl.

2  ¶¶ 55-60, 63-66, 68, 88, 93-94, 99-106; Staff Report at 19.)

3       When transactions offset each other with the result that any delivery obligation has been

4  eliminated, those transactions "move money, not electrons" and, thus, there is no physical delivery

5  of electricity.  *DC Energy*, 138 FERC ¶ 61,165, at P 69 (holding that offsetting transactions did not

6  "contemplate the physical transfer of energy" and, instead, "merely represent *a transfer of financial*

7  *liabilities*, with no intent or prospect of a physical transfer of electric energy."); *see also id*. at PP

8  67-81.

9       Because FERC does not allege that Barclays' transactions resulted in the physical delivery

10 of electricity, and in fact specifically pleads the opposite by alleging that Barclays flattened its

11 contracts to avoid any requirement to physically deliver or receive electricity, FERC has not

12 established that it has any jurisdiction to assert the claims in the Complaint.[49]

13      In an attempt to assert jurisdiction, FERC makes a general, unsupported allegation in a

14 single paragraph of its Complaint that the flattened transactions were "tagged" and "physically

15 scheduled" by Barclays and resulted in physical delivery the following day.   (Compl. ¶ 113.)

16 Tellingly, FERC does not allege that electricity was actually delivered by *Barclays* or any other

17 person.   Indeed, FERC does not explain how its allegation regarding "tagging" and "physical

18 scheduling" relates to the physical delivery of electricity, let alone tie this allegation to an assertion

19 that such tagging or physical scheduling resulted in the physical delivery of electricity by Barclays.

20 More importantly, FERC fails to provide any rationale concerning how this allegation comports

21 with FERC's manipulation theory – namely, that Barclays flattened its transactions to ensure it did

22 *not* deliver or receive electric energy.[50]

23      Because FERC contradicts its general allegations relating to physical delivery with its more

24 detailed allegations regarding Barclays' flattening transactions (allegations which are central to

25

26 [49]     FERC does not allege jurisdiction over Barclays' Swap Contracts.  FERC notes that the Swap Contracts were "financial positions . . . [which] were financially settled through an exchange of payments" and "did not entail physical obligations to deliver or receive electricity."  (Compl. ¶ 26.)  Based on these facts, FERC does not contend that Barclays' Swap Contracts are within its jurisdiction.

27

28 [50]     As FERC admits, by flattening the position, Barclays did not "risk [an] obligation to deliver or receive electric energy."  July 16 Order, at P 39.

1   FERC's alleged manipulation theory), this Court need not credit FERC's general allegations as a

2   purported basis for FERC's jurisdiction, even in the context of a motion to dismiss.  *See Page v.*

3   *United States*, 51 Fed. Cl. 328, 333 (Fed. Cl. 2001) ("'[T]he court will not accept as true

4   allegations that are contradicted by facts . . . or by other allegations or exhibits attached to or

5   incorporated in the pleadings.'") (quoting *Thune v. United States,* 41 Fed. Cl. 49, 51 (1998)); 5C

6   Charles Alan Wright, et al., *Fed. Prac. & Proc. Civ.* § 1363 (3d ed. 2004 & Supp. 2013).

7   Furthermore, given that FERC has not explained how its general allegations regarding tagging or

8   scheduling establish the actual delivery or receipt of electricity by Barclays, those allegations

9   cannot suffice to demonstrate the physical delivery of electricity.  *See Sprewell*, 266 F.3d at 988

10  (court is not "required to accept as true allegations that are merely conclusory, unwarranted

11  deductions of fact, or unreasonable inferences").  As such, FERC has not established that it has

12  jurisdiction over the Barclays' transactions at issue.

13              (c)     **FERC has not adequately pled that the Defendants' transactions
                        were "in connection with" jurisdictional transactions**
14
15          In an effort to circumvent its failure to allege that any of Barclays' transactions involved the

16  delivery or receipt of electricity by Barclays, FERC also makes a naked allegation that the

17  Defendants' "manipulative scheme sought to affect daily index settlements that set the price of

18  jurisdictional transactions by other market participants."  (Compl. ¶ 115.)  FERC then alleges in an

19  entirely conclusory fashion that Defendants' transactions "were also 'in connection with'

20  transactions subject to the Commission's authority under FPA section 222."  *Id.*

21          To establish jurisdiction under 16 U.S.C. § 824v over Defendants' activities based on

22  jurisdictional transactions by other market participants, FERC must show a direct connection

23  between these activities and those transactions.[51]  Moreover, FERC must allege the connection

24  _____

25  [51]     It is well established that a mere incidental or "but for" cause is not enough to satisfy the "in
    connection with" element; the jurisdictional transaction must be an integral part of the fraud.  *Chem. Bank*,
26  726 F.2d at 943; *see Gavin v. AT & T Corp.*, 464 F.3d 634, 639 (7th Cir. 2006); *Madden*, 576 F.3d at 965-66
    (the "misrepresentations and omissions alleged in the complaint" must be "more than tangentially related
27  to" a securities transaction) (citation omitted); *SEC v. Roanoke Tech. Corp.*, No. 6:05-cv-1880, 2006 WL
    3813755, at *4-6 (M.D. Fla. Dec. 26, 2006) ("[N]ot every deceptive device or scheme that has any relation
28  to a sale of securities can suffice" to satisfy the "in connection with" standard.); *see also SEC v. Zandford*,
    535 U.S. 813, 820, 824-25 (2002) (noting that "the statute must not be construed so broadly as to convert
    every common-law fraud that happens to involve securities into a violation of § 10(b)" and distinguishing
    cases where "the fraud would be complete" even in the absence of the associated securities transactions).

1   with the specificity required by Rule 9(b), because FERC's allegations sound in fraud.[52]   The

2   Complaint fails to satisfy this standard.

3        FERC does not allege that Defendants' actions actually affected any jurisdictional

4   transaction, but only that Defendants "sought to."   But FERC also does not allege any facts

5   supporting its conclusory assertion about what Defendants "sought."   For example, the Complaint

6   does not (i) specify any jurisdictional transactions by other market participants that were, or were

7   sought to be, affected; (ii) identify the affected other participants; or (iii) quantify the asserted

8   effect, actual or sought, on any jurisdictional transaction.   FERC's general "in connection with"

9   allegation, with no corroborative detail at all, falls well short of the requirements of Rule 9(b) and

10   is not a sufficient allegation of FERC jurisdiction.

11        **3.    The FPA does not authorize FERC to bring manipulation claims against**
            **individuals**

12

13        When Congress enacted section 222 of the FPA in 2005, it expressly prohibited "any

14   entity" from using a "manipulative or deceptive device or contrivance" in connection with the

15   purchase or sale of wholesale electric energy or transmission services.   16 U.S.C. § 824v.

16   Congress did not define the term "entity" in this legislation, nor is it defined elsewhere in the FPA.

17   Therefore, the term must be "'interpreted in accordance with [its] ordinary meaning.'"   *Sebelius v.*

18   *Cloer*, 133 S. Ct. 1886, 1893 (2013) (citation omitted); *accord Koshman v. Vilsack*, 865 F. Supp.

19   2d 1083, 1092 (E.D. Cal. 2012).

20        The plain meaning of the term "entity" does not include natural persons.   Instead, an

21   "entity" is "[a]n organization (such as a business or a governmental unit) that has a legal identity

22   apart from its members or owners."   Black's Law Dictionary 612 (9th ed. 2009); *Samantar v.*

---

[52]     *See Neubronner v. Milken*, 6 F.3d 666, 671-72 (9th Cir. 1993).   For claims alleging market manipulation, Rule 9(b) requires that FERC plead "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market."   *In re Bank of Am. Corp.*, No. 09-md-02014, 2011 WL 740902, at *9 (N.D. Cal. Feb. 24, 2011) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007)).   As the Ninth Circuit has explained, "Rule 9(b) mandates that 'in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity."   *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1023 (9th Cir. 2000); *see also Roanoke*, 2006 WL 3813755 at *4-6 (requiring the SEC to plead the circumstances of the fraud with particularity, recognizing that "[i]t will not suffice to argue that every misstatement and omission Clark allegedly made was in connection with every Roanoke stock transaction during this time frame").

1   *Yousuf*, 560 U.S. 305, 315 (2010) (citing Black's definition favorably and stating that the term

2   "'entity' typically refers to an organization, rather than an individual"); *Am. Dental Ass'n v.*

3   *Shalala*, 3 F.3d 445, 446 (D.C. Cir. 1993) (concluding that the undefined statutory term "entity"

4   did not include "individual persons").  The plain meaning of "entity" and therefore its usage in the

5   FPA is clear:   Section 222 covers organizations, not individuals.   *Royal Foods Co. v. RJR*

6   *Holdings, Inc.*, 252 F.3d 1102, 1106 (9th Cir. 2001) ("If from the plain meaning of the statute

7   congressional intent is clear, that is the end of the matter").

8        Congress' usage of "entity" elsewhere in the FPA confirms that Congress intended the term

9   to have its ordinary meaning in the statute.  In various provisions throughout the Energy Policy Act

10  of 2005, Pub. L. No. 109-58, 119 Stat. 594 (the "Energy Policy Act"), the legislation that contained

11  section 222, the term "entity" describes or refers to organizations, groups, institutions, associations,

12  or businesses, but not to individuals.  *See, e.g.*, Energy Policy Act §§ 1211(a) (defining "regional

13  entity"), 1231 (defining "unregulated transmitting utility"), 1291 (defining "transmitting utility,"

14  "Regional Transmission Organization," and "Independent System Operator").[53]  Moreover, several

15  sections expressly refer to "individuals" and "entities" separately in disjunctive and conjunctive

16  phrases, providing further evidence that Congress did not intend for "entity" to include both

17  organizations and individual persons.  *See, e.g.*, Energy Policy Act § 133(b), 42 U.S.C. § 15831(b)

18  ("shall invite . . . individuals and entities"), Energy Policy Act § 652(a), 42 U.S.C. § 2169(1)(a)(i)

19  ("shall require each individual or entity").   Thus, Congress clearly used the term "entity" in its

20  ordinary, plain meaning when enacting section 222.  *See Morrison-Knudsen Constr. Co. v. Dir.,*

21  *Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 461 U.S. 624, 633 (1983) ("[A] word is

22  presumed to have the same meaning in all subsections of the same statute.").

23        It is Congress' statutory authorization that defines the limits of FERC's authority to

24  regulate manipulation.  FERC, in adhering to Congress' intent, promulgated the Anti-Manipulation

---

[53]      In addition to these provisions, which amended the FPA and are codified at 16 U.S.C. §§ 796, 824j-1, and 824o, many other sections of the Energy Policy Act also use the term "entity" to describe groups, organizations, associations, companies, or institutions. *See, e.g.*, Energy Policy Act §§ 706, 791, 942, 944, 945 (defining "eligible entities" in the context of various grant or award programs) (codified at 42 U.S.C. §§ 16051, 16131, 16251, 16253, and 16254, respectively; *id.* §§ 962, 964, 989, 999A-H, 1002, 1505 (listing categories or types of entities, all of which are groups or organizations) (codified at 42 U.S.C. §§ 16292, 16294, 16353, 16371-78, 16392,  and 7545(b), respectively).

1  Rule using the term "entity."  Despite the fact that FERC's Anti-Manipulation Rule does not define

2  "entity," FERC has attempted to unilaterally expand that authority by comments accompanying the

3  promulgation of the Final Rule suggesting that "entity" is a "deliberately inclusive term" that

4  includes natural persons.  *See* Prohibition of Energy Market Manipulation, Order No. 670, FERC

5  Stats. & Regs. ¶31,202, at P 18 ("Order No. 670"), *reh'g denied*, 114 FERC ¶ 61,300 (2006).  But

6  this interpretation conflicts with Congress' language and the plain meaning of the term.  *See Santa*

7  *Fe Indus.*, 430 U.S. at 472-73 ("'"The rulemaking power granted to an administrative agency

8  charged with the administration of a federal statute is not the power to make law.  Rather, it is "the

9  power to adopt regulations to carry into effect the will of Congress as expressed by the statute." . . .

10 [The scope of the Rule] cannot exceed the power granted the Commission by Congress . . .'"")

11 (citation omitted).  The FPA only permits FERC to regulate the manipulative acts of entities, such

12 as businesses and organizations.  This authority does not extend to natural persons.  Congress'

13 clear intent must be given effect "'regardless of the interpretation pressed by the Commission.'"

14 *Bonneville Power Admin. v. FERC*, 422 F.3d 908, 920 (9th Cir. 2005) (citation omitted); *see also*

15 *Wolverine Power Co. v. FERC*, 963 F.2d 446, 450 (D.C. Cir. 1992) (dismissing enforcement action

16 because assessment of civil penalties against an unlicensed entity exceeded FERC's statutory

17 authority over "licensees").  The claims as to Mr. Brin, Mr. Connelly, Ms. Levine, and Mr. Smith

18 should therefore be dismissed.

19        **B.      The Complaint Does Not State a Claim for a Manipulation Violation**

20        Nowhere in the Complaint does FERC allege that any of the transactions at issue

21 constituted anything other than actual trades with willing counterparties that accepted the risk of

22 entering into a trading contract opposite Barclays.[54]  Nor is there any allegation that any of the

23 trades involved devices, such as wash trades, which are inherently misleading in themselves.

24 Given the absence of such allegations, the Complaint fails to state a claim and should be dismissed

25 as a matter of law.

26

27 _____

28 [54]      In its July 16 Order, FERC conceded that "[s]imply buying jurisdictional day-ahead power at the
   same location where swap positions would be benefitted from higher prices will not in and of itself violate
   the Anti-Manipulation Rule."  (July 16 Order, at P 45.)

FPA section 222 explicitly incorporated terminology from section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the extensive precedents interpreting section 10(b). Thus, the legal standards applicable to securities manipulation claims apply here. *See* 16 U.S.C. § 824v.   And in the seminal case of *Santa Fe Industries*, the Supreme Court ruled that "'manipulation' is 'virtually a term of art when used in connection with securities markets.' . . . The term refers to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity."  430 U.S. at 476 (citation omitted). The Ninth Circuit, following Supreme Court precedent, has adopted an identical definition of manipulation.  *Desai*, 573 F.3d at 940-41.[55]   FERC has not alleged, because it cannot, that Defendants engaged in such trades or practices, which are inherently misleading.

Like the Ninth Circuit, several other circuit courts have held that parties entering into open-market trades with willing counterparties are not engaged in market manipulation.  In *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857 (7th Cir. 1995), the court rejected a claim of manipulation despite allegations that "'by unprecedented massive short selling and by disguising the nature of their trades, the defendants controlled the price of [a company's stock].'"  *Id.* at 864 (internal citation omitted).  Based upon reasoning relevant here, Judge Posner explained:

> As the plaintiffs themselves point out, the essence of the offense [of manipulation] is creating "a false impression of supply or demand," for example through wash sales, where parties fictitiously trade the same shares back and forth at higher and higher prices to fool the market into thinking that there is a lot of buying interest in the stock. . . . There was nothing like that here.  *On the other side of all of Scattered's transactions were real buyers*, betting against Scattered, however foolishly, that the price of LTV stock would rise.

*Id.* (citing *Santa Fe Indus.*, 430 U.S. at 476) (emphasis added; citation omitted).  Judge Posner also explained why merely "flooding the market" with short sales would not be manipulative:

> But "flooding" a market with short sales is not a rational formula for keeping [the market] price falling.  On the other side of each such sale is a buyer who thinks the market price will rise.  If he is right, the short seller will lose money, and the more shares he has sold short, the more money he will lose.

---

[55]    There are other significant defects in FERC's manipulation claim such as the lack of sufficient allegations of an intent to deceive.  This Motion to Dismiss raises only the *Santa Fe* issue, but all other objections to the manipulation claim not raised in this Motion, including lack of intent to deceive, are reserved to be raised later if this action survives this Motion.

1   *Id.* at 862.  Here, when Defendants purchased an ICE Day-Ahead Contract, their counterparties

2 sold the same contract and stood to profit if prices declined and vice versa.  At most, FERC has

3 alleged that Defendants hoped through their trades to move market prices in a certain way (*e.g.*,

4 Compl. ¶ 68), but that allegation is insufficient to state a claim under the *Santa Fe* line of cases,

5 including *Sullivan* and *Desai*.

6       Similarly, in *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d Cir. 2001), a borrower

7 claimed that a lender violated section 10(b) by selling short a company's stock in order to depress

8 the stock price and thereby obtain more shares of the company's stock.  The Third Circuit rejected

9 this claim, holding that the plaintiff is required "to demonstrate that some action was taken to

10 *artificially* depress or inflate prices, whether by purposely making false statements or by employing

11 illegitimate, deceptive trading techniques that mislead investors about the price or demand for a

12 stock." *Id.* at 204.  It concluded "[t]he fact that these short sales may have contributed to a decline

13 in the stocks' prices is not evidence of deceptive or manipulative conduct . . . ." *Id.* at 207 (citing

14 *Sullivan*, 47 F.3d at 864).[56]

15       Likewise, in *United States v. Radley*, 632 F.3d 177 (5th Cir. 2011), the Fifth Circuit

16 rejected an argument that defendants engaged in manipulation through their bidding practices

17 because they had improper motives and provided false signals to the market.  Because defendants

18 engaged in actual transactions with other parties and "other market participants freely chose which

19 bids to accept and which to reject," the transactions were "bona fide" and "real" and could not

20 constitute market manipulation.  *Id.* at 184.  The Second Circuit has also held that "[t]o be

21 actionable as a manipulative act, short selling [or other trading] must be willfully combined with

22 *something more* to create a false impression of how market participants value a security." *ATSI*,

---

25 [56]    Applying the Supreme Court's holding in *Santa Fe*, the Third Circuit reviewed a host of previously
26 decided market manipulation cases and identified types of sales practices that other courts had found to be
manipulative (each of which is inherently deceptive), including:  unauthorized placements and parking of
stock, secret sales without disclosing the real party in interest, guaranteeing profits to encourage short
27 selling by others, fraudulently low appraisals, painting the tape (buying and selling among market
participants to create the false appearance of substantial trading activity) and matched orders (simultaneous,
28 off-setting buy and sell orders).  *See GFL*, 272 F.3d at 207-08 (collecting cases).  None of those activities is
alleged in FERC's Complaint.

1   493 F.3d at 101 (emphasis added).[57]   In 2011, the Second Circuit held that "[i]n order for market

2   activity to be manipulative, that conduct must involve misrepresentation or nondisclosure." *Wilson*

3   *v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011).

4       FERC's allegations that Barclays intended for its trades in the ICE ECM day-ahead market

5   to contribute to a change in the ICE Daily Index Price that benefitted Barclays' financial positions

6   in its Swap Contracts are not true but even accepting them as true for the purpose of this motion

7   these allegations still do not constitute an actionable claim of market manipulation.   As the

8   Supreme Court, the Ninth Circuit and other circuit courts have held, actual trades with

9   counterparties taking opposite positions do not constitute manipulation, even when those trades

10  were intended to and "may have contributed to a [change] in the stocks' prices." *GFL*, 272 F.3d at

11  207.  *Sullivan* and *GFL* involved claims of "massive" short sales and "flooding the market" with

12  short sales that allegedly had significant effects on market prices, yet each court found that those

13  sales were not manipulative.   FERC's allegation that Defendants set up their positions to engage in

14  trades that tended to cause changes in market prices simply does not state an actionable claim.

15      The allegations in the Complaint with respect to the Traders also do not state actionable

16  claims for manipulation.   Paragraphs 54 through 68 of the Complaint purport to allege that the

17  Defendants engaged in a manipulative scheme, but the Complaint does not allege anything other

18  than purchases and sales in bona fide, open-market transactions, engaged in with willing

19  counterparties at prices accepted in the market by those counterparties.   FERC further alleges that

20  the Traders discussed and aggregated physical positions, coordinating their efforts to flatten those

21  positions.  (*See, e.g.*, Compl. ¶¶ 64-66.)   As FERC acknowledges, flattening physical day-ahead

22  positions was a necessary and standard practice for entities like Barclays.  (*See* Compl. ¶ 56

23  ("Because Barclays did not own electricity generation resources or serve customer load, Barclays'

24  physical day-ahead positions had to be liquidated prior to delivery or receipt of the

25  electricity . . . .").)   It was imperative for the Traders to discuss the physical positions and

26

27  ───────────────────

28  [57]      Here, FERC does not allege that Barclays' transactions were anything other than actual trades in the
    open marketplace with willing counterparties who are not alleged to have been part of any misconduct.

1    coordinate their liquidation in order to ensure that Barclays ended each day physically flat, as it

2    was required to be.  There was nothing inherently false or deceptive about the trades.

3           Even looking outside the Complaint to the Exhibits attached by FERC, they, too, contain no

4    allegations of fictitious trading – they include nothing but trades done openly in the market with

5    willing counterparties.   FERC's recitation of cherry picked trading information, conclusory

6    allegations of knowledge ascribed to all Traders collectively, and selective quotes from isolated

7    communications, taken out of context, are irrelevant to the salient issue raised on this Motion to

8    Dismiss, which is that FERC has failed to allege any inherently manipulative trades and therefore

9    cannot state an actionable claim for manipulation as a matter of law.  As the Ninth Circuit has held,

10   such legitimate trading activity, done on the open market and "consistent with the defendants'

11   normal course of business," is neither inherently deceptive nor fraudulent.  *See Simpson v. AOL*

12   *Time Warner Inc.*, 452 F.3d 1040, 1050 (9th Cir. 2006), *vacated on other grounds sub nom. Avis*

13   *Budget Grp., Inc. v. Cal. State Teachers' Ret. Sys.*, 552 U.S. 1162 (2008).[58]

14          There is a complete absence of allegations of manipulative conduct, as defined by the

15   Supreme Court and the Ninth Circuit, against any of the Traders.  FERC's Complaint simply does

16   not allege deceptive trading practices (such as wash sales or matched orders) by any particular

17   individual and thus it fails to state a claim against any individual.  *See Simpson*, 452 F.3d at 1050

18   ("[W]hen determining whether a defendant is a 'primary violator,' the conduct of each defendant,

19   while evaluated in its context, must be viewed alone . . . .");  *see also Santa Fe Indus.*, 430 U.S. at

20   476;  *Desai*, 573 F.3d at 939.  The conduct of each individual defendant "must satisfy each of the

21   elements or preconditions for liability,"  *Stoneridge*, 552 U.S. at 158, and FERC cannot lump

22   multiple defendants together with general allegations, attempting to impute the conduct and

23   statements of each of them to all of them.  *See Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th

---

24

25   [58]      *Simpson* was vacated *sub nom.* in light of the Supreme Court's decision in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008).  *See Simpson v. Homestore, Inc.*, 519

26   F.3d 1041 (9th Cir. 2008).  However, in *Stoneridge*, the Court "was clear that it disputed the principles of *Simpson* only insofar as they were inconsistent with the requirement that a private plaintiff must rely on the

27   defendant's deceptive conduct for section 10(b) liability to attach."  *SEC v. Fraser*, No. CV-09-00443, 2009 WL 2450508, at *9 (D. Ariz. Aug. 11, 2009); *see also SEC v. Sells*, No. C 11-4941, 2012 WL 3242551, at

28   *5 (N.D. Cal. Aug. 10, 2012) (acknowledging that *Simpson* provides the Ninth Circuit rule for a deceptive act in the scheme liability context); *SEC v. Lowrance*, No. 11-CV-03451, 2012 WL 2599127, at *4 (N.D. Cal. July 5, 2012) (same).

1   Cir. 2007); *Abbate v. Wells Fargo Bank, N.A.*, No. CV 10-651, 2011 WL 9698215, at *2-5 (C.D.

2   Cal. Nov. 17, 2011).

3       With respect to Mr. Brin, FERC essentially alleges that Brin executed the trades for a large

4   portion of the flattening of Barclays' day-ahead position, but FERC has failed to allege that his

5   conduct involved trades that were not actual trades with real counterparties.  There is not a single

6   allegation of particularized trading or other conduct attributed to him in the entire Complaint.

7       The only specific trading activity associated with the alleged scheme ascribed to Mr.

8   Connelly is that he "personally traded MIDC peak dailies" on February 28, 2007, flattening his

9   physical position at a location where he held an opposite financial position.  (Compl. ¶ 88.)  Mr.

10  Connelly's trading was executed with willing counterparties in the market.  FERC itself has

11  conceded that "[s]imply buying jurisdictional day-ahead power at the same location where swap

12  positions would be benefitted from higher prices will not in and of itself violate the Anti-

13  Manipulation Rule." (July 16 Order, at P 45.)  A violation "requires the existence" of fraudulent

14  acts, *id.*, but none is attributed to Mr. Connelly in the Complaint.  *See Cho v. UCBH Holdings, Inc.*,

15  No. C 09-4208, 2011 WL 3809903, at *9 (N.D. Cal. May 17, 2011) (the fact that defendant is a

16  senior executive, without more, is insufficient to state a claim under section 10(b)).

17      Finally, the only particularized trading attributed to Ms. Levine or Mr. Smith is that they

18  "added significant buying pressure to the PV peak market [on November 3, 2006] by purchasing a

19  net of 325 MW/h at escalating prices."  (Compl. ¶ 72.)  Again, these trades were openly executed

20  on ICE ECM at market prices with willing counterparties.  FERC's single particularized allegation

21  related to Ms. Levine and Mr. Smith avers nothing about their trading that constitutes

22  manipulation.[59]

23

24

_____

25  [59]    With respect to Mr. Smith, the Complaint alleges he left Barclays' employ in March 2007 (Compl.

26  ¶ 12), but there are no allegations that he engaged in any conduct related to the alleged scheme after this
    time.  Therefore, even if the Court does not dismiss the Complaint, the generalized allegations related to the

27  time period after March 2007 have no application to Mr. Smith, and FERC's claim against him must be
    appropriately limited.  FERC's Anti-Manipulation Rule prohibits fraudulent conduct, with the requisite

28  scienter, in connection with a jurisdictional transaction.  *See* Order No. 670, at P 49.  This Motion to
    Dismiss is narrowly focused on the conduct element, and Defendants reserve all rights with respect to the
    other elements, including the lack of intent to deceive, and other deficiencies in FERC's claims.

C.   **The Statute of Limitations Precludes FERC From Bringing an Enforcement Action for Many of the Alleged Violations**

The conduct at issue in the Complaint occurred long ago – from November 2006 to December 2008.  (Compl. ¶ 36.)  FERC began its investigation in 2007 but has only now brought suit.  (*Id.* ¶ 35.)  Based on the applicable five-year statute of limitations (as extended 288 days pursuant to the Tolling Agreements entered into among the Parties), all allegations related to conduct occurring prior to December 26, 2007 are time barred.

On June 22, 2011, Barclays and the Traders entered into identical agreements with FERC to temporarily suspend the statute of limitations.  (RJN Decl. Exs A-E.)  These Tolling Agreements state in pertinent part that:  "The tolling of the statute of limitations shall continue until [FERC's Office of Enforcement] provides written notice to [Barclays and the Traders] that the investigation is terminated . . . ."  (*Id.*)  The Tolling Agreements did not require any precise terms, form or manner to effectuate termination – other than that the notice be written – and in particular, did not require FERC to provide explicit notice that the Tolling Agreements themselves were terminated, but only "that the investigation is terminated." (*Id.*)

On April 5, 2012, Staff issued the NAV to Barclays and the Traders.  (RJN Decl. Ex. H, at P 17.)  This written notice informed the Defendants that FERC's investigation was terminated at the latest as of that date because in FERC's own words, a notice of alleged violation could only be issued **"after . . . staff has completed its fact-finding process**" and "**only after the investigation is completed**."  *See* NAV Order, 134 FERC ¶ 61054, at P 17 (emphasis added).  FERC's NAV Order emphasized the importance of protecting against undue reputational harm, noting that "[t]he timing of when the Secretary may issue [NAVs] [*i.e.*, 'only after the investigation is complete'] is an additional consideration mitigating the risk of harm from disclosure of the subjects' identity."  *Id.*[60] Therefore, Staff's NAV was issued **only** after FERC had completed its fact-finding process and investigation.   The NAV, therefore, provided written notice from FERC to Barclays and the

---

[60]     As here, prior to the issuance of a notice of alleged violation, investigations by Staff are typically non-public.  (*Id.*, at P 4.)

1  Traders that FERC's investigation had terminated, which in turn served to terminate the Tolling

2  Agreements.

3              (a)       **FERC's claims are subject to a five-year statute of limitations**

4

5      The general federal statute of limitations, 28 U.S.C. § 2462, applies to FERC's claims of

alleged manipulation.[61]   It requires commencement of an action, suit or proceeding within five

6

7  years from the date when the claim first accrued.[62]   Accrual means the date on which the alleged

manipulative conduct occurred.  *SEC v. Gabelli*, 133 S. Ct. 1216, 1221-22 (2013) (five-year statute

8

9  of limitations under 28 U.S.C. § 2462 begins to run when the alleged conduct occurs).[63]   Thus,

FERC had to commence suit within five years (as extended by the Tolling Agreements) of the

10

conduct at issue to come within the limitations period.

11

12      The government "commences" an "action, suit or proceeding" for purposes of section 2462

only when it initiates an *adjudicatory process* that permits *adversarial fact-finding*.  *See, e.g.*, *FEC*

13

*v. Nat'l Republican Senatorial Comm.*, 877 F. Supp. 15, 17-20 (D.D.C. 1995) (to constitute an

14

"action, suit or proceeding," the respondent must have the opportunity to "obtain and perpetuate

15

16  evidence" – "[s]ection 2462 is not affected by an administrative process that lacks the basic

elements common to adversarial adjudication").   None of FERC's prior administrative steps

17

18  initiated a process whereby Barclays or the Traders obtained or presented evidence, sought

discovery, or otherwise adjudicated the merits.   There was no adjudicatory process prior to FERC's

19

20  issuance of its July 16 Order, and in fact, no adjudicatory process was initiated until FERC filed the

21

22  [61]     *See Prohibition of Energy Market Manipulation*, 114 FERC ¶ 61,300, at P 6 (2006) ("[B]ecause

23  section 4A and section 222 are silent as to a statute of limitations, and no statute of limitations of general applicability appears in the NGA [Natural Gas Act] or FPA, the Commission is limited by the five-year

24  statute of limitations found in 28 U.S.C. § 2462 that applies to any 'action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture. . . .'").

25  [62]     The statute reads in pertinent part:  "Except as otherwise provided by Act of Congress, an action,

26  suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued. . . ."

27  28 U.S.C. § 2462.

28  [63]     As FERC has made clear:  "We intend that any administrative action for violation of the [Anti-Manipulation Rule] be commenced within five years of the date of the fraudulent or deceptive conduct." Order No. 670, at P 46,  n.124.

1   Complaint on October 9, 2013.[64]   Thus, FERC's administrative steps were inadequate to

2   commence an action for purposes of section 2462.[65]   *See*, *e.g.*, *Nat'l Republican*, 877 F. Supp. at 20

3   (finding Federal Election Commission did not take adequate administrative steps to commence an

4   action for purposes of section 2462).

5          **(b)   The NAV constituted notice that FERC's investigation was terminated**

6

7         When FERC issued the NAV to Defendants it not only provided notice of the termination

8   of its investigation but effectively terminated the Tolling Agreements as well.   Many forms of

9   communication can serve as notice of termination of a contract.   In *McDonald's Corp. v. Watson*,

10   69 F.3d 36, 43-44 (5th Cir. 1995), for instance, service of a complaint alleging trademark

11   infringement was held to be adequate notice of the termination of a franchise agreement that had

12   permitted use of the trademark.   The *Watson* court found that the notice of termination did not have

13   to be sent in a separate document or with specific termination language because "the [a]greement

14   did not require any magic language to effect termination, wording that conveyed to the recipient

15   that the franchise *either was or is terminated* accomplishes the purpose of notice."   *Id.* at 43; *see*

16   *also*, *e.g.*, *Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO v. Am. Maize Prods. Co.*, 492 F.2d

17   409, 411-12 (7th Cir. 1974) ("[T]he only reasonable construction" to give Union's letter indicating

18   desire to negotiate a "new contract" was that it constituted a notice of termination of the existing

19   contract.); *Selznick v. Turner Entm't Co.*, 990 F. Supp. 1180, 1185 (C.D. Cal. 1997) (filing

20   copyright claim was reasonable notice of termination of underlying implied copyright contract).

21

22   _____

23   [64]       Nor did any steps in the administrative process toll the limitations period.   Delays caused by procedural administrative rights or "administrative efforts to bring about a consensual disposition" do not suspend the limitations period because the duration of such delays "are, as a practical matter, entirely within

24   the control of the [federal agency]."   *FEC v. Nat'l Right to Work Comm., Inc.*, 916 F. Supp. 10, 13-14 (D.D.C. 1996); *see also United States v. Core Labs.*, 759 F.2d 480, 483-84 (5th Cir. 1985) (administrative

25   processes do not toll limitations periods as to actions brought by the government); *Nat'l Republican*, 877 F. Supp. at 20 (holding that the operation of the FEC administrative process did not toll section 2462).

26

27   [65]       Under applicable FERC regulations, Defendants were not entitled to discovery, and there was no initiation of adversarial adjudication, unless and until FERC either initiated federal district court litigation, as it has now done, or commenced a formal administrative proceeding, a procedural path that the

28   Defendants elected to preclude.   *See* FPA §§ 31(d)(3), 16 U.S.C. § 823b(d)(3)(B), and 307, 16 U.S.C. § 825f; 18 C.F.R. Part 1b.

1    Likewise, the NAV terminated the Tolling Agreements here.  The NAV fits well within the

2    Tolling Agreements' termination provisions by conveying in writing to Defendants the fact that

3    FERC's investigation had ended.  And, the NAV Order explicitly, and for good reason, provides

4    that completion of FERC's investigation was a necessary condition precedent to issuing the NAV.

5    Since issuing the NAV Order, FERC has attempted to backtrack on its conclusion that the

6    NAV was issued "only after the investigation is completed."  NAV Order, at P 17.  For example,

7    FERC argues in the July 16 Order that the NAV "does not necessarily mark the end of OE Staff's

8    investigation."  July 16 Order, at P 22.  Even though FERC made a clear and unambiguous

9    conclusion in the NAV Order with respect to the termination of its investigation, and even though

10   the Tolling Agreements contemplated an eventual termination of the investigation, FERC now

11   appears to argue that, in effect, the Tolling Agreements suspended indefinitely the applicable

12   statute of limitations.  This new view is at odds with the agreements themselves, which evidence

13   the Parties' clear intent that the investigation would terminate, and contrary to the clear language of

14   the FERC's own prior NAV Order.  Furthermore, FERC's expansive and unsupportable view

15   would nullify the purpose of a statute of limitations:  to encourage the prompt conclusion of an

16   investigation.  *See Nat'l Republican*, 877 F. Supp. at 20 ("[A] government agency may not extend

17   its own limitations period indefinitely by failing either to begin or to complete its own

18   investigation.").

19                      (c)     **The statute of limitations bars all claims relating to any alleged**
                              **violations prior to December 26, 2007**
20

21   Because the Tolling Agreements were signed on June 22, 2011 and then terminated on

22   April 5, 2012, they operated to extend the applicable limitations period by 288 days.  *See, e.g.,*

23   *Washington ex rel. Raya v. Taser Int'l, Inc.*, No. 2:05-CV-000881, 2011 WL 5320982, at *5 (E.D.

24   Cal. June 17, 2011).  Accordingly, all claims relating to alleged conduct occurring more than five

25   years plus 288 days prior to the filing of this Complaint – *i.e.*, all claims based on alleged conduct

26   prior to December 26, 2007 – are time-barred as a matter of law, and should be dismissed.  The

27   effect is significant as 25 of the 35 alleged manipulation periods occurred prior to December 26,

28   2007.  To hold otherwise would be unfair to Defendants because "'the right to be free of stale

1   claims in time comes to prevail over the right to prosecute them.'"  *Burnett v. N.Y. Cent. R.R. Co.*,

2   380 U.S. 424, 428 (1965) (citation omitted).

3   **IV.      CONCLUSION**

4           For the foregoing reasons, the Court should dismiss FERC's Complaint or, in the

5   alternative, transfer this action to the Southern District of New York.

6   DATED:  December 16, 2013

7                                                   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

8
                                                    By:  */s/  Thomas J. Nolan*
9                                                            Thomas J. Nolan
                                                    Attorneys for BARCLAYS BANK PLC
10
    DATED:  December 16, 2013
11
12                                                  CADWALADER, WICKERSHAM & TAFT LLP

13                                                  By:  */s/ Gregory A. Markel (as authorized on 12/16/2013)*
                                                            Gregory A. Markel
14                                                  Attorneys for BARCLAYS BANK PLC

15
    DATED:  December 16, 2013
16
17                                                  WILMER CUTLER PICKERING HALE AND DORR LLP

18                                                  By:  */s/ Seth Waxman (as authorized on 12/16/2013*
                                                            Seth P. Waxman
19                                                  Attorneys for BARCLAYS BANK PLC

20
    DATED:  December 16, 2013
21
22                                                  McGUIREWOODS LLP

23                                                  By:  */s/ Todd Mullins (as authorized on 12/16/2013)*
                                                            Todd Mullins
24                                                  Attorneys for DANIEL BRIN and SCOTT
                                                    CONNELLY
25

26

27

28

1  DATED:  December 16, 2013

2                                             BINGHAM McCUTCHEN LLP

3
                                             By:  */s/ Michael L. Spafford (as authorized on 12/16/2013)*
4                                                   Michael L. Spafford
                                                  Attorneys for KAREN LEVINE
5                                                  and RYAN SMITH

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28