1

2

3

4

5

6

7

8

9                   UNITED STATES DISTRICT COURT

10                 EASTERN DISTRICT OF CALIFORNIA

11

12   FEDERAL ENERGY REGULATORY            No.  2:13-cv-2093-TLN-DAD
     COMMISSION,
13
                      Plaintiff,
14                                         **AMENDED ORDER**
          v.
15
     BARCLAYS BANK PLC, DANIEL
16   BRIN, SCOTT CONNELLY, KAREN
     LEVINE, and RYAN SMITH,
17
                      Defendants.
18

19        The matter is before the Court on Defendants Barclays Bank PLC ("Barclays"), Daniel

20   Brin ("Brin"), Scott Connelly ("Connelly"), Karen Levine ("Levine"), and Ryan Smith's

21   ("Smith") (collectively "Defendants") Motion to Dismiss or, in the Alternative, to Transfer (ECF

22   No. 44) Plaintiff Federal Energy Regulatory Commission's ("FERC") Petition to Affirm Civil

23   Penalties (ECF No. 1).  For the reasons discussed below, Defendants' Motion is DENIED.

24                                **BACKGROUND**

25        On July 16, 2013, following a multi-year investigation and proceeding, FERC issued an

26   order assessing penalties against Defendants for engaging in manipulative trading in the

27   electricity market in the western United States from November 2006 to December 2008.  FERC

28   now petitions this Court for an order affirming those penalties.  16 U.S.C. § 823b(d)(3)(B).  The

                                        1

relevant background and factual allegations are set forth more fully below.

**I.  Relevant Markets**[1]

As alleged in FERC's Petition, during the relevant time period, electricity was traded by Defendants at different locations in the United States, including Mid-Columbia ("MIDC"), Palo Verde ("PV"), South Path 15 ("SP"), and North Path 15 ("NP").  MIDC is a trading location in Washington located around hydroelectric facilities in the Columbia River Basin.  PV is a trading location in Arizona that has a substantial amount of nuclear generation.  NP is a trading zone that encompasses most of northern California.  SP is a trading zone that encompasses most of southern California.[3]  (ECF No. 1 ¶¶ 17–18.)

Electricity at these locations traded as "peak" and "off-peak" products.  Peak products included electricity delivered during the hours 7:00 AM to 10:00 PM, Monday through Saturday and excluding holidays.  Off-peak products included electricity delivered all of Sunday, the hours 10:00 PM to 7:00 AM, Monday through Saturday and holidays.  (ECF No. 1 ¶ 19.)

Electricity products could be either physical or financial.  Physical products involved the obligation to deliver or receive physical electricity at a particular location during a particular time.[4]  Physical electricity was typically measured in megawatts-per-hour ("MW/h"), i.e. the number of megawatts of electricity delivered during a given hour.  For example, a person with a "long" physical position (i.e. a net buyer) of 100 MW/h of peak electricity at MIDC for April 2007 had purchased a net volume of 100 MW/h of electricity at MIDC during each peak hour during April 2007, and thus had an obligation to take delivery of (i.e. receive) 100 MW/h at

---

[1] The background regarding the relevant markets and the factual allegations recited herein are taken near-verbatim from the Petition (ECF No. 1).

[3] *See Pub. Utilities Comm'n of California v. F.E.R.C.*, 367 F.3d 925, 927 (D.C. Cir. 2004) ("High voltage transmission lines, known as Path 15, extend from southern to northern California. Path 15 is the principal means of transmitting electricity between these two regions of the state and into the Pacific Northwest.  Energy produced in Southern California comes mainly from natural gas-fired generators; in Northern California and the Pacific Northwest, hydroelectric generation predominates.  In the winter, energy typically flows from south to north. Summer flows are in the opposite direction.  The movement of power along Path 15 is often constrained because of its lack of capacity to handle the transmission of power in the summer and winter months.") *See also* Transcript of the February 26, 2015 Hearing, ECF No. 86 at 20–27 (containing the parties' arguments regarding the relevance of NP, SP, PV, and MIDC to the alleged manipulation).

[4] Defendants strongly argue that the relevant transactions avoided an obligation to deliver or receive electricity.  (*See e.g.* ECF No. 68 at 3.)

1   MIDC for each hour.  (ECF No. 1 ¶ 21.)

2          Physical products could be priced at either a fixed price agreed to by the counterparties

3   (e.g., $50 per MW/h) or at a published index price, that typically reflected the volume-weighted

4   average price ("VWAP") of certain transactions made by electricity market participants.  The

5   relevant index for this case is the Intercontinental Exchange ("ICE") daily index, which was

6   published by ICE each trading day based on the VWAP of all day-ahead fixed-price physical

7   electricity transactions at a particular trading location.  Many of the physical electricity

8   transactions and related financial products during the relevant time period priced off of or settled

9   against the ICE daily index.  (ECF No. 1 ¶¶ 21–23.)

10         The ICE daily index was set by a methodology that calculates an index price based on the

11  VWAP of all contributing volumes and prices traded on ICE.  The volumes and prices that ICE

12  used to calculate the daily index price were those trades that occurred in the day-ahead fixed-price

13  physical market, a market commonly referred to as the "cash" or "dailies" market.   In the dailies

14  market, traders bought and sold electricity for physical delivery the following day at fixed prices

15  (e.g., 25 MW/h of peak MIDC electricity for delivery the following day priced at $50 per MW/h).

16  (ECF No. 1 ¶ 24.)

17         A physical position at index was physical electricity transacted at an index price as

18  opposed to a fixed price (e.g., 25 MW/h of peak MIDC electricity priced at the ICE daily index).

19  Index transactions could be for different lengths of time.  For example, a trader could buy

20  physical index electricity for a day (known as "daily index"), for the remaining days in a month

21  (known as "balance of the month" or "BOM" index), for a month (known as "monthly index"), or

22  for longer periods.  Physical index transactions for lengths greater than a day still settled against

23  the applicable daily index but did so each day as the index was set by the VWAP in the dailies.

24  (ECF No. 1 ¶ 25.)

25         Unlike physical positions, financial positions did not entail physical obligations to deliver

26  or receive electricity.  Financial positions, including the "financial swaps" commonly traded by

27  Defendants, were settled through an exchange of payments.  A financial swap buyer paid a fixed

28  price and received a floating price.  For example, a buyer of a financial swap for MIDC peak

1  electricity during April, 2007 would pay a fixed price (e.g., $50 per MW/h) and receive the

2  floating payment of the ICE daily index settlement for MIDC peak electricity for each day of the

3  month.  (ECF No. 1 ¶ 26.)

4      Market participants also traded "term" fixed-price physical products which were

5  transactions to buy or sell physical power for a period of more than a day (e.g., 200 MW/h of

6  peak MIDC electricity for April 2007 priced at $50 per MW/h).  Fixed-price term positions had

7  price risk that was equivalent to a financial swap because they established a position at a fixed

8  price (e.g. $50) that could be measured against the ICE daily index settlement.  However, they

9  also had the physical obligation to make or receive delivery of physical power when those

10  positions went to delivery each day.  (ECF No. 1 ¶ 27.)

11      Market participants frequently traded the difference – known as a "spread" – between two

12  locations by using a combination of financial swaps and/or physical positions.   A trader was

13  "long" the spread when he or she had a net long position in the premium market and a net short

14  position in the other leg of the spread.  If a trader had a net short position in the premium market

15  and a net long position in the other leg, he or she was "short" the spread.  (ECF No. 1 ¶¶ 29–30.)

16      Generally, the trading zones in California had higher prices than the locations outside

17  California in the western U.S., and power generally flowed from PV and Northwestern states to

18  the California zones.  SP was generally a premium location over MIDC, NP, and PV.  NP was

19  generally a premium location over MIDC.  (ECF No. 1 ¶¶ 31–32.)

20  **II.  Investigation and Penalty Assessment**

21      As alleged in the Petition, in 2007 multiple market participants independently called

22  FERC's Enforcement Hotline to report potentially manipulative trading by Barclays in physical

23  electricity markets in the western United States.  FERC's Office of Enforcement ("Enforcement")

24  commenced an investigation in July, 2007.  (ECF No. 1 ¶¶ 34–35.)  On June 10, 2011,

25  Enforcement issued Preliminary Findings Letters to Defendants stating that it had preliminary

26  concluded that they had violated FERC's "Anti-Manipulation Rule," 18 C.F.R. § 1c.2.  (*See*

27  FERC's July 16, 2013 Order Assessing Civil Penalties, ECF No. 1-1 ¶ 9.)  The Anti-

28  Manipulation Rule provides in relevant part:

4

> (a) It shall be unlawful for any entity, directly or indirectly, in connection with the purchase or sale of electric energy or the purchase or sale of transmission services subject to the jurisdiction of the Commission,
>
> (1) To use or employ any device, scheme, or artifice to defraud,
>
> (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (3) To engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity.

The Anti-Manipulation Rule was promulgated pursuant to the Federal Power Act ("FPA") § 222, 16 U.S.C. § 824v, enacted as part of the Energy Policy Act of 2005.  Section 222 provides in relevant part:

> It shall be unlawful for any entity (including an entity described in section 824(f) of this title), directly or indirectly, to use or employ, in connection with the purchase or sale of electric energy or the purchase or sale of transmission services subject to the jurisdiction of the Commission, any manipulative or deceptive device or contrivance (as those terms are used in section 78j(b) of Title 15), in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of electric ratepayers.

On April 5, 2012, FERC issued a Notice of Alleged Violations ("NAV") to Defendants. On October 31, 2012, FERC issued an Order to Show Cause ("OSC"), with an attached report from Enforcement, ordering Defendants to show cause why 1) they should be found not to have violated FPA § 222 and the Anti-Manipulation Rule, and 2) why they should not be assessed civil penalties of $435 million against Barclays, $1 million against Brin, $15 million against Connelly, $1 million against Levine, and $1 million against Smith, and why Barclays should not be ordered to disgorge $34.9 million, plus interest, in unjust profits.  (ECF No. 1-1 ¶¶ 9–12.)

The OSC also ordered Defendants to elect either an administrative hearing before an Administrative Law Judge prior to the assessment of a penalty, pursuant to 16 U.S.C. § 823b(d)(2), or elect to proceed under 16 U.S.C. § 823b(d)(3)(A), under which FERC was permitted to immediately assess penalties if FERC found a violation.  On November 29, 2012,

Defendants each elected the procedures of § 823b(d)(3)(A), thus opting for an immediate penalty assessment.  (ECF No. 1-1 ¶¶ 12–13.)

On December 14, 2012, Defendants provided Answers to the OSC.  On January 28, 2013, Enforcement filed a Reply.  After review, on July 16, 2013, FERC issued the Order Assessing Civil Penalties, finding that "[Defendants] violated the Commission's Anti-Manipulation Rule from November 2006 to December 2008 by manipulating the energy markets in and around California through the use of a coordinated, fraudulent scheme," and assessing the penalty amounts and the amount in disgorgement, stated *supra*.  (ECF No. 1-1 ¶¶ 2, 8.)

**III.  Alleged Manipulation**

According to the Petition, FERC determined that Defendants' manipulative scheme involved three parts: (1) setting up a financial position; (2) building a physical position that was in the opposite direction to the financial position; and (3) flattening the physical position through trading dailies to benefit the financial position.  (ECF No. 1 ¶ 55.)

During the relevant time period, Barclays operated a West Power Desk from the Barclays Commodities Group trading floor in New York City.  The West Power Desk was headed by Connelly, who supervised Brin, Levine, and Smith.  (ECF No. 1 ¶¶ 8–12, 48.)

Because Barclays did not own electricity generation resources or serve customer load, Barclays' physical day-ahead positions had to be liquidated, i.e. "flattened", prior to delivery or receipt of the electricity by buying (in the case of a short physical day-ahead position) or selling (in the case of a long physical day-ahead position) an equal volume of electricity.  (ECF No. 1 ¶ 56.)

Because the VWAP of the dailies-market trades set the ICE index, Defendants' flattening of their physical positions in the dailies market allowed them to impact ICE index settlements and benefit their related financial positions, which either paid or received the ICE daily index at settlement.  (ECF No. 1 ¶ 58.)  Defendants' flattening of their physical positions in the dailies was uneconomic, consistently losing money on a stand-alone basis.  The Petition asserts that Defendants' dailies trading during the months of manipulation lost money at an average of $117,404 per month, and total net losses from dailies trading in those months exceeded $4

million.  (ECF No. 1 ¶¶ 59–62.)  Taking into account the benefiting financial positions, FERC

Enforcement "preliminarily estimated that Barclays unjustly profited by at least $34.9 million and

caused pecuniary losses to other market participants of at least $139.3 million."  (ECF No. 1 ¶

39.)

According to the Petition, as the primary term trader, Connelly controlled trading books

that held the majority of the financial swaps that benefitted from the scheme.  Connelly, Brin,

Levine, and Smith participated in building the physical positions that were opposite to Barclays'

financial positions.  Brin, Levine, and Smith, as the cash traders, were the traders primarily

responsible for flattening Barclays' physical positions through dailies trading.  (ECF No. 1 ¶ 63.)

The Petition asserts that Defendants acted with scienter, as demonstrated through emails

and instant messages, suspicious timing or repetition of transactions, execution of transactions

benefiting derivative positions, and trading which would be economically irrational but for the

scheme.  A sample of these communications is contained in the Petition.  (ECF No. 1 ¶¶ 69–111.)

The Petition also asserts that "the manipulative scheme was also significant because

…[Defendants'] manipulative trading affected the wholesale price of electricity in the western

U.S.  []  Moreover, by affecting prices paid by load-serving entities such as public utilities, the

scheme affected the ultimate retail price paid by tens of millions of consumers in California and

elsewhere in the western U.S."  (ECF No. 1 ¶ 121.)

**IV.  Procedural History**

On October 9, 2013, FERC filed the Petition (ECF No. 1) for an order from this Court

affirming the penalties, pursuant to 16 U.S.C. § 823b(d)(3)(B), which provides:

> If the civil penalty has not been paid within 60 calendar days after
> the assessment order has been made … [FERC] shall institute an
> action in the appropriate district court of the United States for an
> order affirming the assessment of the civil penalty. The court shall
> have authority to review de novo the law and the facts involved,
> and shall have jurisdiction to enter a judgment enforcing,
> modifying, and enforcing as so modified, or setting aside in whole
> or in [p]art, such assessment.

Attached to the Petition is the July 16, 2013, FERC Order Assessing Civil Penalties (ECF No. 1-

1) and the October 31, 2012 Enforcement Staff Report and Recommendation (ECF No. 1-2).  The

1   Petition includes a demand for a jury trial.  (ECF No. 1 ¶ 124.)

2       On December 16, 2013, Defendants filed the instant Motion to Dismiss and to Transfer

3   (the "Motion") (ECF No. 44), and a supporting Request for Judicial Notice (ECF No. 45).[5]  On

4   January 16, 2014, this Court stayed discovery and declined to issue a briefing schedule, pending a

5   ruling on Defendants' motion.  (ECF No. 62.)

6       On February 14, 2014, FERC filed an Opposition (ECF No. 65) to Defendants' Motion

7   and a supporting Request for Judicial Notice (ECF No. 66).  Defendants have filed a Reply (ECF

8   No. 68) to FERC's Opposition and a Response (ECF No. 69) to FERC's Request for Judicial

9   Notice.  FERC has filed a Reply (ECF No. 70) to Defendants' Response to FERC's Request for

10  Judicial Notice.

11      On February 26, 2015, this Court heard oral argument on Defendants' Motion.[6]  Two

12  issues were focal at the hearing: 1) background on the energy market in which Defendants were

13  trading, including factual specifics of how electricity is transferred; and 2) FERC jurisdiction

14  versus the Commodity Futures Trading Commission's ("CFTC") jurisdiction over the instant

15  matter.

16                          **STANDARD OF REVIEW**

17      The parties agree that to the extent the instant Motion is set forth as a Fed. R. Civ. Proc.

18  12(b)(6) motion, the Court must accept the allegations of the Petition as true.[7]  (ECF No. 65 at 3;

19  ECF No. 44 at 11.)[8]  "To survive a motion to dismiss, a complaint [here, the Petition] must

20  contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

21  face … A claim has facial plausibility when the plaintiff pleads factual content that allows the

22  court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

23

24  [5] Defendants subsequently submitted a corrected motion, with minor changes to citations and other typographical changes.  (ECF No. 58.)

25  [6] A transcript of the hearing (ECF No. 86) was reviewed in preparation of this order.

26  [7] The standard of review for Defendants' improper venue challenge and the motion to transfer is stated separately

27  below.

28  [8] Citations to page numbers on filings, such as the instant Motion or FERC's Opposition, refer to the page number on the document itself, not the Court's ECF page numbers.

*See Ashcroft v. Iqbal*, 556 U.S. 662, 663–64 (2009).  However, "[t]he court need not … accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. … Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988, *amended on other grounds, reh'g denied*, 275 F.3d 1187 (9th Cir. 2001) (internal citations omitted).

**ANALYSIS**

**I.  Requests for Judicial Notice**

Both parties request judicial notice of numerous exhibits.  (ECF Nos. 45 & 66.)  Defendants oppose nearly all of FERC's requests.  Defendants do not dispute that any of FERC's exhibits are true and accurate copies of what they purport to be, but argue, generally, that they are irrelevant, contain disputed facts, or do not stand for the legal conclusion drawn by FERC pursuant to the exhibit.  (*See* ECF No. 69.)  For example, FERC's Exhibit I is a copy of a July, 2010 letter from the Director of Enforcement for the CFTC to the Director of Enforcement for FERC, stating generally the CFTC's decision that FERC – not the CFTC – was best situated to handle the present matter.  Defendants argue that the Court cannot rely upon this letter to conclude that, as a matter of law, FERC has jurisdiction, because the CFTC cannot cede its jurisdiction without authorization from Congress.  *See Board of Tr. of Chic. v. S.E.C.* 677 F.2d, 1142 n. 8 (7th Cir. 1982).  But Defendants do not dispute that the CFTC Enforcement Director, in fact, sent the FERC Enforcement Director a letter communicating this position, and that FERC has attached a true and accurate copy of the letter in its request for judicial notice.  Accordingly, to the extent the Court relies upon a particular exhibit for a fact or statement contained therein in support of the Court's ruling, it will be stated clearly and separately in the course of this Order.  Otherwise the Court takes judicial notice, under Fed. R. Evid. 201, of the exhibits submitted by both parties, to the extent that they are true and accurate copies of what they purport to be.[9] [10]

---

[9]  As to FERC (ECF No. 66): Exhibit A is screenshot of http://www.ferc.gov/docs-filing/eqr/data/spreadsheet.asp, at which an excel sheet can be accessed, showing the Electric Quarterly Reports filed by Barclays during the 2006-08 timeframe.  Exhibit B is a copy of Barclay's Application for Market Based Rate Authority ("MBR") from the Commission.  Exhibit C is a copy of Barclays' Electric Rate Schedule submitted with its Application for MBR.  Exhibit D is a copy of FERC's approval of Barclays' Application for MBR, issued in 2004.  Exhibit E contains a

9

1  **II.  Statute of Limitations**

2      Defendants argue that claims pursuing some of the earlier alleged violations, those

3  occurring before December 26, 2007, are time-barred.  (ECF No. 65 at 39–43.)  Defendants argue

4  that meeting the relevant statute of limitations requires that tolling agreements entered into with

5  FERC extend beyond the date of FERC's Notice of Alleged Violations ("NAV"), issued in April,

6  2012, but that the NAV terminated those agreements.  That argument is stated more specifically

7  below.

8      The parties agree that the applicable statute of limitations is governed by 28 U.S.C. §

9  2462, which provides: "an action, suit or proceeding for the enforcement of any civil fine,

10  penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within

11  five years from the date when the claim first accrued…."

12      *SEC v. Gabelli*, 133 S. Ct. 1216, 1217 (2013), in considering a fraud action brought by the

13  SEC, held that "the five-year clock in § 2462 begins to tick when the fraud occurs, not when it is

14  portion of the investigative testimony of Defendant Connelly taken on July 20, 2009.  Exhibit F contains a portion of
15  the investigative testimony of Daniel Brin taken on September 21, 2010.  Exhibit G is a redacted copy of a
   memorandum attached to Barclay's Answer to the Order to Show Cause filed with the Commission on December 14,
16  2012.  Exhibit H is a copy of the July 1, 2010 Testimony of CFTC Chairman Gary Gensler Before the Financial
   Crisis Inquiry, available at www.cftc.gov/PressRoom/SpeechesTestimony/opagensler-48.  Exhibit I is a copy of a
17  letter, dated July 16, 2010, from Stephen Obie, Acting Director of the CFTC's Division of Enforcement to Norman
   Fay, Director of FERC's Office of Enforcement, communicating the CFTC's decision that FERC was best situated to
18  pursue Barclays on the allegations in the instant Petition.  Exhibit J is a copy of the Notice of Alleged Violation
   ("NAV") issued in the investigation by FERC's Office of the Secretary on April 5, 2012.  Exhibits K, L, and M are
19  copies of the letter notices of termination of the tolling agreements entered into by Defendants, in June, 2011.  Exhibit
   N is a copy of the Report-Recommendation and Order entered by Magistrate Judge Christian F. Hummel of the U.S.
20  District Court for the Northern District of New York on January 25, 2013 in a subpoena enforcement action against
   Defendant Smith, *FERC v. Smith*, No. 12-MC-74, ECF No. 23 (N.D.N.Y. 2012).  Exhibit O is a copy of the
21  Commission's withdrawal of the subpoena enforcement action against Defendant Smith, filed on July 23, 2013.

22  [10] As to Defendants (ECF No. 45): Exhibits A – E are copies of the tolling agreements entered into between
   Defendants and FERC, in June, 2011.  Exhibit F (of which FERC also requests notice) is a copy of the April 5, 2012
23  NAV.  Exhibit G is a copy of a public submission entitled "NYMEX Submission 04.66: Addition of Four Electricity
   Futures Contracts to NYMEX ClearPort Trading and Related Amendments" made by the New York Mercantile
24  Exchange ("NYMEX") to the CFTC on May 28, 2004.  Exhibit H is a copy of an October 2007 public report issued
   by the CFTC entitled "Report on the Oversight of Trading on Regulated Futures Exchanges and Exempt Commercial
25  Markets".  Exhibit I is a copy of a portion of a public submission entitled "Listing of New Cash Settled Energy
   Contracts and Related Rules and Rule Amendments – Submission Pursuant to Section 5c(c)(1) of the Act and
26  Regulations 40.2 and 40.6." made by ICE Futures U.S., Inc. to the CFTC on August 15, 2012.  Exhibit J is a copy of
   the "Order of the Commodity Futures Trading Commission Concerning the Transfer of Energy Contracts from ICE
27  US OTC Commodity Markets, LLC to ICE Futures U.S., Inc." issued by the CFTC to ICE Futures U.S., Inc. on
   October 9, 2012.  Exhibit K is a copy of an October 16, 2012 press release issued by ICE entitled "ICE Completes
28  Transition of Energy Swaps to Futures."

10

1  discovered."  "That is the most natural reading of the statute. In common parlance a right accrues

2  when it comes into existence.... Thus, the standard rule is that a claim accrues when the plaintiff

3  has a complete and present cause of action."  *Id.* at 1220 (internal quotation marks and citations

4  omitted).  Courts have found that administrative proceedings are subject to 28 U.S.C. § 2462 and

5  that the clock begins to tick on the date of the underlying violation.  *See Johnson v. S.E.C.*, 87

6  F.3d 484, 492 (D.C. Cir. 1996); *3M Co. (Minnesota Min. & Mfg.) v. Browner*, 17 F.3d 1453,

7  1462 (D.C. 1994); *National Park & Conserv. Ass'n, Inc. v. Tenn. Vall. Auth.*, 502 F.3d 1316,

8  1322 (11th Cir. 2007).  *See also U.S. v. Core Laboratories, Inc.,* 759 F.2d 480, 482–84 (5th Cir.

9  1985) ("The progress of administrative proceedings is largely within the control of the

10  Government … A limitations period that began to run only after the government concluded its

11  administrative proceedings would thus amount in practice to little or none").

12      Other courts have found that the claim accrues for the purposes of 28 U.S.C. § 2462 only

13  when the administrative proceeding has resulted in a final determination.  *See U.S. v. Meyer*, 808

14  F.2d 912, 922 (1st Cir. 1987) (disagreeing with *Core Labs* and finding that when "final

15  assessment of an administrative penalty is a statutory prerequisite to the bringing of an action

16  judicially to enforce such penalty, the statute of limitations prescribed by 28 U.S.C. § 2462 does

17  not begin to run, so long as administrative proceedings have been seasonably initiated, until the

18  same have been concluded and a final administrative decision has resulted"); *U.S. v. Godbout-*

19  *Bandal*, 232 F.3d 637, 640 (8th Cir. 2000); *SEC v. Mohn*, 465 F.3d 647, 654 (6th Cir. 2006).

20      The Court in this case follows the plain directive from *Gabelli* and finds that the clock

21  starts to tick when the underlying violations occurred, between 2006 and 2008.  Whether or not

22  FERC anticipated this conclusion, FERC's rulemaking, with reference to 28 U.S.C. § 2462, does

23  state an intention that administrative proceedings be commenced within five years of the

24  underlying violation.  *See* FERC's Final Rule, *Prohibition of Energy Market Manipulation,* 114

25  FERC ¶ 61,047 at P. 62, n. 124 ("28 U.S.C. 2462 (2000).  The five-year limitation runs 'from the

26  date the claim first accrued.' *Id.* We intend that any administrative action for violation of the

27  Final Rule be commenced within five years of the date of the fraudulent or deceptive conduct.")

28      Here, FERC takes the position that issuance of the October 31, 2012, OSC commenced an

1    administrative proceeding.[11]  (ECF No. 65 at 36.)  Arguably, this would preclude some of the

2    earliest violations, because the scheme is alleged to have begun in November, 2006.  However,

3    FERC and Defendants entered into identical tolling agreements on June 22, 2011,[12] which stated

4    in relevant part:

5            [Defendant] … hereby agrees to toll the running of any statute of
             limitations for all claims brought by [FERC] and/or its staff arising
6            from [Defendant's] conduct ….   The tolling of the statute of
             limitations shall continue until Enforcement provides written notice
7            to [Defendant] that the investigation is terminated, or, in the
             alternative, [Defendant] elects to terminate the agreement by
8            providing sixty (60) days written notice ….

9    (See Def.'s RJN, ECF No. 45, Ex. A–E.)

10           Defendants did not provide written notice of termination of the tolling agreements until

11   late August, 2013, thus after the issuance of the October, 31 2012, OSC and the July 16, 2013,

12   Order Assessing Penalties, and shortly before the filing of the Petition in this Court, on October, 9

13   2013.  (FERC's RJN, ECF No. 66, Ex. K–M.)  Penalties for violations occurring in November,

14   2006 would not run afoul of the five-year statute of limitations using any of those dates – that of

15   the OSC, the Order Assessing Penalties, or the instant Petition – as the period at which a

16   proceeding commenced, and excluding the tolled time between roughly June, 2011 and August,

17   2013.

18           Defendants argue that when FERC issued the NAV, on April 5, 2012, this constituted

19   written notice of termination of the investigation.  So, the tolled period would run only from June

20   22, 2011, until April 5, 2012, or 288 days.  However, the relevant portion of the NAV states:

21           Take notice [f.n.] that in a nonpublic formal investigation pursuant
             to 18 CFR Part 1b, the staff of the Office of Enforcement of the
22           Federal Energy Regulatory Commission (Commission) has
             preliminarily determined that Barclays Bank PLC, Daniel Brin,
23           Scott Connelly, Karen Levine, and Ryan Smith each violated the

24   ─────────────────────────

[11] The Court has not located, and the parties do not cite, Ninth Circuit authority taking a position on the *Meyer* vs.
25   *Core Labs* split.  FERC's position, despite its statement that the OSC commenced an administrative proceeding, is
     that *Meyer* should control, and thus that the claim accrued 60 days after the July 16, 2013 Order Assessing Penalties,
26   because that is the final day on which Defendants declined to pay the assessed penalty and FERC was permitted to
     initiate proceedings in this Court, per 16 U.S.C. § 823b(D)(3)(B).  (*See* ECF No. 65 at 36.)

27   [12] The tolling agreements for Smith and Levine have signatures dated June 21, 2011, but for explanatory purposes the
     Court uses a June 22, 2011, date for all tolling agreements, which is the date used by Defendants in their Motion in
28   arguing this point.  (ECF No. 44 at 42.)

1

2

3

> Commission's Prohibition of Electric Energy Market Manipulation, 18 CFR 1c.2 (2011) … This Notice does not confer a right on third parties to intervene in the investigation or any other right with respect to the investigation.

4  (*See* Def.'s RJN, ECF No. 45, Ex. F.)

5         That language does not fit Defendants' assertion that the NAV conveyed a "clear and

6  unambiguous conclusion … with respect to the termination of its investigation." (ECF No. 44 at

7  42.)  Both parties cite FERC's policy statement, *Enforcement of Statutes, Regulations, and*

8  *Orders*, 134 FERC ¶ 61,054 (2011), which asserts that a "Preliminary Notice of Violations" will

9  issue "only after the investigation is completed." *Id.* at 61220.  However, that policy statement

10  also stated that such a Notice "provides a vehicle whereby market participants can bring to staff's

11  attention additional information relevant to the investigation.  By learning of the existence of an

12  investigation and the identity of the subject under scrutiny, entities … [among other actions] may

13  bring information to staff's attention that proves exculpatory to the subject, and thus may mitigate

14  the amount of the penalty sought by staff or even cause staff to close the investigation…." *Id.* at

15  61219–20.  That statement further explained that the "issuance of a Notice has no substantive

16  legal effect, and does not conclusively or otherwise affect the rights of the subject.  Issuance of a

17  Notice is entirely separate and unrelated to any findings the Commission may or may not later

18  make with regard to the investigation." *Id.* at 61219.

19         In this case, the NAV itself does not state the investigation had terminated, and otherwise

20  does not show an intent on FERC's part to terminate the tolling agreements.  Without more, the

21  Court rejects Defendants' argument and hereby finds the NAV did not terminate the tolling

22  agreements.

23         Defendants also argue that any proceeding before FERC was insufficient for the purposes

24  of 28 U.S.C. § 2462 because Defendants did not obtain or present evidence, have the opportunity

25  to seek discovery, or otherwise engage in an adjudicatory process.  (ECF No. 44 at 40–41.)

26  FERC states, however, that beginning with the issuance of its June, 2011 preliminary findings,

27  Defendants were afforded multiple opportunities to provide responses.  Defendants responded to

28  the June, 2011 preliminary findings; to Enforcement's May, 2012 notice of intent to recommend

1    that FERC initiate a public proceeding against Defendants; and to the October, 2012 OSC.  Prior

2    to issuance of the July, 2013 Order, Defendant Connelly and another Barclays' employee who

3    worked in risk management submitted additional factual affidavits.  (Joint Status Report, ECF

4    No. 52 at 3–4.)  FERC asserts that the primary testimonial evidence considered for the July, 2013

5    Order was from Barclays' employees and the individual Defendants; and the primary

6    documentary evidence included the trades executed by the individual Defendants and their own

7    written statements contained in their communications, materials which were in the possession of

8    Defendants.  (ECF No. 52 at 4–5.)  FERC further asserts that "[i]n total, Barclays and the

9    Individual Traders submitted over 500 pages of arguments and hundreds of additional pages of

10   exhibits in their defense."  (ECF No. 52 at 5.)  Defendants provide no response to these specific

11   assertions.  Accordingly, this Court does not find that the administrative process "lacked the basic

12   elements common to adversarial adjudication," *FEC v. Nat'l Republican Senatorial Comm.,* 877

13   F. Supp. 15, 17–20 (D.D.C. 1995), as Defendants argue.

14           Thus, based on the foregoing, FERC's Petition is not time-barred under 28 U.S.C. § 2462.

15   **III.  Venue**

16           A court may dismiss a complaint for improper venue pursuant to Fed. R. Civ. Proc.

17   12(b)(3).  "Once venue is challenged, the burden is on the plaintiff to show that venue is properly

18   laid." *Express Co. Inc. v. Mitel Technologies, Inc.*, 2013 WL 5462301, at *2 (S.D. Cal. Sept. 30,

19   2013.)  *See also Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir.

20   1979) ("Plaintiff had the burden of showing that venue was properly laid in the Northern District

21   of California"); *Hope v. Otis Elevator Co.*, 389 F. Supp. 2d 1235, 1243 (E.D. Cal. 2005) (citing

22   *Airola v. King*, 505 F. Supp. 30, 31 (D. Ariz. 1980)) ("Plaintiff has the burden of proving that

23   venue is proper in the district in which the suit was initiated").  "[U]nlike motions to dismiss

24   under Rule 12(b)(6), the court hearing the Rule 12(b)(3) motion need not accept the allegations of

25   the pleadings as true." *Express*, 2013 WL 5462301, at *2.  The Court may consider facts outside

26   the pleadings when considering a motion to dismiss for improper venue. *Id*.

27           The parties agree that venue is governed by FPA § 317, 16 U.S.C. § 825p, which provides

28   that venue is proper where "any act or transaction constituting the violation occurred" or where a

1   defendant is an inhabitant.  FERC does not appear to dispute that no Defendants are, or during the

2   relevant time period were, inhabitants of this District, so the question turns to whether an "act or

3   transaction constituting the violation" occurred in this District.  (ECF No. 44 at 12.)

4        FERC's Opposition asserts that venue is proper based on an act or transaction occurring

5   within this District, for the following reasons.  First, Defendants engaged in acts or transactions

6   constituting the violation at North Path 15, a trading hub located in this District.  Second, the

7   scheme involved the scheduling of the delivery of electricity in this District.  Third, in some

8   transactions, Barclays sold electricity directly to load-serving utilities within this District, such as

9   PG&E, Sacramento Municipal Utility District, Turlock Irrigation District, and Modesto Irrigation

10  District.  Fourth, the electricity sold by Barclays was managed by the California Independent

11  System Operator ("CAISO"), which is located within this District.  (ECF No. 65 at 36–38.)  The

12  Petition also asserts the alleged manipulative transactions affected the wholesale price of

13  electricity, and ultimately the retail price paid by consumers in California and elsewhere in the

14  western United States.  (ECF No. 1 ¶ 121.)

15       Defendants argue, first, that the swap contracts at issue here were purely financial

16  transactions entered into and executed by the individual Defendants, working at Barclays' trading

17  desks in New York.  Second, to the extent the individual Defendants executed transactions

18  associated with the physical positions they had built, these were done on ICE ECM, which is

19  headquartered in Atlanta, Georgia.  But ICE ECM does not appear to have a headquarters or

20  servers in this District.  Third, the flattening step of the alleged scheme occurred on the West

21  Power Desk in New York.  Defendants argue generally that flattening their transactions entails

22  that delivery or receipt of electricity in this District was not part of the relevant transactions.

23  Defendants assert: "Barclays thus had no ability to control the supply of or demand for electric

24  energy, force other market participants to transact with it, or dictate electric energy prices that did

25  not reflect supply and demand.  Instead, Barclays operated as an intermediary, purchasing and

26  selling equal and opposite amounts of electricity to other market participants, in order to avoid

27  any obligation to physically deliver or receive electricity.  This is a commonplace method of

28  trading in these markets."  (ECF No. 44 at 7–8.)  Fourth, Defendants argue that allegations of the

1  impact on retail prices by Defendants' activity are insufficient to establish venue.  (ECF No. 44 at

2  13–14.)

3          In consideration of the arguments made at the hearing, the Court accepts FERC's position

4  that the conduct identified in the Petition – allegedly manipulative – involved Defendants making

5  transactions at California wholesale electricity prices, and via those transactions, further

6  influencing California electricity prices; then, utilities, generators, other power marketers, or

7  individual traders in California and this District made transactions according to those prices.  The

8  Court accepts FERC's position that relevant activities occurred within North Path 15, which

9  includes this District, and they involved some combination of: 1) purchasing from or selling

10  electricity to utilities within North Path 15; 2) taking title to electricity that was transferred within

11  North Path 15; 3) scheduling delivery of electricity to utilities within North Path 15; or 4)

12  scheduling delivery with CAISO, located in this District.  (*See* Hearing Transcript, ECF No. 86 at

13  5–19.)  Overall, these representations meet FERC's burden of establishing that an "act or

14  transaction constituting the violation" occurred in this District.  16 U.S.C. § 825p.   Notably,

15  Defendants do not argue that venue is proper anywhere else in the western United States that

16  includes NP, SP, PV, or MIDC.

17          Defendants cite *DC Energy, LLC v. PJM Interconnection, LLC,* 138 FERC ¶ 61,165 at P.

18  69 (2012) to support the proposition that the transactions here "do not contemplate the physical

19  transfer of energy" because they "have no capability to handle physical performance."  The Court

20  looks to the context of that statement, which was that plaintiffs, via the internal bilateral contracts

21  ("IBTS") at issue in that case, did not act as a marketer-intermediary by contracting with entities

22  owning generation or having load-serving or other physical obligations, and that "[a]t no point did

23  [plaintiffs] acquire title to physical energy, incur any network transmission charges, or make any

24  reservations for point to point transmission capacity. [f.n.] [Plaintiffs'] IBTs settled financially

25  and were intended to settle financially."  *Id*.  The Court accepts FERC's position here that

26  relevant transactions included Barclays taking title to electricity and scheduling delivery with

27  other market participants, such that the transactions had some involvement with the physical

28  transfer of electricity.

Defendants also argue that the effects of the alleged manipulation – on the wholesale price of electricity and thus ultimately the prices paid by consumers – cannot be conflated with the manipulative acts themselves.  (ECF No. 44 at 15.)  *See Premium Plus Partners, L.P. v. Davis*, 2005 WL 711591 at *9 (N.D. Ill. Mar. 28, 2005) (finding venue improper where plaintiff argued solely that the price of financial instruments he purchased in the Northern District of Illinois was impacted by Defendants' alleged manipulation, and did not additionally allege that other acts took place in that district).  But FERC's allegations regarding venue are not restricted to this single argument.  Further, FERC alleges that Defendants made transactions according to ICE index prices; these transactions then pushed the index price up or down depending on how Barclays' financial positions needed to benefit.  These index prices were relied upon by other market participants, including load-bearing entities in this District.  So, influencing the ICE index settlement is not merely an "effect" of the transactions at issue in this case.

With respect to whether the effects of manipulative trading can be considered in a venue analysis, Defendants reference several cases in the securities law context.[13]  *See e.g. Shapiro v. Santa Fe Gaming Corp.*, 1998 WL 102677 (N.D. Ill. Feb. 27, 1998); *Lorenz v. Watson*, 258 F. Supp. 724, 729 (E.D. Pa. 1966); *accord Miller v. Asensio*, 101 F. Supp. 2d 395, 401 (D.S.C. 2000); *C.R.A. Realty Corp. v. Gold Reserve Corp.,* 1988 WL 144752 (S.D.N.Y Sept. 14, 1988). Courts considering securities laws violations have found venue proper on facts consistent with the allegations here.  *See e.g. John Nuveen & Co. v. New York City Hous. Dev. Corp.*, 1986 WL 5780, at *4 (N.D. Ill. May 9, 1986) (finding venue proper in Illinois when defendants knew representations in certain documents would be taken or sent to Illinois, and so "knew or had reason to know that their allegedly false information would be read and relied upon by potential plaintiffs in Illinois"); *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003) ("venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense [of 15 U.S.C. § 78aa] to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue"); *United States v. Royer*, 549

---

[13] In addition to other cases, e.g., *Wood v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995) (involving claims under the Lanham Act); *W. Digital Techs., Inc. v. Bd. of Regents of Univ. Tex. Sys.,* 2011 WL 97785 at *6 (N.D. Cal. Jan. 12, 2011) (involving patent infringement).

1   F.3d 886, 895 (2d Cir. 2008) ("[r]eceipt of electronic transmissions in a district is sufficient to

2   establish venue activity there"); *Steinberg & Lyman v. Takacs*, 690 F. Supp. 263, 267

3   (S.D.N.Y.1988) ("It is clear that a phone call made to the district in furtherance of a conspiracy to

4   violate the securities laws is sufficient to support venue in that district").  Defendants are not

5   persuasive that the dispositive activity, for the purposes of venue, must be the individual traders'

6   initiation of the relevant transactions from the West Power Desk in New York City.  That

7   proposition would insulate Defendants from venue in every district in the United States, except

8   the Southern District of New York ("SDNY").[14]

9          On balance, the Court finds FERC meets its burden of establishing that an "act or

10  transaction constituting the violation" occurred within the Eastern District of California.  16

11  U.S.C. § 825p.

12  **IV.  Motion to Transfer**

13         Alternatively, Defendants argue this matter should be transferred to the SDNY, under 28

14  U.S.C. § 1404(a), which provides: "[f]or the convenience of parties and witnesses, in the interest

15  of justice, a district court may transfer any civil action to any other district or division where it

16  might have been brought or to any district or division to which all parties have consented."

17  "[T]he burden is on the defendant seeking transfer under section 1404(a) to establish why there

18  should be a change of forum …. Without more, it is not enough that the defendant would prefer

19  another forum, nor is it enough merely to show that the claim arose elsewhere." *Allstar*

20  *Marketing Group, LLC v. Your Store Online, LLC*, 666 F. Supp. 2d 1109, 1131 (C.D. Cal. 2009)

21  (citing Wright et al., Fed. Prac. & Proc. § 3848).  "Weighing of the factors for and against transfer

22  involves subtle considerations and is best left to the discretion of the trial judge." *CFTC v.*

23  *Savage*, 611 F.2d 270, 279 (9th Cir. 1979) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 622

24  (1964)).  The Court agrees that this matter could have been brought in the SDNY.  Therefore the

25  Court proceeds to analyze the convenience of the parties and witnesses, and the interests of

26  justice, with respect to this District versus the SDNY.

27  _____

28  [14] Defendants suggest that ICE's headquarters and/or servers, in Chicago and Atlanta, may also support venue in
    those locations, but do not pursue this argument.  (ECF No. 44 at 13.)

Defendants argue (ECF No. 44 at 17–18) that the SDNY is a more convenient venue for all of the parties in this action, for the following reasons. First, the conduct at issue occurred in Barclays' New York City headquarters, and the vast majority of Barclay's current employees with knowledge of that conduct are in New York City.[15] The only current Barclays employee mentioned in the Petition is Joe Gold, who works at Barclays' offices in New York City. Second, none of the individual Defendants currently lives in California, but they all have ties to New York City, due in part to their prior residences while employed by Barclays. (*See* Brin Decl., ECF No. 46 ¶¶ 6–8; Connelly Decl., ECF No. 47 ¶ 6–8; Levine Decl., ECF No. 48 ¶¶ 6–7; Smith Decl., ECF No. 49 ¶¶ 6–8.) Third, Defendants argue the SDNY is a more convenient venue for FERC itself, because FERC is headquartered in Washington D.C. and has a regional office in New York City, but it does not have an office located in this District. In response, FERC points out (ECF No. 65 at 40–41) that none of the individual Defendants currently reside in New York City, and three of the four individual Defendants currently work and reside closer to this District than the SDNY. FERC also points out that it has a satellite office in Folsom, California. On balance, the Court finds this factor favors Defendants.

With respect to the convenience of witnesses, Defendants argue the following. First, several potential witnesses that may be called to testify are in or near New York City. Second, there are not any material witnesses, or witnesses likely to be called, located within this District. On this point, Defendants assert that none of the non-party witnesses FERC has deposed is located within this District, but at least three of the non-party witnesses deposed by FERC are currently located in or near New York City. (ECF No. 44 at 19–20.) In response, FERC argues that Defendants do not describe the testimony of these three non-party witnesses, or claim that they will testify.[16] FERC also argues that employees from CAISO, which is located in this

---

[15] On this point, Defendants reference *Saleh v. Titan Corp.*, 361 F. Supp. 2d 1152, 1160 (S. D. Cal. Mar. 21, 2005) (holding that the location of a corporate defendant's headquarters indicated the transferee forum was "significantly more convenient" for that party). But the *Saleh* court, considering an action by former detainees in an Iraqi prison under U.S. control, also found there was "no basis for concluding that plaintiffs' claims have a material connection with [the S.D. Cal.]." *Id.* at 1158. Here, FERC's claims have a material connection to this District, as they would to others within the PV, SP, NP, or MIDC trading zones.

[16] Defendants then respond that FERC has knowledge of the testimony of these witnesses, and the testimony was referenced in the Enforcement Report (ECF No. 1-2 at 5-6, 22, 39-40, 44, 49-51, 54-55).

1    District, will testify regarding the trading locations targeted by Defendants and the process by

2    which transactions were scheduled for delivery.  (ECF No. 65 at 41–42.)  On balance, the Court

3    finds this factor is neutral with respect to transfer.

4        With respect to "the interest of justice," 28 U.S.C. § 1404(a), Defendants direct the Court

5    to select factors from *Jones v. GNC Franchising, Inc.,* 211 F.3d 495, 498–99 (9th Cir. 2000):

6        (1) the location where the relevant agreements were negotiated and
         executed, (2) the state that is most familiar with the governing law,
7        (3) the plaintiff's choice of forum, (4) the respective parties'
         contacts with the forum, (5) the contacts relating to the plaintiff's
8        cause of action in the chosen forum, (6) the differences in the costs
         of litigation in the two forums, (7) the availability of compulsory
9        process to compel attendance of unwilling non-party witnesses, and
         (8) the ease of access to sources of proof.[17]

10

11   An additional factor to be considered is "the relative court congestion in the two forums."  *Davis*

12   *v. Social Service Coordinators, Inc.,* 2013 WL 4483067, at *2 (E.D. Cal. Aug. 19, 2103).

13       Defendants assert the following, with respect to these factors.  First, FERC's choice of

14   forum should be entitled to little deference because FERC is not located in this District.  Second,

15   all Defendants have greater contacts with New York City, but minimal or no contacts with this

16   District.  Third, the cost of litigation will be lower if this matter is heard in the SDNY, because

17   the relevant sources of proof are located in or near New York City, witnesses are closer to New

18   York City, and counsel for both parties are located in New York City or Washington D.C.  With

19   respect to the relevant sources of proof, Defendants assert that their "corporate and individual

20   trading records, communications and related data" are in New York City.  Fourth, the SDNY has

21   a greater ability to compel attendance of witnesses.  Fifth, this District is more congested in terms

22   of its caseload than the SDNY.  (ECF No. 44 at 20–22.)

23       In response, FERC argues that the presumption in favor of FERC's choice of forum

24   should apply because operative facts have occurred within this District, and this District has an

25   interest in the parties and the subject matter of the case.  FERC disputes that litigation costs, and

26   the congestion of this District and the SDNY, should be dispositive of the transfer motion.

27   _____

28   [17] These factors also encompass the analysis done regarding the convenience of the parties and witnesses.

20

1   Overall, FERC asserts that this District has a strong interest in handling this matter, because

2   Defendants engaged in manipulative trading in this District, which affected the prices paid by

3   consumers in this District.  (ECF No. 65 at 42–45.)

4        On balance, the interest of justice favors retaining this matter in this District.  First, given

5   "the contacts relating to [FERC's] cause of action" in this District – namely, relevant transactions

6   involving the transfer of electricity in this District, and the influencing of prices relied on by

7   market participants in this District – this consideration strongly weighs against transfer.  *Jones*,

8   211 F.3d at 498.

9        Second, with respect to a presumption in favor of FERC's chosen forum, "[t]he general

10   rule is that a plaintiff's choice … is afforded substantial weight."  *Williams v. Bowman*, 157 F.

11   Supp. 2d 1103, 1106 (N.D. Cal. July 26, 2001) (citing *Decker Coal Co. v. Commonwealth Edison*

12   *Co.*, 805 F.2d 834, 843 (9th Cir. 1986); *Fabus Corp. v. Asiana Exp. Corp*, 2001 WL 253185 at *1

13   (N.D. Cal. Mar. 5, 2001)).  *See also Lou v. Belzberg,* 834 F.2d 730, 739 (9th Cir. 1987) ("[G]reat

14   weight is generally accorded [to] plaintiff's choice of forum …. If the operative facts have not

15   occurred within the forum and the forum has no interest in the parties or subject matter,

16   [plaintiff's] choice is entitled to only minimal consideration.")  Defendants' position on this issue

17   – that no operative facts occurred in this District – is not accurate.  This forum also has an interest

18   in the subject matter because it involves allegations that Defendants manipulated the wholesale

19   price of electricity which was relied upon by market participants in this District.  Therefore,

20   FERC's choice of forum is entitled to more than minimal consideration.  Notably, Defendants do

21   not argue this matter should be transferred to any other district in the western U.S. where the price

22   of electricity would have been impacted by the alleged manipulation, or where other operative

23   facts – such as the role of NP, SP, PV, or MIDC as trading locations necessary to the instant

24   transactions – would be relevant.[18]

25    

26   [18] Defendants reference numerous cases to support their position that FERC is entitled to little deference, but generally the Court finds these distinguishable.  (*See* ECF No. 68 at 4–5.)  For instance, Defendants reference *Hawkins v. Gerber Prods. Co.,* 924 F. Supp. 2d 1208, 1216-17 (S.D. Cal. Feb. 20, 2013) (rejecting the argument that transfer was improper solely because "California has an interest in protecting the rights of those [injured]," and finding that an "equally persuasive argument exists that [the transferee courts] have an interest in preventing fraudulent practices by companies that conduct business in their state").  Strongly dispositive in that case was the fact that similar lawsuits against the defendants were already pending in the transferee forum.  Plaintiff in that case, which

27

28

1    Defendants also do not adequately support their position that the cost of litigation or the

2    location of the parties' counsel should be dispositive.  *See Defazio v. Hollister*, 406 F. Supp. 2d

3    1085, 1090 (E.D. Cal. 2005) ("The court may consider the physical condition and the financial

4    strength of each of the parties"; "courts have not considered the location of the parties' counsel as

5    a factor for transfer").  With respect to the ease of access to sources of proof, there is not adequate

6    indication that the "corporate and individual trading records, communications and related data,"

7    referenced by Defendant cannot be transferred to this District.

8        With respect to the SDNY's subpoena power, Defendants do not identify a specific

9    instance where this power would be necessary so as to favor transfer.  However, courts have held

10   that the subpoena power favors transfer based on the risk that compulsion may be necessary.  *See*

11   *Duffer v. United Cont'l Holdings, Inc.*, 2013 WL 2147802, at *4 (S.D. Cal. May 16, 2013).

12   Therefore, this consideration weighs slightly in favor of transfer.  This District is also more

13   congested in terms of its caseload than the SDNY.  (*See e.g.* Nolan Decl., ECF No. 44-1, Ex. 10,

14   "Weighted and Unweighted Filings per Authorized Judgeship".)  However, "[a]dministrative

15   considerations such as docket congestion are given little weight in this circuit in assessing the

16   propriety of a § 1404(a) transfer." *AllStar Marketing Group*, 666 F. Supp. at 1134 (citing *Gates*

17   *Learjet Corp. v. Jensen*, 743 F.2d 1325, 1335 (9th Cir. 1984)).  Therefore, this consideration also

18   weighs slightly in favor of transfer.  For the reasons discussed regarding the convenience of the

19   parties, the Defendants' contacts with the SDNY as opposed to this District also weigh in favor of

20   transfer.  Defendants do not address – and the Court finds to be neutral – considerations regarding

21   which district is most familiar with the governing law and, if relevant, "the location where the

22   relevant agreements were negotiated and executed." *Jones*, 211 F.3d at 498.

23       On balance, given the contacts relating to FERC's claims in this District, and in light of

24   the deference afforded to FERC's choice of forum given that operative facts have occurred in this

25   District and this District's interest in the subject matter, the "interest of justice" favors denying

26   transfer.

27   ―――――――――――――――――――――――――――――――――――――――――――――

was a class action, presented no "persuasive reasons as to why the class has been artificially split into two sub-
classes, the California plaintiffs and the non-California 'nationwide' sub-class." *Id.* at 1215.  That issue, or an

28   analogous concern, is not present here.

1     Overall, in consideration of the foregoing factors – the convenience of the parties and

2  witnesses, and in the interest of justice – Defendants do not carry their burden of showing that

3  transfer should occur.  Therefore, the motion to transfer is DENIED.

4  **V.  FERC's Jurisdiction under FPA §§ 201 and 222**

5     FPA § 201(b), 16 U.S.C. § 824(b)(1), provides:

6     The provisions of this subchapter shall apply to the transmission of
   electric energy in interstate commerce and to the sale of electric
7     energy at wholesale in interstate commerce, but except as provided
   in paragraph (2) shall not apply to any other sale of electric energy
8     or deprive a State or State commission of its lawful authority now
   exercised over the exportation of hydroelectric energy which is
9     transmitted across a State line. The Commission shall have
   jurisdiction over all facilities for such transmission or sale of
10    electric energy, but shall not have jurisdiction, except as
   specifically provided in this subchapter and subchapter III of this
11    chapter, over facilities used for the generation of electric energy or
   over facilities used in local distribution or only for the transmission
12    of electric energy in intrastate commerce, or over facilities for the
   transmission of electric energy consumed wholly by the transmitter.

13

14    *See also* 16 U.S.C.§ 824(d)("'sale of electric energy at wholesale' defined") ("The term

15  'sale of electric energy at wholesale' when used in this subchapter, means a sale of electric energy

16  to any person for resale").  *See Nantahala Power and Light Co. v. Thornburg*, 476 U.S. 953, 956

17  (1986) (FERC "has exclusive jurisdiction over interstate wholesale power rates"); *Public Utility*

18  *Dist. No. 1 of Grays Harbor County Wash. V. Idacorp, Inc.,* 379 F.3d 641, 646 (9th Cir. 2004)

19  ("As an initial matter, it is clear that the [FPA] grants FERC exclusive authority to regulate the

20  transmission and sale at wholesale of electric energy in interstate commerce") (emphasis and

21  quotations marks omitted).  *See Enron Power Mkt., Inc.* 65 FERC ¶ 61305 at p. 62405 (1993)

22  ("for power marketers who own no physical transmission or generation facilities, power sales

23  contracts are the very assets—or 'facilities'—by which they engage in sales for resales in

24  interstate commerce. In other words, power sales contracts are the 'facilities' which make power

25  marketers jurisdictional public utilities under the FPA.").

26    FPA § 222, the anti-manipulation statute relevant here, further provides: "It shall be

27  unlawful for any entity … to use or employ, in connection with the purchase or sale of electric

28  energy or the purchase or sale of transmission services subject to the jurisdiction of the

23

Commission, any manipulative or deceptive device or contrivance ….." 16 U.S.C. § 824v.

Accordingly, FERC's jurisdiction to regulate manipulation under FPA § 222 is invoked where there is the "sale of electric energy at wholesale in interstate commerce" and where the manipulation involves "facilities for such … sale of electric energy," as described in FPA § 201(b). 16 U.S.C. § 824(b).

The allegations made by FERC about Defendants' general activity in the marketplace, which appears to encompass the relevant transactions here, fits the plain meaning of FPA § 201(b). These assertions are that during the relevant time period contracts for the sale of electricity were traded by Defendants at MIDC, SP, NP, and PV, located in Washington, Southern California, Northern California, and Arizona. Defendants also scheduled sales of electricity to utilities in this District, including Pacific Gas & Electric (PG&E), Southern California Edison, Sacramento Municipal Utility District, Turlock Irrigation District and Modesto Irrigation District. The markets in which Defendants traded were relied on by other market participants to meet physical needs, including utilities and generators. (ECF No. 65 at 37–38; ECF No. 1 ¶¶ 17–18.) This activity, combined with the allegations of manipulation stated *supra*, adequately establishes FERC's jurisdiction to pursue anti-manipulation penalties under the FPA §§ 201 and 222.

Defendants' primary argument is: "FERC has jurisdiction where a financial trader— without generating or transmitting power, like Barclays—takes steps to purchase, arrange with a utility for transmission and then itself delivers or receives electric energy. Where electric energy is not received or delivered, FERC does not have jurisdiction." (ECF No. 69 at 15.) As discussed above, based on the representations made at the hearing, it does not appear accurate to characterize Barclays' role in the relevant transactions as lacking any connection to the physical transfer of electricity. Moreover, the authorities cited in support by Defendants do not stand for that blanket proposition. For example, Defendants cite *California Pacific Electric Company, LLC,* 133 FERC ¶ 61,018 at P. 37 (2010) and *Detroit Edison*, 95 FERC ¶ 61,415 at p. 62,535 (2001), which support the proposition that physical delivery of electricity, by a facility with generation or transmission capability, is sufficient to invoke FERC's jurisdiction, which is not the issue here. Defendants cite *Morgan Stanley Cap. Grp., Inc.,* 69 FERC 61,175 at p. 61,696

1  (1994), for its preliminary finding that in cases where the customer contracts for delivery of

2  electricity but does not accept it, the power marketer need not report those transactions to FERC

3  in its quarterly reports; rather, FERC would require the power marketer to report "only those

4  transactions that result in the actual delivery of electricity." *Id.* That is also not the issue here.

5  Defendants cite *Puget Sound Energy, Inc. v. All Jurisdictional Sellers of Energy and/or*

6  *Capacity at Wholesale into Electric Energy and/or Capacity Markets in the Pacific Northwest*, 96

7  FERC ¶ 63,044, n. 318 (2001) for its statement that: "Commission precedent on this issue is clear

8  - the Commission has asserted jurisdiction only over those transactions that result in the physical

9  delivery of electricity. The Commission has jurisdiction under Sections 205 and 206 of the

10 Federal Power Act only where three conditions are present: where '[(i)] the electricity futures

11 contract goes to delivery, [(ii)] the electric energy sold under the contract will be resold in

12 interstate commerce, [(iii)] and the seller is a public utility.' *New York Mercantile Exchange*, 74

13 FERC ¶ 61,311 at p. 61,987 (1996)."  The Court looks to the context of that statement, which was

14 whether "book-out" transactions, i.e. "transactions that, for a variety of reasons (such as the

15 presence of transmission constraints or offsetting purchase and sale transactions), do not result in

16 physical delivery of electricity [and] are instead settled financially," should be included in a

17 proceeding for refunds for unreasonable charges made in spot market sales transactions. *Puget*

18 *Sound*, 96 FERC at n. 317.  At minimum, the Court cannot draw an analogy from that issue to the

19 instant allegations.

20 The Court finds it relevant that Barclays applied to FERC in 2004 for authorization to

21 "sell electricity at market-based rates," (i.e. "MBR" authority), and FERC granted that

22 application.[19]  (FERC's RJN, ECF No. 66-1, Ex. B.)  That application stated that Barclays

23 planned "to engage in marketing and trading electric energy, capacity, and ancillary services at

24 wholesale in various markets in the United States," and that "[t]ransactions subject to regulation

25 under the FPA will be conducted through Barclays under the rate schedule on file with the

26 _____

[19] According to FERC, a seller with MBR authority can sell electricity at market prices rather than at prices

27 specifically prescribed by FERC.  FERC may authorize sales at market-based rates when there is a "competitive market" and the seller lacks or has mitigated market power. *La. Energy and Power Auth. v. FERC*, 141 F.3d 364, 365 (D.C. Cir. 1998).  (ECF No. 65 at 7, n. 5.)

28

Commission."  Barclays' Electric Rate Schedule submitted with its application stated: "Barclays Bank PLC … makes available electric energy and capacity which it purchases from various sources available under this Rate Schedule for wholesale sales in varying amounts, at varying levels of firmness or priorities of service, for varying periods of service, and in accordance with varying delivery schedules, all as agreed between Barclays and the purchases with which Barclays has contracted." (ECF No. 66-1, FERC's RJN, Ex. C.)  Counsel for Defendants argued at the hearing that none of the relevant transactions in the alleged scheme were made pursuant to MBR authority.  Counsel also argued, differently, that FERC cannot identify a relevant transaction made pursuant to MBR authority.  (ECF No. 86 at 40–41.)  If true, the plain inference to draw is that FERC would not have jurisdiction based solely on the 2004 application.  However, as this Court has indicated herein, that is not the only basis on which FERC argues for its jurisdiction over this matter.

For the reasons discussed the Court finds FERC has adequately established its jurisdiction under the FPA §§ 201 and 222.[20]

## VI.  FERC vs. CFTC Jurisdiction

In brief, Defendants' argument regarding CFTC jurisdiction is that the main benefiting positions in the alleged manipulation – financial swaps – actually were or involved futures contracts.  Generally, futures contracts are subject to the exclusive jurisdiction of the CFTC.  7 U.S.C. § 2(a)(1)(A).  So the argument is that the CFTC, not FERC, must take jurisdiction in this case.  But Defendants did not, at the hearing or in their moving papers, isolate a specific series of swaps and explain how the swaps actually were futures as plainly defined, *infra*; and Defendants have not shown why swaps, as the benefiting position, are relevant to jurisdiction, as opposed to the trades involving physical products, from which the swaps were priced.  FERC's allegation is that the manipulation occurred in the physical market and the swaps benefited, not the converse.

---

[20] Defendants' arguments regarding Fed. R. Civ. Proc. 9(b) are directed to FERC's jurisdiction under FPA § 222. The Court views the Petition (ECF No. 1), the attached Order (ECF No. 1-1) and Enforcement Report (ECF No. 1-2) to be "specific enough to give defendants notice of the particular misconduct ... so that they can defend against the charge and not just deny that they have done anything wrong.'"  *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1124 (9th Cir. 2009) (internal citations and quotation marks omitted).  *See* the July, 2013 Order ¶¶ 76 – 111, stating the findings specific to each Defendant.

1  Accordingly, the Court does not find Defendants' arguments viable.  For clarity, Defendants'

2  specific points are addressed below.

3       Section 2(a)(1)(A) ("Section 2") of the Commodity Exchange Act ("CEA"), during the

4  time period of the alleged manipulation occurred, stated:

5         The [CFTC] shall have exclusive jurisdiction, except to the extent

6  otherwise provided in subparagraphs (C) and (D) of this paragraph
   and subsections (c) through (i) of this section, with respect to

7  accounts, agreements … and transactions involving contracts for
   sale of a commodity for future delivery, traded or executed on a

8  contract market designated or derivatives transaction execution
   facility registered pursuant to section 7 or 7a of this title or any

9  other board of trade, exchange, or market …

10  7 U.S.C. § 2(a)(1)(A).  *See also Hunter v. F.E.R.C.*, 711 F.3d 155, 157 (D.C. Cir. 2013) ("Stated

11  simply, Congress crafted CEA section 2(a)(1)(A) to give the CFTC exclusive jurisdiction over

12  transactions conducted on futures markets like the NYMEX.")

13       Defendants argue that that the financial swap contracts traded by Barclays on ICE ECM,

14  those "at the core of FERC's [Petition]" (ECF No. 44 at 25), either were or involved futures

15  contracts, thus invoking the CFTC's exclusive jurisdiction.

16       The Court looks first to the plain definition of futures contracts and financial swaps.

17         A commodities futures contract is an executory contract for the sale

18  of a commodity executed at a specific point in time with delivery of
   the commodity postponed to a future date. Every commodities

19  futures contract has a seller and a buyer. The seller, called a "short,"
   agrees for a price, fixed at the time of contract, to deliver a

20  specified quantity and grade of an identified commodity at a date in
   the future. The buyer, or "long," agrees to accept delivery at that

21  future date at the price fixed in the contract. It is the rare case when
   buyers and sellers settle their obligations under futures contracts by

22  actually delivering the commodity. Rather, they routinely take a
   short or long position in order to speculate on the future price of the

23  commodity.

24  *Strobl v. New York Mercantile Exchange*, 768 F.2d 22, 24 (2d Cir. 1985).

25         A "swap" is a contract between two parties ("counterparties") to

26  exchange ("swap") cash flows at specified intervals, calculated by
   reference to an index. Parties can swap payments based on a

27  number of indices including interest rates, currency rates and
   security or commodity prices.

28

1   *In re Thrifty Oil Co.,* 249 B.R. 537, 539-40 (S.D. Cal. 2000) *aff'd* 322 F.3d 1039 (9th Cir. 2003).

2          Defendants argue that because trading swaps may serve a similar purpose as trading

3   futures – in that they both can be used to speculate on future changes in the price of electricity–

4   then the instant swaps should have been regulated by the CFTC all along, regardless of their

5   label.  Defendants explain: "In August 2012, ICE informed the CFTC that the ICE ECM Swap

6   Contracts encompassed by FERC's allegations were, among other energy contracts, on its futures

7   exchange and thus that those contracts should be traded and regulated as 'futures'," and that the

8   CFTC provided authorization to "change the label on the contracts from 'swaps' to 'futures' as

9   long as the rights and obligation of the parties to those contracts did not change."  (ECF No. 44 at

10  24–25.) (*See* Def.'s RJN, ECF No. 45, Ex. K, 2012 ICE press release) (stating ICE had

11  "completed it transition of cleared-over-the-counter energy swaps to futures" and "[o]pen interest

12  in ICE's cleared [over-the-counter] energy contracts was transitioned to identical futures

13  contracts….")  At minimum, the Court fails to draw the conclusion from this argument that the

14  CFTC, to the exclusion of FERC, has jurisdiction over allegations of manipulating ICE settlement

15  prices in the western United States from 2006 to 2008, off of which Barclays' swaps priced.

16          The legislative history identified by FERC in its moving papers is persuasive that section

17  2(a)(1) as it stood during 2006-2008 was not intended to encompass swaps.   In 2000, the

18  Commodity Futures Modernization Act ("CFMA") "barred the CFTC and SEC from regulating

19  most swaps, including over-the-counter [] swaps markets."  *Investment Co. Institute v. U.S.*

20  *Commodity Futures Trading Com'n*, 891 F.Supp.2d 162, 171 (D.C.C. 2012) (citing 7 U.S.C. §

21  2(g) (2002). Then, in 2010, the Dodd-Frank Act added swaps to the exclusive jurisdiction

22  provision in section 2(a)(1).  *See id.* at 173 ("In 2010, Congress responded to the upheaval in the

23  financial sector by passing Dodd–Frank.  Dodd–Frank expanded the CFTC's jurisdiction over

24  commodities trading by giving the CFTC primary jurisdiction over most swaps") (internal

25  quotations and citations omitted).  Thus, the current text of 7 U.S.C. § 2(a)(1)(A) now reads:

26  "[The CFTC] shall have exclusive jurisdiction … with respect to … transactions involving swaps

27  …."  The plain inference to draw from the inclusion of swaps under Dodd-Frank is that swaps

28  were not already subject to the CFTC's jurisdiction by virtue of being futures contracts.  As

1    FERC also points out, the Dodd-Frank Act, in defining a swap, provided that a futures contract is

2    not a swap.  *See* 7 U.S.C. s. 1a(47)(B)(i) ("The term 'swap' does not include … any contract of

3    sale of a commodity for future delivery.")

4          The most relevant authority cited by Defendants is *Hunter v. FERC*, 711 F.3d 155 (D.C.

5    Cir. 2013).[21]  In *Hunter*, petitioner Hunter, a hedge fund employee, sold a significant number of

6    natural gas futures contracts on the New York Mercantile Exchange ("NYMEX"), resulting in the

7    reduction of the settlement price for natural gas.  Hunter's financial positions benefited because

8    he had positioned his assets in the gas market to capitalize on a price decrease, i.e. he "shorted"

9    the price for natural gas.  The CFTC filed a civil enforcement action, alleging he violated section

10   13(a)(2) of the CEA.  Subsequently, FERC filed an administrative enforcement action, alleging a

11   violation of section 4A of the Natural Gas Act, 15 U.S.C § 717c-1, which prohibits manipulation

12   in the natural gas market.  Following an administrative process, FERC ruled against Hunter and

13   imposed a $30 million fine.  On appeal, Hunter argued that FERC lacked jurisdiction to pursue its

14   enforcement action, and the CFTC intervened on behalf of Hunter.  In ruling in favor of Hunter

15   and the CFTC, the D.C. Circuit invoked the plain language of the CFTC's exclusive jurisdiction

16   provision, 7 U.S.C. § 2(a)(1)(A), to conclude that the CFTC has exclusive jurisdiction over the

17   manipulation of natural gas futures contracts.  *Hunter*, 711 F.3d at 156–58.

18         But here, the parties do not dispute that allegedly manipulative trades occurred on ICE

19   ECM, which is a FERC-jurisdictional market, not NYMEX, which is regulated by the CFTC.  As

20   *Hunter* noted: "Congress crafted CEA section 2(a)(1)(A) to give the CFTC exclusive jurisdiction

21   over transactions conducted on *futures markets like the NYMEX*."  *Id.* at 157 (emphasis added).

22   And, "CEA section 2(a)(1)(A)'s second sentence preserves the jurisdiction of other federal

23   agencies, but its first sentence makes clear that the CFTC's jurisdiction is exclusive with regards

24   to accounts, agreements, and transactions involving *commodity futures contracts on CFTC-*

25   [21] Two other cases relied upon by Defendants are *CFTC v. Co Petro Mktg. Grp., Inc.,* 680 F.2d 573 (9th Cir. 1982)
     (considering whether certain contracts were "cash forward" contracts and thus exempt from CFTC jurisdiction); and
26   *Board of Tr. of Chic. v. S.E.C.* 677 F.2d, 1137 (7th Cir. 1982) (considering whether the SEC had authority over
     trading in options on Governmental National Mortgage Association ("GNMA") mortgage-backed pass through
27   certificates, given that GNMA's were both "commodities" and "securities").  This Court finds that those cases did
     not involve the allegation herein, that trades of an energy commodity are manipulative because they benefited a
28   related financial position.

1   *regulated exchanges*." *Id.* at 158 (emphasis added).  Furthermore, in *Hunter* the CFTC

2   intervened on behalf of Hunter seeking jurisdiction, which is not the case here.

3       The parties also agree that ICE ECM was an exempt commercial market qualifying under

4   section 2(h)(3).  (ECF No. 65 at 17; ECF No. 44 at 7, n. 4.)  See 7 U.S.C. § 2(a)(1) (the CFTC

5   "shall have exclusive jurisdiction, except to the extent otherwise provided in … subsections (c)

6   through (i) of this section.")  Section 2(h)(3) therefore falls within the exception to the CFTC's

7   exclusive jurisdiction, and provides: "nothing in this Act shall apply to … [a] transaction in an

8   exempt commodity which is [] (A) entered into on a principal-to-principal basis solely between

9   person that are eligible commercial entities … and (B) executed or traded on an electronic trading

10  facility."

11      FERC asserts that the financial swaps at issue, by virtue of trading on the ICE ECM, were

12  exempt from the CFTC's exclusive jurisdiction under section 2(h)(3).  The portions of the CEA

13  rulemaking referenced by FERC support this position.  *See* 66 Fed. Reg. 42,256 ("Markets that

14  satisfy the initial and ongoing requirements of section []2(h)(3) … are excluded from the Act's

15  other requirements."); 74 Fed. Reg. 12,178 ("CFMA created a number of exemptions and

16  exclusions from regulation for certain swaps … including an exemption for transactions in

17  exempt commodities traded on electronic trading facilities, also known as exempt commercial

18  markets.")

19      Defendants point out that the CFTC enhanced its market surveillance capabilities in 2004

20  by adopting rules, pursuant to CEA section 2(h)(4), that required ECMs to provide the CFTC with

21  information about futures contracts traded on those markets.[22]  (ECF No. 44 at 23.)  But section

22  2(h)(4) states a number of CEA provisions applying to ECMs despite their exempt status under

23  ─────────────

[22] *See* 69 Fed. Reg. 43,287 (July 20, 2004) ("The Commodity Futures Trading Commission ("Commission") is

24  promulgating final rules relating to electronic trading facilities that operate in reliance on the exemption in section
    2(h)(3) of the Commodity Exchange Act ("the Act").  First, the Commission is amending Rule 36.3(b), which

25  governs Commission access to information regarding transactions on such trading facilities, to provide for access to
    more relevant and useful information from all such markets. Second, the Commission is amending Rule 36.3(c)(2) to

26  require those electronic trading facilities that operate in reliance on the exemption in section 2(h)(3) and that perform
    a significant price discovery function for transactions in the underlying cash market to publicly disseminate certain

27  specified trading data. These price discovery rules are being promulgated pursuant to section 2(h)(4) of the Act,
    which authorizes the Commission to prescribe rules and regulations to ensure timely dissemination by such trading
    facilities of price, trading volume, and other trading data to the extent appropriate.")

28

1    2(h)(3), and the CFTC's exclusive jurisdiction provision is not one of those listed provisions.

2    Without more, the Court cannot conclude that the enhanced market surveillance capabilities

3    identified by Defendants altered ICE ECM's generally exempt status under section 2(h)(3), so as

4    to require the CFTC's exclusive jurisdiction over swaps.

5              For the reasons discussed, Defendants' argument that the CFTC, to the exclusion of

6    FERC, has jurisdiction to assess penalties in this matter is not tenable.

7    **VII.  "Entity" in FPA § 222**

8              Defendants argue that claims against the individual Defendants should be dismissed,

9    because "entity" as used in FPA § 222, 16 U.S.C. § 824v, does not include natural persons.  *See*

10   FPA § 222 ("It shall be unlawful for any entity … to use or employ … any manipulative or

11   deceptive device or contrivance….").

12             Defendants argue that the plain meaning of "entity" does not include natural persons.  *See*

13   *e.g. Samantar v. Yousuf*, 560 U.S. 305, 315 (2010) ("'entity' typically refers to an organization,

14   rather than an individual.'"); Black's Law Dictionary (10th ed. 2014) (defining entity as an

15   "organization (such as a business or a governmental unit) that has a legal identity apart from its

16   members or owners").  Defendants direct the Court to other uses in the Energy Policy Act of

17   2005, in which "entity" is used in a way that means non-persons.  For example, EPA § 1211(a)

18   defines "regional entity" as an entity having enforcement authority pursuant to subsection (e)(4).

19   EPA § 1291 defines a "transmitting utility," "regional Transmission Organization" and

20   "independent System Operator" with reference to "entity" that does not plainly encompass an

21   "individual".[23]  Defendants also point out that 16 U.S.C. § 825d uses language other than "entity"

22   to refer to conduct explicitly prohibited by persons.  *See* 16 U.S.C. § 825d ("It shall be unlawful

23   for any officer or director of any public utility to receive for his own benefit … any money or

24   thing of value in respect of the negotiation, hypothecation, or sale by such public utility of any

25   security issued…").

26   _____

27   [23] The Court declines to visit every use of "entity" as it is referenced in Defendants' briefing.  There are many uses of the word "entity" throughout the full text of the 2005 EPA, many of which refer to non-individuals.  (*See* the 2005 EPA, http://www.gpo.gov/fdsys/pkg/PLAW-109publ58/pdf/PLAW-109publ58.pdf, accessed April 27, 2015.)

28

1    Overall, a meaning of "entity" that includes natural persons appears more consistent with

2    the goals of FPA § 222 and the surrounding statutory scheme.  *See Roberts v. Sea-Land Services,*

3    *Inc.,* 132 S. Ct. 1350, 1357 (2012) ("[T]he words of a statute must be read in their context and

4    with a view to their place in the overall statutory scheme.")  Other relevant enforcement

5    provisions in the FPA include natural persons.  For example, FPA § 221, 16 U.S.C. § 824u, which

6    was enacted concurrently with FPA § 222, provides that "No entity shall willfully and knowingly

7    report any information relating to the price of electricity sold at wholesale or the availability of

8    transmission capacity, which information *the person* or any other entity knew to be false..."

9    (emphasis added).  FPA § 316A, 16 U.S.C. § 825o-1, under which FERC is assessing penalties in

10   this case, provides that penalties may be assessed for a violation by "[a]ny person."  FPA § 316,

11   16 U.S.C. § 825o(a) provides for criminal liability by "[a]ny person" who knowingly violates any

12   provision of the FPA, which would include FPA § 222.  Further, FPA § 222 makes unlawful the

13   use of "any manipulative or deceptive device or contrivance (as those terms are used in section

14   78j(b) of title 15)," i.e. Section 10(b) of the Securities Exchange Act ("SEA") and its

15   corresponding Rule 10b-5.  Actions under Section 10(b) and Rule 10b-5 are routinely brought

16   against individuals.[24]

17        In short, Defendants do not provide adequate reason to conclude that Congress would

18   enact an anti-manipulation statute modeled after the SEA, but preclude enforcement against

19   persons who engaged in manipulative trading.  Thus, the Court does not conclude that "entity" as

20   used in FPA § 222 prevents FERC from bringing claims against the individual Defendants.

21   **VIII.  Manipulative Conduct**

22        FPA § 222 makes unlawful the use of "any manipulative or deceptive device or

23

---

[24] FPA § 222 provides that no entity may use a manipulative device "in contravention of such rules and regulation as
[FERC] may prescribe as necessary or appropriate."  FERC's Final Rule, Order No. 670, 114 FERC ¶ 61,047 at P. 18
(2006), which proposed the current Anti-Manipulation Rule, 18 C.F.R. 1c, determined that "entity" includes persons:
"'Any entity' is a deliberately inclusive term. Congress could have used the existing defined terms in the NGA and
FPA of 'person,' 'natural-gas company,' or 'electric utility,' but instead chose to use a broader term without
providing a specific definition. [f.n.] Thus, the Commission interprets "any entity" to include any person or form of
organization, regardless of its legal status, function or activities. [f.n.]")  The Court decides this issue without
affording FERC *Chevron* deference.  *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 104 S. Ct.
2778 (1984).

1    contrivance (as those terms are used in section 78j(b) of title 15), in contravention of such rules

2    and regulations as [FERC] may prescribe as necessary or appropriate in the public interest or for

3    the protection of electric ratepayers."  15 U.S.C. § 78j, SEA Section 10b, contains nearly identical

4    language, prohibiting "any manipulative or deceptive device or contrivance in contravention of

5    such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

6    interest or for the protection of investors."  In short, the Court agrees with the arguments made by

7    FERC in its Opposition.  (ECF No. 65 at 26–32.)  The precedent set in the SEA context does not

8    favor Defendants.

9           Defendants argue that trades which involve willing counterparties made on the open

10   market cannot be actionable under Section 10(b).  However, as a blanket statement, this is not

11   supportable.  *See Markowski v. S.E.C.*, 274 F.3d 525, 528 (D.C. Cir. 2001) (rejecting the

12   argument that "because [its] bids and trades in this case were 'real'—they involved real

13   customers, real transactions, and real money—the trades cannot be classified as an unlawful

14   manipulation"); *S.E.C. v. Masri*, 523 F. Supp. 2d 361, 372 (S.D.N.Y. 2007) ("if an investor

15   conducts an open-market transaction with the intent of artificially affecting the price of the

16   security, and not for any legitimate economic reason, it can constitute market manipulation");

17   *S.E.C. v. Kwak*, 2008 WL 410427, at *4 (D. Conn. Feb. 12, 2008) (rejecting defendants'

18   argument that "because all of their trades were executed on behalf of real individuals in the open

19   market and did not contain the traditional hallmarks of manipulation, they cannot be guilty of

20   market manipulation"); *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513,

21   534 (S.D.N.Y. 2008) (finding "a legitimate transaction combined with an improper motive is

22   commodities manipulation").

23          Defendants also argue that only inherently misleading trades are illegal under Section

24   10(b), citing *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977), for its holding that

25   manipulation is "virtually a term of art when used in connection with securities markets.  The

26   term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are

27   intended to mislead investors by artificially affecting market activity."  *See also Desai v.

28   Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 938–39 (9th Cir. 2009).  Defendants do not support their

1  position that the aforementioned list is exclusive.  The full precedent from *Santa Fe* includes: "No

2  doubt Congress meant to prohibit the full range of ingenious devices that might be used to

3  manipulate securities prices."  *Sante Fe*, 430 U.S. at 477.  Defendants also cite *Sullivan & Long,*

4  *Inc. v. Scattered Corp.,* 47 F.3d 857, 861 (7th Cir. 1995), finding that plaintiffs had failed "to

5  identify any harm to the objectives of the security laws under which they have sued….  The

6  central objective, we take it, is to prevent practices that impair the function of stock markets in

7  enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily

8  accurate) estimate of the underlying economic value of the securities traded," and *GFL*

9  *Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 205 (3rd Cir. 2011), finding that "courts must

10  distinguish between legitimate trading strategies intended to anticipate and respond to prevailing

11  market forces and those designed to manipulate prices and deceive purchasers and sellers."  Here

12  the allegations, drawn in favor of FERC for the purposes of this motion, state the use of strategies

13  "designed to manipulate prices and deceive purchasers and sellers," *GFL Advantage Fund*, 272

14  F.3d at 205, and which reflect a "distorted … estimate of the underlying economic value,"

15  *Sullivan,* 47 F.3d at 861, of the physical products which Defendants were trading.

16        Defendants also argue that the Petition does not adequately state claims against the

17  individual Defendants.  Defendants' argument is without merit.  On review of the July, 2013

18  Order Assessing Penalties, incorporated by reference into the Petition, there are allegations

19  specific to each Defendant.  *See* ECF No. 1-1 at ¶¶ 76–80 (Brin); ¶¶ 81–85 (Smith); ¶¶ 86–96

20  (Levine); ¶¶ 97–110 (Connelly).  Said allegations, drawn in favor of FERC for this motion, state a

21  claim that Defendants were jointly engaged in manipulation.

22        Based on the foregoing, the Court finds that FERC has alleged both a sufficient factual

23  and legal basis to support its claim of manipulation.

24                                    **CONCLUSION**

25        For the foregoing reasons, Defendants' Motion to Dismiss or, in the Alternative, to

26  Transfer (ECF No. 44) is DENIED.

27  Dated:  May 21, 2015

28

_____
Troy L. Nunley
United States District Judge

34

*Please note that footnote 2 has intentionally been removed from this Amended Order.