FEDERAL ENERGY REGULATORY COMMISSION
DAVID A. APPLEBAUM
David.Applebaum@ferc.gov
WESLEY J. HEATH
Wesley.Heath@ferc.gov
EMILY C. SCRUGGS
Emily.Scruggs@ferc.gov
MARIA CRISTINA MELENDEZ
Cristina.Melendez@ferc.gov
Office of Enforcement
888 1st Street, N.E.
Washington, DC 20426
Telephone:    (202) 502-8100

Attorneys for FEDERAL ENERGY
REGULATORY COMMISSION

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL ENERGY REGULATORY COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>BARCLAYS BANK PLC; DANIEL BRIN; SCOTT CONNELLY; KAREN LEVINE; and RYAN SMITH,<br><br>Defendants. | CASE NO.: 2:13-cv-02093-TLN-DAD<br><br>**OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO SERVE DISCOVERY**<br><br>Hearing Date: December 10, 2015<br>Time: 2:00 p.m.<br>Presiding: Hon. Troy L. Nunley<br>Courtroom: 2, 15th Floor |

On November 9, 2015, Barclays Bank PLC and its former traders, Scott Connelly, Daniel Brin, Karen Levine, and Ryan Smith (collectively "Defendants") filed a motion for leave to take "limited" discovery, arguing that it is "essential to Defendants' ability to oppose the forthcoming motion by the Federal Energy Regulatory Commission ("[Commission]") to affirm its order assessing penalties against Defendants." Defendant's Motion for Leave to Serve Limited Discovery (ECF No. 118) ("Motion"). The Commission hereby opposes Defendants' motion. Respectfully, the Commission submits there is no need for any discovery in this de novo review proceeding, and in any event, certainly not at this stage in the briefing schedule. Moreover,

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR LEAVE TO SERVE DISCOVERY                    1

Defendants' overbroad requests seek information that is irrelevant, duplicative of information already in their possession, or protected.

**I.  DISCOVERY IS NOT WARRANTED AT THIS TIME**

The Court issued a scheduling order on October 2, 2015 directing the Commission to file the administrative record used in assessing civil penalties, followed by a motion for an order affirming those civil penalties.  The Commission's motion is due on December 2, 2015, and Defendants' opposition motion is due on February 1, 2015.[1]  Scheduling Order (ECF No. 106).  The Court indicated that it "will review FERC's assessment to determine whether penalties shall be affirmed, vacated, or modified.  The Court will also consider whether a determination as to [the Commission's] assessment requires supplementation of the record submitted by FERC and/or alternative means of fact-finding."  *Id.* (citation omitted).

The parties' positions on the contours of the Court's de novo review, including the right to discovery, are clear and have been briefed extensively.[2]  As such, the Commission will not re-argue those issues here.  The Court, through its scheduling order, did not foreclose the possibility that it may consider information outside the administrative record in its review of the Commission's assessment.  Indeed, it expressly contemplated such a possibility.  Defendants argue in their motion, however, that the Court should permit their requests for discovery now, at the very initial stages of briefing—before the Court has had the opportunity to review either Defendants' opposition brief or FERC's reply brief, and, as a practical matter, before the Court has had an opportunity to analyze the key materials that already exist in the extensive administrative record.

According to Defendants, the administrative record filed with the Court "does not contain evidence that would enable this Court to review the basis of FERC's complaint."  Motion at 1.  The Commission respectfully suggests that argument has no merit.  First, the basis of FERC's

---

[1] The Commission may also file a reply to Defendants' Opposition.  Scheduling Order (ECF No. 106).

[2] *See* Joint Status Report (ECF No. 52); Amended Joint Status Report (ECF No. 97); Defendants' Supplementary Briefing in Opposition to Bifurcation (ECF No. 101); Plaintiff's Brief in Response to Court's August 3, 2015 Order Requesting Supplementary Briefing (ECF No. 103).

Petition is the Commission's Order Assessing Civil Penalties, 144 FERC ¶ 61,041 (2013) (ECF No. 1-1), AR00001-85 ("Assessment Order"), and all of the parties' briefing to the Commission and underlying factual materials on which that briefing was based. That is the administrative record now before the Court.[3] So, in fact, the Court *does* have the materials needed to determine whether it agrees with the Commission's penalty assessment (notwithstanding the fact that the Court also has the authority to determine it needs additional facts that were not before the Commission). Second, as the Court can see, the administrative record is extensive, totaling nearly 8,500 pages in addition to 1 GB of trade data. It is beyond dispute that Defendants' own trades, communications, testimony, and data analyses comprise nearly all the evidence in the administrative record. And, in a case such as this, Defendants' own documents and statements are the best sources of information for determining what Defendants did and why they did it. In brief, the Court has the entirety of the record that was before the Commission, and that record is both extensive and highly probative.

The issue presented by the Commission's motion will be whether the Court should affirm, vacate or modify the penalty assessment. In moving the Court to affirm the assessment, the Commission will ask the Court to review de novo the facts and legal arguments the parties presented to the Commission. In opposing the Commission's motion and in challenging the Commission's penalty assessment, Defendants should, in the first instance, likewise be limited to those facts and arguments before the Commission in assessing the penalties.

## II. DEFENDANTS' DISCOVERY REQUESTS ARE NOT LIMITED, TARGETED, OR ESSENTIAL AND SHOULD BE DENIED

Even if the Court decides to permit discovery of information outside the administrative record at this stage in the briefing, the Court should deny Defendants' particular requests. Defendants argue the discovery they seek "reflects only the limited, targeted discovery necessary to respond to FERC's motion to affirm, in light of the materials FERC submitted as a record to this Court." Motion at 4. On inspection, Defendants' requests are overbroad (in some cases, as

---

[3] The Commission filed this information in the form of an extensive administrative record on November 2, 2015. *See* Notice of Lodging Administrative Record (ECF No. 115). References to the administrative record are cited herein by page number as "AR___."

noted below, massively so) and seek cumulative, irrelevant, or protected information. Defendants cannot demonstrate how the information they seek would either meaningfully add to or undermine the evidence relied on by the Commission, namely Defendants' own statements and conduct.

### A. Requests for Information from the Commission

Defendants describe the administrative record as "only a subset of FERC's full investigative record," as though the Office of Enforcement ("Enforcement") withheld material information from the Commission (or Defendants) during the show cause proceeding. Motion at 4. As the Court can see, the administrative record is substantial and is comprised mainly of information submitted to Enforcement and the Commission by Defendants themselves. By contrast, the "investigative record" or "investigative file" as Defendants define the term, includes every document, communication, or other material "requested, subpoenaed, demanded, collected, received or prepared in connection with the Investigation." Declaration of Thomas J. Nolan in Support of Defendants' Motion for Leave to Serve Limited Discovery (ECF 118-1), Exhibit 2 at 4 (Defendant Barclays Bank PLC's First Request For Production Of Documents To Plaintiff (("FERC Document Request")) (definitions of "Investigative File" and "Including"). Defendants' concept is so broad that it would include privileged attorney-client communications, protected attorney work-product, as well as intra-agency communications concerning deliberations. Defendants' request for the "investigative file," including these documents, is hardly limited, targeted, or necessary. FERC Document Request 1.

Defendants also request "All Documents and Communications Concerning FERC's Penalty Assessment and calculations of Market Harm and/or disgorgement … [i]ncluding all modeling, analyses and calculations, whether conducted under FERC's Penalty Guidelines or otherwise and whether preliminary or final." FERC Document Request 3. Defendants are essentially demanding the production of all of Enforcement staff's internal work papers regarding the preliminary econometric model. It is undisputed that Enforcement did not present its model to the Commission during the show cause process and only generally described the methodology it used to calculate market harm under the Penalty Guidelines and unjust profits. *See* Assessment

Order at PP 122 n.353 & 126, AR00069 & AR00072. It is also undisputed that the Commission conducted both a Penalty-Guidelines analysis and an independent analysis under the statutory factors of section 316A of the Federal Power Act, 16 U.S.C. § 825o-1 (2012) ("FPA").[4] *See* Assessment Order at PP 118-132, AR00067-75. Under a Penalty-Guidelines analysis, the Commission considered the evidence presented and found that, in the absence of an alternative proposal from Barclays, Enforcement properly applied the Penalty Guidelines. Assessment Order at P 124, AR00071 ("Aside from objecting to the imposition of penalties, Barclays presents no alternative penalty calculation.").

The Commission did not attempt to quantify market harm in its section 316A statutory analysis. *See* Assessment Order at P 128, AR00073 (recognizing that market harm is not a necessary method of assessing "seriousness" of violation). Likewise, market harm is not an element of market manipulation and the Court does not need to calculate market harm to affirm the Commission's penalty assessment under the FPA. *Id.* at P 127, AR00073 ("It is not necessary for the Commission to find proof of illicit profit or pecuniary harm in order to find a violator liable under section 316A."). Discovery on this point is unnecessary.

### 1. Third-Party Testimony Interpreting Defendants' Statements

Defendants make a specific request for certain "third-party materials" in the "investigative file" that "address[ ] how participating third parties interpreted … communications [with Defendants]." Motion at 4. As the Court can determine for itself, Defendants' statements in these communications do not require interpretation, much less interpretation by third-parties. *See* Email and Instant Message Communications, AR05562-817. Defendants had multiple opportunities to provide context for their statements through sworn investigative testimony and multiple submissions to the Commission. But Defendants failed to offer credible explanations that were consistent with the plain meaning and context of the statements. *See* Assessment Order at PP 76-110, AR00047-62 (for example, at P 78, AR00049 ("Respondents tacitly acknowledge this by their silence on any possible alternative meaning for the statement."); P 78, AR00048-49

---

[4] *See Revised Policy Statement on Penalty Guidelines*, 132 FERC ¶ 61,216 (2010) ("Penalty Guidelines").

("there is nothing ambiguous in the statement "im doing phys so i [*sic*] am trying to drive price in fin direction"); P 100, AR00058 ("none of the Respondents in this proceeding have offered an innocent interpretation of this document"); P 104, AR00059 ("the suggestion that his comments prove that he believed that it was impossible to affect the Index—or to affect it enough to make the manipulative scheme work—contradicts both the plain language of the exchange and the circumstances surrounding it, and the Commission declines to adopt Connelly's newly proffered explanation"); P 109, AR00062 ("We find that Connelly's new, and belated, explanation is not credible.")).

As with all other information gathered during its investigation, if Enforcement relied on third-party materials in its case before the Commission, it made those materials available to Defendants and the Commission during the show cause proceeding.[5] Although the Commission could have discussed or cited third-party materials in its penalty assessment order, it instead focused on testimony, communications, and other statements by Defendants and Barclays' employees. In addition to presenting their own interpretations of statements Defendants made to third-parties, Defendants could have presented interpretations by the third-parties to whom the statements were made. However, Defendants presented no such evidence to the Commission although they clearly knew the identity of the individuals they communicated with as well as the substance of their own communications.

### 2.  Defendants' Trades

In support of another request, Defendants incorrectly claim "FERC's administrative record omits the complete, unredacted set of transaction-level data reflecting the trading engaged in by Defendants." Motion at 2. The administrative record includes the trade data Barclays produced in its entirety, including every transaction engaged in by Defendants at the trading points at issue. *See* Barclays Trade Data, AR05556-05558. Defendants seem to be complaining about the inclusion in the administrative record of masked data for all *other* next-day physical

---

[5] It is also both practice and policy for Enforcement staff to scrutinize and produce information to investigative targets that Enforcement receives from third-party sources for material that would be required to be disclosed under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny. *See Policy Statement on Disclosure of Exculpatory Materials*, 129 FERC ¶ 61,248, at P 9 (2009).

power transactions produced by ICE, *i.e.*, every transaction by any participant at the trading points at issue. Defendants argue the ICE data is "missing full counterparty information," in other words, the names of the trade counterparties. Motion at 3. Although the names of market participants are not listed in this data, market participants are identified by unique numbers across all transactions. *See* ICE Data, AR05559-61. Barclays used that masked ICE data to compile trade analyses by certain counterparties in response to the Order to Show Cause. *E.g.*, Appendix G to Joint Response of Barclays and Scott Connelly to the Office of Enforcement's Preliminary Findings and Conclusions ("Barclays' Preliminary Findings Response") (NERA Comparison of Bid-Offer Spread at Time of Trade Execution for Barclays and Other Top 20 Market Participants), AR00304; Appendix M to Barclays' Preliminary Findings Response (NERA Analysis of the Percent of Monthly Periods with a Net Loss in the ICE Fixed Price Physical Day-Ahead Trading When Measured Against the ICE Index Top 20 Companies Most Frequently Trading on ICE for the Total Period), AR00313-14.

Defendants also request the Commission produce information that would allow Defendants "to identify each such [manipulative] [t]ransaction, day and month." FERC Document Request 2. By requesting transaction-level data, Defendants renew an argument the Commission rejected in the show cause proceeding. *See* Assessment Order at P 40 n.137, AR00027. The Commission found that Defendants engaged in an unlawful scheme across 35 product months during a 26-month period at four trading locations by (1) building substantial financial positions, (2) building physical positions in the opposite direction of the financial swap positions at the same points and then (3) trading next-day fixed price physical electricity at those same points to "flatten" their physical obligations to increase or lower the ICE daily Index thus benefiting their financial swap positions. *See* Assessment Order at P 2, AR00003. Defendants improperly attempt to isolate each next-day fixed price transaction from all their other physical trades and financial positions that, when viewed together, demonstrate a scheme to manipulate next-day electric energy prices. Defendants' continued attempt to disaggregate the evidence into isolated, individual transactions ignores the allegations in this case: that Defendants engaged in a coordinated, manipulative scheme involving the three elements summarized above. Defendants'

disaggregation argument also contradicts a basic principle of evidence: "individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it." *Bourjaily v. United States*, 483 U.S. 171, 180-81 (1987). Despite Defendants' flawed reasoning, the administrative record contains all the information necessary for Defendants to identify the months and days in which the Commission found Defendants engaged in manipulative trading of next-day electric energy. *See* Staff Report, AR00106 (Table 1, showing months where defendants engaged in manipulation); FERC Preliminary Findings Letters to Defendants, AR06022-301 (Work Papers for Preliminary Findings Letters, Table 3,[6] AR06085).

### B. Requests for Additional Data and Other Materials from ICE

The administrative record contains all physical fixed-price and daily index electric energy transactions on ICE across seven trading locations including NP-15, SP-15, Mid-C, PV, between 2006 and 2008.[7] *See* ICE Data: Physical Power Deals 2006-2008, AR05559-AR05561. These files contain hundreds of thousands of transactions, yet Defendants claim they require more data "to put the allegedly manipulative trades in context and to test FERC's unproven assertion that those trades affected trading by other market participants."[8] Motion at 3. Specifically, Defendants request all bids, offers, and executed contracts on ICE, by any person, to purchase or sell ICE day-ahead electric energy or contracts labeled as swaps at the four trading locations between November 1, 2006 and December 31, 2008. Declaration of Thomas J. Nolan in Support of Defendants' Motion for Leave to Serve Limited Discovery, Exhibit 1 (Notice of Subpoena to Intercontinental Exchange, Inc. For The Production of Documents or Things, Attachment, Schedule A ("ICE Subpoena")) (Request 1). In essence, Defendants request all

---

[6] The work papers indicate "flow dates" within each alleged manipulation month. Multiple flow dates may correspond to a single transaction date depending on whether the transaction involved next-day physical electric energy delivered in a weekend or holiday.

[7] Enforcement requested, and ICE produced, trading data for seven locations: North Path 15 ("NP-15"), South Path 15 ("SP-15"), Mid-Columbia ("MID-C"), Palo Verde ("PV"), Mead, California Oregon Border ("COB"), and Nevada Oregon Border ("NOB"). Subpoena Duces Tecum Attachment A (Jan. 21, 2009), AR05936; Letter from ICE to FERC regarding Subpoena (Feb. 24, 2009), AR05942-44; ICE Data: Physical Power Deals 2006-2008, AR05559-AR05561.

[8] Defendants also have "order" data from ICE for all but 115 days. Amended Joint Status Report at 20 n.10 (ECF No. 97).

"unconsummated" trade data, that is, offers and bids that did not result in executed contracts of day-ahead electric energy or contracts labeled as swaps.

Defendants' expansive request goes beyond even data and includes all documents and communications concerning all consummated and unconsummated transactions, regardless of whether Barclays was a party to the transaction. It would be difficult to overstate how far afield this request goes in seeking vast amounts of completely irrelevant information. This case is about the trades that Defendants made and why they made them. Documents and communications concerning other market participants' trading are irrelevant. This case is about the investigation into the specific Barclays' trading scheme that the Commission found to be manipulative, which is set forth in the Commission's Order now under review. Barclays evidently wants to take discovery not just of every swap and day-ahead electric energy transaction on ICE—by every single market participant at these four locations over a 26-month period—but also every bid or offer that did not even result in a transaction. The Court should reject Defendants' attempt to derail this proceeding through such overbroad and unnecessary discovery. With the ICE data in the administrative record, Barclays' own trade data, and the nearly 100 pages in analyses Barclays submitted to the Commission about this data (see AR00296-393), the Commission had—and this Court now has—all the evidence needed to place Defendants' trading in context.

As for Defendants' request for any documents or communications concerning analyses or investigations by ICE in connection with complaints of any bid, offer, or executed contract for next-day electric energy or swap, *see* ICE Subpoena (Request 1), this information is not necessary for Defendants to challenge the Commission's findings. That another party may have engaged in questionable conduct, does not exonerate Defendants of the violations found here. This is particularly so where the Commission's findings of market manipulation were based on Defendants' extensive statements and trades. Likewise, although Defendants have not offered an explanation for their request, Defendants do not need "All Documents or Communications Concerning the Trading Data of any Person submitted by ICE to the CFTC pursuant to CFTC Rule 36.3" concerning next-day electric energy transactions or swaps at the time and place at issue. *See* ICE Subpoena (Request 6).

During the investigation, Enforcement provided Defendants copies of ICE memoranda regarding two complaints from other market participants about Barclays' trading. *See* Correspondence between FERC and Barclays at AR06553. Defendants discussed these complaints in the show cause proceeding, Answer of Barclays to Order to Show Cause, AR00193; ICE Complaints, AR00292-95, and now seek discovery regarding ICE's review of them. Motion at 3-4; ICE Subpoena (Request 1). There is no indication from these memoranda that ICE even considered or even had access to Defendants' other physical or financial positions in its brief examination, which involved looking at Barclays' day-ahead physical trades at only two locations over, at most, a few days. ICE Complaints, AR00292-95. The memoranda themselves demonstrate that, in both cases, ICE performed a cursory examination of the day's trading (one day of which is not even a day where staff concluded that Barclays was manipulating) and determined that internal escalation or referral to the government was not warranted. *Id.* The documents describe the extent, and limited focus of, ICE's investigations. *Id.* They do not discuss Defendants' trading across time, products, and locations, which is the essence of the scheme at issue here. *Id.* In short, Defendants already have documentation regarding ICE's investigations into Defendants' trading behavior and further discovery is unnecessary given the limited focus and nature of those investigations. *See* Staff Reply to Defendants' Answers to Order to Show Cause, AR01044-45.

Defendants also argue that "discovery from ICE concerning its method of using trading information to calculate [Index] prices… is indispensable…." Motion at 3. The methodology by which ICE calculated the ICE Day-Ahead Index, including its use of Reserve Quantity Orders, is well known and does not require discovery. In the definitions accompanying Defendant's Subpoena to ICE, Defendants explain that the ICE Day-Ahead Index is "the published volume-weighted average of all peak or off-peak day-ahead physical electric energy transactions on ICE at a Trading Location." ICE Subpoena at 2 ("Ice Day-Ahead Index"). The Individual Traders shared the same understanding of how the Index was calculated. Connelly Testimony, AR01721; Brin Testimony, AR01097; Levine Testimony, AR03517; Smith Testimony, AR04385. Further discovery on the well-known methodology underlying the calculation of the ICE Index is not

necessary. Discovery is also unnecessary regarding the "purpose, use and function of Reserve Quantity Orders" or "their effect on transaction execution and price, and any rules, policies or procedures" ICE had regarding their use. ICE Subpoena (Request 3). The Commission did not discuss reserve quantity orders in the penalty order. In any event, Connelly testified, he regularly used the reserve quantity order on ICE to place offers or bids in increments rather than as single trades. *See* Connelly Testimony, AR02278-79. According to Connelly, it was simply "a more efficient way of entering trades." *Id.* Barclays is one of the largest, most experienced, and most sophisticated trading firms in the world. Through their own experience, Defendants possess the information they seek and have otherwise not explained why this information is essential to respond to the Commission's motion to affirm the penalty assessment.

### C. Requests Related to Jurisdiction

Finally, Defendants continue to inject a physical delivery requirement into the Commission's jurisdiction under sections 201 and 222 of the FPA and now seek discovery based on their incorrect reading of the statute. Defendants argue "the administrative record does not contain facts regarding physical delivery of power necessary to establish that jurisdiction is proper and that the statutory prohibition against energy market manipulation applies to the types of transactions at issue in this case." Motion at 3. They also request information from ICE regarding the scheduling of delivery of electric energy purchased or sold in the ICE day-ahead market. ICE Subpoena (Request 5). The parties litigated this issue at the motion to dismiss stage—and the Court correctly distinguished the cases Barclays cited in support of its jurisdictional arguments on physical delivery. *See* Order at 23-25 (ECF No. 87).

Indeed, as a matter of law, physical delivery of power is not a necessary element of the Commission's jurisdiction over power marketers engaged in the wholesale sale of electric energy. *See Enron Power Marketing, Inc.*, 65 FERC ¶ 61,305 at 62,405 (1993) ("power sales contracts are the 'facilities' which make power marketers jurisdictional public utilities under the FPA"); *see also Automated Power Exch., Inc. v. FERC*, 204 F.3d 1144, 1153 (D.C. Cir. 2000) (recognizing FERC's jurisdiction under the FPA over a computer platform that plays a role in setting wholesale market prices; jurisdiction may lie where entity does not take title to power). To the

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR LEAVE TO SERVE DISCOVERY                    11

necessary. Discovery is also unnecessary regarding the "purpose, use and function of Reserve Quantity Orders" or "their effect on transaction execution and price, and any rules, policies or procedures" ICE had regarding their use. ICE Subpoena (Request 3). The Commission did not discuss reserve quantity orders in the penalty order. In any event, Connelly testified, he regularly used the reserve quantity order on ICE to place offers or bids in increments rather than as single trades. *See* Connelly Testimony, AR02278-79. According to Connelly, it was simply "a more efficient way of entering trades." *Id.* Barclays is one of the largest, most experienced, and most sophisticated trading firms in the world. Through their own experience, Defendants possess the information they seek and have otherwise not explained why this information is essential to respond to the Commission's motion to affirm the penalty assessment.

### C. Requests Related to Jurisdiction

Finally, Defendants continue to inject a physical delivery requirement into the Commission's jurisdiction under sections 201 and 222 of the FPA and now seek discovery based on their incorrect reading of the statute. Defendants argue "the administrative record does not contain facts regarding physical delivery of power necessary to establish that jurisdiction is proper and that the statutory prohibition against energy market manipulation applies to the types of transactions at issue in this case." Motion at 3. They also request information from ICE regarding the scheduling of delivery of electric energy purchased or sold in the ICE day-ahead market. ICE Subpoena (Request 5). The parties litigated this issue at the motion to dismiss stage—and the Court correctly distinguished the cases Barclays cited in support of its jurisdictional arguments on physical delivery. *See* Order at 23-25 (ECF No. 87).

Indeed, as a matter of law, physical delivery of power is not a necessary element of the Commission's jurisdiction over power marketers engaged in the wholesale sale of electric energy. *See Enron Power Marketing, Inc.*, 65 FERC ¶ 61,305 at 62,405 (1993) ("power sales contracts are the 'facilities' which make power marketers jurisdictional public utilities under the FPA"); *see also Automated Power Exch., Inc. v. FERC*, 204 F.3d 1144, 1153 (D.C. Cir. 2000) (recognizing FERC's jurisdiction under the FPA over a computer platform that plays a role in setting wholesale market prices; jurisdiction may lie where entity does not take title to power). To the

extent Defendants are claiming that physical delivery is an element of the "statutory prohibition of market manipulation," this too is a legal question and a plain reading of section 222 of the FPA makes clear there is no such delivery requirement. Therefore, Defendants' requests for discovery related to the scheduling of delivery of electric energy are irrelevant and should be denied.[9]

## CONCLUSION

In opposing the Commission's motion to affirm the assessed penalties, Defendants need only the information that the parties presented to the Commission during the underlying proceeding. Defendants should not be permitted to engage in discovery unless the Court determines the record should be supplemented, and in any event not at this time. Moreover, Defendants' requests are not limited, targeted, or essential—in fact, they are just the opposite. For the reasons stated above, and at any hearing on the matter, the Commission respectfully requests the Court deny Defendants' motion.

DATED:  November 25, 2015          FEDERAL ENERGY REGULATORY
                                    COMMISSION

                          By:      /s/ Emily C. Scruggs
                                    EMILY C. SCRUGGS
                                    DAVID APPLEBAUM
                                    WESLEY J. HEATH
                                    MARIA CRISTINA MELENDEZ

---

[9] The traders themselves admitted they were required to schedule their day-ahead electric energy transactions for delivery. Even if delivery was material to jurisdiction or the elements of the violation here, there can be no question that Defendants scheduled their day-ahead transactions for delivery. As Connelly testified, "you want to make sure that you meet your contractual obligations, that you did what you said you were going to do with respect to the counterparty. You give them the power you said you were giving them and … you make sure it's scheduled, you make sure it's delivered, you follow through on the obligations." Connelly Testimony, AR01867. *See also* Brin Testimony ("all those trades have to be scheduled"), AR01207.