FEDERAL ENERGY REGULATORY COMMISSION
DAVID A. APPLEBAUM
David.Applebaum@ferc.gov
WESLEY J. HEATH
Wesley.Heath@ferc.gov
EMILY C. SCRUGGS
Emily.Scruggs@ferc.gov
MARIA CRISTINA MELENDEZ
Cristina.Melendez@ferc.gov
Office of Enforcement
888 1st Street, N.E.
Washington, DC 20426
Telephone:      (202) 502-8100

Attorneys for FEDERAL ENERGY
REGULATORY COMMISSION

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL ENERGY REGULATORY COMMISSION,<br><br>         Plaintiff,<br><br>    v.<br><br>BARCLAYS BANK PLC; DANIEL BRIN; SCOTT CONNELLY; KAREN LEVINE; and RYAN SMITH,<br><br>         Defendants. | CASE NO.:  2:13-cv-02093-TLN-EFB (TEMP)<br><br>**PLAINTIFF'S NOTICE OF MOTION TO AFFIRM  CIVIL PENALTIES ASSESSED BY THE FEDERAL ENERGY REGULATORY COMMISSION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Hearing Date:   March 10, 2016<br>Time:           2:00 p.m.<br>Presiding:      Hon. Troy L. Nunley<br>Courtroom:    2, 15th Floor |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that the Federal Energy Regulatory Commission ("Commission") hereby respectfully moves for an order pursuant to Federal Power Act Section 31, 16 U.S.C. § 823b(d)(3)(B) (2012) affirming civil penalties assessed by the Commission on July 13, 2013 in its *Order Assessing Civil Penalties*, 144 FERC ¶ 61,041 (2013), ECF No. 1-1:

*First*, $435 million against Defendant Barclays Bank PLC.

*Second*, $15 million against Defendant Scott Connelly.

*Third*, $1 million against Defendant Daniel Brin.

*Fourth*, $1 million against Defendant Karen Levine.

*Fifth*, $1 million against Defendant Ryan Smith.

The Commission's motion is supported by the facts and arguments contained in the administrative record before the Commission and filed with the Court on November 2, 2015 (*see* Notice of Lodging of Admin. Record, ECF No. 115), as well as by the following points and authorities and such other argument as may be presented in this matter. The Commission respectfully requests the Court affirm the Commission's assessed penalties in full and enter a judgment enforcing such assessment.

DATED: December 2, 2015

FEDERAL ENERGY REGULATORY
COMMISSION

By:   */s/ Wesley J. Heath*
      WESLEY J. HEATH
      DAVID A. APPLEBAUM
      EMILY C. SCRUGGS
      MARIA CRISTINA MELENDEZ

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................... 1

PROCEDURAL HISTORY ......................................................................................................... 2

STANDARD OF REVIEW .......................................................................................................... 3

LEGAL STANDARD ................................................................................................................... 4

ARGUMENT ................................................................................................................................. 5

    I.    THE ASSESSMENT ORDER INCLUDED DETAILED FACTUAL FINDINGS AND
         LEGAL CONCLUSIONS REGARDING THE MANIPULATIVE SCHEME ................... 5

       A.  Defendants Engaged in a Manipulative Scheme .............................................................. 5

       B.  Defendants Acted with *Scienter* ...................................................................................... 8

       C.  Defendants' Scheme Used or was in Connection with Jurisdictional Products .............. 14

    II.  THIS COURT SHOULD AFFIRM THE ASSESSED PENALTIES ................................. 15

CONCLUSION ............................................................................................................................ 19

1

**TABLE OF AUTHORITIES**

2

3

**Cases**

4

*Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*,
508 U.S. 602 (1993) ......................................................................................................... 4-5

5

*Doe v. United States*, 821 F.2d 694 (D.C. Cir. 1987) ...............................................4, 19

6

*FERC v. Smith*, No. 12-MC-74, ECF. No. 23 (N.D.N.Y. 2012).....................................19

7

*Gall v. United States*, 552 U.S. 38 (2007)......................................................................15

8

*United States v. Bertie*, 529 F.2d 506 (9th Cir. 1976)......................................................9

9

10

**Statutes**

11

16 U.S.C. § 823b(d)(3)............................................................................................. 1, 3, 4

12

16 U.S.C. § 824v ................................................................................................... 1, 4, 14

13

16 U.S.C. § 825o-1(b) ............................................................................................ 15, 16

14

15

**Code of Federal Regulations**

16

18 C.F.R. § 1c.2 ...................................................................................................... 1, 4

17

18

**FERC Orders & Decisions**

19

*Barclays Bank PLC*, 143 FERC ¶ 61,024 (2013) ....................................................... 19

20

*Barclays Bank PLC, et al., Order Assessing Civil Penalties*, 144 FERC ¶ 61,041 (2013) ... *passim*

21

*Barclays Bank PLC, et al., Order to Show Cause and Notice of Proposed Penalty*, 141 FERC ¶ 61,084 (2012) ......................................................................................... 2, 3, 18

22

23

*Enforcement of Statutes, Orders, Rules, and Regulations*, 132 FERC ¶ 61,216 (2010)............... 15

24

*Prohibition of Energy Market Manipulation*, Order No. 670, 114 FERC ¶ 61,047 (2006)............ 4

25

26

27

28

iii

**PRELIMINARY STATEMENT**

The Federal Energy Regulatory Commission ("Commission" or "FERC") respectfully submits this memorandum of points and authorities in support of its notice of motion under Federal Power Act ("FPA") Section 31(d)(3), 16 U.S.C. § 823b(d)(3) (2012), for an order affirming the Commission's assessment of civil penalties and for a judgment enforcing such assessment as to Defendants Barclays Bank PLC ("Barclays"), Daniel Brin, Scott Connelly, Karen Levine, and Ryan Smith (the "Individual Traders").

As shown in the Commission's *Order Assessing Civil Penalties*, 144 FERC ¶ 61,041 (2013), ECF No. 1-1 & AR00001-85[1] ("Assessment Order"), trade data and communications demonstrate that Defendants engaged in a brazen, sustained, and massive manipulation of western electricity markets in violation of FPA Section 222, 16 U.S.C. § 824v, and the Commission's corresponding regulation, 18 C.F.R. § 1c.2 ("Anti-Manipulation Rule").  Defendants deliberately set out to manipulate the market by placing uneconomic physical trades for the purpose of benefitting their financial swaps positions—and we know this because they said they were doing so.  Connelly set up "oppiste [sic] fin /phys" positions, and Brin traded "phys . . . to drive price in fin direction."  AR00679-82.  They "crap[ped] on the NP light" (AR05595-96) and traded physical index to "protect" financial positions (AR05565-68).  They "s[old] a bunch of index . . . to keep the price up" (AR05780) and acknowledged that "run[ing] the off peak up" meant "tak[ing] the daily loss" (AR05745-46;  *see also* AR05747-48, AR05759-60).   In short, and in their most blunt form, they "totally fuckked" with the market.  *See* AR05576-77 (Smith discussing how "I totally fuckked with the Palo m[a]rk[e]t today" because of "my goal to keep the sp/palo [spread] tighter" through "lifting the piss out of the palo.")[2]  The Commission found

---

[1] "AR" followed by a number refers to the page numbers in the administrative record filed by the Commission on November 2, 2015.  *See* Notice of Lodging Admin. Record, ECF No. 115. Defendants' Answers to the Commission's Order to Show Cause and Notice of Penalty are referred to by Defendant's name followed by "OSC Answer."

[2] The Enforcement Staff Report and Recommendation, ECF No. 1-2 & AR00090-158 ("Staff Report") provides background on the relevant western United States electricity markets and products.  Staff Report at 6-10, AR00097-101.  *See also* FERC Petition for Order Affirming the Commission's Assessment Order against Defendants at ¶¶ 16-33, ECF No. 1.

1    that in these private, contemporaneous communications in which they were planning, carrying

2    out, and commenting on their scheme, Defendants meant—and did—what they said.

3        The Commission carefully analyzed the possibility that, perhaps, Barclays and the

4    Individual Traders should not be taken at their word—that, somehow, their own statements about

5    their own conduct and the trade data supporting those statements should be interpreted in a way

6    that doesn't show manipulation.  Barclays certainly had a full opportunity to demonstrate that

7    Defendants' words and data point to conduct other than manipulation.  Nobody could be in a

8    position to explain Barclays' instant messages, Barclays' trade data, Barclays' documents, and

9    Barclays' employee testimony better than Barclays.  And Defendants availed themselves of this

10   opportunity.  Indeed, the Assessment Order was based on an extensive administrative process that

11   provided them with numerous procedural mechanisms to offer and support whatever defenses

12   they could muster.  The over 500 pages of pleadings and hundreds of additional pages of exhibits

13   Defendants submitted, and the extensive administrative record as a whole, make this clear.  *See*

14   Defendants' OSC Answers and Exhibits, AR00159-957.   After analyzing the evidence, the

15   Commission found that Defendants had executed a manipulative scheme.

16       The Commission respectfully submits that the administrative record from the Assessment

17   Order provides this Court with all the facts and legal arguments needed to conduct its de novo

18   review and affirm the Commission's assessed penalties in full.

19                              **PROCEDURAL HISTORY**

20       Beginning in July 2007, the Commission's Office of Enforcement ("Enforcement")

21   conducted an extensive investigation of Defendants' western United States fixed-price next-day

22   physical electricity trading, also known as "cash" or "dailies" trading, that lasted over five years.

23   *See* Assessment Order at P 9, AR00007-08.  During the investigation, Defendants used the many

24   opportunities offered by the Commission's process to attempt to convince first Enforcement and

25   then the Commission not to proceed with the investigation.  *Id.  See also* Notice of Lodging

26   Admin. Record at 1-5, ECF No. 115.

27       On October 31, 2012, the Commission issued an *Order to Show Cause and Notice of*

28   *Proposed Penalty*, 141 FERC ¶ 61,084 (2012), AR00086-89 ("Order to Show Cause" or "OSC"),

to Defendants.  The Order to Show Cause proposed penalties against each Defendant and ordered them to respond to the Staff Report.  *Id.*  On November 29, 2012, Defendants elected de novo review of any Commission assessment rather than a hearing before an Administrative Law Judge.  Assessment Order at P 13, AR00009.  On December 14, 2012, each Defendant submitted an Answer.  *See* Defendants' OSC Answers and Exhibits, AR00159-957.  The Answers collectively contained or incorporated over 500 pages of argument and hundreds of additional pages of exhibits.  *Id.*  Enforcement filed a Reply on January 28, 2013.  Enforcement Reply to OSC Answers, AR0958-1062 ("Staff Reply").

On July 16, 2013, the Commission issued the Assessment Order, finding unanimously that "Respondents violated the Commission's Anti-Manipulation Rule from November 2006 to December 2008 by manipulating electricity markets in and around California through the use of a coordinated fraudulent scheme."  Assessment Order at P 2, AR00003.  The Commission assessed the following civil penalties against Defendants:  $435 million for Barclays, $15 million for Connelly, $1 million each for Brin, Levine, and Smith.  *Id.* at 84-85, AR00084-85.  Finally, the Commission ordered Barclays to disgorge $34.9 million in unjust profits.  *Id.* at P 151, AR00084.

On October 9, 2013, when Defendants failed to pay the assessed penalties and disgorgement, the Commission filed an action in this Court "for an order affirming the assessment of the civil penalty."  FERC Petition for Order Affirming the Commission's Assessment Order against Defendants, ECF No. 1.  On May 19, 2015, this Court denied Defendants' motion to dismiss or transfer, ECF No. 44.  Order, ECF No. 87.  *See also* Amended Order, ECF No. 88.  The Court issued a scheduling order on October 1, 2015, bifurcating its review of liability and civil penalties from disgorgement, ordering filing of the administrative record, and directing the Commission to file a motion to affirm the assessed penalties.  Scheduling Order, ECF No. 106.  The Commission filed the approximately 8,500-page administrative record on November 2, 2015.  *See* Notice of Lodging Admin. Record, ECF No. 115.

## STANDARD OF REVIEW

FPA Section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B), provides that in an action by the Commission "for an order affirming the assessment of the civil penalties," this Court "shall have

1  authority to review de novo the law and the facts involved, and shall have jurisdiction to enter a

2  judgment enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part,

3  such assessment." De novo review requires a "fresh, independent determination of 'the matter' at

4  stake." *See Doe v. United States*, 821 F.2d 694, 697-98 (D.C. Cir. 1987) (en banc) (Ginsburg, J.

5  R. B.) (citations omitted). "Essentially then, the district court's charge was to put itself in the

6  agency's place, to make anew the same judgment earlier made by the agency." *Id.* at 698. This

7  Court has fulfilled the de novo role when "the district judge made the same judgment earlier

8  entrusted to the agency head, and he apparently did so for himself, *i.e.*, on the basis of

9  information he found sufficient to make the judgment, and without deferring to the prior agency

10  conclusion on the same matter."[3] *Id. See also* Amended Joint Status Report at 6-9, ECF No. 97.

## LEGAL STANDARD

12  FPA Section 222, 16 U.S.C. § 824v(a), makes it "unlawful for any entity . . . directly or

13  indirectly, to use or employ, in connection with the purchase or sale of electric energy . . . any

14  manipulative or deceptive device or contrivance . . . in contravention of such rules and regulations

15  as the Commission may prescribe." The Commission implemented this statute through the Anti-

16  Manipulation Rule, which prohibits: (1) using a fraudulent device, scheme, or artifice or engaging

17  in any act, practice, or course of business that operates or would operate as a fraud or deceit upon

18  any entity; (2) with the requisite *scienter*; (3) in connection with a transaction subject to FERC's

19  jurisdiction. 18 C.F.R. § 1c.2; *Prohibition of Energy Market Manipulation*, Order No. 670, 114

20  FERC ¶ 61,047 (2006) ("Order No. 670") at P 49. "The Commission defines fraud generally, that

21  is, to include any action, transaction, or conspiracy for the purpose of impairing, obstructing, or

22  defeating a well-functioning market. Fraud is a question of fact that is to be determined by all the

23  circumstances of a case." Order No. 670 at P 50.

24  As FPA Section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B), does not specify a burden of

25  proof, this Court should conduct its review using the preponderance of the evidence standard. *See*

26

27  [3] Although this Court's standard of review is de novo, the *Chevron* doctrine applies to legal interpretations of FPA provisions addressed in Commission orders and rulemakings. *See* FERC's

28  Opposition to Defendants' Motion to Dismiss or Transfer at 24-26, ECF No. 65.

*Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993) ("'preponderance of the evidence,' [is] the most common standard in the civil law").

<u>**ARGUMENT**</u>

**I.     THE ASSESSMENT ORDER INCLUDED DETAILED FACTUAL FINDINGS AND LEGAL CONCLUSIONS REGARDING THE MANIPULATIVE SCHEME**

The Commission concluded that, in violation of the Anti-Manipulation Rule and FPA Section 222, "Respondents intentionally engaged in an unlawful scheme to manipulate prices on 655 product days over 35 product months in the period between November 2006 to December 2008 in the Commission-regulated physical markets at the four most liquid trading points in the western United States."  Assessment Order at P 2, AR00003.  "Put simply, Respondents traded fixed price products not in an attempt to profit from the relationship between the market fundamentals of supply and demand, but instead for the fraudulent purpose of moving the Index price at a particular point so that Barclays' financial swap positions at that same trading point would benefit."  *Id.*  The Commission also found that Defendants' fixed-price next-day physical trading was "generally uneconomic."  *Id.* at P 4, AR00004.

**A.     Defendants Engaged in a Manipulative Scheme**

After reviewing the detailed record, the Commission "conclude[d] that Respondents engaged in a fraudulent device, scheme, or artifice and engaged in a course of business that operated as a fraud or deceit upon next-day fixed-price electric market participants and on the ICE daily Index electric market participants in the Manipulation Months."  *Id.* at P 31, AR00020. "Specifically, [the Commission] foun[d] the allegations and evidence demonstrate that Respondents amassed Physical Positions generally and directionally opposite to Financial Swaps, which were then flattened—often at a loss—intentionally to the benefit of the Financial Swaps, and [that] those actions . . . constitute fraud."  *Id.*

The Commission summarized the evidence it relied upon as follows: (1) Defendants' pattern of building physical positions opposite to financial swaps in the manipulation months and flattening those physical positions in the dailies in the direction that benefited their financial

swaps; (2) the difference between Defendants' trading in months where Enforcement alleged manipulation and months where it did not; (3) the communications "which describe and substantiate the scheme and demonstrate the affirmative, coordinated, concerted, and intentional effort, as well as individual actions, among the Respondents to effectuate that scheme;" (4) Defendants' "failure to respond at all in their answers to allegations made by [Enforcement] concerning the building of Physical Positions and Financial Swap positions as being part of the manipulative scheme . . . and Respondents' attempts to instead address only the Dailies trading;" (5) "the uneconomic nature of the Dailies trading;" (6) "the inconsistency between the Individual Traders' testimony under oath concerning certain of their communications and behavior, and the explanation the traders present[ed] in their Submissions [to the Commission] of those same communications and behavior;" and (7) "the failure of Respondents' economic, statistical and legal analyses to provide explanation of or defense for the Physical Positions, Financial Swaps and the Dailies trading." *Id.* at P 7, AR00005-7 (citations omitted). *See also id.* at P 32, AR00021-22.

In finding Defendants liable, the Commission considered and rejected a series of factual arguments and defenses put forth by Defendants:[4]

*First*, the Commission rejected Defendants' arguments that the evidence did not demonstrate they engaged in a joint manipulative scheme. Assessment Order at PP 33-35, AR00022-23. As the Commission concluded, Enforcement "provided trade data analyses, communications among and between the Individual Traders, and evidence of daily meetings

---

[4] The Commission also rejected a number of legal defenses. *See* Assessment Order at PP 21-22, AR00014-15 (rejecting statute of limitations defense); PP 23-24, AR00015-16 (rejecting estoppel defense); PP 36-37, AR00023-25 (rejecting argument that a joint scheme was not actionable under the FPA); PP 50-58, AR00034-38 (rejecting argument that open-market trades cannot be manipulative as a matter of law); P 59, AR00038-39 (rejecting argument that demonstrating artificial price or market power are necessary elements of a violation of the Anti-Manipulation Rule and FPA Section 222); P 61, AR00040 (rejecting argument that a legitimate business purpose is an affirmative defense to manipulation and holding rather "that factor would just be one of many that the Commission would consider to determine whether each [entity] possessed scienter"). This Court similarly rejected many of those same defenses. *See* Amended Order at 10-14 (statute of limitations), 34 (joint scheme), 32-34 (open-market trades), ECF No. 88.

1   where the Individual Traders discussed Financial Swap positions and coordination of physical

2   trading coordination." *Id.* at P 33, AR00022 (citation omitted).  *See also* Staff Reply at 57-66,

3   AR01017-26.

4          *Second*, the Commission rejected Defendants' arguments that no pattern of manipulative

5   trading existed across the thirty-five product months where Enforcement alleged manipulation

6   (Assessment Order at PP 38-41, AR00025-28), finding instead that "the record in this case

7   reflects a sustained and deliberate effort by Respondents first to build Physical Positions in a

8   direction opposite to their Financial Swaps and then to flatten those Physical Positions in order to

9   benefit the Financial Swaps" (*id.* at P 40, AR00027 (footnote omitted)).   In considering this

10   argument, the Commission rejected invitations by Defendants to consider their trading

11   "aggregated" across the entire 2006-08 period as a single unit (*id.* at P 40, AR00026), or

12   alternatively to consider it in a "disaggregate[d]" fashion on a minute-by-minute basis, as

13   "nothing more than an attempt to obfuscate the evidence of the scheme" (*id.* at P 40 n.137,

14   AR00027).  The Commission also rejected Defendants' related arguments about how the dailies

15   trading was not "aggressive" (as defined by Defendants) and therefore could not be manipulative

16   because those arguments addressed just one part of the three-part scheme and also were based on

17   "irrelevant" and "unsurprising" facts that did not prove or disprove aggressiveness.  *Id.* at P 41,

18   AR00027-28.  *See also* Staff Reply at 76-78, AR01036-38.

19          *Third*, the Commission rejected Defendants' argument that they could not have been

20   manipulating if their cash trading made money on a particular trading day or month because

21   "[p]rofitability is an indicium to be considered among the overall facts."  Assessment Order at P

22   43, AR00029.  Indeed, the mere fact that some of Barclays' physical trades were profitable on

23   occasion is of no significance because Defendants' "trading was generally uneconomic" across

24   the trading days (*id.*), and "the credible information . . . indicates that Respondents engaged in the

25   physical manipulation not only at a financial loss, but by accepting that such losses were a

26   foreseeable outcome of the scheme" (*id.* at P 44, AR00030).  *See also* Staff Report at 28-35,

27   AR00119-26; Staff Reply at 76-78, AR01036-38.

28

*Fourth*, the Commission considered Defendants' argument that the alleged manipulation was "irrational" because their financial positions lacked the proper mathematical ratio to their physical positions to provide them with an "incentive" to manipulate.  Assessment Order at P 46, AR00031.  Among other reasons, the Commission rejected Barclays' argument as "contrary to the contemporaneous evidence presented to us because the communications among the traders themselves demonstrate[d] that the traders understood that they were moving the Index to benefit Barclays' financial position."  *Id.* at P 47, AR00032.  Moreover, Defendants' argument was "inherently flawed" because "Respondents' theory wrongly assumes that each day's trading would unfold identically—with the same prices, volumes, and trade times—whether or not Barclays traded that day.  In short, Barclays wrongly assumes that its trading Dailies had no impact on other market participants." *Id.* at P 48, AR00033.   *See also* Staff Reply at 71-76, AR01031-36.

*Fifth*, the Commission found Defendants' arguments that they "could not have impacted price" to be contradicted by the Individual Traders' communications.  Assessment Order at P 59, AR00038-39 (citing Staff Reply at 67-68, AR01027-28).   The Individual Traders themselves certainly thought they could impact price.  *See* Staff Reply at 67-68, AR01027-28 (discussing Defendants' communications where they talked about impacting prices).  They said so repeatedly. *Id.*  And their communications make clear that impacting price is exactly what they intended.  *Id.*

*Sixth*, the Commission rejected the defense that the "trades were made for a legitimate business purpose" as contradicted by the actual evidence in the case, finding "[i]n short, manipulation is not a legitimate business purpose."  Assessment Order at P 60, AR00039.  *See also* Staff Reply at 80-84, AR01040-44.

The Assessment Order examined these arguments and numerous others raised by the Parties and concluded that Defendants had engaged in a manipulative scheme.

## B.   Defendants Acted with *Scienter*

The Commission found that Enforcement "identifies evidence that, we find, demonstrates *scienter*, including direct evidence of manipulative intent, such as emails and instant messages (IMs), suspicious timing or repetition of transactions, execution of transactions benefiting

derivative positions, and lack of legitimate economic motive or economically irrational conduct." Assessment Order at P 62, AR00040 (citation omitted).  "The evidence establishes . . . that the Individual Traders . . . worked, collaborated, and communicated with one another about the manipulative scheme."  *Id.* at P 63, AR00040 (citations omitted).  The Commission further concluded that "[t]he evidence shows that [Defendants] understood how this scheme would work; that they expected it to work; that they intended it to work; that they built positions and executed trades for the purpose of making it work; and that they communicated with one another (and occasionally with outsiders), and sometimes with considerable candor, about various aspects of the workings of this scheme."  *Id.* at P 63, AR00041.  "The evidence presented demonstrates that each of the Respondents individually, and all of them together, knowingly or recklessly undertook actions in furtherance of the manipulative scheme."  *Id.* at P 64, AR00041.

The Commission determined that Enforcement presented "compelling evidence to demonstrate that the Individual Traders understood the impact their Dailies trading would have on the Index and that they executed those trades for precisely that reason, communicating freely about 'trying to drive price,' 'protect[ing]' their positions, and 'mov[ing]' or 'affect[ing]' the Index."  *Id.* at P 7, AR00006-7.  "Speaking documents that provide direct evidence of a violation are rare in fraud and manipulation cases, which do not require direct evidence of intent and instead typically rely on more indirect inferences of intent from circumstantial evidence."  *Id.* at P 7, AR00007 (citation omitted).  *See also, e.g., United States v. Bertie*, 529 F.2d 506, 508 n.3 (9th Cir. 1976) (Kennedy, J. A. M.) ("Courts have recognized that direct proof of fraudulent intent is so peculiarly within the control of those sought to be charged with fraud that it is proper, and usually necessary, to show the inferences of fraudulent intent from the circumstances surrounding the transaction.").  Many of these speaking documents are tied "to contemporaneous (or near contemporaneous) trading in furtherance of the scheme."  Assessment Order at P 7, AR00007 (citation omitted).

In addition to the contemporaneous communications, the Commission relied upon "[1] information which demonstrates the pattern of Dailies trading consistent with the scheme; [2] information which demonstrates the pattern of establishing the physical and financial positions

1   and identifies those positions as being established by or held in the books of the various

2   Individual Traders; [3] information which demonstrates that Respondents' Dailies were generally

3   traded at a loss; and [4] information proffered by [Enforcement] demonstrating that price was

4   impacted by the trading of Dailies." *Id*. at P 57, AR00037.

5        Considering Brin's *scienter*, the Commission found Brin's claims that he was too

6   inexperienced to understand or execute the manipulative scheme irreconcilable with his

7   contemporaneous, unambiguous statements, particularly the November 30, 2006 IM, AR00679-

8   82, in which Brin states that Connelly is "oppiste [sic] fin[ancial]/phys[ical], im [sic] doing

9   phys[ical] so i [sic] am trying to drive price in fin[ancial] direction." Assessment Order at PP 76-

10  80, AR00047-50.  As this IM shows, Brin had detailed knowledge of Connelly's positions and

11  intended his physical trading to "drive price" in the direction of the "much bigger" financial

12  positions.  *Id*.  Defendants' "silence on any possible alternative meaning for this statement"

13  "tacitly acknowledge[s]" the statement's clear meaning.[5]  *Id*. at 78, AR00049 (citation omitted).

14       Considering Smith's *scienter*, the Commission rejected his arguments that his numerous

15  IMs discussing the manipulative scheme constituted "playful banter" and could not be connected

16  to "actual inappropriate trading activity."  *Id.* at PP 81-82, AR00050.  In a November 3, 2006 IM,

17  AR05576-77, Smith stated "I totally fuckked [sic] with the Palo [i.e. PV] m[a]rk[e]t today" by

18  "lifting the piss out of the Palo" because "my goal was to keep the sp/palo [spread] tighter."  The

19  Commission found this IM to be "compelling evidence of *scienter*" and directly tied to Smith's

20  trading on that day.  Assessment Order at PP 83-84, AR00050-52.  "In this instance, because

21  Smith was unguarded in his IM chatter, the evidence provides a direct window into his

22  understanding of the manipulative scheme, even as he was in the process of implementing it."[6]

23  *Id.* at P 84, AR00051.

---

24  [5] Although the November 30, 2006 IM, AR00679-82, is the clearest expression of Brin's *scienter*,
25  the Staff Report documents other examples.  *See* Staff Report at 40-41, AR00131-32; 45-46,
    AR00136-37; 48-49, AR00139-40.
26

27  [6] "[T]he events of November 3, 2006 do not represent the only instance in which Smith explicitly
    describes the manipulative scheme, in whole or in part, and actions he has taken in furtherance of
28  it."  Assessment Order at P 84, AR00051-52 (citation omitted).  The Staff Report at 40-46,

Considering Levine's *scienter*, the Commission concluded that her communications demonstrated her intent and were consistent with her trading.  In assessing IMs Levine exchanged with a broker on October 11, 2006, AR05565-68, where she explained that Barclays traded index to "protect a position," the Commission rejected Levine's contention in her Answer to the Staff Report that she "was not talking about Barclays."  *See* Levine Answer at 21, AR00904.  The Commission found this contention "not credible" in light of her investigative testimony where she repeatedly insisted she did not know other people's strategies.  Assessment Order at PP 88-89, AR00053.  It also found her explanation in her Answer that "protecting" refers to "flattening" as lacking credibility because in the same October 11, 2006 IMs the broker had already discussed "flattening" positions as a reason to trade index to which Levine added the additional reasons of "protect[ing] a position."  *Id.* at P 89, AR00053-54.

The Commission also reviewed two communications where Levine stated how she would like her position traded while she was out of the office:  1) a January 31, 2007 email, AR05615-16, from Levine to her Barclays' colleagues where she documented her financial position in the SP to PV spread and requested "[i]f we can keep the PV index up and the SP daily index down somehow that will be good to keep the BOM [(Balance of Month financial swap)] in" and 2) an April 2, 2007 email, AR05780, from Levine to her colleague, Monal Dhabliwala, where she stated "[i]f you can sell a bunch of index that would be good to keep the price up."  Assessment Order at PP 90-92, AR00054-55.  As the Commission found, Levine was unable to offer any explanation for the first and "could not offer a credible alternative explanation" for the second.[7]  *Id.* at P 94, AR00056.  Finally, the Commission also rejected her argument that Enforcement was unable to link her April 2, 2007 email, AR05780, to Dhabliwala to cash trades made by Brin

AR00131-37, discusses these other communications in detail.

[7] The Commission considered a number of "Respondents' newly advanced explanations" for the communications demonstrating *scienter* and accorded them "little weight" because, having reviewed their investigative testimony, "in many instances those traders either could not remember what those communications meant or professed not to know what they meant."  Assessment Order at P 47 n. 164, AR00033.  "This is especially true given what the Commission sees as the plain meaning of the language in those communications as compared to the unnatural interpretations which the traders now advance."  *Id.*

1   because she admitted that the email was "an instruction" and also admitted that "I don't

2   necessarily know who would be executing." Assessment Order at P 95, AR00056. "Indeed, we

3   find these communications demonstrate that: (1) Levine understood that financial positions could

4   be 'protected' by Index trading; (2) Levine established positions that would have benefited from a

5   change in the Index price; and (3) Levine requested her colleagues to execute cash trades for the

6   explicit purpose of moving Index and thereby enhancing the value (or preventing the diminution)

7   of those positions."[8] *Id.* at P 96, AR00056.

8        Considering Connelly's *scienter*, the Commission based its determination not only on

9   certain communications but also on the trade data, the facts surrounding his operational oversight,

10  and the movement of the scheme's cash-trading losses into his trading books. Assessment Order

11  at PP 98-99, AR00057-58. For example, the Commission considered Connelly's unusual

12  decision to trade dailies on February 28, 2007 in conjunction with two of his IMs that day. *Id.* at

13  PP 101-05, AR00058-60. In these IMs, AR05648-50, Connelly makes fun of a trader threatening

14  to report him to FERC (AR05648-49) and in response to the question of "[Y]ou going to have fun

15  with the index all month[?]" stated "[N]o—it isn't going to affect much" (AR05650). *See*

16  Assessment Order at PP 102-103, AR00058-59. The Commission found "[i]t was Connelly

17  himself who introduced into the conversation the idea that his trading could 'affect' the Index,

18  and, as a result, this further demonstrates his belief that the Index was affected by his trading," a

19  position which contradicted his later stated assertion that "it was impossible to affect the Index –

20  or to affect it enough to make the manipulative scheme work." Assessment Order at P 104,

21  AR00059. These IMs correspond with Connelly's uneconomic dailies trading that day when he

22  "came to the office unusually early, traded physicals, which he did not typically do, and traded

23  them in volumes and in a direction that would have been expected to move the Index price in a

24  direction favorable to his Financial Swaps for March." *Id.* at P 105, AR00060 (footnote omitted

25  but noting a $44,316 loss from Connelly's trading of dailies).

26

---

27  [8]  The Staff Report also discusses additional communications between Brin and Smith documenting Levine's *scienter* and the losses the cash traders accepted as part of the scheme.

28  Staff Report at 44-46, AR00135-37.

A few days after Connelly learned of FERC's investigation, the Western Power Trading Forum's newsletter unrelatedly questioned unusual patterns of physical trading, asking "'[w]hat the hell is going on out there?' and noted that 'the worst thing possible would be one party trying to move the financial markets with large physical positions.'"  *Id.* at P 106, AR00060 (alteration in original; quoting AR05859-69 at AR05860).  "Before the next business day, Connelly wrote an email to the publisher . . . offering an innocuous explanation for the physical trading volumes, and urging him to 'embrace the change . . . as opposed to being afraid of it.'  Connelly consented to allow [publication of] his email, but requested that his and Barclays' identities be kept anonymous."  *Id.* at P 106, AR00060 (quoting AR05793).  The Commission considered whether Connelly was trying "to quash discussions regarding Barclays' manipulation . . . by providing alternative explanations for large volumes of cash trading."  *Id.* at P 107, AR00061.  Considering this email and its unusual timing, the Commission found Connelly's request for anonymity "difficult to reconcile" with his prior testimony that his "'raison d'etre' for his job was to '*raise* Barclays' profile'" and rejected his newly-proffered explanation for anonymity of not being authorized to speak to the media as "not credible" given its absence from his prior testimony.  *Id.* at P 109, AR00061-62.

Looking beyond Connelly's communications and personal trading, the Commission found "[i]n fact these communications, though probative, are neither the only nor even the most compelling evidence of Connelly's manipulative intent" (*id.* at P 98, AR00057):

> There are additional facts, communications, and trade data which demonstrate that Connelly understood the manipulative strategy that he both oversaw and personally implemented, and that directly contradict his current claims of ignorance of the scheme.  For example, it is impossible to reconcile his role as the Managing Director of Barclays' North American power trading desk, with the ignorance he has now professed regarding his subordinates' trading practices, strategies, and profitability.  In addition, it is also clear that Connelly allowed his traders to move their sometimes substantial losses incurred as a result of trading Dailies into his own book.

*Id.* at P 99, AR00057 (citations omitted).  Finally, the Commission considered Levine's January 31, 2007 email, AR05615-16, discussed *supra* at 11-12, that "was addressed to Connelly among others" and noted that "Respondents have not put forward any evidence that Connelly responded

to this email, and they certainly do not suggest that he found anything untoward about the email. And, tellingly, none of the Respondents in this proceeding have offered an innocent interpretation of this document." Assessment Order at P 100, AR00058 (footnote omitted).

Although finding that Connelly "acted with actual intent," the Commission "also f[ound] that the evidence supports a finding that his conduct satisfies the lesser 'recklessness' standard, however stringently defined." *Id.* at P 110, AR00062 (footnote omitted). The Commission made the same finding for Brin, Levine, and Smith.[9] *Id.* at P 110 n.323, AR00062. Defendants did not contest that the Individual Traders' *scienter* was imputable to Barclays. *Id.* at P 111, AR00063.

**C.    Defendants' Scheme Used or was in Connection with Jurisdictional Products**

The Commission rejected Barclays' argument that it lacked jurisdiction "over what [Barclays] describes as the 'financially-settled day-ahead transactions' at issue." *Id.* at P 112, AR00063 (citation omitted). Finding that both the establishment of physical positions "which contained physical delivery obligations" in step two of the manipulative scheme and the flattening of those obligations through trading dailies during step three involved physical products (*id.* at P 114, AR00064), the Commission held that Defendants "were engaging in the 'sale of electric energy to any person for resale' subject to section 201 of the FPA" (*id.* at P 115, AR00064-65 (quoting 16 U.S.C. §§ 824(b), (d))). Moreover, it found that because Defendants traded "to affect" index prices, they traded "in connection with" FERC-jurisdictional products under FPA Section 222, 16 U.S.C. § 824v, and the Anti-Manipulation Rule. Assessment Order at P 115, AR00065. This Court rejected the same blanket jurisdictional defense. Amended Order at 23-31, ECF No. 88.

---

[9] The Commission rejected a number of arguments that a heightened level of intent is necessary for *scienter*. Assessment Order at PP 66-68, AR00042-43 (rejecting argument that recklessness is insufficient or that "extreme" recklessness is necessary); PP 69-70, AR00043-44 (rejecting argument that proving *scienter* requires showing that the sole intent was manipulative and holding "[t]he Anti-Manipulation Rule requires manipulative intent; it does not require *exclusively* manipulative intent"); PP 71-73, AR00044-45 (rejecting claim that *scienter* requires proving each Individual Trader's personal motive for and benefit received from the manipulation but finding that the evidence demonstrated motive); PP 74-75, AR00046-47 (rejecting claim that *scienter* could only be shown by communications from the exact time period of specific manipulative transactions and that each Defendant's communications must be considered in isolation).

II.     **THIS COURT SHOULD AFFIRM THE ASSESSED PENALTIES**

Having found Defendants liable, the Commission considered the penalties proposed by Enforcement and Defendants' arguments against those penalties, and assessed penalties of $435 million against Barclays, $15 million against Connelly, and $1 million each against Brin, Levine, and Smith.   Assessment Order at PP 117-46, AR00066-82.   "Aside from objecting to the imposition of penalties, Barclays presents no alternative penalty calculation."[10]   *Id.* at P 124, AR00071.   FPA Section 316A(b), 16 U.S.C § 825o-1(b), provides for "a civil penalty of not more than $1,000,000 for each day that such violation continues."   Considering the number of violations, the Commission found the recommended $435 million civil penalty for Barclays to be "well within our statutory authority" (Assessment Order at P 120, AR00067-68) because "each manipulative trade made pursuant to the unlawful scheme constitutes a separate violation" (*id.* at P 120 n.347, AR00068).   "Even if Respondents engaged in only an average of two or three manipulative trades on each of the 655 product days at issue here, that would amount to a maximum penalty under the FPA of well over $1 billion, and perhaps more than $2 billion."   *Id.*

FPA Section 316A(b), 16 U.S.C. § 825o-1(b), provides that "[i]n determining the amount of a proposed penalty, the Commission shall take into consideration the seriousness of the violation and the efforts of such person to remedy the violation in a timely manner."   Just as district courts first look to the United States Sentencing Guidelines as a starting point and initial benchmark before conducting an individualized assessment under statutory sentencing factors, *Gall v. United States*, 552 U.S. 38, 50 (2007), the Commission first considered its Penalty Guidelines, *Enforcement of Statutes, Orders, Rules, and Regulations*, 132 FERC ¶ 61,216 (2010) ("Penalty Guidelines"), before conducting an independent assessment under the statutory penalty factors.[11]   *See* Assessment Order at P 121, AR00068-69.   *See also* FERC Resp. to Court's Aug. 3, 2015 Order Requesting Briefing ("FERC Bifurcation Response") at 5-7, ECF No. 103.

---

[10]  The Individual Traders also offered arguments against penalties but offered no alternative penalty recommendations.  *See* Assessment Order at PP 133-46, AR00075-82.

[11]  The Penalty Guidelines were adopted by the Commission as a non-binding policy statement and do not supplant the two statutory factors.  Penalty Guidelines at P 19 ("our decision to adopt a

1    In its separate analysis under the statutory penalty factors, the Commission considered the

2   "seriousness of the violation" and "efforts to remedy the violation in a timely manner."  *See* FPA

3   § 316A(b), 16 U.S.C. § 825o-1(b).  At the outset, the Commission rejected the argument that

4   Barclays "'would not be liable for any civil penalty' . . . if [Enforcement] proved 'no market

5   harm.'  That argument falls well short of the mark.  The sanctions of section 316A of the FPA are

6   penalties for unlawful conduct—not restitution, compensatory relief, disgorgement, or any other

7   legal or equitable remedy."[12]  Assessment Order at P 127, AR00072 (footnote omitted) (quoting

8   Barclays' Answer at 31 & n.34, AR00194).  *See also* FERC Bifurcation Resp. at 7-8 (discussing

9   separate nature of penalties and disgorgement).  Finding that quantifying loss "is not the only

10   method of assessing 'seriousness'—or even a necessary one" (Assessment Order at P 128,

11   AR00073), the Commission considered the conduct directly:

12       It is evident that Respondents' scheme was, in fact, serious.  It was complex,
         requiring the Respondents to coordinate as they traded multiple products over
13       long periods of time.  It was also widespread, involving trading of more than 35
         monthly products on more than 655 product days at the four most liquid
14       electricity trading points in the western United States at the time.  The scheme
         was also significant because Respondents manipulatively traded tens of thousands
15       of [megawatt-hours] of electricity to affect monthly Index.  Moreover, because
         large volumes of electricity are traded at the Index price, Respondents'
16       manipulative trading affected the wholesale price of electricity in the western
         United States and, by affecting the cost of electricity eventually borne by load
17       serving entities (including public utilities with load serving obligations), the
         scheme affected the ultimate retail price paid by tens of millions of consumers in
18       California and elsewhere in the western United States.  Finally, the evidence
         recounted . . . demonstrates that Respondents were aware of the seriousness of
19       their conduct even as they manipulated prices.

20

21

22

---

23   guidelines-based approach does not restrict the discretion that we have always exercised and will
     continue to exercise in order to make an individualized assessment based on the facts presented in
24   a given case").

25   [12] Considering the implications of Barclays' argument, the Commission also found that "requiring
     [Enforcement] to precisely quantify the difference between the fair market value and the
26   manipulated value of the Index—and thus market harm—would require, in effect, [Enforcement]
     to prove that the manipulative scheme resulted in an 'artificial price' even though it is not an
27   element of manipulation under either the FPA or the Commission's regulations."  Assessment
     Order at P 129, AR00074 (citations omitted).
28

1   *Id.* at P 130, AR00074.  "Looking to the other statutory factor, Respondents did not attempt 'to

2   remedy the violation in a timely manner.'  Indeed, it appears that the scheme ended only after

3   Respondents were aware that they were being investigated.  And there is no evidence that

4   Respondents made any attempt to remedy the harm they caused."  *Id.* at P 131, AR00074.

5   Finding "[t]he unlawful conduct here not only was widespread in scope, but it affected the

6   integrity of the nation's wholesale energy markets," the Commission assessed penalties of $435

7   million against Barclays.  *Id.* at P 132, AR00075.

8        The Commission assessed penalties of $15 million against Connelly, and $1 million each

9   against Brin, Levine, and Smith.  *Id.* at P 137, AR00077 (Connelly); P 140, AR00079 (Brin); P

10  143, AR00080 (Levine); P 146, AR00082 (Smith) (citations omitted).  Because the "Penalty

11  Guidelines do not apply to individuals," it applied the statutory factors directly.  *Id.* at P 134,

12  AR00075 (citation omitted).  Rejecting Connelly's arguments why he deserved no penalty, the

13  Commission, after emphasizing particular facts, concluded "[t]he evidence . . . demonstrates that

14  he directed the scheme with manipulative intent, and that he was aware that such conduct was

15  unlawful."  *Id.* at P 136, AR00076.

16       Turning to arguments raised by Brin, Levine, and Smith against penalties, the Commission

17  concluded that "Brin and the other traders undoubtedly had knowledge of both the scheme and

18  that it was unlawful.  Indeed, the evidence indicates that the traders undertook the scheme in spite

19  of Barclays' compliance training, and . . . Brin in particular understood the concept of

20  uneconomic trading."  *Id.* at P 139, AR00078 (citation omitted).  "Brin's role was substantial, for

21  not only did he participate in the scheme as a cash trader, but he was responsible for informing the

22  other traders of Connelly's positions to be traded each day, which was critical in ensuring the

23  scheme's continuation and success."  *Id.*  Similarly, the Commission found that "[t]he evidence . .

24  . indicates that Levine participated in the scheme, and did so with manipulative intent."  *Id.* at P

25  142, AR00079.  Finally, the Commission found that "Smith's conduct and intent was particularly

26  egregious and visible."  *Id*. at P 145, AR00081.

27       Considering the Individual Traders' arguments that their "personal financial circumstances

28  may make payment of these penalties difficult," the Commission found that "participation in a

serious scheme to manipulate the nation's wholesale power markets warrants the imposition of significant penalties" and that the penalties "were well short of what the statute allows." *Id.* at P 137, AR00077 (Connelly); P 140, AR00078 (Brin); P 143 AR00080 (Levine); P 146, AR00081-82 (Smith). As to Connelly, the Commission determined that the $15 million penalty "provides appropriate deterrence to other managers who might otherwise seek to induce their subordinates to participate in a scheme." *Id.* at P 137, AR00077. For Brin, Levine, and Smith, the Commission found the $1 million penalty for each "while severe, [to] provide[] appropriate deterrence to future traders." *Id.* at P 140, AR00078-79 (Brin); P 143, AR00080 (Levine); P 146, AR00082 (Smith). "In fact, given the facts and circumstances of [their] role[s] in this manipulative scheme, the $1 million penalty represents the minimum penalty that we would find acceptable in this matter." *Id.*

The administrative record provides ample factual and legal bases for this Court to affirm the assessed penalties. As discussed above, the Commission evaluated the evidence cited by the Parties and determined that Defendants engaged in the three-part manipulative scheme alleged by Enforcement (*see id.* at P 7, AR00005-7; P 17, AR00011; P 31, AR00020; P 65, AR00041) and had failed to put forth valid defenses supported by the evidence (*see supra* at 6-8). This is despite Defendants submitting over 500 pages of arguments and hundreds of pages of exhibits in their defense. *See* Defendants' OSC Answers and Exhibits, AR00159-957. These exhibits included analyses by two groups of experts, witness testimony, market fundamentals data, and information from the Intercontinental Exchange. *See* AR00291-456, AR00520-32.

Defendants also submitted factual affidavits of Connelly (AR00490-92) and of another Barclays' employee who worked in risk management (Aff. of Amy McLean with accompanying exhibits, AR00457-89). The Commission placed no page limits on the arguments or evidence that Defendants could offer. *See* OSC, AR00086-89. If Barclays had more data, documents, explanation, or argument about what its own employees did and intended to do, it could have put all of this into the record. This case is about what Defendants did—and thus the core evidence comes from Barclays' own files. Barclays' own documents and the testimony of its own witnesses failed to offer a legitimate, non-manipulative explanation for their trading.

In performing a de novo review, this Court has the discretion to expand or limit the scope of evidence.  *See Doe*, 821 F.2d at 698 (citing B. Mezines, J. Stein & J. Gruff, Administrative Law § 51.04 (rev. ed. 1985)).  Nevertheless, the Commission respectfully submits that expanding the record is unnecessary in this case due to the voluminous administrative record and the Commission's careful analysis of the various arguments and evidence.[13]

The Commission respectfully submits that this Court should affirm the assessed penalties in full.  Although this Court is not bound by the Commission's assessment and is free to determine greater or lesser penalties under the statutory factors, the Commission considered those factors and the supporting evidence in detail.  As the nation's primary regulator of the interstate electricity markets, the Commission possesses substantial expertise that it brought to bear in determining that these violations were "in fact, serious."  *See* Assessment Order at P 130, AR00074.

## CONCLUSION

For the foregoing reasons, this Court should affirm the penalties assessed by the Commission in full.

DATED: December 2, 2015                    FEDERAL ENERGY REGULATORY
                                           COMMISSION


                               By:   */s/ Wesley J. Heath*
                                     WESLEY J. HEATH
                                     DAVID A. APPLEBAUM
                                     EMILY C. SCRUGGS
                                     MARIA CRISTINA MELENDEZ

---

[13] The Commission now possesses additional evidence that was unavailable during the administrative litigation because Defendants fought subpoenas requiring additional documents and testimony and belatedly produced certain evidence after the Penalty Assessment.  *See Barclays Bank PLC*, 143 FERC ¶ 61,024 (2013) (denying Barclays' motion to quash subpoena); *FERC v. Smith*, No. 12-MC-74, ECF No. 23 (N.D.N.Y. 2012) (recommending enforcement of subpoena against Smith), AR01063-81; Decl. of Wesley J. Heath at ¶ 2.  If the Court decides additional evidence of *scienter* is necessary, the Commission will ask to make this new evidence part of the record.

PLAINTIFF'S MOTION TO AFFIRM CIVIL                    19
PENALTIES AND MEMORANDUM IN SUPPORT