1  THOMAS J. NOLAN (SBN 66992)
Thomas.Nolan@skadden.com
2  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
3  Los Angeles, California 90071-3144
Telephone:     (213) 687-5000
4  Facsimile:     (213) 687-5600

5  *Please see continuation page for a complete
list of counsel.*

6

7

8

9

10

11

12              IN THE UNITED STATES DISTRICT COURT

13           FOR THE EASTERN DISTRICT OF CALIFORNIA

14  FEDERAL ENERGY REGULATORY          CASE NO.: 2:13-cv-02093-TLN-EFB (TEMP)
    COMMISSION,                      )
15                                   )  **DECLARATION OF R. GLENN HUBBARD IN**
                                     )  **SUPPORT OF DEFENDANTS' OPPOSITIONS**
            Plaintiff,               )  **TO PLAINTIFF'S MOTION TO AFFIRM CIVIL**
16                                   )  **PENALTIES**
        v.                           )
17                                   )
    BARCLAYS BANK PLC; DANIEL         )
18  BRIN; SCOTT CONNELLY; KAREN       )
    LEVINE; and RYAN SMITH,          )
19                                   )
            Defendants.              )
20                                   )
                                     )
21                                   )
                                     )
22                                   )
                                     )
23                                   )
                                     )
24                                   )
                                     )
25                                   )

26

27

28

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

**CONTINUATION SHEET: DEFENDANT BARCLAYS BANK PLC'S COUNSEL**

STEVEN R. GLASER (Admitted *Pro Hac Vice*)
Steven.Glaser@skadden.com
BORIS BERSHTEYN (Admitted *Pro Hac Vice*)
Boris.Bershteyn@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Telephone:      (212) 735-3000
Facsimile:      (212) 735-2000

PATRICK FITZGERALD (Admitted *Pro Hac Vice*)
Patrick.Fitzgerald@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
Telephone:      (312) 407-0700
Facsimile:      (312) 407-0411

JOHN N. ESTES III (Admitted *Pro Hac Vice*)
John.Estes@skadden.com
DONNA M. BYRNE (Admitted *Pro Hac Vice*)
Donna.Byrne@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone:      (202) 371-7000
Facsimile:      (202) 393-5760

GREGORY A. MARKEL (Admitted *Pro Hac Vice*)
Greg.Markel@cwt.com
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone:      (212) 504-6000
Facsimile:      (212) 504-6666

PAUL J. PANTANO JR. (Admitted *Pro Hac Vice*)
Paul.Pantano@cwt.com
JODI L. AVERGUN (Admitted *Pro Hac Vice*)
Jodi.Avergun@cwt.com
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, N.W.
Washington, D.C. 20001
Telephone:      (202) 862-2410
Facsimile:      (202) 862-2400

Attorneys for BARCLAYS BANK PLC

**CONTINUATION SHEET: DEFENDANT BARCLAYS BANK PLC'S COUNSEL**

SETH P. WAXMAN (Admitted *Pro Hac Vice*)
Seth.Waxman@wilmerhale.com
DAN M. BERKOVITZ (Admitted *Pro Hac Vice*)
Dan.Berkovitz@wilmerhale.com
JONATHAN G. CEDARBAUM (Admitted *Pro Hac Vice*)
Jonathan.Cedarbaum@wilmerhale.com
HEATHER M. ZACHARY (Admitted *Pro Hac Vice*)
Heather.Zachary@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone:     (202) 663-6000
Facsimile:     (202) 663-6363

MARK C. KALPIN (Admitted *Pro Hac Vice*)
Mark.Kalpin@wilmerhale.com
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telephone:     (617) 526-6000
Facsimile:     (617) 526-5000

Attorneys for BARCLAYS BANK PLC

---

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

**Table of Contents**

Page

I.  Introduction ........................................................................................................... 1

    A.  Qualifications ............................................................................................. 1

    B.  Scope of Assignment ................................................................................. 2

    C.  Declaration Preparation ............................................................................. 3

II.  Summary of Opinions ........................................................................................... 3

III.  Background ........................................................................................................... 6

    A.  Operation of the ICE Western Electricity Markets .................................... 6

    B.  FERC's Alleged Manipulative Scheme .................................................... 13

    C.  FERC's Estimated Penalty ....................................................................... 16

IV.  Barclays' Conduct Does Not Meet FERC's Conditions for Manipulation on, at a Minimum, 96 percent (or 628 of the 655) of the Alleged Manipulation Days ..................... 17

V.  Information in the Administrative Record is Inconsistent with FERC's Alleged Manipulation Claims ........................................................................................... 20

    A.  Barclays' Actual Conduct is Inconsistent with "Substantial, Repeated, and Avoidable" Losses .................................................................................. 20

    B.  There Is No Evidence of Incremental Changes in Prices Caused by Barclays' Allegedly Fraudulent Trading ................................................................ 29

    C.  Barclays Would Not Have Expected FERC's Alleged Manipulative Scheme to be Profitable on All 655 Alleged Manipulation Days ........................... 31

    D.  FERC's Reliance on Anecdotal Communications Fails to Provide Sufficient Support Barclays Participated in an Intentionally Manipulative Scheme Across the 655 Alleged Manipulation Days ............................................... 34

VI.  The Administrative Record is Insufficient to Support FERC's Alleged Manipulation Claims 38

VII.  Additional Information Outside the Administrative Record Provides Further Support Against FERC's Alleged Manipulation Claims .................................................... 39

    A.  FERC Has Admitted that the Relevant Markets Are Liquid But Did Not Address the Implications of a Liquid Market for its Alleged Manipulative Scheme .................................................................................................... 39

    B.  FERC's Administrative Record Does Not Include an Evaluation of the ICE Orders Data ............................................................................................. 41

## EXPERT DECLARATION OF R. GLENN HUBBARD

I, Robert Glenn Hubbard, declare as follows:

1. I make this declaration in support of the Oppositions to Plaintiff's Motion to Affirm Civil Penalties submitted by Defendants Barclays Bank PLC, Ryan Smith, Karen Levine, Daniel Brin, and Scott Connelly. I have personal knowledge of the facts described herein and, if called as a witness, am competent to testify thereto.

## I.   Introduction

### A.   Qualifications

2. I am the Dean of the Graduate School of Business at Columbia University, where I hold the Russell L. Carson Professorship in Finance and Economics. In addition, I am a Professor of Economics in the Department of Economics of the Faculty of Arts and Sciences. At the National Bureau of Economic Research, I am a Research Associate in programs on corporate finance, public economics, industrial organization, monetary economics, and economic fluctuations and growth. I am also a visiting scholar at the American Enterprise Institute in programs on tax policy and financial markets. Since 2006, I have been the Co-chair of the Committee on Capital Markets Regulation, a nonpartisan organization offering analyses and policy advice on financial regulation. Prior to joining the Columbia faculty as Professor of Economics and Finance in 1988, I taught in the Department of Economics at Northwestern University. I have also served as Visiting Professor of Business Administration at Harvard Business School, John M. Olin Visiting Professor at the University of Chicago, Visiting Professor and Research Fellow of the Energy and Environmental Policy Center at Harvard University's John F. Kennedy School of Government, and John M. Olin Fellow at the National Bureau of Economic Research. I hold A.M. and Ph.D. degrees in Economics from Harvard University, and B.A. and B.S. degrees in Economics from the University of Central Florida, *summa cum laude*.

3. My professional work has centered on problems in corporate finance, public economics, industrial organization, monetary economics, and natural resource economics. I have authored more than 100 publications, edited a number of books, and authored leading textbooks on money and financial markets, macroeconomics, and principles of economics. I am also an author

of a book on mutual funds entitled *The Mutual Fund Industry: Competition and Investor Welfare*. This book describes the results of extensive research that my coauthors and I did on topics including growth and development, competition, economies of scale in the mutual fund industry, and the sensitivity of demand for mutual funds to after-fee performance and fees.

4.   I have been an adviser or consultant to the Board of Governors of the Federal Reserve System, Congressional Budget Office, Federal Reserve Bank of New York, Internal Revenue Service, International Trade Commission, National Science Foundation, U.S. Department of Energy, and U.S. Department of the Treasury.  From 1991 to 1993, I served as Deputy Assistant Secretary (Tax Analysis) of the U.S. Department of the Treasury, where I was responsible for economic analysis of tax policy, the administration's revenue estimates, and health care policy issues.  From 2001 to 2003, I served as Chairman of the President's Council of Economic Advisers. Over that time period, I also served as Chair of the Economic Policy Committee for the Organization for Economic Cooperation and Development in Paris.  A copy of my *curriculum vitae* is attached as **Exhibit A** and a list of my recent testimony is attached as **Exhibit B**.

**B.    Scope of Assignment**

5.   I have been retained by Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates ("Counsel"), counsel for Defendant Barclays Bank PLC ("Barclays").  Counsel asked me to assess, from an economic perspective, issues related to allegations by the Federal Energy Regulatory Commission ("FERC") that Barclays manipulated Intercontinental Exchange, Inc. ("ICE") western electricity markets from November 2006 through December 2008.

6.   I consider the following questions in evaluating these allegations:  First, is information in the administrative record consistent with FERC's conclusions regarding Barclays' alleged manipulation of the ICE western electricity markets?  (Section IV and Section V)  Second, does the administrative record as submitted by FERC include the analysis, calculations, and data needed to support FERC's conclusion regarding Barclays' alleged manipulation of the ICE western electricity markets?  (Section VI)  Third, how does the review of information currently available to me and not in the administrative record affect my conclusions reached based solely on the review of the administrative record?  (Section VII)

C.   **Declaration Preparation**

7.     My billing rate for time spent on this matter is $1,200 per hour.  This compensation is not contingent upon my particular findings or on the outcome of this litigation.

8.     Employees of Analysis Group, Inc., an economics research and consulting firm, working under my direction and supervision, have assisted me in this assignment at standard hourly rates charged by that firm.  Consistent with industry practice, I also receive compensation based on the professional fees earned by Analysis Group in conjunction with its support for this declaration (my "Report").  This compensation is not contingent upon the nature of my findings or on the outcome of this litigation.

9.     The materials that I have considered in reaching my conclusions are listed in **Exhibit C** of this Report.

10.     My work on this matter is ongoing, and I may review additional materials or conduct further analysis.  To the extent that additional information comes to my attention, I reserve the right to update, refine, and/or revise my opinions.

II.   **Summary of Opinions**[1]

11.     Based on my analysis of FERC's allegations, from an economic perspective, data and other information in the administrative record are inconsistent with the conclusion that Barclays manipulated the ICE western electricity markets on 655 product-days spanning 35 product-months.

11.1.     FERC claims that "Barclays' trading of next-day fixed-price physical against index produced substantial, repeated, and avoidable losses in the next-day fixed-price physical markets [which] Barclays was willing to accept […] to move the settlement of daily indices in the direction that benefited its financial swaps."[2]  Data in the administrative record allow me to evaluate these

---

[1]     A full description of my opinions is contained throughout this Report, including the associated exhibits.

[2]     FERC Office of Enforcement, "Enforcement Staff Report and Recommendations," filed with FERC's "Order to Show Cause and Notice of Proposed Penalty," issued October 31, 2012 ("Staff Report"), p. 1.

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

1   claims empirically, as a screen to determine whether Barclays' conduct could potentially be

2   considered manipulative.

3       11.2.   I test whether Barclays' trading "was not intended to get the best price"[3] as FERC

4   claims.  I compare the outcomes of Barclays' trading in fixed price next-day physical markets in the

5   alleged manipulation period to the outcomes in the non-manipulation period.  This test indicates

6   that outcomes for four of the six products, representing 72 percent (or 470 of the 655) of the

7   alleged manipulation days, were statistically indistinguishable from Barclays' presumed economic

8   trading in the non-manipulation period.

9       11.3.   I test whether Barclays would have expected to earn positive net profits from the

10  alleged scheme.  Specifically, I assess whether incremental gains on its financial swap positions

11  were expected to be sufficiently large relative to losses on its trading in fixed price next-day

12  physical markets to earn positive net profits from the alleged scheme.  This test indicates that on 79

13  percent (or 517 of the 655) of the alleged manipulation days Barclays would not have expected the

14  alleged scheme to be profitable.

15      11.4.   Combining only these two tests, I find that on at least 96 percent (or 628 of the 655)

16  of the alleged manipulation days Barclays' conduct was inconsistent with FERC's claims that

17  Barclays did not intend to get the best price and was willing to accept losses in the fixed price next-

18  day physical market with the expectation of earning larger gains on its financial swap positions.

19      11.5.   Further, FERC did not provide evidence in the administrative record that Barclays'

20  trading conduct led to price distortions.  FERC asserts that such analyses were performed, but

21  provides no support or results.  FERC's conclusion that Barclays engaged in the alleged

22  manipulative scheme cannot properly be reached without such evidence.

23      11.6.   In addition, FERC relies on anecdotal trader communications across 25 product-

24  days, of which only 18 are alleged manipulation days, to claim that Barclays engaged in an

25  intentional scheme to manipulate on all 655 alleged manipulation days despite: (a) these days

26

27  ────────────────────

28  [3]   Staff Report, p. 12.  *See also* FERC, Order Assessing Civil Penalties, Docket No. IN08-8-000, July 16, 2013 ("FERC Order"), ¶29.

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

accounting for only 2.75 percent of the alleged manipulation days, and (b) none of these days meeting both of the two tests outlined above.

11.7.    Thus, taken as a whole, my analysis of the administrative record does not support FERC's conclusion that Barclays engaged in an alleged scheme to manipulate the ICE daily index price (the "ICE Index") on 655 product-days spanning 35 product-months.

12.    The administrative record lacks empirical support for the analyses that FERC performed and relies on for its theory of manipulation.

12.1.    The administrative record does not include the backup for certain key analyses that FERC indicates in its Staff Report it has performed and relied on to reach conclusions, including the analysis of price impact, the analysis of profits, and losses and the criteria used to identify alleged manipulation days (or an identification of the specific days themselves).

12.2.    The administrative record does not include data necessary to assess the reliability of the conclusions FERC reaches regarding Barclays' losses and price impact, including data on published ICE Indices needed to calculate profits and losses and the ICE order data needed to evaluate the full extent of Barclays' bids and offers in the market.

13.    The findings reported above reflect my review of only the administrative record.  I have also considered information outside the administrative record to determine whether such information would alter any of my findings.  It does not.  In fact, this additional review further supports my conclusions.

13.1.    FERC acknowledges that the ICE western electricity markets are liquid.  Liquid markets are challenging for any individual trader or trading firm to manipulate.  Using various measures of market activity, I find that the ICE markets were as liquid during the alleged manipulation period as the non-manipulation period.

13.2.    FERC did not identify *how* Barclays traded fraudulently and did not establish *how* such trading affected the ICE Index.  However, from an economic perspective, it is necessary to identify how Barclays "conveyed false price information,"[4] as is alleged by FERC, and test whether

_____

[4]    Staff Report, p. 38.

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

1  Barclays' orders indicate it took such steps.  Tests of individual orders and many theories of

2  fraudulent trading would require use of the ICE orders data, which is not in the administrative

3  record.

4        14.    I set forth my findings in more detail in the remainder of this Report, including the

5  associated exhibits.

6  **III.    Background**

7        15.    FERC alleges that Barclays manipulated the ICE western electricity markets on 655

8  product-days (the "alleged manipulation days") spanning 35 product-months (the "alleged

9  manipulation months").  These allegations span the period November 2006 through December

10 2008.  I refer to the combined product-days on which FERC alleges manipulation as the "alleged

11 manipulation period," and all other product-days as the "non-manipulation period."

12       16.    Below, I provide background on the operation of the ICE electric power markets.  I

13 then provide a description of the alleged manipulative scheme.

14       **A.    Operation of the ICE Western Electricity Markets**

15              *i.    Relevant ICE Western Electric Power Product Markets*

16       17.    ICE operates electronic trading platforms for a wide range of commodities.  FERC

17 alleges that Barclays engaged in manipulative activity in the ICE electricity markets for delivery at

18 four hubs in the western U.S.:  Mid-Columbia, North Path 15, Palo Verde, and South Path 15.

19 These ICE western electricity products are further segmented by the period over which electric

20 power is delivered.  A "Peak" product corresponds to electricity delivery on Monday through

21 Saturday (excluding holidays) for the hours of 6 am to 10 pm, while an "Offpeak" product

22 corresponds to electricity delivery on Sundays, holidays (all day), and Monday through Saturday

23 for the hours of 10 pm to 6 am.[5]  FERC's allegations involve trades for each of the following six

24

25

26

27

28  ――――――――――――――――――
    [5]    Transcript of the Testimony of Scott Connelly, Volume I, July 20, 2009,, pp. 92-93; Transcript of the Testimony of Ryan J. Smith, Volume I, September 13, 2010,, pp. 52-53.

1  products:[6] Mid-Columbia Peak; North Path 15 Peak; Palo Verde Peak; South Path 15 Peak; Mid-

2  Columbia Offpeak; and North Path 15 Offpeak.

3       18.    **Exhibit 1** lists the number of alleged manipulation months and days by relevant ICE

4  product market.  While FERC alleges misconduct from trading in the six product markets indicated

5  above, the vast majority of trades were in only a few of these product markets.  Palo Verde Peak

6  alone accounts for more than one-half of all alleged manipulation days, while Mid-Columbia Peak,

7  Palo Verde Peak, and Mid-Columbia Offpeak account for a combined 84 percent of alleged

8  manipulation days.

**Exhibit 1**
**Summary of Alleged Manipulation Period**
**ICE Fixed Price Physical Day-Ahead Trading**
**Delivery Period: November 2006 – December 2008**

|  | Alleged Manipulation Months | Alleged Manipulation Days |
|---|---|---|
| Mid-Columbia Peak | 6 | 123 |
| North Path 15 Peak | 3 | 62 |
| Palo Verde Peak | 17 | 333 |
| South Path 15 Peak | 3 | 41 |
| Mid-Columbia Offpeak | 5 | 93 |
| North Path 15 Offpeak | 1 | 3 |
| Palo Verde Offpeak | 0 | 0 |
| South Path 15 Offpeak | 0 | 0 |
| **All Products** | **35** | **655** |

**Source:** FERC Enforcement Staff Report and Recommendation (AR00090 - 158).

19       19.    **Exhibit 2** reports average prices for each relevant ICE product market.  Generally

20  speaking, as shown in the exhibit, average prices for Peak products are higher than average prices

21  for Offpeak products, reflecting the higher demand for electricity during Peak hours.

22       20.    **Exhibit 2** also reports Barclays' average "profit and loss" from day-ahead trading on

23  ICE, as defined by FERC.  This profit and loss reflects the difference between Barclays' volume-

24  weighted average price ("VWAP") for fixed price day-ahead physical and the VWAP for the entire

---

[6]    I use the term "product" to designate a combination of hub (location) and peak/offpeak product type (e.g., Mid-Columbia Peak).

market on that day.[7]  As I discuss below, this measure of profits and losses is important to FERC's theory that Barclays engaged in allegedly fraudulent trading that generally led to excess losses in the fixed price day-ahead physical market.[8]  FERC claims that Barclays' trading "was not intended to get the best price,"[9] therefore, one would expect losses in the fixed price day-ahead ICE market. Like FERC, I focus on this measure of profits and losses, which I will often refer to simply as "losses," as a means of evaluating Barclays' trading.  If Barclays' trading was in fact fraudulent, then I would expect this behavior to be reflected in what I refer to as "excess losses" relative to losses observed in the non-manipulation period.

**Exhibit 2**
**Summary of Market VWAP and Barclays' Profit and Loss (P&L)**
**ICE Fixed Price Physical Day-Ahead Trading**
**Delivery Period: November 2006 – December 2008**

|  | Market VWAP ($/MWh) | Average P&L per MWh ($/MWh) |
|---|---|---|
| Mid-Columbia Peak | $61.19 | $(0.35) |
| North Path 15 Peak | $73.52 | $(0.04) |
| Palo Verde Peak | $66.67 | $(0.28) |
| South Path 15 Peak | $73.05 | $(0.05) |
| Mid-Columbia Offpeak | $47.66 | $(0.27) |
| North Path 15 Offpeak | $52.66 | $(0.06) |
| Palo Verde Offpeak | $46.32 | $(0.11) |
| South Path 15 Offpeak | $51.79 | $(0.06) |

**Source:** ICE Trades Data.

21.    **Exhibit 3**, which shows the VWAP over the November 2006 through December 2008 period, illustrates that there is substantial volatility in prices for these products.  For Mid-Columbia Peak, while the average price is $61 per megawatt-hour ("MWh"), prices range from less

---

[7]    While FERC calculated profits and losses using the published ICE Index, I rely on the calculated market-wide VWAP because the administrative record does not include the published ICE Index.

[8]    Staff Report, p. 28.

[9]    Staff Report, p. 12.

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

than $10 per MWh to nearly $200 per MWh.  For some other products, particularly Mid-Columbia Offpeak, prices can even be negative.  Prices in these markets vary in response to changes in supply and demand fundamentals, including: weather-driven changes in customer loads; seasonal changes in electricity supply from hydropower, driven in part by the uncertain timing of spring snowmelt; changes in fuel prices; unanticipated mechanical failures at generation or transmission facilities; and "congestion" due to limits on the transmission system's ability to move electric power.  Because of their impact on prices, information on these supply and demand fundamentals is valuable to traders because it allows them to anticipate the direction in which prices will move in the future.

**Exhibit 3**
**ICE Market VWAP**
**ICE Fixed Price Physical Day-Ahead Trading**
*Mid-Columbia Peak*



**Note**: The VWAP for one day is not shown due to truncation of the Y-Axis.
**Source**: ICE Trades Data.

9

1        ii.      *ICE Products and Trading Platform*[10]

2        22.      ICE products differ along several dimensions:  First, products include both

3   "physical" and "financial" products.[11]  Physical products represent an exchange of the actual

4   commodity, whereas financial products (which I will refer to as "financial swaps") involve no

5   exchange of the underlying product but instead involve payments between parties that typically

6   depend on market prices, often as measured through a market index.  Second, products differ in

7   terms of how the price paid is determined.  Under "fixed price" trades, the price is determined

8   when the transaction is made, whereas, with "at index" trades, the price is determined based on the

9   settled ICE Index, which is calculated as the VWAP over the course of the trading day (7 a.m. to

10  noon).[12]  Below, I describe how the ICE platform clears fixed price transactions.  Third, products

11  differ in terms of when the trade is made relative to the day on which electricity is delivered.  The

12  "day-ahead" or "next day" market trades electricity for delivery on the next day.[13]  The "forward"

13  market involves any trades in which settlement and any transfer of product occurs sometime in the

14  future, beyond the next day.

15       23.      Each product is referenced through each of these attributes.  For example, the

16  market in which parties trade electricity the day before delivery for a fixed price, determined by

17  _____

18  [10]   The ICE markets that are relevant here are no longer in operation.  I nonetheless use the present
    tense in describing the ICE western electricity markets, for simplicity.

19

20  [11]   Although Barclays traded in the market that required physical delivery, it possessed no
    generation facilities by which it could produce and deliver electricity and did not serve customers
    that would require delivery of electricity supplies.

21

22  [12]   Trades are excluded from the calculation of the ICE Index if they are between two companies
    owned by the same parent company, are legs of a "price basis spread" (*i.e.*, spread trades that are
    subsequently converted into two outright prices for trade reporting purposes), trades that are
23  subsequently cancelled or altered, and certain option trades.  U.S. Energy Information
    Administration, "Wholesale Electricity and Natural Gas Market Data," AR08487-88, October 1,
24  2015.

25  [13]   Day-ahead trades made on Thursday and Friday are done as two-day "packages" (Thursday
    trades of peak and offpeak products are for peak and offpeak power on Friday and Saturday, and
26  Friday trades in the offpeak market are for power on Sunday and Monday).  Day-ahead trades
    made on Friday in the peak market are for delivery on Monday.  Multi-day packages are also
27  traded during holiday periods.  ICE Trades Data (AR05559-61) contain delivery date information
    for all days in the relevant period; an example list of ICE trading holidays for 2008 is available at
28  https://www.theice.com/publicdocs/support/support_cal.pdf.

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

1   when the trade is made, is referred to as the day-ahead fixed price physical ("FPP") market.  These

2   trades are also referred to as "cash" or "dailies" trades by FERC.

3                              *iii.*            *How Fixed Price Trades Are Made on ICE*

4          24.     ICE provides a means to "clear" transactions between the buyers and sellers of

5   electricity.  Market participants submit "orders" to ICE, including "bids" to buy electricity and

6   "offers" to sell electricity.  A bid consists of a desired volume to purchase and a maximum price

7   that the participant is willing to pay.  For example, a buyer might submit a bid of $45 for 100

8   units.[14]  An offer consists of a desired volume to sell and a minimum price that the participant is

9   willing to accept.  For example, a seller might submit an offer of $50 for 100 units.  The difference

10  between the lowest offer and the highest bid at any given point in time is referred to as the "bid-

11  offer" spread.  In the example above, the bid-offer spread would be $5 ($50 − $45 = $5).

12         25.     ICE market transactions are consummated when a market participant accepts an

13  *existing* bid or offer.  When a participant accepts an existing bid to buy, this is called "hitting" the

14  bid.  A participant who accepts an existing offer to sell is said to be "lifting" the offer.  The

15  participant who hits a bid or lifts an offer is said to be a "price taker" because the participant is

16  taking a price proposed by another market participant.  A market participant whose proposed price

17  is accepted is said to be a "market maker."

18         26.     ICE market participants face multiple restrictions that affect which transactions are

19  eventually consummated and the settlement terms of those transactions.  The most important is that

20  the market participant must take the order that offers the "best" available price among eligible

21  orders.[15]  When hitting a bid, a market participant must take the highest bid available, and, when

22

23

24  _____

25  [14]   Unless otherwise noted, I reference prices in dollars per megawatt-hour ("$/MWh") and units in megawatts ("MW") which are delivered in every hour of the relevant package.

26  [15]   Market participants "take" an existing order by submitting a bid to buy that is equal to or
27  greater than the lowest offer to sell (or submitting an offer to sell that is equal to or less than the highest bid to buy).  When a new bid to buy exceeds the current best offer to sell, the trade is consummated at the maker's offer to sell, not the taker's bid to buy.  Thus, ICE gives precedence to
28  bids/offers in the order in which they are received.

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

1    lifting an offer, a market participant must take the lowest offer available.[16]  Thus, ICE's restrictions

2    on the matching of bids and offers ensure that the taker of any order receives the "best" available

3    price.  As a consequence, it also does not allow the taker to "jump" over the best bids or offers to

4    take a less favorable bid or offer, nor does it allow the taker to transact at a better price for the

5    maker than the price it submitted in its initial order.  Consequently, activity aimed at manipulating

6    the price on the ICE platform is constrained by design.  Another restriction is that market

7    participant must have an existing credit agreement with another party to be eligible to transact with

8    that party on ICE.[17]

9          *iv.*      *Information Available to Market Participants when Trading on ICE*

10        27.      ICE provided traders with a computer "terminal" on which they can observe

11    information about trading activity in the market.  This information includes: the complete set of

12    bids and offers made in the market, color-coded by whether the bid or offer meets the market

13    participant's counterparty, credit and risk management criteria; the price and volume of previously

14    consummated same-day trades; the cumulative weighted average price of all previously

15    consummated same-day trades; and a live ticker for all contracts traded in over-the-counter

16    ("OTC") markets.[18]

17        28.      While the ICE platform provides a significant amount of exchange information,

18    prior to consummating a transaction, traders do not know the identity of the counterparty for the

19    orders available on the trading screen.  ICE matches orders anonymously, and the identities of the

20

21    _____

22    [16]    In general, ICE gives precedence to orders in the order in which they are received.  So, if there
23    are multiple existing orders at the same price, then the order that was entered first is cleared before
     the others.

24    [17]    To transact on ICE, both parties must have an existing contract, including credit pre-approval.
25    Each counterparty "bears the credit and/or delivery risk of the other."  The ICE platform "allows
     participants to pre-approve trading counterparties and establish parameters for trading with each
26    counterparty."  Participants "may set firm-wide limits on tenor (duration) and the total daily value
     of trades that its traders may conduct with a particular counterparty in a given market."
27    Intercontinental Exchange, Inc., *Annual Report on Form 10-K*, 2008, p. 14.

28    [18]    Intercontinental Exchange, Inc., *Annual Report on Form 10-K*, 2008, p. 14; Intercontinental
     Exchange, Inc., *Annual Report on Form 10-K, 2007*, p. 17.

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

1  two trading parties are revealed to each other after the trade is consummated.[19]  The ICE platform

2  also includes an instant messaging service that allows participants to communicate directly with

3  other market participants on a "secure, anonymous, and real-time basis."[20]

4  **B.   FERC's Alleged Manipulative Scheme**

5  29.   FERC asserts that Barclays manipulated ICE day-ahead physical western electricity

6  markets through a "scheme" involving the following steps: first, Barclays built up financial swap

7  positions;[21] second, Barclays built substantial physical positions in the opposite direction of its

8  financial swap positions;[22] and third, because Barclays lacked the capacity to generate or consume

9  physical electricity, Barclays liquidated, or "flattened," its physical positions in the day-ahead

10  market.[23]

11  30.   FERC alleges that, in taking this last step of flattening its physical positions,

12  Barclays: (1) engaged in trading in the ICE FPP day-ahead markets that "was not intended to get

13  the best price"[24] and led to greater than normal losses; (2) through this fraudulent trading succeeded

14  in moving the ICE Index in a direction that benefited its financial swap positions that paid

15  ("settled") at the ICE Index; and (3) earned profits by gaining more on its financial swap positions

16

17  [19]   Intercontinental Exchange, Inc., *Annual Report on Form 10-K*, 2007, pp. 17-18; Intercontinental Exchange, Inc., *Annual Report on Form 10-K*, 2008, p. 14.

18  [20]   Intercontinental Exchange, Inc., *Annual Report on Form 10-K*, 2007, p. 17.

19  [21]   "In the alleged manipulation months, Barclays established significant financial swap positions
20  at one or more of the trading locations of MIDC, PV, SP, and NP."  Staff Report, p. 11.  *See also* "OE Staff similarly has shown that Respondents established "substantial" Financial Swaps in 35 product months (the Manipulation Months) at one or more of the four trading points."  FERC
21  Order, ¶5.

22  [22]   "Barclays built significant physical index positions in the alleged manipulation months that
23  were in the opposite direction of its financial swap positions." Staff Report, p. 16.  FERC contends that the "price risk" that is calculated as "Barclays' financial swap position adjusted for any
24  offsetting or additive physical fixed-price position" is a measure of the swaps that would benefit from the alleged manipulation. Staff Report, p. 13.  *See also* "Specifically, OE Staff avers that
25  Respondents engaged in a coordinated scheme to assemble 'substantial' Physical Positions which were generally in the opposite direction of Respondents' fixed-for-floating Financial Swaps."
26  FERC Order, ¶28.

27  [23]   "Barclays did not control generation or serve load and hence needed to liquidate or flatten its physical position with counterparties each day."  Staff Report, p. 12.  *See also* FERC Order, ¶39.

28  [24]   Staff Report, p. 12.

13

than it lost on its trades in the physical market.[25]  Below, I describe each of these allegations in further detail.

i.        *FERC's Allegations of Fraudulent Trading*

31.      On each day, Barclays would need to "flatten" its physical position because it did not own assets to generate or utilize energy: it would need to sell *all* electric power it had bought, or buy back *all* electric power it had sold.  In so doing, FERC alleges that Barclays would trade in a way that "was not intended to get the best price"[26] and was "generally uneconomic."[27]  Relatedly, FERC claims that Barclays "demonstrated a pattern of flattening its physical positions through the day-ahead physical market in the direction of its financial swaps," and that Barclays' flattening of physical positions "generally produced significant losses."[28]

32.      To support its claims, FERC references certain statistical tests, in which it uses Barclays' losses as a means to identify uneconomic trading, but does not provide sufficient detail on the calculations performed or include the support materials for such calculations in the administrative record, making replication of FERC's results impossible.[29]  FERC also reports that Barclays' losses over the alleged manipulation months totals $4,109,126.[30]  FERC notes that: "most months display significant losses although some display small losses and gains."[31]

---

[25]  As measured by FERC, the financial gains from changes in the ICE Index reflect Barclays' "price risk," including its swaps and physical positions that settled at a fixed price.

[26]  Staff Report, p. 12.

[27]  Staff Report, p. 34.

[28]  Staff Report, p. 12.  The FERC Order notes that Barclays' trading of dailies "generally produced trading losses which were avoidable" and that: "OE Staff notes that in some instances the Dailies produced gains or less substantial losses."  FERC Order ¶29 and footnote 94.

[29]  FERC finds that Barclays' propensity to suffer losses in the day-ahead physical market was greater during the allegation months (losses on 68 percent of trading days) than the allegation months (losses on 53 percent of trading days).  FERC also claims that Barclays' losses during the allegation months were of greater magnitude than and statistically significantly different from Barclays' losses during the non-allegation months.  FERC Staff Report, p. 33.

[30]  Staff Report, p. 31.

[31]  Staff Report, p. 33.

33.     FERC makes assertions regarding Barclays' trading, indicating that: "Barclays' cash trading was not intended to get the best price on those transactions and was not in response to supply and demand fundamentals in the market,"[32] and "Barclays exhibited a willingness to lose money."[33]   FERC also relies on "a substantial number of contemporaneous instant messages and e-mails"[34] in making these claims of intentionally fraudulent trading, stating that: "[t]he communications among the traders not only describe and substantiate the scheme, but also demonstrate the affirmative, coordinated, concerted, and intentional effort among the Respondents, as well as their individual actions, to effectuate the scheme."[35]

34.     However, FERC merely claims to observe fraudulent trading during the alleged manipulation period but does not indicate what specific trading conduct in the FPP day-ahead market led to the conclusion that such trading was, in fact, fraudulent.   Further, FERC does not provide a consistent and cohesive statement about the relationship between its allegations – the manipulative scheme, fraudulent actions, and uneconomic trading – and market outcomes.

### ii.     FERC's Allegations of Moving the ICE Index

35.     As an alleged intended consequence of Barclays' fraudulent trading of its physical positions, FERC claims that Barclays moved the ICE Index in a direction that benefited its swap positions.   Specifically, FERC claims that: "[b]y flattening its physical positions through the cash market in the direction of its financial swaps, Barclays was able to *move the settlement of the daily indices* and thereby enhance the value of its financial swaps,"[36] and "Barclays flattened its physical positions in a manner to *push cash prices up* if it was buying dailies and to *drive them down* if it

---

[32]   Staff Report, p. 12.  *See also* FERC Order ¶4.

[33]   FERC Order ¶41.

[34]   Staff Report, p. 1.  *See also* FERC Order at ¶29 noting that FERC relies on "numerous communications between and among the Individual Traders."

[35]   FERC Order, ¶2.

[36]   Staff Report, p. 34. (emphasis added)

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

1  was selling dailies."[37]  FERC appears to have performed a statistical analysis of prices to inform its

2  findings.[38]  However, the econometric model referenced by FERC is not included in the

3  administrative record nor is there any description of this model, let alone the data and work papers

4  that would be needed to reproduce its findings.

5           iii.      *FERC's Allegations of Earning Net Profits on Swap Positions from the*
                     *Alleged Manipulative Scheme*

6

7         36.     Finally, FERC claims that the alleged scheme was profitable for Barclays, such that

   the gains to its financial swap positions were large enough to more than offset any losses from its

8  allegedly fraudulent FPP day-ahead trading.  For example, FERC claims that: "[a]lthough Barclays'

9  cash trading often produced substantial losses, its financial swaps settled against the indices

10 derived from cash trading and thereby increased in value by an amount that exceeded Barclays'

11 cash trading losses."[39]  FERC provides no empirical analysis to support this statement, but

12 references a "preliminary econometric model"[40] that it used to develop its "current estimate" ($34.9

13 million) of "the amount Barclays made on its financial swap positions in the 35 alleged

14 manipulation months."[41]

15       **C.    FERC's Estimated Penalty**

16        37.     FERC assessed penalties against Barclays for the alleged manipulative scheme

17 described above.  These penalties include a $435 million civil penalty against Barclays.[42]  This

18 _____

19 [37]   Staff Report, p. 12. (emphasis added)  The FERC Order quotes pg. 23 of the Staff Report
   noting that: "[t]he frequency and timing of the Dailies trading was done pursuant to a manipulative
20 scheme designed 'to push daily [I]ndex settlements up if Barclays was buying Dailies and to push
   them down if it was selling.'"  FERC Order ¶4.
21
   [38]   "Staff derived its estimate of the price difference through econometric modeling of Barclays'
22 cash trading for the products that Barclays manipulated over the trading period of November 2006
   to December 2008."  Staff Report, p. 63, and FERC Order ¶150.
23
   [39]   Staff Report, p. 34.
24
   [40]   Staff Report, p. 63, and FERC Order, ¶150.
25
   [41]   FERC notes that its "[s]taff will continue to refine this estimate as this case proceeds."  Staff
26 Report, p. 35.  This current estimate is also cited in the FERC Order at ¶150.

27 [42]   Additional civil penalties for the individual traders amount to the following: $1 million against
   Daniel Brin, $15 million against Scott Connelly, $1 million against Karen Levine, and $1 million
28 against Ryan Smith.  FERC Order, ¶11.

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

civil penalty was calculated by multiplying FERC's estimate of pecuniary losses to the market

("market harm"), which is $139 million, by a "Culpability Score," which is associated with a

penalty multiplier that FERC estimated to range from 2.0 to 4.0.  FERC selected close to the mid-

point of the range of estimated civil penalties to arrive at its $435 million total.[43]  In addition,

FERC found that Barclays should be required to disgorge $34.9 million in unjust profits, plus

interest.  Thus, total penalties against Barclays, including the civil penalty and disgorgement of

unjust profits, are estimated at nearly $470 million.

38.     FERC's estimates of market harm and unjust profits both rely on FERC's price

impact analysis, which is not included in the administrative record.  Further, FERC's estimate of

market harm relies on an estimate of open interest held by other market participants in the ICE

markets that Barclays is alleged to have manipulated, which is also not available in the

administrative record.

**IV.     Barclays' Conduct Does Not Meet FERC's Conditions for Manipulation on, at a Minimum, 96 percent (or 628 of the 655) of the Alleged Manipulation Days**

39.     FERC claims that "Barclays' trading of next-day fixed-price physical against index

produced substantial, repeated, and avoidable losses in the next-day fixed-price physical markets

[which] Barclays was willing to accept […] to move the settlement of daily indices in the direction

that benefited its financial swaps."[44]  These, and similarly related, claims can readily be evaluated

empirically using data in the administrative record.  I analyze these claims to determine, as a

preliminary matter, whether Barclays' conduct is potentially consistent with FERC's alleged

manipulative scheme.  To do so, I test whether Barclays' conduct meets the following two tests.

The first test is whether Barclays actually traded in a way that "was not intended to get the best

price"[45] as FERC claims.  To address this question, I test whether Barclays' profits and losses in the

alleged manipulation period were different than its profits and losses in the non-manipulation

---

[43]  FERC Order, ¶123.

[44]  Staff Report, p. 1

[45]  Staff Report, p. 12.  *See also* FERC, Order Assessing Civil Penalties, Docket No. IN08-8-000, July 16, 2013 ("FERC Order"), ¶29.

1    period.  The second test is whether Barclays would have expected to earn positive profits from this

2    scheme, such that the gains on its financial swap positions would exceed the losses on its physical

3    positions.

4         40.    Each of these tests is a required element of FERC's theory.  Thus, by analyzing

5    which of the alleged manipulation days fail to meet either of these tests, I can determine the extent

6    to which Barclays' actual conduct was inconsistent with FERC's alleged manipulative scheme.

7         41.    I begin by assessing whether Barclays traded in a way that "was not intended to get

8    the best price."[46]  To do so, I test whether the losses incurred by Barclays for each product in the

9    alleged manipulation periods were *statistically significantly different* from those Barclays incurred

10   during the non-manipulation period.[47]  Importantly, I note that FERC's definition of losses, which I

11   have adopted for the purpose of this declaration, is based on comparing Barclays' VWAP for fixed

12   price day-ahead physical to the settled ICE Index.[48]  In other words, "losses" are based on

13   comparing Barclays' VWAP to the ICE Index Barclays is alleged to have manipulated.  In addition,

14   I emphasize "statistically significantly different" because my test is not evaluating whether

15   Barclays incurred greater losses than profits, but rather whether the data on profits and losses

16   indicate that Barclays' trading behavior differed in the alleged manipulation period relative to the

17   non-manipulation period.  As shown in **Exhibit 2**, Barclays generally incurred losses in its daily

18   trading.  The question I ask is whether this level of losses was any different (statistically) in the

19   alleged manipulation period as compared to the non-manipulation period.

20        42.    The outcome of this test indicates that the difference in losses between these two

21   periods was not statistically significantly different from zero for four products: Palo Verde Peak,

22   South Path 15 Peak, Mid-Columbia Offpeak and North Path 15 Offpeak.[49]  If Barclays' trading was

23   _____

24   [46]   Staff Report, p. 12.  *See also* FERC, Order Assessing Civil Penalties, Docket No. IN08-8-000, July 16, 2013 ("FERC Order"), ¶29.

25   [47]   Further details on my analysis will be provided in Section V.A of my Report.

26   [48]   Staff Report, footnote 118.

27   [49]   Put differently, an analysis of losses only supports the conclusion that Barclays' trading
28   behavior may have differed (statistically) in the alleged manipulation period relative to the non-manipulation period for two products: Mid-Columbia Peak and North Path 15 Peak.

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

1    in fact fraudulent, then, given FERC's theory and assertions, I would expect this behavior to have

2    been reflected in "excess losses" relative to losses observed in the non-manipulation period.

3    However, the data suggests this is not the case for these four products.  I thus conclude that

4    Barclays' trading of these products is inconsistent with FERC's theory of manipulation requiring

5    that Barclays traded fraudulently in the alleged manipulation period.

6          43.     Next, I test whether, on each day, Barclays would have expected to earn positive net

7    profits from the alleged manipulative scheme; in other words, whether the swap positions were of

8    sufficient size relative to the physical positions such that Barclays would have expected to earn

9    positive net profits from the alleged manipulative scheme.[50]  I find that Barclays' incremental

10    profits on its financial swaps (and other positions that settled at the ICE Index) would not have

11    been expected to exceed its losses in the physical market on 79 percent (or 517 of the 655) of the

12    alleged manipulation days based on an approximation of expected trading outcomes.[51]

13          44.     Because each of these conditions is necessary but not sufficient, conduct by

14    Barclays that fails to meet either of these tests would not be consistent with FERC's allegations that

15    Barclays traded uneconomically in one market in order to profit in another.  I find that 96 percent

16    (628 of the 655) of the alleged manipulation days do not meet at least one of these two tests.[52]  In

17    other words, losses from Barclays' physical positions in the alleged manipulation period were either

18    statistically indistinguishable from non-manipulation period losses *or* the gains to financial swap

19    positions were not large enough to yield a positive gain overall.  These results alone shed

20    significant doubt on FERC's allegations of manipulation.  Further, even if both tests were to be

21    satisfied, these results provide, at most, a screen for potential manipulative conduct as there is

22    much additional information that is required before a conclusion that manipulation occurred can be

---

23, 24    [50]    Further details on my analysis will be provided in Section V.C of my Report.

25, 26, 27    [51]    The count of 517 days is based on an *ex ante* approach to approximate *expected* profits.  I believe the *ex ante* approach to be more appropriate from an economic perspective because it captures Barclays' *expectations* at the time it opted to make the alleged non-economic trades, rather than the *actual* outcomes, which may differ from reasonable beginning-of-day expectations.  However, I note that the *ex post* approach using realized profits would yield a count of 508 days.

28    [52]    The count of 628 of 655 days is based on an *ex ante* approach approximating expected profits.  Using an ex post approach based on realized profits, the count decreases to 615 of 655 days.

reached, such as: (1) whether Barclays' losses led to price distortions of the ICE Index; (2) whether factors other than manipulative conduct explain the losses; and (3) whether Barclays' losses reflect or can be tied to manipulative conduct.[53]   These results do present one clear conclusion, however: FERC's claim that Barclays manipulated the ICE western electricity markets on 655 product-days is not supported by the information and data in the administrative record, and the $435 million penalty assessed by FERC similarly lacks support in the administrative record.

## V.   Information in the Administrative Record is Inconsistent with FERC's Alleged Manipulation Claims

45.     Despite my finding that Barclays' conduct on alleged manipulation days is inconsistent with FERC's claims, I have undertaken additional analyses to evaluate whether, from an economic perspective, the information contained in the administrative record supports a finding that Barclays engaged in the manipulative scheme as alleged by FERC.   In approaching this assignment, I evaluate: (1) whether data in the administrative record indicates that Barclays' trading resulted in losses in the physical market; (2) whether analysis exists in the administrative record that demonstrates that allegedly fraudulent trading moved (or "distorted") the ICE Index to benefit Barclays' financial swap positions; and (3) whether the combination of the data and analysis in the administrative record indicates that Barclays would have expected to earn positive profits from this scheme (*i.e.*, whether the expected incremental gains from the financial swaps resulting from movements in the ICE Index were greater than the losses incurred when trading FPP day-ahead).   These three categories of analysis serve the purpose of answering questions related to the economic plausibility of the alleged scheme.

### A.   Barclays' Actual Conduct is Inconsistent with "Substantial, Repeated, and Avoidable"[54] Losses

46.     A key element of FERC's theory of manipulation is that Barclays' trading was not intended to get the "best" price, and thereby was willing to (and often did) incur excess losses on its

---

[53]   I will show in Section V that the simple comparison of Barclays' trading across all trading days in the relevant period is an unreliable test, because it lumps together days on which Barclays actively traded with days in which Barclays was not an active participant in the market.

[54]   Staff Report, p. 1.

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

1  FPP day-ahead trading with the goal of moving the ICE Index in a direction that benefited its

2  financial swap positions.  In the absence of uneconomic trading that distorts prices, FERC's claims

3  of manipulation no longer hold.

4      47.     The administrative record includes data on all trades consummated on ICE.  As

5  discussed above, FERC's measure of losses reflects the difference between the average ICE FPP

6  day-ahead price of power bought or sold by Barclays and the published ICE Index for each market.

7  Because the administrative record does not include the published ICE Index, I have used the

8  VWAP of all trades in the FPP day-ahead market as a proxy for the published ICE Index.  The

9  absence of the published ICE Index is an important deficiency in the administrative record.

10      i.     *Barclays' Losses Are Not Statistically Significantly Different Between the*
         *Alleged Manipulation and Non-Manipulation Periods for Most Products*

11      48.     The Staff Report indicates that there are statistically significantly differences

12  between the losses in the alleged manipulation period and the losses in the non-manipulation

13  period.[55]  Chart 6 of FERC's Staff Report compares losses during the alleged manipulation period

14  and the non-manipulation period, reporting these differences for all products combined.

15

16      49.     Based on my evaluation of these products, I find that combining losses from

17  different products into one test – as FERC does – would be inappropriate for several reasons.  First,

18  the markets for these products differ in potentially important ways, such as the level of trading

19  activity, market volatility, and market liquidity.  Because of these product market differences, the

20  magnitude and distribution of daily losses from trading in these products may differ such that

21  combining outcomes from multiple products would lead to inaccurate results.  Second, because the

22  number of alleged manipulation days varies widely across products, pooling losses across products

23  results in average losses representative of very different underlying mixes of products.  **Exhibit 4**

24  illustrates the mix of trading days by product used in calculating the average losses for both the

25  alleged manipulation period and non-manipulation period.  This exhibit shows large differences in

26  the mix of product-days included in each period's average loss calculation.  For example, while

27

28  [55]  "These are statistically significant differences that show a difference in the scale of losses in
     alleged-manipulation and non-manipulation month trade sessions."  Staff Report, p. 33.

Palo Verde Peak makes up 50.8 percent of the trading days in the alleged manipulation period, it makes up only 5.5 percent of the trading days in the non-manipulation period.  Third, pooling together conduct from separate markets obscures potentially important differences in conduct across products.

**Exhibit 4**
**Composition of Alleged Manipulation and Non-Manipulation Period Trading Days by Product**
**Delivery Period:  November 2006 – December 2008**

**Percent of Alleged Manipulation Trading Days by Product**

**Percent of Non-Manipulation Trading Days by Product**



**Source:** FERC Enforcement Staff Report and Recommendation (AR00090 - 158).

50.     **Exhibit 5** shows the average of FERC's measure of losses incurred by Barclays in the alleged manipulation and non-manipulation periods.[56]  I then calculate the difference between these loss measures and test whether it is statistically significantly different from zero.  In other words, I test whether the losses incurred by Barclays in the alleged manipulation period were greater than the losses it would typically incur during "normal" trading (in the non-manipulation period).

---

[56]   Contrary to facilitating replication, FERC did not include in the administrative record an explicit listing of all days on which it alleges manipulation.  I construct the alleged manipulation period by selecting days that most closely match the data provided in the Staff Report.

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

51.     As discussed in Section IV, I find that the difference in losses was not statistically significantly different from zero for four of the six products: Palo Verde Peak, South Path 15 Peak, Mid-Columbia Offpeak and North Path 15 Offpeak.[57]  In other words, for these four products, I find that losses in the alleged manipulation period are not distinguishable (as measured by statistical significance) from losses in the non-manipulation period, and thus conclude that Barclays' conduct in these product markets is inconsistent with FERC's theory of manipulation. Namely, the results of this test are not consistent with a finding that Barclays engaged in fraudulent and generally uneconomic trading during the alleged manipulation period with the objective of moving the ICE Index.  In particular, I note that losses in the alleged manipulation period are not statistically significantly different from losses in the non-manipulation period for the market with the largest number of alleged manipulation days: Palo Verde Peak.  These findings are inconsistent with FERC's claim that there are "statistically significant differences" between losses in the alleged manipulation and non-manipulation periods.[58]

_____

[57]   Put differently, trading outcomes are only found to be statistically significantly different in the alleged manipulation period relative to the non-manipulation period for two products: Mid-Columbia Peak and North Path 15 Peak.

[58]   Staff Report, p. 33.

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

**Exhibit 5**
**Barclays' Average Daily Profit and Loss (P&L) by Product and Statistical Testing**
**ICE Fixed Price Physical Day-Ahead Trading**
**Delivery Period: November 2006 - December 2008**

| | Market VWAP ($/MWh) | Alleged Manipulation Period | | Non-Manipulation Period | | Difference in Average Daily P&L per MWh ($/MWh) | t-Statistic | |
|---|---|---|---|---|---|---|---|---|
| | | Barclays Trade Days | Average Daily P&L per MWh ($/MWh) | Barclays Trade Days | Average Daily P&L per MWh ($/MWh) | | | |
| Mid-Columbia Peak | $61.19 | 123 | $(0.64) | 379 | $(0.26) | $(0.38) | 2.172 | ** |
| North Path 15 Peak | $73.52 | 62 | $(0.51) | 435 | $0.03 | $(0.54) | 5.746 | *** |
| Palo Verde Peak | $66.67 | 333 | $(0.33) | 189 | $(0.21) | $(0.12) | 1.324 | |
| South Path 15 Peak | $73.05 | 41 | $(0.17) | 489 | $(0.04) | $(0.13) | 1.019 | |
| Mid-Columbia Offpeak | $47.66 | 93 | $(0.35) | 417 | $(0.25) | $(0.10) | 1.002 | |
| North Path 15 Offpeak | $52.66 | 3 | $(0.04) | 486 | $(0.06) | $0.02 | (0.031) | |
| Palo Verde Offpeak | $46.32 | - | - | 440 | $(0.11) | - | - | |
| South Path 15 Offpeak | $51.79 | - | - | 528 | $(0.06) | - | - | |

**Notes:**
[1] The reported t-statistic reflects a two-sample t-test. If the null hypothesis of equality of variances between the two samples was rejected, a Satterthwaite test was used; otherwise a Pooled test was used.
[2] "*" reflects significance at the 10 percent level, "**" reflects significance at the 5 percent level, and "***" reflects significance at the 1 percent level.
**Source:** ICE Trades Data.

52.     For two products, Mid-Columbia Peak and North Path 15 Peak, I find statistically significant differences in losses during the manipulation period relative to the non-manipulation period.  However, a finding of statistical significance does not imply that such excess losses were necessarily manipulative or achieved intentionally as additional analyses would be necessary to reach such a conclusion.  The administrative record and FERC's Staff Report lack such additional analyses.  For instance, the administrative record and FERC's Staff Report do not contain any analysis of intra-day trading to support a finding that Barclays intentionally traded in a fraudulent manner, generally leading to excessive losses in the FPP day-ahead market.  FERC did not identify in the administrative record any sort of mechanism that was used by Barclays to trade fraudulently, let alone perform the type of statistical or day-by-day analysis necessary to test whether Barclays used such mechanisms.  Moreover, to the extent FERC selected alleged manipulation days or months based on observing large losses, the tests I performed to determine statistical significance are likely biased toward finding statistical significance.  Such bias would arise because the days in the alleged manipulation period would, by design, include larger-than-average losses.  It is not possible for me to control for this selection bias, as FERC did not include in the administrative record the criteria it used to select its alleged manipulation days.

24

*ii.*      *The Exhibits Contained in FERC's Staff Report Mischaracterize the Frequency of Barclays' Losses*

53.      The Staff Report makes several empirical statements in an attempt to support the claim that Barclays incurred "substantial, repeated, and avoidable" losses.[59]  In Charts 1 to 5, FERC shows the cumulative losses over the course of each month for five product markets.  These visual comparisons are followed by the statement that the difference in the daily losses in the alleged manipulation and non-manipulation periods is statistically significantly different from zero and supportive of a finding of manipulation.[60]  FERC also states that there are differences in the frequency of trading days with losses in the alleged manipulation and non-manipulation periods.[61]

54.      My analysis of information in the administrative record indicates that FERC's graphics mischaracterize the losses incurred by Barclays, and the statements about differences in frequency of losses do not accurately portray differences in losses between the alleged manipulation and non-manipulation periods.

55.      **Exhibit 6** reconstructs FERC's Charts 1 to 5 with the inclusion of the daily losses, in addition to the intra-month cumulative losses reported by FERC.[62]  While FERC's charts, which only report cumulative losses, suggest that Barclays bore consistent and sustained losses within months, **Exhibit 6** shows that daily losses are highly variable from day-to-day both within and outside of the alleged manipulation period.

---

[59]   Staff Report, p. 1.

[60]   *Ibid*, p. 33.

[61]   *Ibid*, p. 33.

[62]   In addition to the five product-markets presented in FERC's Charts 1-5, I also show charts for North Path 15 Offpeak, Palo Verde Offpeak, and South Path 15 Offpeak.

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

1



**Exhibit 6**
**Barclays' Estimated Monthly Cumulative and Daily Profit and Loss**
**ICE Fixed Price Physical Day-Ahead Trading**
*Mid-Columbia Peak*

**Notes:**
[1] Cumulative Monthly Profit and Loss represents the cumulative total P&L for a single flow month.
[2] Some values are not shown due to truncation of the Y-Axis.
**Source:** ICE Trades Data.

56.     **Exhibit 6** raises several important points. First, there are many days during the alleged manipulation period during which Barclays incurred profits rather than losses. Across the six products in which manipulation is alleged, Barclays incurred profits on 32 percent (or 209 of 655) of the alleged manipulation days. This indicates that Barclays' conduct appears to be inconsistent with FERC's claim that Barclays incurred "substantial, repeated, and avoidable losses […] to move the settlement of daily indices in the direction that benefited its financial swaps."[63]

---

[63] Staff Report, p. 1.

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

1  Second, to further investigate these daily losses, I have performed an analysis aimed at identifying

2  whether the frequency of large daily losses was "unusual" in the alleged manipulation period in

3  comparison to the non-manipulation period.  To make this comparison, I establish a benchmark for

4  a "large" loss at two standard deviations of the average profits and losses during the non-

5  manipulation period.[64]  By setting my benchmark based on variation in profits and losses during

6  the non-manipulation period, my test provides a measure of whether the frequency of losses is

7  higher in the alleged manipulation period than what would be expected during the non-

8  manipulation period.

---

[64] It is common to use standard deviation as a measure of the variability around an average value. *See* Federal Judicial Center, *Reference Manual on Scientific Evidence*¸ Second Edition, 2000, pp. 85 and 114.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Exhibit 7**
**Barclays' Estimated Daily Profit and Loss per MWh**
**With Non-Manipulation Period Standard Deviation**
**ICE Fixed Price Physical Day-Ahead Trading**
*Mid-Columbia Peak*

**Notes:**
[1] Dashed lines represent two standard deviations (positive and negative) from the mean daily Profit and Loss during non-manipulation days in which Barclays consummated a trade.
[2] Some values are not shown due to truncation of the Y-Axis.
**Source:** ICE Trades Data.

57.     Large losses occurred on both manipulation and non-manipulation days.  **Exhibit 7**

visually compares, for Mid-Columbia Peak, the daily losses in the alleged manipulation period

with the daily losses in the non-manipulation period.  The two horizontal lines in the exhibit

represent two standard deviations (above and below) the average profit or loss from the non-

manipulation period, where the standard deviations were calculated using data for the non-

manipulation period only.  **Exhibit 8** provides the proportion of days during the alleged

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

manipulation and non-manipulation periods in which losses exceed this two-standard deviation threshold.  As shown, there are relatively few alleged manipulation days in which losses exceeded this two standard deviation threshold even though the threshold is calculated using data on profits and losses from the non-manipulation period.

**Exhibit 8**
**Days with Large Loss ($ per MWh) by Product**
**ICE Fixed Price Physical Day-Ahead Trading**
**Delivery Period: November 2006 - December 2008**

| | Alleged Manipulation Period | | Non-Manipulation Period | |
|---|---|---|---|---|
| | Barclays Trade Days | Percent of Days with Loss > 2 Stdev | Barclays Trade Days | Percent of Days with Loss > 2 Stdev |
| Mid-Columbia Peak | 123 | 2% | 379 | 1% |
| North Path 15 Peak | 62 | 15% | 435 | 3% |
| Palo Verde Peak | 333 | 5% | 189 | 4% |
| South Path 15 Peak | 41 | 0% | 489 | 1% |
| Mid-Columbia Offpeak | 93 | 3% | 417 | 4% |
| North Path 15 Offpeak | 3 | 0% | 486 | 2% |
| Palo Verde Offpeak | - | - | 440 | 3% |
| South Path 15 Offpeak | - | - | 528 | 2% |

**Notes:**
[1] Barclays Trade Days represents the count of days where Barclays had non-zero gross trading volume.
[2] Standard Deviation (Stdev) of Profit and Loss (P&L) per MWh is calculated using the daily P&L per MWh during non-manipulation days in which Barclays consummated a trade. Percent of days greater than two standard deviations from the mean daily P&L per MWh in the loss direction are included above.
**Source:** ICE Trades Data.

## B.  There Is No Evidence of Incremental Changes in Prices Caused by Barclays' Allegedly Fraudulent Trading

58.  An essential feature of price manipulation is a measureable distortion of price, or an "artificial" price.  In this matter, such a price effect is also an essential feature of FERC's allegations against Barclays.  Even if one assumes FERC's claim that "Barclays' cash trading was not intended to get the best price on those transactions and was not in response to supply and demand fundamentals in the market,"[65] this does not imply that such trading would lead to a distortion or inaccuracy in pricing.

---

[65]  Staff Report, p. 12.  *See also* FERC Order, ¶4.

29

59.     A quantitative analysis is necessary to determine whether the alleged market manipulation has led to a change in price as compared to otherwise normal market-based prices (*i.e.*, price distortion).  Such an analysis requires potentially complex statistical models aimed at determining whether prices during the alleged manipulation period are statistically different than they would have been in the absence of the alleged wrongdoing, after controlling for all relevant supply and demand factors that affect prices.

60.     In its evaluation of Barclays' conduct, FERC indicates that it has relied on such a statistical analysis to determine liability and the magnitude of the penalty for market impact.[66]  On the basis of this analysis, FERC asserts that Barclays' manipulative conduct caused an estimated $139.3 million in market harm to participants in the ICE western electricity markets over the 655 alleged manipulation days.[67]  However, FERC did not include the statistical analysis that it relied upon in the administrative record.   Lacking such an analysis, there is no information or facts in the administrative record to reliably find that Barclays' conduct led to any distortion in the ICE Index, as alleged by FERC.  Put differently, in my opinion, the conclusion of manipulation that FERC makes cannot properly be reached without this evidence on price distortions.

61.     Moreover, it is not possible to perform such a price impact analysis relying only on data from the administrative record.  Reliable analysis to determine whether there were distortionary price impacts associated with alleged manipulative conduct (and, if so, how large such impacts are) requires information on electricity market prices and factors that affect such prices, including supply and demand factors such as weather conditions, temperature, customer loads, fuel prices, outages of electric power generation facilities or transmission lines, and congestion in the delivery of power.  Lacking such data, statistical analysis cannot distinguish between movements in price associated with alleged manipulative actions and movements in price associated with competitive market fundamentals.

---

[66]   Staff Report, p. 63 and FERC Order, ¶150.

[67]   FERC Order, ¶122.

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

62.     In addition, without the ability to identify the precise trades that FERC deems fraudulent or uneconomic – information that is again missing from the administrative record – it is not possible to determine the price impact of those trades.  Because the administrative record lacks such data, reliable approaches to analyzing distortionary price impacts are limited.

**C.     Barclays Would Not Have Expected FERC's Alleged Manipulative Scheme to be Profitable on All 655 Alleged Manipulation Days**

63.     A key element of FERC's allegations is that the alleged manipulative scheme was profitable: as claimed by FERC, Barclays' financial swaps "increased in value by an amount that exceeded Barclays' cash trading losses."[68]  Unless Barclays could expect to profit from the alleged manipulative scheme, FERC's theory of market manipulation is not plausible.  Because this is a critical part of FERC's theory, it is important to test such profitability.  FERC asserts that Barclays earned profits on the alleged scheme of $34.9 million, but provides no description of how it performed this test and no support for its analysis.

64.     Using data from the administrative record, I empirically investigate whether the alleged manipulative scheme would have been expected to be profitable.  For each day in the alleged manipulation period, I calculate the additional revenues that the scheme would have been expected to generate on Barclays' financial swap positions (and other positions that settled at the ICE Index).  These additional revenues reflect the possible impact of Barclays' losses from the scheme on the ICE Index.  My calculation of this price impact depends only on two factors: (1) Barclays' daily share of trades in the market, and (2) the losses (if any) Barclays would have incurred on its own trades due to the alleged manipulative scheme.  I then calculate the additional revenues that the scheme would have been expected to generate by applying this price impact to Barclays' positions that settled at the ICE Index.[69]  I use the resulting values to calculate the daily profit that Barclays would have been expected to earn from the alleged scheme as the difference

---

[68]   Staff Report, p. 34.

[69]   Such positions include Barclays' financial swap position as well as its physical-at-index position.

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

1    between these additional revenues and the losses that the alleged scheme would have been

2    expected to generate in the physical market.

3          65.     **Exhibit 9** provides the results of my estimates of whether, on each day, Barclays

4    would not have expected to earn positive net profits from the alleged manipulative scheme.[70]  I find

5    that any incremental profits on Barclays' positions that settled at the ICE Index would have failed

6    to exceed expected losses from the alleged scheme in the physical market on 79 percent (or 517 of

7    655) of the alleged manipulation days.  In other words, on a substantial majority of the alleged

8    manipulation days, Barclays would not have expected to profit by following the alleged

9    manipulative scheme.  Moreover, for three of the six product markets in which manipulation is

10   alleged, there were *no* days in which Barclays would have expected to earn a profit from the

11   alleged manipulative scheme.  These calculations indicate that even if Barclays was motivated to

12   manipulate the ICE Index, for the vast majority of the alleged manipulation days, it would have

13   failed to recoup any losses in the physical market through additional profits realized on its

14   positions that settled at the ICE Index.  These findings are inconsistent with FERC's alleged

15   manipulative scheme, which requires that Barclays be motivated to manipulate the market with the

16   intent of earning positive profits.

---

[70]   Barclays' ability to move the ICE Index depends on its share of all transactions in the market on each day.  The calculations reflect an estimate of the market share Barclays would have expected on each day, based on non-Barclays trading volume over the prior three days and Barclays' physical position.  In addition, lacking information on FERC's claimed price impact, I have assumed that ICE Index changes reflect the impact from Barclays' trades but no impact from trades in which Barclays did not participate.

**Exhibit 9**
**Days in Which Barclays Would Not Have Expected to Earn Positive Net Profits**
**from the Alleged Manipulative Scheme**
**Alleged Manipulation Period**

| | Alleged Manipulation Days | Days in Which Barclays Would Not Have Expected to Profit from Alleged Scheme | Percent |
|---|---|---|---|
| Mid-Columbia Peak | 123 | 117 | 95% |
| North Path 15 Peak | 62 | 41 | 66% |
| Palo Verde Peak | 333 | 222 | 67% |
| South Path 15 Peak | 41 | 41 | 100% |
| Mid-Columbia Offpeak | 93 | 93 | 100% |
| North Path 15 Offpeak | 3 | 3 | 100% |
| Palo Verde Offpeak | - | - | - |
| South Path 15 Offpeak | - | - | - |
| **All Products** | **655** | **517** | **79%** |

**Sources:** ICE Trades Data; Barclays Trades Data.

66.     In **Exhibit 10**, I quantify the extent to which the alleged manipulative scheme would have been expected to fall short of the price impact necessary to break even on all alleged manipulation days for each product. Specifically, I first define the ratio between the price impact needed for the scheme to be profitable and the price impact that would have been expected from the scheme as the "price impact multiplier" for each product-day. For example, if the alleged manipulative scheme would not have been expected to break even on a given product-day, but would have been expected to break even if its price impact had been twice as large, then the price impact multiplier for this product-day would be two. I then calculate for each product the smallest price impact multiplier needed to expect the scheme to at least break even on all alleged manipulation days. For example, if this "minimum" price impact multiplier equaled one, the alleged manipulative scheme would have been expected to break even on all the days alleged by FERC. Instead, I find that this minimum price impact multiplier ranges from 1.5 for North Path 15 Peak to 5.7 for Mid-Columbia Offpeak. Such results indicate that the alleged manipulative scheme's impact on the ICE Index would have been insufficient to expect the scheme to be profitable in all product markets on all alleged manipulation days.

**Exhibit 10**
**Minimum Price Impact Multiplier Necessary for Barclays to Have Expected**
**to Earn Positive Net Profits from the Alleged Manipulative Scheme**
**on All Alleged Manipulation Days**

| | Alleged Manipulation Days | Multiplier |
|---|---|---|
| Mid-Columbia Peak | 123 | 5.2 |
| North Path 15 Peak | 62 | 1.5 |
| Palo Verde Peak | 333 | 3.4 |
| South Path 15 Peak | 41 | 4.7 |
| Mid-Columbia Offpeak | 93 | 5.7 |
| North Path 15 Offpeak | 3 | - |
| Palo Verde Offpeak | - | - |
| South Path 15 Offpeak | - | - |

**Note:** Across all products, 6 out of 655 alleged manipulation days are excluded from the analysis because Barclays' positions that settled at the ICE index and built physical position are in the same direction. These days include the 3 alleged manipulation days for North Path 15 Offpeak. **Sources:** ICE Trades Data; Barclays Trades Data.

D.     **FERC's Reliance on Anecdotal Communications Fails to Provide Sufficient Support Barclays Participated in an Intentionally Manipulative Scheme Across the 655 Alleged Manipulation Days**

67.     Even if Barclays' losses are statistically significantly different between the alleged manipulation period and the non-manipulation period, which they are not for four of the six product markets in which manipulation is alleged, such a difference does not necessarily imply that such losses are motivated by the alleged manipulative scheme. The Staff Report does not include any statistical or systematic analysis of Barclays' conduct to reach a conclusion that the losses FERC claims to have measured were achieved through some scheme.

       i.     *Reliance on Anecdotes to Prove Participation in an Intentionally Manipulative Scheme Across 655 Product-Days is Inappropriate and Insufficient*

68.     To demonstrate Barclays' participation in an intentional manipulative scheme, FERC relies on anecdotal descriptions of trading that occurred over the course of particular days, in some cases supported by communications between traders through instant messaging ("IM"). In my opinion, such anecdotal evidence is not a sufficient analytical framework for evaluating potential manipulation. In other words, such anecdotal "data points" typically cannot substitute for

34

1  systematic or statistical analysis of the evidence.  Reliance solely on anecdotal evidence leads to

2  unreliable conclusions when applied broadly to periods beyond those anecdotes.

3       69.     FERC seeks to establish a motivation by Barclays to effectuate the alleged scheme

4  on 655 product-days based on claimed inappropriate communications relating to 25 product-days.[71]

5  FERC has alleged manipulation on only 18 of these product-days, which represents just 2.75

6  percent of the alleged manipulation period.  Thus, on 7 of the 25 product-days that FERC draws

7  upon for evidence of manipulation, representing more than 25 percent of these communications,

8  FERC does not even allege manipulation.  This reliance on a limited number of communications is

9  unreasonable from an economic perspective, particularly in light of the amount of economic

10  evidence available to FERC that is inconsistent with its theory of alleged market manipulation.

11      70.     Further, Barclays' conduct on these above-mentioned 18 product-days (*i.e.*, product-

12  days with communications during the alleged manipulation period that FERC uses to demonstrate

13  Barclays' intentional participation in a manipulative scheme) is inconsistent with FERC's theory.

14  For example, on 8 of these 18 product-days, Barclays' ICE FPP day-ahead trading was profitable.[72]

15  Such profits are inconsistent with FERC's theory that Barclays traded fraudulently and generally

16  uneconomically on its ICE FPP day-ahead trading.  Moreover, *none* of these 18 product-days meets

17  both of the tests I considered in Section IV (*i.e.*, *none* of these product-days involves both a product

18  that has excess losses *and* a product-day in which Barclays would have expected to earn positive

19  net profits from the alleged manipulative scheme).  Thus, none of these 18 product-days meet the

20  tests necessary to be consistent with FERC's manipulative theory.

21      71.     I have also evaluated minute-to-minute trading on days in which FERC has

22  indicated that trader IM communications provide evidence of intentional market manipulation by

23

24  _____

25  [71]   FERC cites to 29 emails and IMs to prove intent, 6 IMs/emails of which fail to mention specific trading by Barclays.  The remaining 23 IMs/emails discuss 25 hub/product trading days.

26  [72]   For example, Barclays' trading yielded profits on November 9, 2006, Palo Verde Peak ("… I
27  was trying to prop up the palo index…") [Staff Report, p. 40]; November 17, 2006, Palo Verde Peak and South Path 15 Peak ("I own the SP and palo btw … man I'm going thru my ice deals. Wow. def. a record") [Staff Report, p. 40]; December 21, 2006, North Path 15 ("my lil secret" and
28  "I ran out of NP light to sell") [Staff Report, pp. 41-42, respectively].

1  Barclays.  **Exhibits 11** and **12** illustrate such intra-day trading.[73]  For **Exhibit 11**, given that

2  Barclays' financial swap position was short in that product market (South Path 15 Peak) on that

3  given day (February 8, 2007), under FERC's theory of alleged manipulation, Barclays should have

4  been trying to drive down the ICE Index.  However, as is shown in **Exhibit 11**, there is no evidence

5  of a decreasing price pattern caused by Barclays' trading.  Similarly, for **Exhibit 12**, Barclays'

6  financial swap position was long in that product market (Palo Verde Peak) on that given day

7  (November 17, 2006), so under FERC's theory of alleged manipulation, Barclays should have been

8  trying to drive up the ICE Index.  Instead, Barclays' buys tended to occur at a relatively *low* price,

9  as shown in **Exhibit 12**.  In my opinion, Barclays' actual minute-to-minute trading illustrated in

10  these exhibits does not differ from normal market conduct.

11  72.   While FERC alludes to conduct such as early trading[74] and use of reserve offers as a

12  means by which Barclays may have manipulated the ICE markets,[75] nowhere in its Staff Report

13  does FERC actually identify how losses were achieved, nor does FERC conduct any statistical

14  analysis of Barclays' conduct to determine whether such conduct systematically occurred over the

15  655 alleged manipulation days.  Data within the administrative record potentially permit such tests,

16  assuming that there is a plausible scheme to be tested at all.

17  ii.   *FERC Disregards the Lack of Incentive for Traders to Intentionally Incur*

18  *Losses*

19  73.   FERC alleges that: "[c]ommunications demonstrating manipulative intent surfaced

20  from all three physical cash traders," Karen Levine, Ryan Smith, and Daniel Brin.[76]  FERC further

21  argues that: "it cannot be said that the traders lacked motive: they were highly-compensated

22  individuals who had reason to believe that their compensation would be increased even further if

23  _____

24  [73]  Additional exhibits showing minute-to-minute trading for the remaining 16 alleged

25  manipulation days with allegedly inappropriate communications are included in **Supplemental Exhibits S.1 to S.16**.

26  [74]  Staff Report, pp. 24-26, and 54.  *See also* FERC Order, ¶105.

27  [75]  Staff Report, pp. 24, 25, and 54.  *See also* FERC Order, ¶101.

28  [76]  Staff Report, p. 39.

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

1  they were able to produce sufficient profits through their trading."[77]  However, evidence in the

2  administrative record demonstrates that: (1) the positions that stood to gain from the alleged

3  manipulation were largely held in Mr. Connelly's book;[78] (2) the cash traders were compensated

4  based on the profit and loss in their personal trading books;[79] (3) the trading books of the cash

5  traders suffered net losses during the alleged manipulation period,[80] which meant that they did not

6  receive performance bonuses;[81] and (4) the traders were concerned about the losses they incurred

7  and about a negative reaction from Mr. Connelly.[82]  Thus, I do not find support in the

8  administrative record for the assumption that the alleged manipulative scheme could be expected to

9  or did benefit the cash traders financially.

10  ───────────────────

11  [77]  FERC Order, ¶73.

12  [78]  Staff Report, p. 53

13  [79]  "*Q: Was your annual bonus to be based on performance?* A: Yes." (Transcript of the
    Testimony of Karen Levine, Volume I, October 19, 2010, p. 51); "I had a book with my own P&L

14  and I was supposed to make money off it, so yes. *Q: And after that point, were your bonuses
    supposed to be based on your profitability in that book?* A: That's the general understanding."

15  (Transcript of the Testimony of Daniel Brin, Volume I, October 7, 2010, pp. 94-95); "My P&L
    would be captured in that book, and it's my responsibility to manage the risk in that book and also

16  the P&L. *Q: Was part of your compensation based upon how that book performed?* A: Yes. *Q:
    Went into your bonus, I would guess?* A: Correct." (Transcript of the Testimony of Ryan J. Smith,

17  Volume I, September 13, 2010, p. 85); AR05700-01.

18  [80]  AR04988-990; AR01308-09; AR05797-98.  In Mr. Brin's deposition FERC and Mr. Brin
    discussed his 2008 performance.  "*Q: Were you -- was your trading profitable in 2008?* A: No. It

19  was flat, I believe, in '08, maybe down slightly." (Transcript of the Testimony of Daniel Brin,
    Volume I, September 21, 2010, p. 45.)

20

21  [81]  "*Q: Did you get any sort of performance bonus for 2006?* A: No, I did not. *Q: Was that not
    available to you?* A: Well, my performance was negative P&L, so I didn't receive anything other

22  than the guaranteed 75,000 [signing bonus]." (Transcript of the Testimony of Ryan J. Smith,
    Volume I, September 13, 2010, p. 115.)  Smith was fired at the end of March 2007. (Transcript of

23  the Testimony of Ryan J. Smith, Volume I, September 13, 2010, pp. 182 and 194.)  "*Q: Did you
    receive a bonus in 2007?* A: Yes.  *Q: Approximately how much was that?*  A: I think it was 20k or

24  25.  *Q: And what was that bonus based on?* […] A: It was -- it's based on the fundamental analysis
    and the other things I add to the desk […] *Q: And did you receive a bonus in 2008?* A: No."

25  (Transcript of the Testimony of Daniel Brin, Volume I, October 7, 2010, pp. 44-46.)  "*Q: Did you
    get paid a bonus in 2006?* A: My signing bonus. *Q: But no performance bonus?* A: No. *Q: How

26  about 2007?* A: The second part of my signing bonus. It was split over two years. *Q: Did you
    receive any performance bonus that year?* A: No. *Q: How about 2008?* A: No." (Transcript of the

27  Testimony of Karin Levine, Volume I, October 19, 2010, pp. 51-52.)

28  [82]  AR05735-37; AR01633- AR01634; Transcript of the Testimony of Scott Connelly, Volume III,
    October 26, 2010, pp. 549-550, and 558.

───────────────────

## VI.     The Administrative Record is Insufficient to Support FERC's Alleged Manipulation Claims

74.     The administrative record lacks empirical support for the analyses that FERC performed and relies on for its theory of manipulation.  Hence, it is not possible to critically assess, or even simply verify, the results reported by FERC.  I noted some of these deficiencies previously. Nevertheless, I enumerate them here to provide a list of the deficiencies in the administrative record, from an economic perspective.

75.     First, the administrative record does not include the backup for certain key analyses that FERC indicates in its Staff Report it has performed and relied on to reach its conclusions.  As I discussed in Section V.B, the administrative record does not include any analysis of price impact, including the analysis of price impact relied on by FERC to reach its findings that Barclays distorted the ICE Index and to calculate its estimates of market harm and disgorgement.  The administrative record also does not include any analysis of the profits and losses incurred by Barclays from its trading in the ICE FPP day-ahead markets, including the analysis relied on by FERC to reach its findings that Barclays incurred larger than normal losses during the alleged manipulation periods.

76.     Second, the administrative record does not include data necessary to assess the reliability of the conclusions FERC reaches.  Specifically, the administrative record:  lacks the published ICE Indices, which are needed to calculate FERC's estimates of Barclays' losses; lacks the ICE order data, which are needed to evaluate the full scope of Barclays' bids and offers in the market, as opposed to only the orders that were eventually transacted; and lacks the essential information needed to estimate price impact reliably, in particular (a) data on factors that affect market prices, including supply and demand factors (weather conditions, temperature, customer loads, fuel prices, outages of electric power generation facilities or transmission lines, and congestion in the delivery of electricity), and (b) the precise trades that FERC deems fraudulent or uneconomic.

77.     Third, FERC did not include in the administrative record the *criteria* it used to identify the alleged manipulation days.  In fact, nowhere in the administrative record are the

alleged manipulation days actually listed or identified.[83]  While the Staff Report suggests certain measures such as "price risk," net FPP trading, and "losses" (as defined by FERC) inform its decisions, it provides no details on how these measures are used to identify the 655 manipulation days.

## VII.  Additional Information Outside the Administrative Record Provides Further Support Against FERC's Alleged Manipulation Claims

78.    The findings reported in Sections IV and V above reflect my review of only the administrative record.  I have also considered information outside the administrative record to determine whether such information would alter any of my previous findings.  It does not, as I explain in this section of my Report.

### A.    FERC Has Admitted that the Relevant Markets Are Liquid But Did Not Address the Implications of a Liquid Market for its Alleged Manipulative Scheme

79.    FERC acknowledges that it alleges manipulation at the "four most liquid trading points in the Western United States."[84]  FERC also asserts that: "Index was a good instrument for the type of manipulation Barclays pursued because it was a liquid product that could be obtained in sizable quantities at a low cost."[85]  However, FERC does not address the implications that trading in a liquid market has on its alleged manipulative scheme.  In particular, FERC does not consider how the greater liquidity would reduce bid-offer spreads, thus limiting Barclays' ability to move the price, nor does it consider how other traders – many of whom possessed information about market fundamentals – would tend to move the market toward an efficient equilibrium price.  FERC provides no support for its statements regarding market liquidity within the administrative record. I therefore undertook an analysis using data both outside and inside of the administrative record.[86]

---

[83]   However, I am able to infer the alleged manipulation days by identifying which days replicate the results in Table 1 of the Staff Report.

[84]   FERC Order, ¶2.

[85]   FERC Order, footnote 85, referencing the Staff Report at p. 16.

[86]   Many of the metrics I examined cannot be developed without using the ICE orders data, which are missing from the administrative record.  Measures that cannot be calculated without the ICE orders data include the number of orders placed, the average number of orders per trade, the

*(cont'd)*

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

1  My analysis shows that these markets were generally as liquid during the alleged manipulation

2  period as during the non-manipulation period based on a number of different measures.

3         80.     **Exhibit 13** provides a comparison across the alleged manipulation and non-

4  manipulation periods of a number of metrics of market liquidity, including product-level averages

5  for the number of buyers, the number of sellers, the number of consummated trades, the daily

6  volume transacted, the number of orders placed, the average number of orders per trade, the

7  number of market participants, the bid-offer spread, and average number of bids/offers available

8  when trades are consummated.  On average, the markets for each of the products that Barclays

9  allegedly manipulated were as liquid during the alleged manipulation period as during the non-

10  manipulation period, with the exception of South Path 15 Peak and North Path 15 Offpeak, which

11  collectively make up only 44 of the 655 alleged manipulation days (or 6.72 percent).

12         81.     In **Exhibit 14**, I control for Barclays' alleged conduct by only considering trades in

13  which Barclays was not a counterparty.  The results are effectively unchanged:  the periods in

14  which FERC alleges that Barclays conducted a manipulative scheme tended to be as liquid as the

15  non-manipulation period.  Together, these results suggest that FERC's alleged manipulative scheme

16  occurred in periods in which it would have been no easier to move the ICE Index as alleged by

17  FERC.

18         82.     Moreover, as I explained in Section III above, there are trading constraints to the

19  ICE western electricity markets that are embedded into the design of the ICE platform.

20  Specifically, an ICE market participant must take the order that offers the best available price

21  among eligible orders.  Thus, a market participant with a product for sale must take the highest bid

22  available when accepting an existing bid to buy.  Similarly, a market participant looking to

23  purchase a product must take the lowest offer available when accepting an existing offer to sell.  As

24  a consequence, it is not normally possible for a price taker to "jump" over the best bids or offers to

25

26

27  _____
    (cont'd from previous page)
    number of market participants, the bid-offer spread, and average number of bids/offers available
28  when trades are consummated.

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

take a less favorable bid or offer,[87] nor is it possible for a price taker to transact at a price that would be more favorable for the market maker other than the price the maker submitted initially. These features of the ICE platform thereby inhibit activity aimed at manipulating the ICE Index.

**B.   FERC's Administrative Record Does Not Include an Evaluation of the ICE Orders Data**

83.     From an economic perspective, to conclude that Barclays traded fraudulently or uneconomically, it is necessary to first develop a theory of *how* Barclays conducted such trading and then test this theory using data.   FERC does not take either of these necessary steps in evaluating its alleged scheme.

84.     Nowhere in its Staff Report, Order Assessing Civil Penalties, or other materials does FERC actually identify specific trades in which Barclays traded in an "uneconomic" fashion.  To infer intent, FERC relies on anecdotal evidence that alludes to certain conduct by Barclays that might have been used to trade uneconomically (such as early trading[88] and use of reserve offers[89]). While these examples illustrate instances in which Barclays' trading in the FPP day-ahead market led to losses, the fact that Barclays incurred losses, by itself, does not indicate Barclays was engaged in an intentional manipulative scheme that led to such losses, as alleged by FERC.  In fact, it was common for Barclays to incur losses from daily trading, even outside the alleged manipulation period.

85.     In addition to not identifying particular mechanisms by which Barclays traded fraudulently or uneconomically, FERC does not include in the administrative record or its Staff Report any systematic or statistical analysis of Barclays' actual trading behavior over this period. Because FERC's allegations imply fraudulent or uneconomic intra-day trading by Barclays, it would be important to evaluate such claims using data about the actual orders – the bids to buy and offers to sell – placed by Barclays into the ICE markets.

---

[87]   A market participant must have an existing credit agreement with another party to be eligible to transact with that party on ICE.  Buyers and sellers could "jump" to the next offer or bid if the best offer or bid was not from a credit-approved counterparty.

[88]   Staff Report, pp. 24-26, and 54.  *See also* FERC Order, ¶105.

[89]   Staff Report, pp. 24, 25, and 54.  *See also* FERC Order, ¶101.

86.     Information and data on individual orders in the ICE markets are not in the administrative record.  These ICE orders data include orders made by market participants in the relevant ICE markets.  For each order, the data include the time the order was placed, whether the order aimed to buy or sell electricity, the price at which the market participant was willing to trade, and the quantity of electricity the market participant was willing to buy or sell.  With these data, one could evaluate the actual orders placed by Barclays and how they compared to contemporaneous existing orders from other market participants.  For example, consider the trading on April 11, 2007 at Mid-Columbia for Peak power.  The ICE orders data show that at 8:32:55 AM, Barclays submitted a bid to buy 25 MW (as part of a 200 MW reserve order) at a price of $60.00/MWh.  Non-Barclays bids submitted before and after Barclays' bid were as follows: (1) at 8:31:41 AM, bid to buy 25 MW at a price of $61.25/MWh; and (2) at 8:33:42 AM, bid to buy 25 MW at a price of $60.25/MWh.  Thus, the ICE orders data show that this Barclays bid had a lower price than non-Barclays bids submitted before and after Barclays' bid.  This example is just one case, but the ICE orders data provide thousands of instances in which Barclays' actual market behavior – the bids and offers it placed – could be assessed.

87.     Given FERC's allegations, from an economic perspective, it is necessary to identify *how* Barclays' traded fraudulently or uneconomically and test whether in fact Barclays' orders indicate it took such steps.  The ICE order data would permit such analysis and, in fact, are necessary to developing such findings.  Therefore, in the absence of such data, the administrative record is deficient.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. I executed this declaration at New York, New York January 31, 2016.




R. Glenn Hubbard
R. Glenn Hubbard

DECLARATION OF R. GLENN HUBBARD IN SUPPORT OF DEFENDANTS' OPPOSITIONS

Exhibit A

**Exhibit A**

**ROBERT GLENN HUBBARD**

*Curriculum Vitae*

# P E R S O N A L   D A T A

Born:               In Orlando, Florida.
Marital Status:     Married, two children.

# F I E L D S   O F   S P E C I A L I Z A T I O N

Public Economics, Corporate Finance and Financial Institutions, Macroeconomics, Industrial Organization, Natural Resource Economics, Public Policy.

# E D U C A T I O N

Ph.D., Economics, Harvard University, May 1983.
Dissertation: *Three Essays on Government Debt and Asset Markets*, supervised by Benjamin M. Friedman, Jerry A. Hausman, and Martin S. Feldstein.

A.M., Economics, Harvard University, May 1981.

B.A., B.S., Economics, University of Central Florida, June 1979, *summa cum laude*.

# H O N O R S   A N D   A W A R D S

Silver Beaver Award, Boy Scouts of America, 2014.

Medal of Honor, Foreign Policy Association, 2014.

Homer Jones Lecture, Federal Reserve Bank of St. Louis, 2013.

Fiftieth Anniversary Award of Scholarship, University of Central Florida, 2013.

Franklin Delano Roosevelt Distinguished Service Award, Greater New York Council, Boy Scouts of America, 2012.

Bloomberg Markets, 50 Most Influential Members of the Global Financial Community, 2012.

National Association of Corporate Directors, Directorship 100: People to Watch, 2011.

Joint American Economic Association/American Finance Association Distinguished Speaker, 2008.

Cairncross Lecture, University of Oxford, 2007.

Fellow of the National Association of Business Economists, 2005.

William F. Butler Memorial Award, New York Association of Business Economists Award, 2005.

Exceptional Service Award, The White House, 2002.

Michelle Akers Award for Distinguished Service, University of Central Florida, 2001.

Alumni Hall of Fame, University of Central Florida, 2000.

Best Paper Award for Corporate Finance, Western Finance Association, 1998.

Exceptional Service Award, U.S. Department of the Treasury, 1992.

Distinguished Alumnus Award, University of Central Florida, 1991.

John M. Olin Fellowship, National Bureau of Economic Research, 1987-1988.

Teaching Commendations, Graduate School of Business, Columbia University.

Northwestern University Associated Student Government Teaching Awards, announced in 1985, 1986, and 1987.

Graduate Distinctions: National Science Foundation Fellowship, Alfred P. Sloan Foundation Fellowship.

**Exhibit A**

Robert Glenn Hubbard                                                                        November 2015

Undergraduate Distinctions: National Merit Scholarship, National Society of Professional Engineers Award, Florida Society of Professional Engineers Award, National Council of Teachers of English Award, Omicron Delta Kappa, Financial Management Association Honor Society.

## P O S I T I O N S   H E L D

| | |
|---|---|
| 2004-present | Dean, Graduate School of Business, Columbia University |
| 1994-present | Russell L. Carson Professor of Economics and Finance, Graduate School of Business, Columbia University |
| 1997-present | Professor of Economics, Faculty of Arts and Sciences, Columbia University |
| 2007-present | Panel of Economic Advisors, Federal Reserve Bank of New York (also 1993-2001) |
| 2003-present | Featured commentator, *Nightly Business Report* |
| 2003-2010 | Featured commentator, *Marketplace* |
| 2003-2007 | Visiting Scholar American Enterprise Institute (also 1995-2001) |
| 1999-2004 | Co-Director, Columbia Business School Entrepreneurship Program |
| 2004-2005 | Viewpoint Columnist, *Business Week* |
| 2004-2006 | Member, Panel of Economic Advisors, Congressional Budget Office |
| 2001-2003 | Chairman, President's Council of Economic Advisers |
| 2001-2003 | Chairman, Economic Policy Committee, Organization for Economic Cooperation and Development |
| 2001-2003 | Member, White House National Economic Council and National Security Council |
| 2001-2003 | Member, President's Council on Science and Technology |
| 1997-1998 | Visiting Professor of Business Administration, Harvard Business School |
| 1995-2001 | Visiting Scholar and Director of Tax Policy Program, American Enterprise Institute |
| 1994-1997 | Senior Vice Dean, Graduate School of Business, Columbia University |
| 1994 | MCI Fellow, American Council for Capital Formation |
| 1994 | John M. Olin Visiting Professor, Center for the Study of Economy and the State, University of Chicago |
| 1991-1993 | Deputy Assistant Secretary (Tax Analysis), U.S. Department of the Treasury |
| 1988-present | Professor of Economics and Finance, Graduate School of Business, Columbia University |
| 1987-1988 | John M. Olin Fellow in residence at the National Bureau of Economic Research |
| 1983-1988 | Assistant Professor of Economics, Northwestern University, with half-time research appointment in the Center for Urban Affairs and Policy Research |
| 1985 | Visiting Scholar, Center for Business and Government, John F. Kennedy School of Government, Harvard University |

**Exhibit A**

Robert Glenn Hubbard                                                                November 2015

|  | |
|---|---|
| 1981-1983 | Teaching Fellow (Department of Economics) and Resident Tutor in Economics (Dunster House), Harvard University |

## D I R E C T O R S H I P S

| | |
|---|---|
| 2007-present | Met Life |
| 2006-2008 | Capmark Financial Corporation; Information Services Group |
| 2004-present | ADP, Inc.; BlackRock Closed-End Funds |
| 2004-2014 | KKR Financial Corporation |
| 2004-2008 | Duke Realty Corporation |
| 2004-2006 | Dex Media/R.H. Donnelley |
| 2003-2005 | ITU Venturesp |
| 2000-2001 | Angel Society, LLC; Information Technology University, LLC |

## C O N S U L T I N G   O R   A D V I S O R Y   R E L A T I O N S H I P S

| | |
|---|---|
| 2014-present | Fiscal Note |
| 2007-present | Consulting or Speaking Engagements at Some Point: U.S. Department of Justice, Internal Revenue Service, Airgas, AlixPartners, Alternative Investment Group, American Century, America's Health Insurance Plans, ApexBrasil, Association for Corporate Growth, Atlantic Point, Bank of America, Bank of New York Mellon, Barclays Services Corporation, BBVA Compass, BGC, BNP Paribas, Brevan Howard, Capital Research, Carlyle Group, Citigroup, Commonfund, Compagnie Financiere Tradition, Credit Suisse, Dell, Deutsche Bank, Donald Fewer, Fidelity, Franklin Resources, Freddie Mac, Goldman Sachs, Government of Greece, Sue Ann Hamm, The Hartford, Intel, JP Morgan Chase, Key Bank, Kosmos, Microsoft, Morgan Stanley, NAREIT, National Rural Utilities Cooperative Finance Corporation, New York Bankers Association, NMS Group, Nationwide, Oracle, Patriarch, Pension Real Estate Association, Principal Management Corporation, Prium, Promontory, Real Estate Roundtable, Related Properties, Reynolds American, Royal Bank of Canada, Royal Bank of Scotland, Telia Sonera, Trust Company of the West, Tullett Prebon, Visa, Walter Energy, Wells Fargo |
| 2005-2009 | Arcapita |
| 2005-2010 | Nomura Holdings America |
| 2008 | Laurus Funds |
| 2005-2008 | Chart Venture Partners |
| 2003-2009 | Ripplewood Holdings |

## P O S T S   I N   N O N - P R O F I T   O R G A N I Z A T I O N S

| | |
|---|---|
| 2006-present | Co-Chair, Committee on Capital Markets Regulation |
| 2004-present | Member, Advisory Board, National Center on Addiction and Substance Abuse |
| 2003-present | Member, Manhattan District Council Board, Boy Scouts of America |
| 2012-2015 | Trustee, Fifth Avenue Presbyterian Church, New York |
| 2010-2011 | Co-Chair, The Study Group on Corporate Boards |
| 2008-2011 | Elder, Fifth Avenue Presbyterian Church |
| 2008-2010 | Chairman, Economic Club of New York |
| 2006-2008 | Member, Board of Directors, Resources for the Future |
| 2003-2008 | Trustee, Tax Foundation |

**Exhibit A**

**Robert Glenn Hubbard**                                                                                       **November 2015**

| | |
|---|---|
| 2004-2010 | Trustee, Economic Club of New York |
| 2004-2007 | Trustee, Fifth Avenue Presbyterian Church, New York |

**Exhibit A**

Robert Glenn Hubbard                                                                                     November 2015

P R O F E S S I O N A L   A C T I V I T I E S

| | |
|---|---|
| 1987-present | Research Associate, National Bureau of Economic Research (Monetary Economics, Corporate Finance, Public Economics, Economic Fluctuations, Industrial Organization) |
| 2007-present | Life Member, Council on Foreign Relations |
| 2003 | Member, Committee of Visitors, National Science Foundation |
| 2000 | Panelist, Graduate Fellowship Selection Committee, National Science Foundation |
| 1999-2001 | Director, Project on Nonprofit Organizations, National Bureau of Economic Research |
| 1997-2001 | Member, COSSA-Liaison Committee, American Economic Association |
| 1993-2001 | Board of Advisors, Institutional Investor Project, School of Law, Columbia University |
| 1995-1999 | Member, Board of Academic Consultants, American Law Institute |
| 1997 | Member, Grants Panel for Integrative Graduate Education and Research Training Program, National Science Foundation |
| 1994-1996 | Member, Economics Grants Panel, National Science Foundation |
| 1993-1996 | Member, Federal Taxation and Finance Committee, National Tax Association |
| 1990-1995 | Co-organized research program on International Aspects of Taxation at the National Bureau of Economic Research, Cambridge, Massachusetts |
| 1995 | Member, Program Committee, American Economic Association Meeting |
| 1983-1987 | Faculty Research Fellow, National Bureau of Economic Research |
| 1983-1986 | Adjunct Faculty Research Fellow, Energy and Environmental Policy Center, John F. Kennedy School of Government, Harvard University, Cambridge, Massachusetts |
| 1986, 1988, 1994 | Member of the Brookings Panel on Economic Activity |
| 1985, 1987 | Special guest of the Brookings Panel on Economic Activity |
| 1990-1991 | Organized research program on Environmental Economics and Public Policy at the National Bureau of Economic Research, Cambridge, Massachusetts |
| 1988-1990 | Co-organized research program on Dynamic Models of Firms and Industries at the National Bureau of Economic Research, Cambridge, Massachusetts |
| 1985-1989 | Organized research program and workshops on contracting in financial markets at the Summer Institute, National Bureau of Economic Research, Cambridge, Massachusetts |
| 1988 | Organized Economic Fluctuations program on Industrial Economics and Macroeconomics, National Bureau of Economic Research, Stanford, California |
| 1986-1988 | Organized research program and workshop on links between macroeconomics and industrial organization at the Summer Institute, National Bureau of Economic Research, Cambridge, Massachusetts |
| 1991 | Member, Program Committee, Econometric Society Winter Meetings |

**Exhibit A**

Robert Glenn Hubbard                                                                        November 2015

| | |
|---|---|
| 1982-1983 | Member, Energy Modeling Forum VII Study Group, Stanford University, Stanford, California |
| 1981-present | Consultant on research projects with private corporations and government and international agencies, including the Internal Revenue Service, Social Security Administration, U.S. Department of Energy, U.S. Department of State, U.S. Department of Treasury, and U.S. International Trade Commission; National Science Foundation; The World Bank; Board of Governors of the Federal Reserve System; Federal Reserve Bank of New York; Congressional Budget Office |
| Member: | American Economic Association, American Finance Association, Association for Public Policy and Management, Econometric Society, International Association of Energy Economists, National Tax Association, the Royal Economic Society, and the Institute for Management Science |
| Referee: | *American Economic Review; Canadian Journal of Economics; Columbia Journal of World Business; Econometrica; Economic Journal; Energy Economics; Energy Journal; International Finance; International Tax and Public Finance; Journal of Business; Journal of Business and Economic Statistics; Journal of Economic History; Journal of Economic Literature; Journal of Finance; Journal of Financial Economics; Journal of Financial Intermediation; Journal of Financial and Quantitative Analysis, Journal of Financial Services Research; Journal of  Industrial Economics; Journal of International Money and Finance; Journal of Law and Economics; Journal of Macroeconomics; Journal of Money, Credit, and Banking; Journal of Monetary Economics; Journal of Political Economy; Journal of Public Economics; Journal of Regulatory Economics; Journal of Small Business Finance; Management Science; National Tax Journal; Quarterly Journal of Economics; Quarterly Review of Economics and Finance; RAND Journal of Economics; Review of Economic Dynamics; Review of Economic Studies; Review of Economics and Statistics; Review of Financial Economics; Scandinavian Journal of Economics; Southern Economic Journal; National Science Foundation*; C.V. Starr Center for Applied Economics (New York University); Addison-Wesley Publishing Company; Ballinger Press; Cambridge University Press; Harvard Business School Press; MIT Press; W.W. Norton; Oxford University Press |
| Associate Editor: | *Journal of Applied Corporate Finance* |
| Former Associate Editor: | *Federal Reserve Bank of New York Economic Policy Review; International Finance; International Tax and Public Finance; Journal of Industrial Economics; Journal of Macroeconomics; Journal of Small Business Finance; National Tax Journal* |

# P U B L I C A T I O N S   A N D   P A P E R S

## Edited Volumes

*Transition Costs of Fundamental Tax Reform* (with K.A. Hassett), Washington, DC: AEI Press, 2001.

*Inequality and Tax Policy* (with K.A. Hassett), Washington, DC: AEI Press, 2001.

*Effects of Taxation on Multinational Corporations* (with M. Feldstein and J.R. Hines), Chicago: University of Chicago Press, 1995.

*Taxing Multinational Corporations* (with M. Feldstein and J. R. Hines), Chicago: University of Chicago Press, 1995.

*Studies in International Taxation* (with A. Giovannini and J. B. Slemrod), Chicago: University of Chicago Press, 1993.

*Financial Markets and Financial Crises*, Chicago: University of Chicago Press, 1991.

*Asymmetric Information, Corporate Finance, and Investment*, Chicago: University of Chicago Press, 1990.

**Exhibit A**

**Robert Glenn Hubbard**                                                    **November 2015**

**Books**

> *Balance* (with T. Kane), Simon and Schuster, 2013.
>
> *Healthy, Wealthy, and Wise* (with J.F. Cogan and D.P. Kessler), Hoover Institution Press and AEI Press, 1st ed., 2005; 2nd ed., 2011.
>
> *Seeds of Destruction* (with P. Navarro), FT Publishing, 2010.
>
> *The Mutual Fund Industry: Competition and Investor Welfare* (with M.F. Koehn, S.I. Ornstein, M. Van Audenrode, and J. Royer), New York: Columbia Business School Publishing, 2010.
>
> *The Aid Trap: Hard Truths About Ending Poverty* (with W. Duggan), Columbia Business School Publishing, 2009.

**Textbooks**

> *Principles of Economics* (with A.P. O'Brien), Pearson Prentice Hall, 1st ed., 2006; 2nd ed., 2008; 3rd ed., 2010; 4th ed., 2013; 5th ed., 2015.
>
> *Money, Banking, and the Financial System* (with A.P. O'Brien), Pearson Prentice Hall, 1st ed., 2012; 2nd ed., 2013.
>
> *Macroeconomics* (with A.P. O'Brien and M. Rafferty), Pearson Prentice Hall, 1st ed., 2012; 2nd ed., 2014.
>
> *Money, the Financial System, and the Economy,* Reading: Addison-Wesley Publishing Company, 1st ed., 1994; 2nd ed., 1997; 3rd ed., 2000; 4th ed., 2002; 5th ed., 2004; 6th ed., 2007.

**Publications**

> *Articles*
>
> "Taking Capital's Gains: Capital's Ideas and Tax Policy in the Twenty-First Century", *National Tax Journal*, 68 (2015): 409-424.
>
> Reforming the Tax Preference for Employer Health Insurance" (with J. Bankman, J.F. Cogan, and D.P. Kessler), *Tax Policy and the Economy*, volume 26, Cambridge, University of Chicago Press, 2012.
>
> "The Effect of Tax Preferences on Health Spending" (with J.F. Cogan and D.P. Kessler), *National Tax Journal*, 64 (2011): 795-816.
>
> "The Effect of Medicare Coverage for the Disabled on the Market for Private Insurance" (with J.F. Cogan and D.P. Kessler), *Journal of Health Economics* 29 (2010): 418-428.
>
> "The Effect of Massachusetts' Health Reform on Employer-Sponsored Insurance Premiums" (with J.F. Cogan and D.P. Kessler), *Forum for Health Economics and Policy*, 2010.
>
> "The Mortgage Market Meltdown and House Prices" (with C. Mayer), *The B.E. Journal of Economic Analysis & Policy* 9: Issue 3 (Symposium), Article 8 (2009).
>
> "Competition in the Mutual Fund Industry: Evidence and Implications for Policy" (with J. Coates), *Journal of Corporation Law*, 33 (Fall 2007).
>
> "Evaluating Effects of Tax Preferences on Health Care Spending and Federal Revenues" (with J.F. Cogan and D.P. Kessler), in J.M. Poterba, ed., *Tax Policy and the Economy*, volume 21, Cambridge: MIT Press, 2007.
>
> "To Bundle or Not to Bundle: Firms' Choices Under Pure Building" (with A. Saha and J. Lee), *International Journal of the Economics of Business*, 14 (2007): 59-83.

Exhibit A

**Robert Glenn Hubbard**                                                                      **November 2015**

"The Effects of Progressive Income Taxation on Job Turnover" (with W.M. Gentry), *Journal of Public Economics* 88 (September 2004): 2301-2322.

"Business, Knowledge, and Global Growth", *Capitalism and Society*, 1 (2006).

"Precautionary Savings and the Governance of Nonprofit Organizations" (with R. Fisman), *Journal of Public Economics*, 2005.

"Government Debt and Interest Rates" (with E. Engen), in M. Gertler and K. Rogoff, *NBER Macroeconomics Annual 2004*, Cambridge: MIT Press, 2005.

"Entrepreneurship and Household Saving" (with W.M. Gentry), *Advances in Economic Analysis and Policy*, 4 (2004).

"Taxing Multinationals" (with M. Devereux), *International Taxation and Public Finance* 10(2003):469-487.

"The Effect of the Tax Reform Act of 1986 on the Location of Assets in Financial Services Firms" (with R. Altshuler), *Journal of Public Economics* 87 (January 2003):109-127.

"The Role of Nonprofit Endowments" (with R. Fisman), in E. Glaeser, ed., *The Governance of Not-For-Profit Organizations*, Chicago: University of Chicago Press, 2003.

"Are There Bank Effects in Borrowers' Costs of Funds?: Evidence from a Matched Sample of Borrowers and Banks" (with K.N. Kuttner and D.N. Palia), *Journal of Business* 75 (October 2002): 559-581.

"The Share Price Effects of Dividend Taxes and Tax Imputation Credits" (with T.S. Harris and D. Kemsley), *Journal of Public Economics* 79 (March 2001): 569-596.

"Tax Policy and Entrepreneurial Entry" (with W.M. Gentry), *American Economic Review* 90 (May 2000).: 283-287.

"Understanding the Determinants of Managerial Ownership and the Link Between Ownership and Performance" (with C.P. Himmelberg and D. Palia), *Journal of Financial Economics* 53 (1999): 353-384.

"A Reexamination of the Conglomerate Merger Wave in the 1960s" (with D. Palia), *Journal of Finance* 54 (June 1999): 1131-1152.

"Inflation and the User Cost of Capital: Does Inflation Still Matter?" (with D. Cohen and K.A. Hassett), in M. Feldstein, ed., *The Costs and Benefits of Achieving Price Stability*, Chicago: University of Chicago Press, 1999.

"Are Investment Incentives Blunted by Changes in Prices of Capital Goods?: International Evidence" (with K.A. Hassett), *International Finance* 1 (October 1998): 103-125.

"Capital-Market Imperfections and Investment," *Journal of Economic Literature* 36 (March 1998): 193-225.

"Fundamental Tax Reform and Corporate Financial Policy" (with W.M. Gentry), in J.M. Poterba, ed., *Tax Policy and the Economy*, volume 12, Cambridge: MIT Press, 1998.

"Distributional Implications of Introducing a Broad-Based Consumption Tax" (with W.M. Gentry), in J.M. Poterba, ed., *Tax Policy and the Economy*, volume 11, Cambridge: MIT Press, 1997.

"How Different Are Income and Consumption Taxes?," *American Economic Review* 87 (May 1997): 138-142.

"Tax Policy and Investment," (with K.A. Hassett), in A.J. Auerbach, ed., *Fiscal Policy: Lessons from Economic Research*, Cambridge: MIT Press, 1997.

"Assessing the Effectiveness of Saving Incentives" (with J. Skinner), *Journal of Economic Perspectives* 10 (Fall 1996): 73-90.

"The Political Economy of Branching Restrictions and Deposit Insurance: A Model of Monopolistic Competition Among Small and Large Banks" (with N. Economides and D. Palia), *Journal of Law and Economics* 39 (October 1996): 667-704.

**Exhibit A**

"Tax Reforms and Investment: A Cross-Country Comparison" (with J.G. Cummins and K.A. Hassett), *Journal of Public Economics* 62 (1996): 237-273.

"Benefits of Control, Managerial Ownership, and the Stock Returns of Acquiring Firms" (with D. Palia), *RAND Journal of Economics* 26 (Winter 1995): 782-792.

"Executive Pay and Performance: Evidence from the U.S. Banking Industry" (with D. Palia), *Journal of Financial Economics* 39 (1995): 105-130.

"Tax Policy, Internal Finance, and Investment: Evidence from the Undistributed Profits Tax of 1936-1937" (with C. Calomiris), *Journal of Business* 68 (October 1995): 443-482.

"A Reconsideration of Investment Behavior Using Tax Reforms as Natural Experiments" (with J.G. Cummins and K.A. Hassett), *Brookings Papers on Economic Activity* (1994:2): 1-59.

"Precautionary Saving and Social Insurance" (with J. Skinner and S. Zeldes), *Journal of Political Economy* 105 (April 1995): 360-399.

"Expanding the Life-Cycle Model: Precautionary Saving and Public Policy" (with J. Skinner and S. Zeldes), *American Economic Review* 84 (May 1994): 174-179.

"The Tax Sensitivity of Foreign Direct Investment: Evidence from Firm-Level Panel Data" (with J. Cummins), in M. Feldstein, J.R. Hines, and R.G. Hubbard, eds., *Effects of Taxation on Multinational Corporations*, Chicago: University of Chicago Press, 1995.

"International Adjustment Under the Classical Gold Standard: Evidence for the U.S. and Britain, 1879- 1914" (with C. Calomiris), in T. Bauoumi, B. Eichengreen, and M. Taylor, eds., *Modern Perspectives on the Gold Standard*, Cambridge: Cambridge University Press, 1995.

"Internal Finance and Firm-Level Investment" (with A. Kashyap and T. Whited), *Journal of Money, Credit, and Banking* 27 (August 1995): 683-701.

"Do Tax Reforms Affect Investment?" (with J.G. Cummins and K.A. Hassett), in J.M. Poterba, ed., *Tax Policy and the Economy*, vol. 9, Cambridge: MIT Press, 1995.

"The Importance of Precautionary Motives for Explaining Individual and Aggregate Saving" (with J. Skinner and S. Zeldes), *Carnegie-Rochester Conference Series on Public Policy* 40 (June 1994): 59-126.

"Corporate Financial Policy, Taxation, and Macroeconomic Risk" (with M. Gertler), *RAND Journal of Economics* 24 (Summer 1993): 286-303.

"Internal Net Worth and the Investment Process: An Application to U.S. Agriculture" (with A. Kashyap), *Journal of Political Economy* 100 (June 1992): 506-534.

"Long-Term Contracting and Multiple-Price Systems" (with R. Weiner), *Journal of Business* 65 (April 1992): 177-198.

"Efficient Contracting and Market Power: Evidence from the U.S. Natural Gas Industry" (with R. Weiner), *Journal of Law and Economics* 34 (April 1991): 25-67.

"Interest Rate Differentials, Credit Constraints, and Investment Fluctuations" (with M. Gertler and A. Kashyap), in R.G. Hubbard, ed., *Financial Markets and Financial Crises*, Chicago: University of Chicago Press, 1991.

"Taxation, Corporate Capital Structure, and Financial Distress" (with M. Gertler), in L.H. Summers, ed., *Tax Policy and the Economy*, volume 4, Cambridge: MIT Press, 1990.

"Firm Heterogeneity, Internal Finance, and Credit Rationing" (with C. Calomiris), *Economic Journal* 100 (March 1990): 90-104.

"Coming Home to America: Dividend Repatriations in U.S. Multinationals" (with J. Hines), in A. Razin and J.B. Slemrod, eds., *Taxation in the Global Economy*, Chicago: University of Chicago Press, 1990.

**Exhibit A**

"Price Flexibility, Credit Availability, and Economic Fluctuations: Evidence from the U.S., 1894-1909" (with C. Calomiris), *Quarterly Journal of Economics* 104 (August 1989): 429-452.

"Financial Factors in Business Fluctuations" (with M. Gertler), in Federal Reserve Bank of Kansas City, *Financial Market Volatility--Causes, Consequences, and Policy Responses*, 1989.

"Contracting and Price Adjustment in Commodity Markets: Evidence from Copper and Oil" (with R. Weiner), *Review of Economics and Statistics* 71 (February 1989): 80-89.

"Financing Constraints and Corporate Investment" (with S. Fazzari and B.C. Petersen), *Brookings Papers on Economic Activity*, 1988:1: 141-195; Reprinted in Z.J. Acs, ed., *Small Firms and Economic Growth*, Cheltenham, U.K.: Edward Elgar Publishing Ltd., 1995.

"Investment, Financing Decisions, and Tax Policy" (with S. Fazzari and B.C. Petersen), *American Economic Review* 78 (May 1988): 200-205.

"Market Structure and Cyclical Fluctuations in U.S. Manufacturing" (with I. Domowitz and B.C. Petersen), *Review of Economics and Statistics* 70 (February 1988): 55-66.

"Capital Market Imperfections and Tax Policy Analysis in the Life-Cycle Model" (with K. Judd), Annales d' *Economie et de Statistique* 9 (January-March 1988): 111-139.

"Social Security and Individual Welfare: Precautionary Saving, Borrowing Constraints, and the Payroll Tax" (with K. Judd), *American Economic Review* 77 (September 1987): 630-646.

"Oligopoly Supergames: Some Empirical Evidence on Prices and Margins" (with I. Domowitz and B.C. Petersen), *Journal of Industrial Economics* 36 (June 1987): 379-398.

"Uncertain Lifetimes, Pensions, and Individual Saving," in Zvi Bodie, John B. Shoven, and David A. Wise (eds.), *Issues in Pension Economics,* Chicago: University of Chicago Press, 1987, pp. 175-205.

"The Farm Debt Crisis and Public Policy" (with C. Calomiris and J. Stock), *Brookings Papers on Economic Activity*, 1986:2: 441-479.

"Liquidity Constraints, Fiscal Policy, and Consumption" (with K. Judd), *Brookings Papers on Economic Activity*, 1986:1: 1-50.

"The Intertemporal Stability of the Concentration-Margins Relationship" (with I. Domowitz and B.C. Petersen), *Journal of Industrial Economics* 35 (September 1986): 13-34.

"Pension Wealth and Individual Saving: Some New Evidence," *Journal of Money, Credit, and Banking* 18 (May 1986): 167-178.

"Supply Shocks and Price Adjustment in the World Oil Market," *Quarterly Journal of Economics* 101 (February 1986): 85-102.

"Regulation and Long-Term Contracts in U.S. Natural Gas Markets" (with R. Weiner), *Journal of Industrial Economics* 35 (September 1986): 51-71.

"Business Cycles and the Relationship Between Concentration and Price-Cost Margins" (with I. Domowitz and B.C. Petersen), *RAND Journal of Economics* 17 (Spring 1986): 1-17.

"Inventory Optimization in the U.S. Petroleum Industry: Empirical Analysis and Implications for Energy Emergency Policy" (with R. Weiner), *Management Science 32* (July 1986): 773-790.

"Social Security, Liquidity Constraints, and Pre-Retirement Consumption," *Southern Economic Journal* 51 (October 1985): 471-484.

"Personal Taxation, Pension Wealth, and Portfolio Composition," *Review of Economics and Statistics* 67 (February 1985): 53-60.

"Industry Margins and the Business Cycle: Some New Microeconomic Evidence" (with I. Domowitz and B.C. Petersen), *Economics Letters* 19 (1985): 73-77.

Exhibit A

**Robert Glenn Hubbard**                                                                                    **November 2015**

"Oil Supply Shocks and International Policy Coordination" (with R. Weiner), *European Economic Review* 30 (February 1986): 91-106.

"Do IRAs and Keoghs Increase Saving?," *National Tax Journal* 37 (March 1984): 43-54.

*The Financial Impacts of Social Security: A Study of Effects on Household Wealth Accumulation and Allocation, in Monograph Series in Finance and Economics*, New York University, 1983.

**Exhibit A**

**Robert Glenn Hubbard**                                                                                           **November 2015**

### *Writings on Public Policy*

"Taking Capital's Gains:  Capital's Ideas and Tax Policy in the Twenty-First Century", *National Tax Journal*, 68 (2015): 409-424

"Financial Regulatory Reform: A Progress Report," Federal Reserve Bank of St. Louis *Review* (May/June 2013): 181-197

"Consequences of Government Deficits and Debt," *International Journal of Central Banking* (January 2012).

"Putting Economic Ideas Back into Innovation Policy," in J. Lerner and S. Stern, eds., *The Rate and Direction of Inventive Activity Revisited.* Chicago: University of Chicago Press, 2012.

"Back to the Future: The Marshall Plan" (with W. Duggan), in C. Schramm, ed. Entrepreneurship and Expeditionary Economics, Kansas City: Kauffman Foundation (2011): 8-19.

"The Morning After: A Road Map for Financial Regulatory Reform," in R. B. Porter, R. R. Glauber, and J.J. Healey, eds., *New Directions in Financial Services Regulation*, Cambridge: MIT Press (2011): 77-98.

"The Best Business Education Ever," *BizEd* 6:5 (2007).

"An Action Plan for US Capital Markets," *International Finance* 10:1 (2007): 91-99.

"Nondestructive Creation," *strategy+business* 27 (Summer 2007): 30-35.

"The Productivity Riddle," *strategy+business* 45 (Winter 2006): 28-33.

"Overview of the Japanese Deficit Question," *(with T. Ito),* in *"Tackling Japan's Fiscal Challenges: Strategies to Cope with High Public Debt and Population Aging*, Palgrave, Macmillan (October 31, 2006).

"The U.S. Current Account Deficit and Public Policy," *Journal of Policy Modeling* 28 (2006): 665-671.

"Making Markets Work," (with J.F. Cogan and D.P. Kessler), *Health Affairs* 24 (November/December 2005): 1447-1457.

*How Capital Markets Enhance Economic Performance and Facilitate Job Creation* (with W.C. Dudley), New York: Goldman Sachs Markets Institute, 2004.

"Would a Consumption Tax Favor the Rich?," In A.J. Auerbach and K.A. Hassett, eds., *Toward Fundamental Tax Reform.* Washington, DC: AEI Press, 2005.

"The Economist as Public Intellectual," *Journal of Economic Education* 35 (Fall 2004): 391-394.

"Success Taxes, Entrepreneurship, and Innovation," (with W.M. Gentry), in *Innovation and the Economy*, volume 5, forthcoming.

 "Tax Policy and International Competitiveness," *Taxes-The Tax Magazine* (March 2004): 233-241.

"Capital-Market Imperfections, Investment, and the Monetary Transmission Mechanism," in Heinz Hermann, ed., *Investing for the Future.* Frankfurt: Deutsche Bundesbank, 2001.

"The Growth of Institutional Stock Ownership: A Promise Unfulfilled,"(with F.R. Edwards), *Journal of Applied Corporate Finance* 13 (Fall 2000): 92-104.

"Telecommunications, the Internet, and the Cost of Capital," in Ingo Vogelsang and Benjamin Compaine, eds., *The Internet Upheaval*, Cambridge: MIT Press, 2000.

"Federal Deposit Insurance: Economic Efficiency or Politics?" (with N. Economides and D. Palia), *Regulation* 22 (1999): 15-17.

*Institutional Investors and Corporate Behavior* (with G. R. Downes, Jr. and E. Houminer), Washington, D.C., American Enterprise Institute, 1999.

**Exhibit A**

*The Magic Mountain: Is There a Budget Surplus?* (with K.A. Hassett), Washington, D.C.: American Enterprise Institute, 1999.

*Medical School Financing and Research: Problems and Policy Options*, Washington, D.C.: American Enterprise Institute, 1999.

"The Golden Goose: Understanding (and Taxing) the Saving of Entrepreneurs," in Gary D. Libecap, ed., *Advances in the Study of Entrepreneurship, Innovation, and Growth*, volume 10, Greenwich: JAI Press, 1998.

"U.S. Tax Policy and Multinational Corporations: Incentives, Problems, and Directions for Reform," in Dale W. Jorgenson and James M. Poterba, eds., *Borderline Case: International Tax Policy, Corporate Research and Development, and Investment*, Washington, D.C.: National Research Council, 1998.

"Distributional Tables and Tax Policy," in David F. Bradford, ed., *Distributional Analysis of Tax Policy*, Washington, D.C.: AEI Press, 1995.

"Is There a 'Credit Channel' for Monetary Policy?," *Federal Reserve Bank of St. Louis Review* 77 (May/June 1995): 63-77.

"U.S. Tax Policy and Foreign Direct Investment: Incentives, Problems, and Reform," *Tax Policy and Economic Growth,* Washington, DC: American Council for Capital Formation, 1995.

"The Use of 'Distribution Tables' in the Tax Policy Process," *National Tax Journal* 46 (December 1993): 527-537.

"Securities Transactions Taxes: Tax Design, Revenue, and Policy Considerations," *Tax Notes* (November 22, 1993): 985-1000.

"Corporate Tax Integration: A View from the Treasury Department," *Journal of Economic Perspectives* (Winter 1993): 115-132; reprinted in P. Roberti, ed., *Financial Markets and Capital Income Taxation in a Global Economy*, Amsterdam: North-Holland, 1998.

"The President's 1992 Health Care White Paper: An Economic Perspective," *National Tax Journal* 45 (September 1992): 347-356.

"Household Income Changes Over Time: Some Basic Questions and Facts," *Tax Notes* (August 24, 1992).

"Household Income Mobility During the 1980s: A Statistical Assessment Based on Tax Return Data" (with J. Nunns and W. Randolph), *Tax Notes* (June 1, 1992).

"Debt Renegotiation," *Institutional Investor* 24 (June 1990).

"Petroleum Regulation and Public Policy" (with R. Weiner), in Leonard Weiss and Michael Klass (eds.), *Regulatory Reform: What Actually Happened,* Boston: Little, Brown, and Company, 1986.

"Natural Gas: The Regulatory Transition" (with R. Braeutigam), in Leonard Weiss and Michael Klass (eds.), *Regulatory Reform: What Actually Happened,* Boston: Little, Brown, and Company, 1986.

"Natural Gas Contracting in Practice: Evidence from the United States" (with R. Weiner), in Michael Hoel and Bruce Wolman (eds.), *Natural Gas Markets and Contracts, Contributions to Economic Analysis Series*, North-Holland, 1986.

"Contracting and Regulation Under Uncertainty: The Natural Gas Market" (with R. Weiner), in John P. Weyant and Dorothy B. Sheffield (eds.), *The Energy Industries in Transition: 1985-2000*, Boulder: Westview Press, 1985.

"Oil and OECD Economies: Measuring Stockpile Coordination Benefits" (with J. Marquez and R. Weiner), in Mark Baier (ed.), *Energy and Economy: Global Interdependencies*, Bonn: Gesellschaft für Energiewissenschaft und Energiepolitik, 1985.

"Managing the Strategic Petroleum Reserve: Energy Policy in a Market Setting" (with R. Weiner), *Annual Review of Energy* 10 (1985): 339-359.

**Exhibit A**

"Modeling Oil Price Fluctuations and International Stockpile Coordination" (with R. Weiner), *Journal of Policy Modeling* 7 (Summer 1985): 339-359.

"Crude Oil Trading and Price Stability" (with R. Weiner), in William F. Thompson and David J. De Angelo (eds.), *World Energy Markets: Stability or Cyclical Change*, Boulder: Westview Press, 1985.

"Energy Price Shocks, Inflation, and Economic Activity: Simulation Results of the Hubbard-Fry Model", in Bert Hickman and Hillard Huntington (eds.), *Macroeconomic Impact of Oil Supply Shocks: Report of the Energy Modeling Forum VII Project*, 1985.

"Drawing Down the Strategic Petroleum Reserve: The case for Selling Futures Contracts" (with S. Devarajan), in Alvin Alm and Robert Weiner (eds.), *Oil Shock: Policy Response and Implementation*, Cambridge: Ballinger Press, 1983.

"Government Stockpiles in a Multi-Country World: Coordination versus Competition" (with R. Weiner), in Alvin Alm and Robert Weiner (eds.), *Oil Shock: Policy Response and Implementation*, Cambridge: Ballinger Press, 1983.

"The 'Sub-Trigger' Crisis: An Economic Analysis of Flexible Stock Policies" (with R. Weiner), *Energy Economics* 5 (July 1983): 178-189.

"Temporary Tax Reductions as Responses to Oil Shocks," in Alvin Alm and Robert Weiner (eds.), *Oil Shock: Policy Response and Implementation*, Cambridge: Ballinger Press, 1983.

"Policy Analysis with Your Hands Tied: The Case of Disruption Tariff Under Oil Price Controls," in Fred S. Roberts (ed.), *Energy Modeling IV: Planning for Energy Disruptions*, Institute of Gas Technology, 1982.


### Comments, Notes, and Reviews

"Comment" on A.J. Auerbach, "The Choice Between Income and Consumption Tax: A Primer," in A.J. Auerbach and D. Shaviro, eds., *Key Issues in Public Finance: Essays In Honor of David Bradford,* forthcoming.

"Pay Without Performance: A Market Equilibrium Critique," *Journal of Corporation Law* 30 (Summer 2005): 717-720.

"Financing Constraints and Corporate Investment: Response to Kaplan and Zingales," *Quarterly Journal of Economics* 115 (May 2000): 695-705.

"Comment" on Charles Handlock, Joel Houston, and Michael Ryngaert, "The Role of Managerial Incentives in Bank Acquisitions," *Journal of Banking and Finance* 23 (1999): 250-254.

"Comment" on D.H. Moss, "Courting Disaster?: The Transformation of Federal Disaster Policy Since 1903," in K.A. Froot, ed., *The Financing of Catastrophic Risk*, Chicago: University of Chicago Press, 1999.

"Market for Corporate Control" (with D. Palia), in P. Newman, ed., *The New Palgrave Dictionary of Economics and the Law*, London: Macmillan, 1998.

"Comment" on Joseph Peek and Eric Rosengren, "Do Monetary Policy and Regulatory Policy Affect Bank Loans?" in *Is Bank Lending Important for the Transmission of Monetary Policy?* Federal Reserve Bank of Boston, Conference Series (Proceedings) 39 (1995): 47-79.

"Introduction," in M. Feldstein, J.R. Hines, and R.G. Hubbard, eds., *Effects of Taxation on Multinational Corporations*, Chicago: University of Chicago Press, 1995.

"Introduction," in M. Feldstein, J.R. Hines, and R.G. Hubbard, eds., *Taxing Multinational Corporations*, Chicago: University of Chicago Press, 1995.

"Investment Under Uncertainty: Keeping One's Options Open," *Journal of Economic Literature* 32 (December 1994): 1794-1807.

"Introduction," in A. Giovannini, R.G. Hubbard, and J. Slemrod, eds., *Studies in International Taxation*, Chicago: University of Chicago Press, 1993.

**Exhibit A**

"Comment" on G. Peter Wilson, "The Role of Taxes in Location and Source Decisions," in A. Giovannini, R.G. Hubbard, and J.B. Slemrod, eds., *Studies in International Taxation*, Chicago: University of Chicago Press, 1993.

"Market Structure and Cyclical Fluctuations in U.S. Manufacturing: Reply" (with I. Domowitz and B.C. Petersen), *Review of Economics and Statistics*, 1993.

"Introduction," in R.G. Hubbard, ed., *Financial Markets and Financial Crises*, Chicago: University of Chicago Press, 1991.

"Introduction," in R.G. Hubbard, ed., *Asymmetric Information, Corporate Finance, and Investment*, Chicago: University of Chicago Press, 1990.

"Comment" on Alberto Giovannini and James R. Hines, Jr., "Capital Flight and Tax Competition: Are There Viable Solutions to Both Problems?," in A. Giovannini and C. Mayer, eds., *European Financial Integration*, London: Centre for Economic Policy Research, 1990.

"Comment" on Roger H. Gordon and Jeffrey K. MacKie-Mason, "Effects of the Tax Reform Act of 1986 on Corporate Financial Policy and Organizational Form," in J.B. Slemrod, ed., *Do Taxes Matter?: Economic Impacts of the Tax Reform Act of 1986*, Cambridge: MIT Press, 1990.

"Comment" on James M. Poterba, "Tax Policy and Corporate Saving," *Brookings Papers on Economic Activity*, 1987:2.

"Comment" on Robert E. Hall, "Market Structure and Macro Fluctuations," *Brookings Papers on Economic Activity, 1986*:2.

"Comment" on Alan S. Blinder and Angus Deaton, "The Time-Series Consumption Function Revisited," *Brookings Papers on Economic Activity*, 1985:2.

"Comment" on Benjamin S. Friedman and Mark Warshawsky, "The Cost of Annuities: Implications for Saving Behavior and Bequests," in Zvi Bodie, John Shoven, and David Wise (eds.), *Pensions in the U.S. Economy*, Chicago: University of Chicago Press, 1987.

"Energy Security: Book Reviews," *Energy Journal* 4 (April 1983).

"When the Oil Spigot is Suddenly Turned Off: Some Further Thoughts" (with R. Weiner), *Journal of Policy Analysis and Management* 2 (Winter 1983).


***Submitted Papers and Working Papers***

"Country Characteristics and the Incidence of Capital Income Taxation on Wages: An Empirical Assessment" (with C. Azémar), Working Paper, Columbia University, 2013.

"Analysis of Discrimination in Prime and Subprime Mortgage Markets" (with Darius Palia and Wei Yu), Working Paper, Columbia University, 2011.

"The Elasticity of Deferred Income With Respect to Marginal Income Tax Rates" (with K.A. Hassett and A. Mathur), Working Paper, Columbia University, 2011.

"Tax Policy and Wage Growth" (with W. M. Gentry), Working Paper, Columbia University, 2001.

"Investor Protection, Ownership, and Investment" (with C.P. Himmelberg and I. Love), Working Paper, Columbia University, 2000.

"Incentive Pay and the Market for CEOs: An Analysis of Pay-for-Performance Sensitivity" (with C.P. Himmelberg), Working Paper, Columbia University, 2001.

"Noncontractible Quality and Organizational Form in the U.S. Hospital Industry," (with K.A. Hassett), Working Paper, Columbia University, 1999.

"Entrepreneurship and Household Saving," (with W. M. Gentry), Working Paper, Columbia University, 2001.

**Exhibit A**

**Robert Glenn Hubbard**                                                      **November 2015**

"Corporate Payouts and the Tax Price of Corporate Retentions: Evidence from the Undistributed Profits Tax of 1936-37" (with P. Reiss),Working Paper No. 3111, National Bureau of Economic Research, September 1989.

"Market Structure, Durable Goods, and Cyclical Fluctuations in Markups" (with I. Domowitz and B. Petersen), Working Paper, Northwestern University, 1987.

"Finite Lifetimes, Borrowing Constraints, and Short-Run Fiscal Policy" (with K. Judd), Working Paper No. 2158, National Bureau of Economic Research, 1987.

**Exhibit A**

Robert Glenn Hubbard                                                                                November 2015


G R A N T S   R E C E I V E D

"Corporate Board Study Group," Rockefeller Foundation, 2009.

"Institutional Investors, Boards of Directors, and Corporate Governance," Korn/Ferry, 1997.

"An Economic Analysis of Saving Incentives," Securities Industry Association, 1994, with Jonathan Skinner.

"Securities Transactions Taxes: Tax Design, Revenue, and Policy Considerations," Catalyst Institute, 1993.

"Precautionary Saving in the U.S. Economy," Bradley Foundation, 1989-1990, with Jonathan Skinner and Stephen Zeldes.

"Taxation, Corporate Leverage, and Financial Distress," Garn Institute for Finance, 1989-1990.

"Precautionary Saving in a Dynamic Model of Consumption and Labor Supply," National Science Foundation (Economics Group SES-8707997), 1987-1989, with Jonathan Skinner and Stephen Zeldes.

"Industrial Behavior and the Business Cycle: A Panel Data Study of U.S. Manufacturing," National Science Foundation (Economics Group SES-8420152), 1985-1987, with Ian Domowitz and Bruce Petersen.

"Efficient Contracting and Market Power: Evidence from the U.S. Natural Gas Market," Transportation Center, Northwestern University, Summer 1985.

"Constructing a Panel Data Base for Studies of U.S. Manufacturing," University Research Grants Committee, Northwestern University, 1985-1986.

"Economic Analysis of Multiple-Price Systems: Theory and Application, "National Science Foundation (Regulatory Analysis and Policy Group, SES-8408805), 1984-1985.

"Contracting and Price Adjustment in Product Markets," University Research Grants Committee, Northwestern University, 1983-1984.


PAPERS PRESENTED


*University Seminars*

Bard College, University of Bergamo, University of California (Berkeley), University of California (Los Angeles), University of California (San Diego), Carleton, University of Chicago, Columbia, University of Dubuque, Emory, University of Florida, University of Central Florida, Florida Atlantic University, George Washington, Georgetown, Harvard, Hendrix College, University of Illinois, Indiana University, Johns Hopkins, Laval, Lehigh, University College (London), University of Kentucky, London School of Economics, MIT, University of Maryland, University of Miami, Miami University, University of Michigan, University of Minnesota, New York University, Northwestern, Oxford, University of Pennsylvania, Princeton, Rice, University of Rochester, Stanford, Syracuse, University of Miami, University of Texas, Texas Tech University, Tufts, University of Virginia, University of Wisconsin (Madison), University of Wisconsin (Milwaukee), Virginia Tech, and Yale.


*Conference Papers Presented*

American Council for Capital Formation, Washington, DC, June 1994.

**Exhibit A**

Robert Glenn Hubbard                                                                    November 2015

American Economic Association, Philadelphia, 2014; San Diego, 2013; Chicago, 2012; New Orleans, 2008; Chicago, 2007; Boston, 2006; Philadelphia, 2005; San Diego, January 2004; Atlanta, January 2002; New Orleans, January 2001; Boston, January 2000; New York, January 1999; New Orleans, January 1997; San Francisco, January 1996; Washington, D.C., January 1995; Boston, January 1994; Anaheim, January 1993; Washington, D.C., December 1990; Atlanta, December 1989; New York, December 1988; Chicago, December 1987; New Orleans, December 1985; Dallas, December 1984.

American Enterprise Institute, Conference on Private Equity, 2007; Conference on Corporate Taxation, 2006; Conference on Multinational Corporations, 2004, 2003; Conference on Multinational Corporations, February 1999; Conference on Income Inequality, January 1999; Conference on Transition Costs of Fundamental Tax Reform, November 1998; Conference Series on Social Insurance Reform, 1997-1998; Conference Series on Fundamental Tax Reform, 1995-1998; Conference on Distributional Analysis of Tax Policies, Washington, D.C., December 1993.

American Finance Association, New Orleans, January 2008; San Diego, January 2004; Boston, January 2000; New York, January 1999; New Orleans, January 1997.

Association of Environmental and Resource Economists, Dallas, December 1984; San Francisco, December 1983.

Association of Public Policy Analysis and Management, New Orleans, October 1984; Philadelphia, October 1983.

Bipartisan Commission on Entitlement and Tax Reform, Washington, DC, June 1994.

Brookings Panel on Economic Activity, September 1994, April 1988, September 1987, September 1986, April 1986, September 1985.

Centre for Economic Policy Research Conference on Capital Taxation and European Integration, London, September 1989.

Conference on International Perspectives on the Macroeconomic and Microeconomic Implications of Financing Constraints, Centre for Economic Policy Research, Bergamo, Italy, October 1994.

Congressional Research Service Conference for New Members of Congress, Williamsburg, January 1999.

Congressional Research Service Conference for Members of the Ways and Means Committee, Baltimore, October 2001.

Deutsche Bundesbank Conference on Investing for the Future, Frankfurt, Germany, May 2000.

Eastern Economic Association, Boston, March 1988; Boston, February 1983.

Econometric Society, New Orleans, January 1997; San Francisco, January 1996; Washington, D.C., January 1995; New Orleans, January 1992; Washington, December 1990; Atlanta, December 1989; New York, December 1988; Chicago, December 1987; New Orleans, December 1986; New York, December 1985; Boston, August 1985; Madrid, September 1984; San Francisco, December 1983; Pisa, August 1983.

Energy Modeling Forum, Stanford University, August 1983; February 1983; August 1982.

European Commission, Conference on Taxation of Financial Instruments, Milan, June 1998.

European Institute for Japanese Studies, Tokyo, September 2002; March 2002.

Federal Reserve Bank of Boston, Annual Economic Conference, North Falmouth, Massachusetts, June 1995.

Federal Reserve Bank of Kansas City Symposium on "Financial Market Volatility – Causes, Consequences, and Policy Responses," Jackson Hole, Wyoming, August 1988; Comment of Rogoff, August 2004.

Federal Reserve Bank of New York, Conference on Consolidation of the Financial Services Industry, New York, March 1998.

**Exhibit A**

Federal Reserve Bank of Philadelphia Conference on Economic Policy, Philadelphia, November 2007; November 2001.

Federal Reserve Bank of St. Louis, Conference on Economic Policy, St. Louis, October 1994.

Harvard Law School U. S.-Japan Symposium, Tokyo, December 2003; Washington, D. C., September 2002; Tokyo, December 2001.

Hoover Institution, Conference on Fundamental Tax Reform, December 1995.

The Institute of Gas Technology, Washington, DC, May 1982.

The Institute of Management Science/Operations Research Society of America, Orlando, November 1983; Chicago, April 1983.

International Association of Energy Economists, Boston, November 1986; Philadelphia, December 1985; Bonn, June 1985; San Francisco, November 1984; Washington, DC, June 1983; Denver, November 1982; Cambridge (England), June 1982; Houston, November 1981.

International Conference on the Life Cycle Model, Paris, June 1986.

International Institute of Public Finance, Innsbruck, August 1984.

International Seminar on Public Economics, Amsterdam, April 1997.

National Academy of Sciences, February 1997.

National Association of Business Economists, Washington, March 2015; Orlando, September 2003; Washington, September 2002; New York, September 2001; Boston, September 1996; Dallas, September 1992; New Orleans, October 1987.

National Bureau of Economic Research - IMEMO Conference on the American Economy, Moscow, August 1989.

National Bureau of Economic Research Summer Institute, August 2014; August 2012; August 2009; August 2006; August 2005; July-August 2003; July-August 2000; July-August 1999; July-August 1998; August 1997; July 1995; July 1994; July 1993; August 1992; July-August 1991; July-August 1990; July-August 1989; July-August 1988; July-August 1987; July-August 1986; July 1985; July 1984; July 1983.

National Bureau of Economic Research Conference on Asymmetric Information, Corporate Finance, and Investment, Cambridge, May 1989.

National Bureau of Economic Research Conference on Chinese Economic Reform, Shanghai, China, July 2000.

National Bureau of Economic Research Conference on Financial Crises, Key Biscayne, March 1990.

National Bureau of Economic Research Conference on Government Expenditure Programs, Cambridge, November 1986.

National Bureau of Economic Research Conference on Indian Economic Reform, Rajasthan, India, December 1999.

National Bureau of Economic Research Conference on Innovation Policy, Washington, DC, April 2004, April 2003.

National Bureau of Economic Research Conference on International Taxation, Washington, DC, April 1994; Cambridge, January 1994; New York, September 1991; Nassau, Bahamas, February 1989.

National Bureau of Economic Research, Macroeconomic Annual Conference, Cambridge, MA, April 2004.

National Bureau of Economic Research Conference on Macroeconomics and Industrial Organization, Cambridge, July 1988; Cambridge, July 1987; Cambridge, July 1986; Chicago, November 1985.

**Exhibit A**

Robert Glenn Hubbard                                                                                                    November 2015

National Bureau of Economic Research Conference on Nonprofit Organizations, Cheeca Lodge, January 2002; Cambridge, October 2001.

National Bureau of Economic Research Conference on Pensions, Baltimore, March 1985; San Diego, April 1984.

National Bureau of Economic Research Conference on Productivity, March 1988; March 1987.

National Bureau of Economic Research Conference on Public Economics, Cambridge, April 1999, April 1994, April 1993, November 1991, April 1991, March 1988, November 1987, March 1987.

National Bureau of Economic Research Conference on Tax Policy and the Economy, Washington, DC, October 2001, November 1998, November 1996, November 1994, November 1991, November 1989.

National Bureau of Economic Research Trans-Atlantic Public Economics Seminar, London, May 2002; Gerzensee, May 2000; Turin, May 1994.

Organization for Economic Cooperation and Development, Economic Policy Committee Meeting, Paris, November 2002, April 2002, November 2001, April 2001.

National Tax Association/Tax Institute of America, Washington, DC, June 2000; Atlanta, October 1999; Arlington, May 1992; Seattle, October 1983.

Organization for Economic Cooperation and Development, Ministerial Meeting, Paris, May 2002, May 2001.

Princeton Center for Economic Policy Conference, October 2000, October 1995.

Sveriges Riksbank/Stockholm School of Economics Conference on Asset Markets and Monetary Policy, Stockholm, Sweden, June 2000.

U.S. House of Representatives, Budget Committee, June 2001.

U.S. House of Representatives, Committee on Ways and Means, Washington, DC, June 2006; June 2005; June 1999; April 1997, June 1996, July 1992.

U.S. Joint Economic Committee, Washington, DC, February 2003, October 2002, October 2001, May 2001.

U. S. Senate Committee on Banking, Housing, and Urban Affairs, Washington, DC, October 2001, May 2001.

U.S. Senate Committee on Budget, February 2003, September 2001.

U. S. Senate Committee on Commerce, Science, and Technology, July 2002.

U.S. Senate Committee on Finance, Washington, DC, February 2003, February 2002, February 1997, January 1995, January 1992, December 1981.

Exhibit B

**Exhibit B**

# ROBERT GLENN HUBBARD

### *Testimony as an expert witness 2011 – 2015*

*Symbol Technologies, Inc., Securities Litigation,* Consolidated C.A. No. 05-cv-3923-DRH, United States District Court, Eastern District of New York.  Provided deposition testimony in 2015.

*American Chemicals & Equipment, Inc. 401(K) Retirement Plan v.  Principal Management Corporation and Principal Global Investors, LLC.*, 4:14-cv-00044-JAJ-HCA, United States District Court, Southern District of Iowa.  Provided deposition testimony in 2015.

*Appraisal of Dell Inc.,* Consol. C.A. No. 9322-VCL, In the Court of the Chancery of the State of Delaware.  Provided deposition testimony and trial testimony in 2015.

*Jacqueline Coffin and Sandra Lowry v. Atlantic Power Corporation, et al.,* Court File No. CV-13-480939-00CP, Ontario Superior Court of Justice.  Provided deposition testimony in 2015.

*Peter J. Rush, et al. v. Walter Energy, Inc., et al.,* Master File No. 2:12-cv-00281-VEH, United States District Court Northern District of Alabama, Southern Division.  Provided deposition testimony in 2014.

*Tullett Prebon PLC, Tullett Prebon Financial Services LLC f/k/a Tullett Liberty Securities LLC and Tullett Prebon Americas Corp. v. BGC Partners, Inc.,* case No. L-003796-11, Superior Court of New Jersey, Hudson County.  Provided trial testimony in 2014.

*Basis Pac-Rim Opportunity Fund & Basis Yield Alpha Fund v. TCW Asset Management Company, Index No. 654033/2012,* Supreme Court of the State of New York, County of New York.  Provided deposition testimony in 2014.

*Postova Bank, A.S. and Istrokapital SE v. The Hellenic Republic,* case no. ARB/13/8, International Centre for Settlement of Investment Disputes.  Provided arbitration testimony in 2014.

*Sue Ann Hamm v. Harold G. Hamm*, case no. FD-2012-2048, District Court of Oklahoma County, State of Oklahoma.  Provided deposition testimony and trial testimony in 2014.

*GE Dandong, et al. v. Pinnacle Performance Limited, et al*, court file no. 10-civ-8086, United States District Court Southern District of New York.  Provided deposition testimony in 2014.

*Commonwealth REIT, Barry M. Portnoy, Adam D. Portnoy, Joseph L. Morea, William A.Lamkin, Frederick N. Zeytoonjian and REIT Management & Research LLC v. Corvex Management LP and Related Fund Management, LLC,* case no. 11-512-Y-276-13, United States District Court of Massachusetts.  Provided arbitration testimony in 2013.

**Exhibit B**

*Tullett Prebon PLC, Tullett Prebon Financial Services LLC f/k/a Tullett Liberty Securities LLC and Tullett Prebon Americas Corp. v. BCG Partners, Inc.,* Case No. L-003796-11, Superior Court of New Jersey, Hudson County.  Provided deposition testimony in 2013.

*Donald P. Fewer v. GFI Group Inc. and Jersey Partners Inc.,* 601099/08, Supreme Court of the State of New York, County of New York. Provided deposition testimony in 2013.

*United States of America v. Countrywide Financial Corporation; Countrywide Home Loans, Inc.; Countrywide Bank, FSB; Bank of America Corporation; Bank of America, N.A.; and Rebecca Mairone*, Index No. 12 Civ. 1422, United States District Court Southern District of New York.  Provided deposition testimony in 2013.

*Judith Curran and Michael Earp v. Principal Management Corporation and Principal Funds Distributor, Inc.*, Case no. 4:09-cv-00433-RP-CFB, United States District Court Southern District of Iowa Central Division. Provided deposition testimony in 2013.

*The State Treasurer of the State of South Carolina v. The Bank of New York Mellon and The Bank of New York Mellon*, Civil Action No. 2011-CP-40-00533, State of South Carolina, Court of Common Pleas for the Fifth Judicial Circuit. Provided deposition testimony in 2012.

*MBIA Insurance Corporation v. Countrywide Home Loans, Inc., Countrywide Securities Corp., Countrywide Financial Corp., Countrywide Home Loans Servicing, LP and Bank of America Corp.,* 08/602825, Supreme Court of the State of New York, County of New York. Provided deposition testimony in 2012.

*City of St. Petersburg, Florida v. Wells Fargo Bank, N.A.,* 8:10-CV-00693-JSM-TBM, United States District Court, Middle District of Florida.  Provided deposition testimony in 2011 and trial testimony in 2012.

*Pacific Select Fund v. The Bank of New York Mellon*, CV 10-00198 JST, United States District Court, Central District of California.  Provided deposition testimony in 2011.

*Securities and Exchange Commission against Ralph Cioffi and Matthew Tannin,* 08 Civ. 2457 (FB), United States District Court, Eastern District of New York.  Provided deposition testimony in 2011.

*Chemtech Royalty Associates, L.P., by Dow Europe, S.A., as Tax Matters Partner v. United States of America*, 06-258-BAJ-DLD, United States District Court, Middle District of Louisiana. Provided deposition testimony in 2009 and trial testimony in 2011.

*The Board of Trustees of the Southern California IBEW-NECA Defined Contribution Plan v. The Bank of New York Mellon Corporation, et al.*, Civil Action No. 09-cv-06273 (RMB)(AJP), United States District Court, Southern District of New York.  Provided deposition testimony in 2011.

**Exhibit B**

*SCF Arizona v. Wachovia Bank, N.A.*, 09 Civ. 9513 (WHP), United States District Court, Southern District of New York.  Provided deposition testimony in 2011.

*Novell, Inc. v. Microsoft Corporation*, Case No. 2:04-CV-1045 JFM, United States District Court, Central Division of Utah.  Provided trial testimony in 2011.

Exhibit C

**Exhibit C**
**Documents Considered**

| Description | Bates Range |
| --- | --- |
| **Bates Stamped Documents** | |
| All Documents and Information Included in the Administrative Record. | AR00001-08488 |
| | |
| **Publicly Available Documents** | |
| Federal Judicial Center, *Reference Manual on Scientific Evidence* (2nd ed.), 2000. | |
| Intercontinental Exchange, Inc., *Annual Report on Form 10-K*, 2007. | |
| Intercontinental Exchange, Inc., *Annual Report on Form 10-K*, 2008. | |
| Intercontinental Exchange, Inc., *ICE 2008 Calendar*, November 2008, accessed at: https://www.theice.com/publicdocs/support/support_cal.pdf. | |
| | |
| **ICE Orders Data** | |
| Power Orders APR07.dat. | |
| Power Orders APR08.dat. | |
| Power Orders AUG07.dat. | |
| Power Orders AUG08.dat. | |
| Power Orders DEC06.dat. | |
| Power Orders DEC07.dat. | |
| Power Orders DEC08.dat. | |
| Power Orders FEB07.dat. | |
| Power Orders FEB08.dat. | |
| Power Orders JAN07.dat. | |
| Power Orders JAN08.dat. | |
| Power Orders JAN09.dat. | |
| Power Orders JUL07.dat. | |
| Power Orders JUL08.dat. | |
| Power Orders JUN07.dat. | |
| Power Orders JUN08.dat. | |
| Power Orders MAR07.dat. | |
| Power Orders MAR08.dat. | |
| Power Orders MAY07.dat. | |
| Power Orders MAY08.dat. | |
| Power Orders NOV06.dat. | |
| Power Orders NOV07.dat. | |
| Power Orders NOV08.dat. | |
| Power Orders OCT06.dat. | |
| Power Orders OCT07.dat. | |
| Power Orders OCT08.dat. | |
| Power Orders SEP07.dat. | |
| Power Orders SEP08.dat. | |

Exhibit 1

**Exhibit 1**
**Summary of Alleged Manipulation Period**
**ICE Fixed Price Physical Day-Ahead Trading**
**Delivery Period: November 2006 - December 2008**

|  | Alleged Manipulation Months | Alleged Manipulation Days |
|---|---|---|
| Mid-Columbia Peak | 6 | 123 |
| North Path 15 Peak | 3 | 62 |
| Palo Verde Peak | 17 | 333 |
| South Path 15 Peak | 3 | 41 |
| Mid-Columbia Offpeak | 5 | 93 |
| North Path 15 Offpeak | 1 | 3 |
| Palo Verde Offpeak | 0 | 0 |
| South Path 15 Offpeak | 0 | 0 |
| **All Products** | 35 | 655 |

**Source**:
FERC Enforcement Staff Report and Recommendation (AR00090 - 158).

Exhibit 2

**Exhibit 2**
**Summary of Market VWAP and Barclays' Profit and Loss (P&L)**
**ICE Fixed Price Physical Day-Ahead Trading**
**Delivery Period: November 2006 - December 2008**

|  | Market VWAP ($/MWh) | Average P&L per MWh ($/MWh) |
|---|---|---|
| Mid-Columbia Peak | $61.19 | $(0.35) |
| North Path 15 Peak | $73.52 | $(0.04) |
| Palo Verde Peak | $66.67 | $(0.28) |
| South Path 15 Peak | $73.05 | $(0.05) |
| Mid-Columbia Offpeak | $47.66 | $(0.27) |
| North Path 15 Offpeak | $52.66 | $(0.06) |
| Palo Verde Offpeak | $46.32 | $(0.11) |
| South Path 15 Offpeak | $51.79 | $(0.06) |

**Source:**
ICE Trades Data.

Exhibit 3.1

**Exhibit 3.1**
**Market VWAP**
**ICE Fixed Price Physical Day-Ahead Trading**
*Mid-Columbia Peak*



**Note:**
[1] The VWAP for one day is not shown due to truncation of the Y-Axis.
**Source:** ICE Trades Data.

# Exhibit 3.2

**Exhibit 3.2**
**Market VWAP**
**ICE Fixed Price Physical Day-Ahead Trading**
*North Path 15 Peak*



**Note:**
[1] The VWAP for one day is not shown due to truncation of the Y-Axis.
**Source:** ICE Trades Data.

Exhibit 3.3

**Exhibit 3.3**
**Market VWAP**
**ICE Fixed Price Physical Day-Ahead Trading**
*Palo Verde Peak*



**Note:**
[1] The VWAP for one day is not shown due to truncation of the Y-Axis.
**Source:** ICE Trades Data.

Exhibit 3.4

**Exhibit 3.4**
**Market VWAP**
**ICE Fixed Price Physical Day-Ahead Trading**
*South Path 15 Peak*



**Note:**
[1] The VWAP for one day is not shown due to truncation of the Y-Axis.
**Source:** ICE Trades Data.

Exhibit 3.5

**Exhibit 3.5**
**Market VWAP**
**ICE Fixed Price Physical Day-Ahead Trading**
*Mid-Columbia Offpeak*



**Source:** ICE Trades Data.

Exhibit 3.6

**Exhibit 3.6**
**Market VWAP**
**ICE Fixed Price Physical Day-Ahead Trading**
*North Path 15 Offpeak*



**Source:** ICE Trades Data.

Exhibit 3.7

**Exhibit 3.7**
**Market VWAP**
**ICE Fixed Price Physical Day-Ahead Trading**
*South Path 15 Offpeak*



**Source:** ICE Trades Data.

Exhibit 3.8

**Exhibit 3.8**
**Market VWAP**
**ICE Fixed Price Physical Day-Ahead Trading**
*Palo Verde Offpeak*



**Source:** ICE Trades Data.

Exhibit 4

**Exhibit 4**
**Composition of Alleged Manipulation and Non-Manipulation Trading Days by Product**
**Delivery Period: November 2006 - December 2008**



Percent of Alleged Manipulation Trading Days by Product

Percent of Non-Manipulation Trading Days by Product

- Mid-Columbia Peak
- North Path 15 Peak
- Palo Verde Peak
- South Path 15 Peak
- Mid-Columbia Offpeak
- North Path 15 Offpeak
- Palo Verde Offpeak
- South Path 15 Offpeak

<u>Source</u>:
FERC Enforcement Staff Report and Recommendation (AR00090 - 158).

Exhibit 5

**Exhibit 5**
**Barclays' Average Daily Profit and Loss (P&L) by Product and Statistical Testing**
**ICE Fixed Price Physical Day-Ahead Trading**
**Delivery Period: November 2006 - December 2008**

| | Market VWAP ($/MWh) | Alleged Manipulation Period | | Non-Manipulation Period | | Difference in Average Daily P&L per MWh ($/MWh) | *t*-Statistic | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Barclays Trade Days | Average Daily P&L per MWh ($/MWh) | Barclays Trade Days | Average Daily P&L per MWh ($/MWh) | | | |
| Mid-Columbia Peak | $61.19 | 123 | $(0.64) | 379 | $(0.26) | $(0.38) | 2.172 | ** |
| North Path 15 Peak | $73.52 | 62 | $(0.51) | 435 | $0.03 | $(0.54) | 5.746 | *** |
| Palo Verde Peak | $66.67 | 333 | $(0.33) | 189 | $(0.21) | $(0.12) | 1.324 | |
| South Path 15 Peak | $73.05 | 41 | $(0.17) | 489 | $(0.04) | $(0.13) | 1.019 | |
| Mid-Columbia Offpeak | $47.66 | 93 | $(0.35) | 417 | $(0.25) | $(0.10) | 1.002 | |
| North Path 15 Offpeak | $52.66 | 3 | $(0.04) | 486 | $(0.06) | $0.02 | (0.031) | |
| Palo Verde Offpeak | $46.32 | - | - | 440 | $(0.11) | - | - | |
| South Path 15 Offpeak | $51.79 | - | - | 528 | $(0.06) | - | - | |

**Notes:**

[1] The reported *t*-statistic reflects a two-sample *t*-test. If the null hypothesis of equality of variances between the two samples was rejected, a Satterthwaite test was used; otherwise a Pooled test was used.

[2] "*" reflects significance at the 10 percent level, "**" reflects significance at the 5 percent level, and "***" reflects significance at the 1 percent level.

**Source:**

ICE Trades Data.

Exhibit 6.1

**Exhibit 6.1**

**Barclays' Estimated Monthly Cumulative and Daily Profit and Loss
ICE Fixed Price Physical Day-Ahead Trading**

*Mid-Columbia Peak*



**Notes:**
[1] Cumulative Monthly Profit and Loss represents the cumulative total P&L for a single flow month.
[2] Some values are not shown due to truncation of the Y-Axis.
**Source:** ICE Trades Data.

Exhibit 6.2

**Exhibit 6.2**

**Barclays' Estimated Monthly Cumulative and Daily Profit and Loss**
**ICE Fixed Price Physical Day-Ahead Trading**

*North Path 15 Peak*



**Notes:**
[1] Cumulative Monthly Profit and Loss represents the cumulative total P&L for a single flow month.
[2] Some values are not shown due to truncation of the Y-Axis.
**Source:** ICE Trades Data.

Exhibit 6.3

**Exhibit 6.3**

**Barclays' Estimated Monthly Cumulative and Daily Profit and Loss**

**ICE Fixed Price Physical Day-Ahead Trading**

*Palo Verde Peak*



**Notes:**
[1] Cumulative Monthly Profit and Loss represents the cumulative total P&L for a single flow month.
[2] Some values are not shown due to truncation of the Y-Axis.
**Source:** ICE Trades Data.

Exhibit 6.4

**Exhibit 6.4**
**Barclays' Estimated Monthly Cumulative and Daily Profit and Loss**
**ICE Fixed Price Physical Day-Ahead Trading**
*South Path 15 Peak*



**Notes:**
[1] Cumulative Monthly Profit and Loss represents the cumulative total P&L for a single flow month.
[2] Some values are not shown due to truncation of the Y-Axis.
**Source:** ICE Trades Data.

Exhibit 6.5

**Exhibit 6.5**

**Barclays' Estimated Monthly Cumulative and Daily Profit and Loss**

**ICE Fixed Price Physical Day-Ahead Trading**

*Mid-Columbia Offpeak*



**Notes:**
[1] Cumulative Monthly Profit and Loss represents the cumulative total P&L for a single flow month.
[2] Some values are not shown due to truncation of the Y-Axis.
**Source:** ICE Trades Data.

Exhibit 6.6

**Exhibit 6.6**
**Barclays' Estimated Monthly Cumulative and Daily Profit and Loss**
**ICE Fixed Price Physical Day-Ahead Trading**
*North Path 15 Offpeak*



**Notes:**
[1] Cumulative Monthly Profit and Loss represents the cumulative total P&L for a single flow month.
[2] Some values are not shown due to truncation of the Y-Axis.
**Source:** ICE Trades Data.

Exhibit 6.7

**Exhibit 6.7**
**Barclays' Estimated Monthly Cumulative and Daily Profit and Loss**
**ICE Fixed Price Physical Day-Ahead Trading**
*Palo Verde Offpeak*



**Notes:**
[1] Cumulative Monthly Profit and Loss represents the cumulative total P&L for a single flow month.
[2] Some values are not shown due to truncation of the Y-Axis.
**Source:** ICE Trades Data.

Exhibit 6.8

**Exhibit 6.8**
**Barclays' Estimated Monthly Cumulative and Daily Profit and Loss**
**ICE Fixed Price Physical Day-Ahead Trading**
*South Path 15 Offpeak*



**Notes:**
[1] Cumulative Monthly Profit and Loss represents the cumulative total P&L for a single flow month.
[2] Some values are not shown due to truncation of the Y-Axis.
**Source:** ICE Trades Data.

Exhibit 7.1

**Exhibit 7.1**
**Barclays' Estimated Daily Profit and Loss per MWh**
**With Non-Manipulation Period Standard Deviation**
**ICE Fixed Price Physical Day-Ahead Trading**
*Mid-Columbia Peak*



**Notes:**
[1] Dashed lines represent two standard deviations (positive and negative) from the mean daily Profit and Loss during non-manipulation days in which Barclays consummated a trade.
[2] Some values are not shown due to truncation of the Y-Axis.
**Source:** ICE Trades Data.

Exhibit 7.2

**Exhibit 7.2**
**Barclays' Estimated Daily Profit and Loss per MWh**
**With Non-Manipulation Period Standard Deviation**
**ICE Fixed Price Physical Day-Ahead Trading**
*North Path 15 Peak*



**Notes:**
[1] Dashed lines represent two standard deviations (positive and negative) from the mean daily Profit and Loss during non-manipulation days in which Barclays consummated a trade.
[2] Some values are not shown due to truncation of the Y-Axis.
**Source:** ICE Trades Data.

Exhibit 7.3

**Exhibit 7.3**
**Barclays' Estimated Daily Profit and Loss per MWh**
**With Non-Manipulation Period Standard Deviation**
**ICE Fixed Price Physical Day-Ahead Trading**
*Palo Verde Peak*



**Notes:**
[1] Dashed lines represent two standard deviations (positive and negative) from the mean daily Profit and Loss during non-manipulation days in which Barclays consummated a trade.
[2] Some values are not shown due to truncation of the Y-Axis.
**Source:** ICE Trades Data.

Exhibit 7.4

**Exhibit 7.4**
**Barclays' Estimated Daily Profit and Loss per MWh**
**With Non-Manipulation Period Standard Deviation**
**ICE Fixed Price Physical Day-Ahead Trading**
*South Path 15 Peak*



**Notes:**
[1] Dashed lines represent two standard deviations (positive and negative) from the mean daily Profit and Loss during non-manipulation days in which Barclays consummated a trade.
[2] Some values are not shown due to truncation of the Y-Axis.
**Source:** ICE Trades Data.

Exhibit 7.5

**Exhibit 7.5**
**Barclays' Estimated Daily Profit and Loss per MWh**
**With Non-Manipulation Period Standard Deviation**
**ICE Fixed Price Physical Day-Ahead Trading**
*Mid-Columbia Offpeak*



**Notes:**
[1] Dashed lines represent two standard deviations (positive and negative) from the mean daily Profit and Loss during non-manipulation days in which Barclays consummated a trade.
[2] Some values are not shown due to truncation of the Y-Axis.
**Source:** ICE Trades Data.

Exhibit 7.6

**Exhibit 7.6**
**Barclays' Estimated Daily Profit and Loss per MWh**
**With Non-Manipulation Period Standard Deviation**
**ICE Fixed Price Physical Day-Ahead Trading**
*North Path 15 Offpeak*



**Notes:**
[1] Dashed lines represent two standard deviations (positive and negative) from the mean daily Profit and Loss during non-manipulation days in which Barclays consummated a trade.
[2] Some values are not shown due to truncation of the Y-Axis.
**Source:** ICE Trades Data.

Exhibit 7.7

**Exhibit 7.7**
**Barclays' Estimated Daily Profit and Loss per MWh**
**With Non-Manipulation Period Standard Deviation**
**ICE Fixed Price Physical Day-Ahead Trading**
*Palo Verde Offpeak*



**Notes:**
[1] Dashed lines represent two standard deviations (positive and negative) from the mean daily Profit and Loss during non-manipulation days in which Barclays consummated a trade.
[2] Some values are not shown due to truncation of the Y-Axis.
**Source:** ICE Trades Data.

Exhibit 7.8

**Exhibit 7.8**
**Barclays' Estimated Daily Profit and Loss per MWh**
**With Non-Manipulation Period Standard Deviation**
**ICE Fixed Price Physical Day-Ahead Trading**
*South Path 15 Offpeak*



**Notes:**
[1] Dashed lines represent two standard deviations (positive and negative) from the mean daily Profit and Loss during non-manipulation days in which Barclays consummated a trade.
[2] Some values are not shown due to truncation of the Y-Axis.
**Source:** ICE Trades Data.

Exhibit 8

**Exhibit 8**
**Days with Large Loss ($ per MWh) by Product**
**ICE Fixed Price Physical Day-Ahead Trading**
**Delivery Period: November 2006 - December 2008**

| | Alleged Manipulation Period | | Non-Manipulation Period | |
|---|---|---|---|---|
| | **Barclays Trade Days** | **Percent of Days with Loss > 2 Stdev** | **Barclays Trade Days** | **Percent of Days with Loss > 2 Stdev** |
| Mid-Columbia Peak | 123 | 2% | 379 | 1% |
| North Path 15 Peak | 62 | 15% | 435 | 3% |
| Palo Verde Peak | 333 | 5% | 189 | 4% |
| South Path 15 Peak | 41 | 0% | 489 | 1% |
| Mid-Columbia Offpeak | 93 | 3% | 417 | 4% |
| North Path 15 Offpeak | 3 | 0% | 486 | 2% |
| Palo Verde Offpeak | - | - | 440 | 3% |
| South Path 15 Offpeak | - | - | 528 | 2% |

**Notes:**
[1] Barclays Trade Days represents the count of days where Barclays had non-zero gross trading volume.
[2] Standard Deviation (Stdev) of Profit and Loss (P&L) per MWh is calculated using the daily P&L per MWh during non-manipulation days in which Barclays consummated a trade. Percent of days greater than two standard deviations from the mean daily P&L per MWh in the loss direction are included above.
**Source:**
ICE Trades Data.

Exhibit 9

**Exhibit 9**
**Days in Which Barclays Would Not Have Expected To Profit from FERC's Alleged**
**Manipulative Scheme**
**Alleged Manipulation Period**

| | Alleged Manipulation Days | Days in Which Barclays Would Not Have Expected to Profit from Alleged Scheme | Percent |
|---|---|---|---|
| Mid-Columbia Peak | 123 | 117 | 95% |
| North Path 15 Peak | 62 | 41 | 66% |
| Palo Verde Peak | 333 | 222 | 67% |
| South Path 15 Peak | 41 | 41 | 100% |
| Mid-Columbia Offpeak | 93 | 93 | 100% |
| North Path 15 Offpeak | 3 | 3 | 100% |
| Palo Verde Offpeak | - | - | - |
| South Path 15 Offpeak | - | - | - |
| **All Products** | **655** | **517** | **79%** |

**Sources:**
ICE Trades Data; Barclays Trades Data.

Exhibit 10

**Exhibit 10**
**Minimum Price Impact Multiplier Necessary for Barclays to Have Expected**
**to Earn Positive Net Profits from the Alleged Manipulative Scheme**
**on All Alleged Manipulation Days**

| | Alleged Manipulation Days | Multiplier |
|---|---|---|
| Mid-Columbia Peak | 123 | 5.2 |
| North Path 15 Peak | 62 | 1.5 |
| Palo Verde Peak | 333 | 3.4 |
| South Path 15 Peak | 41 | 4.7 |
| Mid-Columbia Offpeak | 93 | 5.7 |
| North Path 15 Offpeak | 3 | - |
| Palo Verde Offpeak | - | - |
| South Path 15 Offpeak | - | - |

**Note**:
[1] Across all products, 6 out of 655 alleged manipulation days are excluded from the analysis because Barclays' positions that settled at the ICE index and built physical position are in the same direction. These days include the 3 alleged manipulation days for North Path 15 Offpeak.
**Sources**:
ICE Trades Data; Barclays Trades Data.

Exhibit 11

**Exhibit 11**
**ICE Fixed Price Day-Ahead Trading With Barclays' Transactions Marked**
**Alleged Manipulation Period**
*South Path 15 Peak on February 8, 2007*

[January 31, 2007] 7:11 PM: Levine email to Connelly, Brin, Dhabliwala, Gerome, and Smith discussing trading 2/1/2007 - 2/9/2007: "If we can keep the PV index up and the SP daily index down somehow that will be good to keep the BOM in."



<u>Sources:</u>  ICE Trades Data; Barclays Trades Data; BARC0472014-15.

Exhibit 12

**Exhibit 12**
**ICE Fixed Price Day-Ahead Trading With Barclays' Transactions Marked**
**Alleged Manipulation Period**
*Palo Verde Peak on November 17, 2006*

10:04 AM: Smith to Crowell [Mirant]: "I own the SP and palo btw… man I'm going thru my ice deals. wow. def. a record."



Exhibit 13

**Exhibit 13**
**Measures of Market Liquidity by Product**
**All Market Participants**
**Delivery Period: November 2006 - December 2008**

### Calculated Using Trade Data

| | Number of Buyers | | Number of Sellers | | Number of Trades | | Volume (MW) | |
| | Alleged Manipulation Days | Non-Manipulation Days | Alleged Manipulation Days | Non-Manipulation Days | Alleged Manipulation Days | Non-Manipulation Days | Alleged Manipulation Days | Non-Manipulation Days |
|---|---|---|---|---|---|---|---|---|
| Mid-Columbia Peak | 24.7 | 21.8 | 27.0 | 24.9 | 242.1 | 158.2 | 6,669 | 4,165 |
| North Path 15 Peak | 17.0 | 14.3 | 19.5 | 15.3 | 129.2 | 81.5 | 3,752 | 2,182 |
| Palo Verde Peak | 17.1 | 14.6 | 17.6 | 15.9 | 81.2 | 62.7 | 2,140 | 1,623 |
| South Path 15 Peak | 25.1 | 26.6 | 26.5 | 27.5 | 222.1 | 287.4 | 6,032 | 7,846 |
| Mid-Columbia Offpeak | 18.2 | 14.5 | 20.6 | 17.3 | 113.5 | 73.3 | 3,102 | 1,898 |
| North Path 15 Offpeak | 14.7 | 12.4 | 11.0 | 13.3 | 43.3 | 59.3 | 1,150 | 1,578 |
| Palo Verde Offpeak | - | 10.1 | - | 10.2 | - | 30.3 | - | 775 |
| South Path 15 Offpeak | - | 16.5 | - | 16.7 | - | 79.6 | - | 2,061 |

### Calculated Using Trade and Order Data

| | Daily Average: | | | | | | Average at Second Prior to Consummated Trade: | | | | | |
| | Number of Orders | | Orders per Trade | | Number of Market Participants | | Number of Active Bids | | Number of Active Offers | | Bid-Offer Spread | |
| | Alleged Manipulation Days | Non-Manipulation Days | Alleged Manipulation Days | Non-Manipulation Days | Alleged Manipulation Days | Non-Manipulation Days | Alleged Manipulation Days | Non-Manipulation Days | Alleged Manipulation Days | Non-Manipulation Days | Alleged Manipulation Days | Non-Manipulation Days |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mid-Columbia Peak | 627.1 | 438.3 | 2.4 | 3.0 | 36.4 | 33.9 | 15.5 | 11.7 | 15.1 | 12.0 | $1.09 | $1.00 |
| North Path 15 Peak | 272.8 | 167.8 | 2.1 | 2.1 | 25.2 | 22.7 | 4.7 | 4.0 | 6.8 | 4.5 | $0.71 | $1.27 |
| Palo Verde Peak | 213.7 | 173.5 | 2.8 | 2.9 | 25.1 | 23.3 | 5.8 | 4.8 | 7.1 | 6.1 | $1.27 | $1.27 |
| South Path 15 Peak | 542.5 | 630.7 | 2.4 | 2.4 | 33.5 | 33.9 | 12.2 | 15.9 | 14.5 | 16.8 | $0.61 | $0.80 |
| Mid-Columbia Offpeak | 283.1 | 217.6 | 2.6 | 3.1 | 31.4 | 26.7 | 7.0 | 7.4 | 9.3 | 7.7 | $1.09 | $1.03 |
| North Path 15 Offpeak | 117.7 | 137.3 | 2.7 | 2.4 | 21.0 | 21.4 | 3.3 | 4.9 | 4.8 | 6.2 | $0.78 | $1.06 |
| Palo Verde Offpeak | - | 88.8 | - | 3.2 | - | 17.6 | - | 3.2 | - | 3.7 | - | $1.68 |
| South Path 15 Offpeak | - | 172.1 | - | 2.3 | - | 25.3 | - | 6.5 | - | 8.0 | - | $0.99 |

**Notes:**
[1] Trade data are available for 4,272 product days. Order data are available for 3,334 product days. There are 960 product days for which trade data are available and order data are not. Of these 960 product days, 847 are non-manipulation days and 113 are alleged manipulation days. There are 22 product days for which order data are available and trade data are not. Of these 22 product days, all are non-manipulation days.
[2] Number of Orders is defined as the total number of active orders on a given product day.
[3] Number of Orders per Trade is only calculated on days for which both trade and order data are available.
[4] Number of Market Participants is defined as the number of unique companies that either consummated a trade as the buyer, consummated a trade as the seller, or placed an order that was not consummated. Number of Market Participants is only calculated on days for which both trade and order data are available.
**Sources:**
ICE Trades Data; ICE Orders Data.

Exhibit 14

**Exhibit 14**
**Measures of Market Liquidity by Product**
**All Market Participants, Excluding Trades In Which Barclays Was a Counterparty**
**Delivery Period: November 2006 - December 2008**

**Calculated Using Trade Data**

**Daily Average:**

| | Number of Buyers | | Number of Sellers | | Number of Trades | | Volume (MW) | |
|---|---|---|---|---|---|---|---|---|
| | Alleged Manipulation Days | Non-Manipulation Days | Alleged Manipulation Days | Non-Manipulation Days | Alleged Manipulation Days | Non-Manipulation Days | Alleged Manipulation Days | Non-Manipulation Days |
| Mid-Columbia Peak | 23.6 | 20.9 | 25.7 | 24.0 | 200.9 | 147.9 | 5,415 | 3,889 |
| North Path 15 Peak | 15.8 | 13.3 | 17.5 | 14.4 | 82.1 | 71.5 | 2,184 | 1,907 |
| Palo Verde Peak | 15.8 | 13.4 | 15.8 | 14.4 | 60.4 | 48.3 | 1,575 | 1,242 |
| South Path 15 Peak | 23.9 | 25.6 | 25.5 | 26.4 | 189.6 | 268.2 | 5,064 | 7,326 |
| Mid-Columbia Offpeak | 17.0 | 13.7 | 18.9 | 16.3 | 88.0 | 68.8 | 2,359 | 1,783 |
| North Path 15 Offpeak | 12.0 | 11.4 | 9.3 | 12.4 | 30.3 | 52.3 | 775 | 1,389 |
| Palo Verde Offpeak | - | 9.4 | - | 9.4 | - | 27.1 | - | 695 |
| South Path 15 Offpeak | - | 15.5 | - | 15.6 | - | 71.9 | - | 1,860 |

**Calculated Using Trade and Order Data**

| | Daily Average: | | | | | | Average at Second Prior to Consummated Trade: | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of Orders | | Orders per Trade | | Number of Market Participants | | Number of Active Bids | | Number of Active Offers | | Bid-Offer Spread | |
| | Alleged Manipulation Days | Non-Manipulation Days | Alleged Manipulation Days | Non-Manipulation Days | Alleged Manipulation Days | Non-Manipulation Days | Alleged Manipulation Days | Non-Manipulation Days | Alleged Manipulation Days | Non-Manipulation Days | Alleged Manipulation Days | Non-Manipulation Days |
| Mid-Columbia Peak | 595.7 | 426.3 | 2.8 | 3.2 | 35.4 | 32.9 | 15.5 | 11.7 | 15.1 | 11.9 | $1.12 | $1.01 |
| North Path 15 Peak | 238.8 | 162.0 | 3.0 | 2.3 | 24.0 | 21.7 | 4.5 | 4.0 | 6.9 | 4.5 | $0.83 | $1.26 |
| Palo Verde Peak | 196.4 | 162.0 | 3.5 | 3.5 | 24.0 | 22.2 | 5.7 | 4.7 | 7.0 | 6.0 | $1.25 | $1.42 |
| South Path 15 Peak | 520.4 | 614.1 | 2.8 | 2.5 | 32.5 | 32.9 | 12.3 | 15.9 | 14.3 | 16.9 | $0.63 | $0.80 |
| Mid-Columbia Offpeak | 262.9 | 212.5 | 3.1 | 3.3 | 30.2 | 25.7 | 7.0 | 7.4 | 9.2 | 7.7 | $1.15 | $1.02 |
| North Path 15 Offpeak | 101.0 | 132.4 | 3.4 | 2.6 | 19.0 | 20.3 | 3.4 | 4.9 | 4.5 | 6.2 | $0.83 | $1.06 |
| Palo Verde Offpeak | - | 87.0 | - | 3.5 | - | 16.7 | - | 3.2 | - | 3.7 | - | $1.67 |
| South Path 15 Offpeak | - | 167.0 | - | 2.4 | - | 24.2 | - | 6.6 | - | 8.0 | - | $0.98 |

**Notes:**

[1] Trade data are available for 4,272 product days. Order data are available for 3,334 product days. There are 960 product days for which trade data are available and order data are not. Of these 960 product days, 847 are non-manipulation days and 113 are alleged manipulation days. There are 22 product days for which order data are available and trade data are not. Of these 22 product days, all are non-manipulation days.

[2] Number of Orders is defined as the total number of active orders on a given product day.

[3] Number of Orders per Trade is only calculated on days for which both trade and order data are available.

[4] Number of Market Participants is defined as the number of unique companies that either consummated a trade as the buyer, consummated a trade as the seller, or placed an order that was not consummated. Number of Market Participants is only calculated on days for which both trade and order data are available.

**Sources:**

ICE Trades Data; ICE Orders Data.

Exhibit S.1

**Supplemental Exhibit S.1**
**ICE Fixed Price Day-Ahead Trading With Barclays' Transactions Marked**
**Alleged Manipulation Period**
*Mid-Columbia Peak on February 28, 2007*

9:57 AM: Connelly to Thomas [Sempra]: "your boy started crying this morning... said he wass calling ferc"; Thomas [Sempra] "you going to have fun with the index all month?" / Connelly: "no - it isn't going to affect much"



**Sources:** ICE Trades Data; Barclays Trades Data; BARC0090305-06; BARC0090353.

Exhibit S.2

**Supplemental Exhibit S.2**
**ICE Fixed Price Day-Ahead Trading With Barclays' Transactions Marked**
**Alleged Manipulation Period**
*Palo Verde Peak on February 7, 2007*

[January 31, 2007] 7:11 PM: Levine email to Connelly, Brin, Dhabliwala, Gerome, and Smith discussing trading 2/1/2007 - 2/9/2007: "If we can keep the PV index up and the SP daily index down somehow that will be good to keep the BOM in."



**Sources:** ICE Trades Data; Barclays Trades Data; BARC0472014-15.

Exhibit S.3

**Supplemental Exhibit S.3**
**ICE Fixed Price Day-Ahead Trading With Barclays' Transactions Marked**
**Alleged Manipulation Period**
*Palo Verde Peak on February 9, 2007*

[January 31, 2007] 7:11 PM: Levine email to Connelly, Brin, Dhabliwala, Gerome, and Smith discussing trading 2/1/2007 - 2/9/2007: "If we can keep the PV index up and the SP daily index down somehow that will be good to keep the BOM in."



**Sources:**  ICE Trades Data; Barclays Trades Data; BARC0472014-15.

Exhibit S.4

**Supplemental Exhibit S.4**
**ICE Fixed Price Day-Ahead Trading With Barclays' Transactions Marked**
**Alleged Manipulation Period**
*Palo Verde Peak on April 3, 2007*

[April 2, 2007] 5:02 PM: Levine email to Dhabliwala on 4/2/2007 discussing trading on 4/3/2007: "If you can sell a bunch of index that would be good to keep the price up"



**Sources:**   ICE Trades Data; Barclays Trades Data; BARC0496996.

Exhibit S.5

**Supplemental Exhibit S.5**
**ICE Fixed Price Day-Ahead Trading With Barclays' Transactions Marked**
**Alleged Manipulation Period**
*Palo Verde Peak on November 3, 2006*

9:22 AM: Smith to Gerome: "I totally fuckked with the Palo Market Today… My goal was to keep sp/palo tighter… I just started lifting the piss out of the palo"; Smith to Lehr [Mirant]: "I own the palo markt, BTW"



Exhibit S.6

**Supplemental Exhibit S.6**
**ICE Fixed Price Day-Ahead Trading With Barclays' Transactions Marked**
**Alleged Manipulation Period**
*Palo Verde Peak on November 9, 2006*

10:20 AM: Smith to Brin: "that sp/palo keeps getting wider, so I was trying to prop up the palo index. I think it worked well too."; Smith to Hunzeker [Mirant]: "had one of my days again / about 29 to 30 deals on ice. Don't know why I do it"



**Sources:**  ICE Trades Data; Barclays Trades Data; BARC0633705-06; BARC0260120-21.

Exhibit S.7

**Supplemental Exhibit S.7**
**ICE Fixed Price Day-Ahead Trading With Barclays' Transactions Marked**
**Alleged Manipulation Period**
*South Path 15 Peak on February 1, 2007*

[January 31, 2007] 7:11 PM: Levine email to Connelly, Brin, Dhabliwala, Gerome, and Smith discussing trading 2/1/2007 - 2/9/2007: "If we can keep the PV index up and the SP daily index down somehow that will be good to keep the BOM in."



**Sources:** ICE Trades Data; Barclays Trades Data; BARC0472014-15.

Exhibit S.8

**Supplemental Exhibit S.8**
**ICE Fixed Price Day-Ahead Trading With Barclays' Transactions Marked**
**Alleged Manipulation Period**
*South Path 15 Peak on February 2, 2007*

[January 31, 2007] 7:11 PM: Levine email to Connelly, Brin, Dhabliwala, Gerome, and Smith discussing trading 2/1/2007 - 2/9/2007: "If we can keep the PV index up and the SP daily index down somehow that will be good to keep the BOM in."



**Sources:**  ICE Trades Data; Barclays Trades Data; BARC0472014-15.

Exhibit S.9

**Supplemental Exhibit S.9**
**ICE Fixed Price Day-Ahead Trading With Barclays' Transactions Marked**
**Alleged Manipulation Period**
*South Path 15 Peak on February 5, 2007*

[January 31, 2007] 7:11 PM: Levine email to Connelly, Brin, Dhabliwala, Gerome, and Smith discussing trading 2/1/2007 - 2/9/2007: "If we can keep the PV index up and the SP daily index down somehow that will be good to keep the BOM in."



**Sources:**  ICE Trades Data; Barclays Trades Data; BARC0472014-15.

Exhibit S.10

**Supplemental Exhibit S.10**
**ICE Fixed Price Day-Ahead Trading With Barclays' Transactions Marked**
**Alleged Manipulation Period**
*South Path 15 Peak on February 6, 2007*

> [January 31, 2007] 7:11 PM: Levine email to Connelly, Brin, Dhabliwala, Gerome, and Smith discussing trading 2/1/2007 -
> 2/9/2007: "If we can keep the PV index up and the SP daily index down somehow that will be good to keep the BOM in."



Sources:  ICE Trades Data; Barclays Trades Data; BARC0472014-15.

Exhibit S.11

**Supplemental Exhibit S.11**
**ICE Fixed Price Day-Ahead Trading With Barclays' Transactions Marked**
**Alleged Manipulation Period**
*South Path 15 Peak on February 7, 2007*

[January 31, 2007] 7:11 PM: Levine email to Connelly, Brin, Dhabliwala, Gerome, and Smith discussing trading 2/1/2007 - 2/9/2007: "If we can keep the PV index up and the SP daily index down somehow that will be good to keep the BOM in."



**Sources:**  ICE Trades Data; Barclays Trades Data; BARC0472014-15.

Exhibit S.12

**Supplemental Exhibit S.12**
**ICE Fixed Price Day-Ahead Trading With Barclays' Transactions Marked**
**Alleged Manipulation Period**
*South Path 15 Peak on February 9, 2007*

[January 31, 2007] 7:11 PM: Levine email to Connelly, Brin, Dhabliwala, Gerome, and Smith discussing trading 2/1/2007 - 2/9/2007: "If we can keep the PV index up and the SP daily index down somehow that will be good to keep the BOM in."



**Sources:**  ICE Trades Data; Barclays Trades Data; BARC0472014-15.

Exhibit S.13

**Supplemental Exhibit S.13**
**ICE Fixed Price Day-Ahead Trading With Barclays' Transactions Marked**
**Alleged Manipulation Period**
*Mid-Columbia Offpeak on March 21, 2007*

8:34 AM: Smith to Brin: "think she wants you to run the off peak up (she's long) not sure why she doesn't do more"; 1 hr later Brin to Smith: "she is getting killed on that midc ll, she really wanted someone to try and prop it up"



Sources: ICE Trades Data; Barclays Trades Data; BARC0636940-41; BARC0636944-45.

Exhibit S.14

# Supplemental Exhibit S.14
## ICE Fixed Price Day-Ahead Trading With Barclays' Transactions Marked
## Alleged Manipulation Period
*North Path 15 Offpeak on December 7, 2006*

8:40 AM: Smith to Brin: "don't buy any sp light index. I'm gonna try to crap on the NP light"

**Sources:** ICE Trades Data; Barclays Trades Data; BARC0634600-01.

# Exhibit S.15

**Supplemental Exhibit S.15**
**ICE Fixed Price Day-Ahead Trading With Barclays' Transactions Marked**
**Alleged Manipulation Period**
*North Path 15 Offpeak on December 19, 2006*

9:29 AM: Smith to Crowell [Mirant]: "ha. hope you weren't long NP light … I seriously did half the volume / was afraid I wasn't going to be able to sell it….Beat index on 500"



Sources: ICE Trades Data; Barclays Trades Data; BARC0261649-51.

Exhibit S.16

**Supplemental Exhibit S.16**
**ICE Fixed Price Day-Ahead Trading With Barclays' Transactions Marked**
**Alleged Manipulation Period**
*North Path 15 Offpeak on December 21, 2006*

8:35 AM: Crowell [Mirant]: "why you buy index if its gonna tank?" / Smith: "my lil secret"; 2hrs. later Crowell: "didn't really tank like I thought" / Smith: "I ran out of NP light to sell"

