LESLIE M. WERLIN (SBN 67994)
lwerlin@mcguirewoods.com
McGUIREWOODS LLP
1800 Century Park East, 8th Floor
Los Angeles, California 90067
Telephone:      (310) 315-8222
Facsimile:      (310) 315-8210

TODD MULLINS (Admitted *Pro Hac Vice*)
tmullins@mcguirewoods.com
McGUIREWOODS LLP
2001 K Street, N.W.
Washington, D.C. 20006-1040
Telephone:      (202) 857-1752
Facsimile:      (202) 828-3320

ALLISON D. CHARNEY (Admitted *Pro Hac Vice*)
acharney@mcguirewoods.com
McGUIREWOODS LLP
1345 Avenue of the Americas, 7th Floor
New York, New York 10105
Telephone:      (212) 548-2166
Facsimile:      (212) 715-6279

Attorneys for DANIEL BRIN and SCOTT CONNELLY

*Please see continuation sheet for a complete
list of the defendants and their counsel.*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL ENERGY REGULATORY COMMISSION,<br><br>                    Plaintiff,<br><br>          v.<br><br>BARCLAYS BANK PLC; DANIEL BRIN; SCOTT CONNELLY; KAREN LEVINE; and RYAN SMITH,<br><br>                    Defendants. | No.  2:13-cv-02093-TLN-EFB (TEMP)<br><br>**DECLARATION OF DANIEL BRIN IN SUPPORT OF DEFENDANTS' OPPOSITIONS TO PLAINTIFF'S MOTION TO AFFIRM CIVIL PENALTIES** |

**<u>CONTINUATION SHEET: DEFENDANTS AND THEIR RESPECTIVE COUNSEL</u>**

THOMAS J. NOLAN (SBN 66992)
Thomas.Nolan@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:      (213) 687-5000
Facsimile:      (213) 687-5600

STEVEN R. GLASER (Admitted *Pro Hac Vice*)
Steven.Glaser@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Telephone:      (212) 735-3000
Facsimile:      (212) 735-2000

PATRICK FITZGERALD (Admitted *Pro Hac Vice*)
Patrick.Fitzgerald@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
Telephone:      (312) 407-0700
Facsimile:      (312) 407-0411

JOHN N. ESTES III (Admitted *Pro Hac Vice*)
John.Estes@skadden.com
DONNA M. BYRNE (Admitted *Pro Hac Vice*)
Donna.Byrne@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone:      (202) 371-7000
Facsimile:      (202) 393-5760

GREGORY A. MARKEL (Admitted *Pro Hac Vice*)
Greg.Markel@cwt.com
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone:      (212) 504-6000
Facsimile:      (212) 504-6666

PAUL J. PANTANO JR. (Admitted *Pro Hac Vice*)
Paul.Pantano@cwt.com
JODI L. AVERGUN (Admitted *Pro Hac Vice*)
Jodi.Avergun@cwt.com
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, N.W.
Washington, D.C. 20001
Telephone:      (202) 862-2410
Facsimile:      (202) 862-2400

*Attorneys for BARCLAYS BANK PLC*

**CONTINUATION SHEET: DEFENDANTS AND THEIR RESPECTIVE COUNSEL**

SETH P. WAXMAN (Admitted *Pro Hac Vice*)
Seth.Waxman@wilmerhale.com
DAN M. BERKOVITZ (Admitted *Pro Hac Vice*)
Dan.Berkovitz@wilmerhale.com
JONATHAN G. CEDARBAUM (Admitted *Pro Hac Vice*)
Jonathan.Cedarbaum@wilmerhale.com
HEATHER M. ZACHARY (Admitted *Pro Hac Vice*)
Heather.Zachary@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone:     (202) 663-6000
Facsimile:     (202) 663-6363

MARK C. KALPIN (Admitted *Pro Hac Vice*)
Mark.Kalpin@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone:     (617) 526-6000
Facsimile:     (617) 526-5000

*Attorneys for BARCLAYS BANK PLC*

HOLLY A. HOUSE (SBN 136045)
hollyhouse@paulhastings.com
PAUL HASTINGS LLP
55 Second Street, Twenty-Fourth Floor
San Francisco, California 94105
Telephone:     (415) 856-7075
Facsimile:     (415) 856-7175

MICHAEL L. SPAFFORD (Admitted *Pro Hac Vice*)
michaelspafford@paulhastings.com
VICTORIA L.T. EARLS (Admitted *Pro Hac Vice*)
victoriaearls@paulhastings.com
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, D.C. 20005
Telephone:     (202) 551-1700
Facsimile:     (202) 373-1705

*Attorneys for KAREN LEVINE and RYAN SMITH*

## DECLARATION OF DANIEL BRIN

I, DANIEL BRIN, declare as follows:

1.      I make this declaration of facts in support of Defendants Barclays Bank PLC, Daniel Brin, Scott Connelly, Karen Levine, and Ryan Smith's oppositions to the motion of the Federal Energy Regulatory Commission ("FERC") to affirm civil penalties (the "Motion to Affirm").  I make this declaration based upon my knowledge of the facts stated herein.  If called as a witness, I could and would testify competently to such facts.  For ease of reference, I am including in this declaration citations to the transcripts of my September 2010 deposition taken by FERC, to the extent relevant to the matters I am stating here and to the extent FERC asked me about them.   I understand that my deposition and other materials from the FERC investigation (AR01082-637) have been submitted to the Court as part of the "Administrative Record."  I also rely on Barclays Trade Data (AR05556-58), ICE Data for Physical Power Deals 2006-2008 (AR05559-61), and ICE Bid and Offer Data at Exhibit C to the Declaration of Todd Mullins ("ICE Orders Data").

2.      I am a defendant in this matter.  FERC has made serious allegations against me (and others) claiming that I engaged in a scheme with Scott Connelly, Karen Levine and Ryan Smith to manipulate the Intercontinental Exchange ("ICE") daily index to benefit Barclays' larger financial positions that settled against this index.  I vehemently deny all of these allegations and will explain in this declaration, as I have done consistently throughout this harrowing years long process, that I have done nothing wrong.

3.      I want to make it clear at the outset that I did not trade in the manipulative fashion alleged by FERC, or in any manipulative fashion, during my career as an electricity trader, including while I was employed by Barclays.  Deposition Transcript of Daniel Brin ("Brin Tr.) at 144:14-16; 313:6-12; 392:3-393:3; 388:18-24; 389:11-14; 389:25-17; 392:3-6; AR00538.

4.      I did not coordinate with Scott, Karen or Ryan (or any other traders) in an effort to manipulate any trading market in any way during my career as a trader, including while I was employed by Barclays.  Brin Tr. at 81:23-82:11; 144:21-145:3; 313:6-12; 392:3-393:3.

5.      During my career as an electricity trader I never intentionally lost money on any trade that I executed.  My goal was always to profit from my trades.  Brin Tr. at 52:9; 65:24-66:2; 392:3-6.

6.      From what I understand, FERC is alleging that Barclays entered into financial positions, then built physical positions opposite from those financial positions, and flattened the physical positions in a way that manipulated the ICE daily index to benefit the financial positions. But just because a trader sells and buys electricity does not mean that the ICE daily index price will be impacted in a way that does not reflect fundamentals or is in some way artificial or "manipulated."  Instead, the index price is based on the volume and prices of electricity being traded, and these components may be affected by a number of factors, including market fundamentals and/or who is buying or selling.  Brin Tr. at 16:21-22; 81:20-22.

7.      In the end, and due in part to FERC's allegations, I have not been able to build a career as an energy trader.  I left Barclays in 2011, and have been unable to secure consistent employment since FERC's allegations became public.  As a result, my earnings have decreased significantly.  Last year, I was let go from my job due in part to FERC's allegations, and was told by my supervisor that it would be better for the company if I were not associated with it.  I do not currently have a full-time job, and am earning a living and attempting to support my family as a freelance consultant.  I continue to seek full-time employment, but FERC's allegations and investigation are often raised during job interviews, and I believe that the ongoing and public nature of FERC's investigation has negatively impacted my ability to secure stable employment.

8.      I have disclosed to FERC that I have limited financial resources and that a penalty in $1 million amount assessed would be devastating not only to myself, but to my family and children as well.  I was a low-level junior trader at Barclays who did not receive compensation that was tied to the performance of the trading desk, when I even received a bonus at all.  I received a low six-figure salary at Barclays, and only received one very small raise during my time at the bank.  I received a signing bonus, but did not receive any bonus at all for most of the years that I was employed by Barclays, and at no point did I receive any combination of bonus or salary that

1   even approached the $1 million penalty.  I simply cannot afford to pay the penalty assessed.  Brin

2   Tr. at 42:14-23; 44:14-45:5; 45:13-46:3; AR00540; AR00583-5.

3          9.      FERC deposed me under oath in person for two days in September 2010.  The

4   statements in this declaration are consistent with the testimony I gave to FERC, to the extent

5   FERC questioned me regarding these topics and provided me with sufficient context and

6   supporting documentation for its questions.

7                                   **My Background**

8          10.     I began my career in the energy trading business in 2001, when I joined Mirant as a

9   recent college graduate.  I started as a real-time trader, meaning that I worked on a desk that traded

10  electricity 24 hours a day and 7 days a week.  Karen Levine was my supervisor while I worked on

11  Mirant's real-time desk.  I was responsible for trading primarily in the Western United States, but

12  was also responsible for managing Mirant's energy producing assets in California and the

13  southwestern United States as well.  However, for almost two years I left trading completely and

14  served as the assistant to Mirant's Chief Operating Officer.  Brin Tr. at 19:1-25:25; AR00541-2.

15         11.     In 2006, while I was still at Mirant, Karen Levine, who now worked at Barclays,

16  approached me and asked if I had any interest in moving to New York and working for the bank.  I

17  learned that Barclays was growing its energy trading business and although I knew that I was too

18  inexperienced to start working as a trader as soon as I arrived, I was intrigued by the opportunity

19  of working my way up to a trading position.  I had a number of interviews with Barclays,

20  including a conversation with Scott Connelly, who I knew tangentially from when he worked at

21  Mirant.  Brin Tr. at 33:24-25; 39:23-41:15; AR00542.

22         12.     I was hired by Barclays in July 2006 as a trading analyst.  Brin Tr. at 39:23-25;

23  AR00542.

24

25

26

27

28

## My Responsibilities at Barclays

13.     As a trading analyst, I was working under Scott and one other Barclays trader. When I began I had no substantive experience trading in the day-ahead physical electricity markets, which is also referred to as trading in "cash" or "dailies."  Brin Tr. at 40:6-7; AR00542.

14.     My responsibilities as a trading analyst were mainly to gather information about weather patterns, forecasts, and other kinds of fundamental data that would assist the cash traders. I also assisted Scott with a variety of clerical tasks that would help him to organize his trading positions.  This included gathering trade information and updating his book.  Scott would usually get to the office between 8:30 am and 9:30 am, but sometimes he would arrive earlier, when the cash trading might have been most important in revealing fundamentals, such as during the spring run-off, or snow melt, at the Mid-Columbia ("Mid-C") hub which was a very important trading hub for him given his background, or when he had to attend to administrative matters that were unrelated to the day's trading.  From time-to-time I also executed trades for the traders on the desk.  This was the first time that I was exposed to trading in dailies, but because I was only an analyst, and not a trader with my own trading book, I did not have a "profit and loss" or "PnL" or a compensation package that was tied to any trading profits.  Brin Tr. at 40:18-20; 44:21-45:5; 59:4-17; 63:17-64:8; 68:1-16; 96:11-14; 120:2-4; 121:10-18; 127:20-22; AR00538; AR00542.

15.     In addition to my analyst duties, I also spent the first year at Barclays learning how to trade electricity generally, and specifically physical trading in the day-ahead market.  I started cash trading on a regular basis in November 2006, and by the spring of 2007 I transitioned from my role as an analyst and began to prepare to become a full cash trader with my own book. Although I was still very junior, this was an exciting step for me because I was responsible for my own profits and losses based on my own trading views.  I always tried to profit in my trading, which would be better both for the bank and for my future career as an energy trader, but when I began trading I did not receive compensation that was directly tied to the profits generated in my book, and I was still very much learning the market, but I knew that this was an important transition that I hoped would jump-start my trading career.  Brin Tr. at 43:19-44:3; 45:1-5; 52:9;

61:5-63:13; AR00538; AR00542-3.

16.     As a junior cash trader who traded primarily on the ICE daily index, one of my most important tasks was making sure that our positions were flat at the end of the day.  Barclays was not an actual producer or consumer of electricity, like a generator or utility, so we had to make sure that at the end of the trading day we were not left with any electricity positions on our books that would require Barclays to receive or deliver any electricity.  That was called being "flat."  I always tried to profit when flattening Barclays' positions.  Brin Tr. at 52:9; 65:17-66:2; 71:11-13; 169:7-10; AR00538; AR00544; AR00551.

### Barclays' Cash Desk

17.     A cash trader could make money in the course of flattening a position if he sold higher or bought lower than the ICE daily index price (if the position was acquired at index) or otherwise relative to the fixed-prices at which Barclays acquired the position.  For example, if electricity was originally purchased by the desk at the index price, a trader who flattened the bank's position by selling at a higher price relative to the index would profit.  Conversely, if a trader had to purchase electricity to flatten the bank's position, he could profit by buying at a lower price relative to the index if the electricity was originally sold at the index price.  A dailies trader could also profit by "day trading" or acquiring a position during the course of the trading day with the idea that the position could be exited at a profit later in the day.  But most of what I did was just flatten the physical positions that Barclays had at the beginning of the day, and try to flatten at a profit.  Brin Tr. at 50:20-22; 65:17-66:2; 71:11-13; 114:4-9; AR00538.

18.     I was not a term trader, I generally did not trade positions that were left open for more than one day, and I was not responsible for any of the longer-term financial positions that FERC alleges benefited from Barclays' daily cash trading.  I did not control these positions.  I did help to validate Scott's positions as reflected in our systems each day until August 2007, but this was more akin to data-entry, did not include the total Barclays' swap position, and I was not always aware of the overall picture of Scott's financial positions and any specific strategy that he might have had with respect to those positions because I did not always understand what those

1  positions actually were in terms of the behavior of the constituent instruments.  I also recall that I

2  sometimes traded in balance of the month positions to flatten the physical positions.  These were

3  positions that could last as long as a month, but were not the longer-term financial swap positions

4  that more senior traders like Scott traded.  Brin Tr. at 84:23-24; 119:19-21; AR00544.

5      19.    Trading dailies was one of the main ways that new traders such as myself were

6  trained in the market.  There was not much price risk involved in dailies trading, assuming that

7  you weren't day trading in large volumes, for example, purchasing large volumes of electricity and

8  later that day attempting to sell the same amount at a profit.  Because dailies traders were just

9  flattening the physical positions that Barclays had at the beginning of the day, there was a limit as

10  to how much you could lose on a set day, which was usually relatively small compared to the

11  amounts at risk in most of Barclays' trades.  This was also true because the trades were by

12  definition short term, so there was no risk of entering into a large long-term position that carried a

13  higher amount of price risk.  So new employees on the desk would start out by trading dailies in

14  order to learn the market, the various hubs, and develop their trading instincts.  In this way the

15  dailies market served as a training ground for new traders such as myself.  I knew when I started

16  as a cash trader that if I performed well and flattened my positions in a profitable way, I could

17  eventually move into a term trading role.  Brin Tr. at 50:1-11; AR00545.

18      20.    It was important for Barclays to participate in the dailies market because the bank

19  was a new player in the energy trading business and was trying to build its reputation.  One of the

20  ways to do this was by demonstrating that the bank could quickly and efficiently trade physical

21  electricity.  This showed the market that Barclays was able to handle its purchase and sale

22  obligations, which would be noticed by counterparties, brokers, and potential customers.

23  AR00541; AR00543-4.

24      21.    I recall that trading in the dailies market was also important for the bank because it

25  did not have a real-time desk that would allow it to obtain instantaneous information about the

26  electricity market.  Without a real-time desk, like the one I worked on while at Mirant, the only

27  way for Barclays to see who was buying and selling electricity in a close to real-time basis was by

28

trading electricity in the day-ahead cash market.  The electricity markets are highly specialized markets without much public information, and the only way to see who is buying and selling is to actually enter into transactions to buy and sell electricity.  On the ICE trading screen you could see the offers and bids for the purchase and sale of electricity and whether you could execute those offers and bids based on whether or not your bank had credit with the counterparty.  But you didn't know the identity of the counterparty until you actually executed the trade.  Brin Tr. at 72:20-73:9; 74:2-19; 82:14-16; AR00543-5.

22.     It was important to see the entities that were trading electricity on a close-to-real-time basis because that would impact a trader's view of the market.  For example, if a utility was purchasing electricity at certain hub, such as Pacific Gas & Electric at North Path 15 ("NP-15"), it meant that they might not have an adequate supply of electricity, and the price would go up.  On the other hand, if a utility was selling electricity, it often meant that it had excess capacity, and that the price of electricity would fall.  I know that this information would be used to evaluate the longer-term financial positions that term traders like Scott had for the bank, but because I was a junior trader who only traded dailies, I did not have much insight into how these positions would be adjusted based on the market information gathered in cash trading. I was expected to and regularly did report to Scott and others on the desk whatever I might have learned from and observed in cash trading.  Typically, one of the first things Scott would have wanted to know in the morning when he arrived, and that he would ask about, was "What happened in cash?" meaning what had happened to prices in the cash market early that morning, who were the market participants, and why did we think the market had behaved the way it did.  I understood from what he asked me that this information was important to the rest of the bank's trading operations in related markets.  Brin Tr. at 72:20-73:9; 74:2-19; 77:10-18; 80:13-14; AR00543-5.

23.     In addition to utilities, it was important to see what other speculators and investment banks were doing in order to get a sense of their view of the market, since they were our competitors.  Again, the only way to gather this information was by entering into physical trades in the daily cash market.  Brin Tr. at 76:8-25; 80:13-14; AR00543-5.

24.     A dailies trading desk was also important because it allowed Barclays to enter into transactions directly with load serving entities (LSEs).  These were deals that were not available directly on ICE or with brokers and that involved non-standard megawatt orders or smaller hubs, like Pinnacle Peak and other transmission points, that may not trade on the usual platforms.  These deals could result in larger relative profit.  In order to execute the deals and fulfill the relevant orders, a trader would often have to purchase electricity and transmission to move the electricity to the final destination.  This could only be done with a cash desk.  I recall that at Barclays, we purchased the electricity for a lot of these types of deals at the Palo Verde ("PV") hub because of the credit that we had with the counterparties in this region.  We had smaller LSEs as our customers that could not always purchase electricity because they operated out of more illiquid markets, were less credit-worthy, or wanted to purchase non-standard megawatt orders.  They contracted with Barclays to supply electricity for them by buying at other hubs, such as the more liquid hub at PV, and moving it by transmission to the utility (this does not mean that Barclays actually delivered physical electricity, since the flattening of the dailies was used to ensure that we did not do so).  I specifically recall these transactions because of how difficult it was to purchase power in order to fulfill these contracts.  It is my understanding that of the 35 manipulation months that FERC has alleged, 17 of them occurred at PV.  I suspect that this is due to the fact that Barclays entered into a large amount of the smaller direct customer deals described above in the PV market.  As a result of entering into these contracts, Barclays might appear to be a consistent or frequent player at PV, even though we were simply acting as intermediaries for the smaller LSEs from whom we were purchasing electricity.  Brin Tr. at 111:14-24.

25.     Even though the losses that a cash trader could incur were generally smaller relative to the profit and loss for other trades at an investment bank like Barclays, losses were still losses, and they were something that I always tried to avoid when flattening my positions.  At the end of each trading day I would look at whether or not my trades had been profitable.  When I transitioned from an analyst to a cash trader with my own book I knew that my performance would be evaluated in part by how profitable I was, so I always tried to make a profit flattening

1    and avoid large losses.  Brin Tr. at 52:9; 65:24-25; 124:1-3; 142:14-15; AR00545-6.

2        26.    As I testified, I recall that one of the largest losses I incurred trading dailies was

3    approximately $100,000.  I remember this precisely because of how distraught I was and how I

4    thought it might impact my review and speak to my performance as a trader.  In fact, I recall that

5    at one point one of my performance evaluations was negatively affected by poor profit and loss

6    numbers that resulted from my trading.  Brin Tr. at 57:13-25; 146:1-3; AR00546.

7        27.    I spoke with Scott about this loss, and about my losses generally.  I recall that Scott

8    was also concerned with incurring losses, even in the dailies market, and that he always stressed

9    that a trader should seek to profit with every trade.  Scott encouraged an open dialogue, and he

10   would challenge me with questions about why my trading might not have been profitable and what

11   mistakes I had made while trying to read the market.  Part of this open dialogue was an ongoing

12   discussion about the size of Barclays' physical positions at each hub.  This did not happen with

13   any regularity, but we wanted to make sure that we had a position large enough to allow us to

14   gather the market intelligence that we needed while also making sure that we could flatten the

15   positions without overexposing the bank to a potential liquidity crunch.  In other words, we

16   wanted to make sure that we could sell or buy from other market participants without having to

17   pay an increased price if we were stuck with a long or short position that we needed to flatten and

18   where there were no readily available counterparties.  Brin Tr. at 57:1-6; 70:9-71:8; 72:18-73:9;

19   137:9-16; AR00546.

20       28.    One of my more administrative roles was allocating profits and losses to the correct

21   traders' books at the end of the trading day.  As I explained, my role as a cash trader was mainly to

22   flatten Barclays' physical positions, and I would often do this for a number of different traders on

23   the same day.  In order to flatten more efficiently, I would flatten all of the positions in the

24   aggregate out of one trading book.  This helped to ensure that the bank was flat overall.  Then, at

25   the end of the trading day, I would have to execute inter-book transfer trades in order to reallocate

26   any losses or gains to the correct trading book.  This trade administration was part of my role as a

27   junior trader on the desk.  Brin Tr. at 106:14-111:10; 372:8-374:11.

28

29.     Like that of many other investment banks, all of the traders at Barclays sat in one large room.  The trading floor contained not just dailies traders, but also gas traders, the electricity traders for both the Eastern and Western United States, and traders that were not involved in the power markets at all.  It was an open area in which people could move around freely.  I also recall that the compliance department had a presence on the trading floor as well, and that the department would sometimes review our trading to make sure that we complied with Barclays' policies and applicable laws.  Brin Tr. at 101:20-103:3; AR00547.

30.     This open seating arrangement allowed you to easily converse with other traders about their views of the market.  AR00547.

31.     Often the cash traders such as myself would discuss flattening the bank's physical positions.  This was not a formal meeting, but was more of an informal discussion of the positions going into the trading day, who, if anyone, should flatten in what hub, and what the market fundamentals were looking like. This was necessary in order to avoid mistakes in trading which might leave Barclays with an open position.  Brin Tr. at 68:14-69:18; 120:21-121:4.  AR00548-9.

32.     As I testified, this meeting was used to help make sure that we were flat at the end of the trading day, not to reach any sort of agreement on how to trade.  Scott encouraged all of his traders to be independent and did not tell me, or any other trader that I know of, to use a single trading strategy, let alone one designed to manipulate the market as FERC alleges.  Instead, Scott wanted us to trade based on our own views of the market and its fundamentals.  This could result in traders taking opposite positions because they each had a different interpretation of a weather forecast, for example.  Brin Tr. at 62:6-10; 65:15-17; 77:10-11; 81:23-82:1; 189:10-190:2; 313:6-12; 389:7-10.  AR00548-9.

33.     My own trading reflected this.  I was certainly my own person when it came to my trading strategies, as I believe were Scott, Ryan and Karen.  While we would all occasionally associate outside of the office and at certain business-related functions, and Ryan came to my wedding, I would say that all of the members on the desk had mainly a professional relationship. Brin Tr. at 38:17-23;87:16-21; 90:1-17; 100:6-10; AR00548.

34.     I have known and worked with Scott for many years.  Although I had limited interaction with Scott when we were both at Mirant, we worked together on a daily basis at Barclays.  I know Scott to be an intelligent, successful trader and a demanding supervisor, and I know that he did not engage in the type of trading that FERC is alleging.  I also can attest to the fact that Scott never told me to trade in a manipulative fashion or to intentionally lose money on any trades.  Brin Tr. at 81:23-82:1; 392:7-393:3.

35.     I knew Karen both at Mirant and at Barclays, and I know that she was an honest and determined trader, even if we did not always see eye to eye.  We primarily had differing opinions on how to execute the flattening of Barclays' "spread" positions, (a physical product that reflected the difference in price between two hubs).  If part of her spread had a physical component opposite to me, I wanted to flatten them internally, while she wanted to flatten by buying or selling another spread on ICE.  Ryan and I often chatted on IM about our frustrations with Karen, both in her execution and because sometimes she just got on my nerves, as co-workers often do.  I regret the way that I sometimes spoke about Karen, but this was just the product of the highly-charged atmosphere of the trading floor and our differing opinions.  I know that she would not have engaged in the kind of manipulative trading that FERC has alleged, and simply because we had differing approaches to execution and work habits does not mean that she is the type to engage in fraudulent behavior.  Indeed, despite our differences, I know that Karen is an honest person and a trader who always tried to profit based on her views of the electricity market.  Brin Tr. at 52:9; 82:6-11; 159:20-25; 392:7-393:3; AR00548.

36.     Ryan and I worked together both at Mirant and at Barclays, and I probably know him the best of the defendants in this case, although I would not say that we were that close.  We did occasionally socialize outside of the office as co-workers often do, and he also attended my wedding.  I would not have associated myself with someone who was trading in the kind of manipulative way that FERC alleges.  I know that Ryan was an honest trader who, like me, had trouble keeping his position straight from time-to-time.  But I do not think that he ever purposefully lost money on trades or traded with an intent to manipulate the electricity markets.

1  Brin Tr. at 82:3-5; 89:23-90:17; 392:7-393:3.

2      37.    I was surprised when Ryan was let go from Barclays, but I knew that employment

3  at an investment bank like Barclays could often be unpredictable.  I was unaware of Ryan's profits

4  and losses at the time that he was let go, but I do not believe that his termination had anything to

5  do with FERC's allegations.  Brin Tr. at 91:21-25; 92:14-16.

6              **My Trading During FERC's Alleged Manipulation Days/Months**

7      38.    I understand that FERC has alleged that my trading during certain months and

8  specific days – but not all – demonstrates that I traded dailies in a manipulative fashion in order to

9  benefit Barclays' financial positions.  Even after all these years, it is difficult to respond to FERC

10  since it has made sweeping generalizations about my trading that are not supported by trading data

11  or, in other instances, has cherry-picked a few alleged days or months of my trading to support the

12  claim that I manipulated the electricity markets.  In connection with my defense of this matter, I

13  have endeavored to respond to FERC's allegations regarding (i) the specific days in which it

14  claims that I traded with a manipulative intent (July 5, 2007 at PV Peak and May 27, 2008 at Mid-

15  C Peak) and (ii) certain months in which FERC implies that I or Barclays traded with a

16  manipulative intent (March 2007 at Mid-C Peak, March 2007 at SP-15 Peak, and April 2007 at

17  PV).

18      39.    As part of this response to FERC's allegations, I have reviewed trading data and

19  certain communications for the specific months and days referenced below.  Some of this data is

20  data obtained from ICE only after the proceedings at FERC were concluded.  I can attest that I did

21  not trade with any manipulative intent and was only trying to flatten Barclays' positions and profit

22  in my trading.  AR05556-58; AR05559-61; ICE Orders Data.

23      40.    During my explanation of the trading data that I have examined, below, I discuss

24  the various ways that someone can trade electricity on ICE.  One way that you can trade is by

25  making your own "bids" to purchase (which are "hit" by market participants if they want to sell to

26  you) or "offers" to sell (which are "lifted" by those that want to buy from you).  This type of

27  trading is sometimes referred to as being a "market-maker" or "market-making."  An alternative

28

1  trading approach is to accept the bids or offers that are set by other market participants.  This type

2  of trading is sometimes referred to as being a "price-taker" or "price-taking."

3      41.    I did not trade in a manipulative fashion when I was a market-maker or price-taker.

4  The ICE trading platform only allowed a trader to execute at the best available price, i.e. the

5  highest bid or lowest offer, assuming that you had credit with the relevant buyer or seller, and

6  therefore could transact, with the counterparty offering the highest bid or lowest offer.  If I was

7  trading as a market-maker I always strove to propose bids or offers to the market that were based

8  on fundamentals and in line with the bid-offer spread.  Similarly, when I traded as a price-taker, it

9  could have been that my bids were not being hit or my offers were not being lifted and, since I

10  needed to be flat by the end of the day, there were times I had to accept the bids or offers on the

11  screen even if I thought that they were not as good as my own bids or offers.  Irrespective of

12  whether I was trading as a market-maker or price-taker, I never transacted in a manipulative way.

13  Brin Tr. at 170:17-171:10.

14            March 2007 Mid-C Peak

15      42.    In its Order to Show Cause and Enforcement Staff Report Recommendation (the

16  "OTSC"), it appears that FERC implies that I traded dailies in the Mid-C Peak electricity market

17  in March 2007 with manipulative intent.  Based on the fact that FERC alleges that Barclays' swap

18  position gained in value from a higher ICE daily index settlement price, I assume that it is

19  claiming that I was manipulating the ICE daily index higher by purchasing at uneconomically high

20  prices.  AR00116.  But my review of the trading data and communications objectively shows that

21  FERC's suggestion that I was trading with a manipulative intent is wrong.

22      43.    By March 2007 I was trading dailies almost every day at Mid-C, as it was my

23  primary responsibility to flatten Barclays' physical positions.  I was not responsible for

24  establishing or managing Barclays' financial swap positions at this (or any other) hub, and that

25  was not something that I reviewed or took into account when trading dailies.  I also recall that this

26  was the first spring runoff season that I traded at Mid-C, which is a particularly volatile time in the

27  market because of the timing of the snow melt from the mountains and its corresponding impact

28

on hydroelectricity generation.  Brin Tr. at 149:14-20; 156:5-7; 275:1-2; AR00551.

44.     First, I profited in my dailies trading on six of the twenty days I traded at Mid-C Peak in March 2007, as measured against the ICE daily index (the 2nd, 19th, 20th, 22nd, 23rd, and 26th).  This was my goal when flattening Barclays' physical positions, and it shows that I was not trading in an uneconomic fashion.  Mathematically, such trading could not have resulted in a higher index price that would have benefitted a long swap position as FERC alleges. The opposite is true.  AR00554; AR05556 (Barclays Trade Data); AR05560 (ICE Data).

45.     It appears that on seven of the twenty days that I traded this month (the 20th, 21st, 22nd, 23rd, 26th, 27th, and 29th), I was mostly a market-maker at Mid-C Peak and executed most of these trades through reserve quantity orders.  Based on my review of the data, my market-making bids were at economical prices relative to other market prices occurring around the time of my trades; I never set the high price in a market-making trade on these days and, in fact, I actually set the low price on March 26 in a market-making purchase, which counters FERC's argument that I was trying to manipulate the price upwards by purchasing at uneconomically high prices.  On multiple occasions, I chose not to take an opportunity to purchase at a higher price, instead seeking to make a market at a lower price.  My trading behavior on these days shows that I was actively seeking out the most profitable price point in my trades and I was not trading in a manipulative fashion, which is reinforced by my profiting in four of the seven days.  Additionally, on two other days in March (the 16th and 19th) I was a market-maker nearly as much as I was a price-taker, which I believe demonstrates that I did not trade with a manipulative intent, but rather was simply reacting to the market in the hopes of obtaining the best prices.  AR00552-53; AR05556 (Barclays Trade Data); AR05560 (ICE Data).

46.     It is also my understanding that in order to materially benefit Barclays' corresponding financial position, I would have had to trade a much higher volume of dailies on ICE than I actually traded.  AR00552.

47.     I have also reviewed trading data for certain days where I incurred relatively large losses in my dailies trading in March 2007 at Mid-C Peak.  Even though I lost money while

1   purchasing electricity on certain days, the trading data shows, objectively and mathematically, that

2   FERC's conclusion that I traded with a manipulative intent cannot be correct.

3       48.   I incurred the highest losses in March 2007 trading dailies at Mid-C Peak on the

4   28th. I do not believe that the trading data supports FERC's theory that I was manipulating the

5   market by intentionally losing money in trading dailies by purchasing electricity at high prices. I

6   began the trading day as a market-maker by entering a reserve bid for 500 megawatts at $35. A

7   reserve quantity order, or bid in this case, is a way to set up an order to buy or sell electricity in set

8   increments, usually 25 megawatts, at a set price. For example, when I set my reserve quantity bid

9   at $35, other traders would see a bid to purchase 25 megawatts at $35, but they would not see that

10   I was looking to purchase 500 megawatts total. Once someone hits my bid, the next 25 megawatts

11   in the reserve quantity would then be visible to the market. Using a reserve quantity order is a

12   good way to ensure that you are transacting at a price reflecting your view of the market, because

13   if no one is willing to buy or sell at the price that you have set, it means that your reserve quantity

14   price is too far from the market overall, and you would have to readjust. A reserve quantity order

15   also ensures that the market will not be disproportionately impacted by the volume that one wishes

16   to trade. This is because it only releases the order in small increments, so the market does not

17   know if a market participant, such as Barclays, has a strong view of the direction of the market.

18   Brin Tr. At 278:11-14; 280:12-14; AR00554; AR05556 (Barclays Trade Data); AR05560 (ICE

19   Data); ICE Orders Data.

20       49.   The data shows that the prior trading session in Mid-C Peak, on March 27, 2007,

21   had a low price of $31 and high price of $41, so I likely thought my reserve bid of $35 was

22   reflective of that spread. The data also shows that at the time I put in my reserve bid, there were

23   higher offers to sell 25 megawatts of electricity at $36, $37, $38, $39, and $40 available to me. If

24   I were trading in the manner alleged by FERC, I could have lifted each of those offers to try and

25   raise the index to a higher price. I did not. Instead, because I thought the market was dropping, I

26   submitted a reserve bid for $35. My reserve bid was hit by other market participants and

27   completely filled within a couple of minutes. AR05556 (Barclays Trade Data); AR05560 (ICE

28

Data); ICE Orders Data.

50.     For the remainder of the day, I lifted offers at prices that were consistent with the market, generally between $34 and $35.  It appears that after 8:00 AM, when I was mostly done with trading, prices started to drop rapidly.  I lost money at Mid-C Peak on March 28, 2007, which is unsurprising given that this was a particularly volatile trading day and prices fell rapidly after I was mostly done trading, but I certainly did not trade in a manipulative way, and as always, based my trading on my understanding of the market and its fundamentals.  During the time I was trading, I was very much in line with the market and the data objectively shows that I avoided opportunities to make trades to raise the index price, contrary to what FERC is alleging. AR00554; AR05556 (Barclays Trade Data); AR05560 (ICE Data); ICE Orders Data.

51.     In general, I have reviewed the ICE Orders Data across many of the days during the period that FERC claims I was manipulating the ICE index by trading in the way that FERC suggests.  Instead it shows that I consistently sought the best prices available.  When buying, I frequently placed bids to buy at prices lower than prevailing offers made by others to sell and did not buy at other traders' higher priced offers to sell.  When I was selling, I usually placed offers to sell at prices higher than others' bids to buy and I usually declined to sell at bids lower than my own offers.

52.     FERC has attempted to support its allegation that I was trading with a manipulative intent by referencing certain instant message communications from March 2007.   FERC's inferences are incorrect.  As I explain in more detail below, these conversations can often be hard to understand in hindsight because it is not often clear what someone is responding to, and they often consisted of sarcastic and joking language.  But even given that, I do not believe that the instant messages that FERC cites in connection with my March 2007 trading demonstrate any intent to manipulate the market.

53.     In the first instant message, from March 21, 2007 (BARC0636940; AR05743), Ryan commented to me regarding Karen's trading by saying "think she wants you to run the off peak up (she's long) not sure why she doesn't do more. prob. doesn't want to take the loss daily

and pay all the bro." I recall testifying before FERC that, rather than it demonstrating that I understood and participated in the alleged scheme, I in fact did not understand what Ryan meant by this statement, which is reflected by the fact that I did not respond to it. Instead, I just said that "i think she cannot handle her position" and that she was trying to get another trader to cover it. As I testified, this simply reflects the fact that there were times when Karen was trading in a number of different hubs and would ask for help from other traders. Brin Tr. at 159:14-25; 161:8-12; 162:25-163:163:5; AR00558.

54.   Later that day, I wrote to Ryan in an instant message that Karen "is really getting killed on that midc ll, she really wanted someone to try and prop it up" (BARC0636944; AR05747). If anything, I believe that this shows no one, including myself or anyone else at Barclays, was trading in a manipulative way because it is clear that whatever was being referenced actually did not occur. Moreover, the term "prop" does not mean trade in a manipulative fashion, instead it is generally just a slang term that can be used to describe someone purchasing in the market or the hope the market will rise and the price increase. Brin Tr. At 173:11-22; 175:19-25; 239:8-13; AR00558-9.

55.   Finally, FERC also has claimed that the next day, March 22, 2007, Ryan and I continued to discuss Karen's alleged intent to manipulate the market. I do not believe that this instant message (BARC0637014; AR05759) shows any sort of understanding of a scheme to manipulate the electricity markets. That morning, Ryan asked me "why does she tell me to do stuff"? I responded that it was "bc she wants marks on trades but doesn't want them herself" and "just like she didnt want daily loss trading midcll in her book so wanted us to trade it". Not only does this not demonstrate any manipulative intent, but it also appears that FERC did not consider the next lines in the instant message (BARC0637016; AR05761), where Ryan informs me that he is "never listening to [Karen] again" because he disagreed with her advice, to which I responded by saying that Karen had certain amounts of unique knowledge in certain trading areas, but in others was just as knowledgeable as Ryan and I. This shows that the three of us were not engaged in any sort of coordinated manipulative trading, either in March 2007 or at any time while we

1  worked at Barclays.  AR00559.

2                    March 2007 South Path 15 ("SP-15") Peak

3        56.    FERC claims that March 2007 at SP-15 Peak is an alleged manipulation month.  I

4  find FERC's implication that I traded with a manipulative intent in March 2007 in the SP-15 Peak

5  market particularly troubling.  This is because the trading data shows that I only traded dailies in

6  SP-15 Peak on two days in March 2007 – the 13th and the 14th.  AR00560; AR05556 (Barclays

7  Trade Data); AR05560 (ICE Data).

8        57.    It is my understanding that FERC alleges that I traded to benefit Barclays' short

9  financial position by *selling* electricity at lower prices in order to lower the ICE daily index price.

10  However, based on the trading data, I was a *purchaser* of electricity at SP-15 Peak on March 13,

11  meaning that FERC's theory does not work on that day of my trading.  AR00560; AR05556

12  (Barclays Trade Data); AR05560 (ICE Data).

13        58.    This leaves one day, March 14th, where I sold dailies in this alleged manipulation

14  month.  It is my understanding that the price of electricity at SP-15 Peak on the 14th moved

15  between $49.50 and $53.  All of my transactions were done between $51 and $51.50, very close to

16  the published index price of $51.54, indicating that I was transacting at around the average market

17  price, not at low prices.  AR00560; AR05556 (Barclays Trade Data); AR05560 (ICE Data).

18        59.    It is also my understanding that the combination of the financial position relative to

19  the share and size of my physical trading would have made it impossible for me to benefit the

20  financial positions with my physical trading.  I believe that this further confirms that I did not

21  trade with manipulative intent.   AR00560.

22

23

24

25

26

27

28

July 5, 2007 PV Peak

60.     In the OTSC, FERC alleges that I traded with manipulative intent on July 5, 2007 in the PV Peak market by purchasing electricity in an effort to increase the ICE daily index price in a way that would benefit a related financial swap position.  AR00117.  However, the trading data for that day shows that I did not trade in a manipulative fashion and was trading only with the hope that I would flatten Barclays' position at the best possible price.

61.     As an initial matter, trading days following holidays, such as July 4th and Memorial Day, are generally more volatile and less predictable than normal trading days.  This is because the load forecasts, or the estimates of how much electricity utilities are expected to purchase, are not as accurate because of the vacation day, and also because there tend to be fewer traders participating in the market.

62.     Going into July 5, 2007, Barclays was short 1,500 megawatts of physical electricity, meaning that the cash traders had to purchase 1,500 megawatts of electricity in order to flatten the position.  AR00351; AR05556 (Barclays Trade Data); AR05560 (ICE Data).

63.     Based on my review of an industry publication that was provided by Barclays, the PV market around this time was extremely volatile, due to higher-than-normal temperatures, increasing demand for electricity, and a delay in activating one of the nuclear generators at PV from a scheduled outage.  This caused the price of electricity at PV to be trading much higher than normal going into the day.  AR00351; AR00417; AR00562.

64.     The data for this day shows that I began my trading by entering a reserve quantity bid at $115 to try and purchase 500 megawatts of electricity.  The data also shows that in the prior trading session at PV Peak on July 3, 2007, there was a low price of $210 and high price of $340.  I likely thought that my $115 bid, among the earliest bids in the trading session, would have been a great deal for Barclays if a counterparty hit my bid.  AR05556 (Barclays Trade Data); AR05560 (ICE Data); ICE Orders Data.

65.     It appears that when I submitted my $115 reserve quantity bid, there were no other active bids or offers at the time.  However, the price of electricity at PV that day started to drop,

and I withdrew my reserve quantity bid after only purchasing 150 megawatts.  It appears this was because I saw that the price of electricity was falling, and thought that I could purchase at a lower cost, which would benefit the bank.  In my next few trades, I bought 175 megawatts in three transactions based on offers that were on the ICE screen.  AR05556 (Barclays Trade Data); AR05560 (ICE Data); ICE Orders Data.

66.     The volatility in the PV market made the price of electricity drop throughout the day, often in short amounts of time.  However, throughout the trading day I attempted to purchase electricity at the best prices available, and I was not trying to manipulate the ICE daily index higher.  AR05556 (Barclays Trade Data); AR05560 (ICE Data); ICE Orders Data.

67.     For example, at the same time that I was acting as a price-taker in a few trades, I put in a reserve bid to buy 225 megawatts at $107.  At the time I put in this bid, it appears there was an offer of $110 available, which indicates that I thought I could create a market at a lower price.  While my reserve bid was out to the market but not yet hit, I lifted a couple of offers for $110 in order to further flatten Barclays' physical position.  Once my reserve bid started being hit, I stopped lifting offers while it was being fulfilled since I had created a market at a lower price.  In fact, approximately 80% of my trading volume this day was a result of other market participants hitting my bids.  AR00351-52; AR05556 (Barclays Trade Data); AR05560 (ICE Data); ICE Orders Data.

68.     Finally, the price of electricity at PV was falling throughout the day, which I believe, from looking at my trades, caused me to lower the prices at which I was bidding in order to stay in-line with the market.  This further confirms that I was not trading in a manipulative fashion.  AR05556 (Barclays Trade Data); AR05560 (ICE Data); ICE Orders Data.

69.     Further, Karen was selling dailies on July 5, 2007.  This shows FERC's theory that we were coordinating to collectively manipulate the price of the ICE daily index higher by purchasing electricity in order to benefit Barclays' financial position is wrong given that she was selling, since under FERC's theory her selling might cause the price of electricity to fall.  AR05556 (Barclays Trade Data); AR05560 (ICE Data).

70.     I was not profitable in my trading at the PV hub on July 5, 2007.  But I believe that this was only a result of the extreme volatility of the market that day.  I was trading within the confines of the market to try and purchase electricity at the best prices for the bank, not with any manipulative intent.  AR00117.

<u>May 27, 2008 Mid-C Peak</u>

71.     In its OTSC, FERC alleges that I traded with manipulative intent on May 27, 2008 in the Mid-C Peak market by selling electricity in an effort to decrease the ICE daily index price in a way that would benefit a related financial swap position.  AR00118.  However, I believe that the trading data for that day demonstrates I did not trade in a manipulative fashion and was trading only with the hope that I would flatten Barclays' position at the best possible price.

72.     May 27, 2008 was the day after the Memorial Day holiday, and as I noted above, trading days following holidays are generally more volatile and less predictable than normal trading days.   Additionally, based on my review of an industry publication that was provided by Barclays, the Mid-C market during the spring of 2008 was very volatile and experienced extreme price fluctuation due to hotter than normal temperatures and dry conditions that resulted in a low amount of hydroelectric energy.  AR00436.

73.     The price of electricity at Mid-C during this month was extremely volatile, ranging from $5 per megawatt to nearly $100 per megawatt.  I believe that this was due to higher than normal temperatures, which resulted in an increased demand for electricity before hydroelectric production reached its peak.  This first drove up the price before sending the price much lower once temperatures returned to normal and production increased.  AR05561 (ICE Data).

74.     The trading data shows that Barclays was long 825 megawatts of physical electricity at Mid-C going into the day, meaning that Barclays had to sell a net 825 megawatts in order to flatten the bank's position.  AR00354.

75.     I began my trading by entering a reserve quantity offer to sell 200 megawatts at $16.  The price of electricity at Mid-C peak had been falling during the trading sessions prior to May 27th.  After I entered my reserve quantity offer, there was a bid for $10.  Had I wished to

manipulate the market in the way that FERC alleges, and I did not, it would have made sense for me to hit this lower bid but because I was trying to trade in a profitable way, I did not hit the bid and waited to see if my reserve quantity offer would be lifted.  AR05561 (ICE Data); AR05558 (Barclays Trade Data); ICE Orders Data.

76.     After my reserve quantity offer was lifted, I thought there may be a market at a slightly higher price, so I submitted another reserve quantity offer to sell 200 megawatts at $18. Still, I needed to sell to flatten, so I sold 500 megawatts of electricity at $16 in both market-making and price-taking trades.  I believe that this shows that I was simply trading to try and flatten Barclays' position at a profit, and not with the intent to manipulate the index lower. AR05561 (ICE Data); AR05558 (Barclays Trade Data); ICE Orders Data.

77.     After selling a total of 700 megawatts at $16, I hit a bid to sell 50 megawatts at $16.25.  After hitting this bid, my $18 reserve quantity offer that I had submitted earlier was lifted and completely fulfilled.    This shows that I did not trade with any manipulative intent, because I raised the price of my offer for the electricity that I was trying to sell, instead of offering to sell at the earlier or then prevailing, lower prices.  I finished my selling very early in the trading session, with all of my sales occurring before 8 AM.  When I was done selling, the market started to rise. If I had waited until a little later in the trading session to sell, I may have profited.  However, carrying out my flattening duties by offsetting Barclays' position earlier in the day when the market was lower – which led to a loss on the day – does not mean that I was trading with the intent to manipulate, I simply misread the market.  AR05561 (ICE Data); AR05558 (Barclays Trade Data); ICE Orders Data.

78.     I also profited in dailies trading by "beating" the index in the two days following May 27, 2008.  This demonstrates that I was not trying to intentionally lose money trading dailies to benefit a financial position.  If you wanted to lose money against the index, that would have been a simple thing to accomplish, so the fact that I beat the index clearly shows I was not "trying" to lose money.  AR00563; AR05561 (ICE Data); AR05558 (Barclays Trade Data).

79.     Finally, I was aware that FERC was investigating Barclays' trading by May 2008,

1   and certainly would not have traded in a manipulative fashion knowing that the government was

2   investigating the bank's behavior at the time. We just continued to trade as we had in the past

3   because we knew that our trading was legitimate.  AR00564.

4         April 2007 PV

5         80.    It is my understanding that although FERC does not directly allege that I traded

6   with manipulative intent in the PV hub in April 2007, it suggests in the OTSC that I was working

7   with Karen to try and "move" the ICE daily index higher in order to benefit Barclays' financial

8   position by purchasing electricity at artificially high prices.  AR00143-4.  However, the trading

9   data and communications that I have reviewed demonstrate that I was not trading in a

10  manipulative fashion.

11        81.    In April 2007, I only traded on ICE in the Peak market at PV, and on seven of those

12  days (March 30th and April 9th, 10th, 13th, 17th, 19th, and 27th) I made a profit while flattening

13  Barclays' position.  My trading days at PV Peak throughout April 2007 were also almost exactly

14  split between market-making and price-taking behavior, which shows that I was not trading with

15  an intent to manipulative the market, but was just reacting to the market in order to try and profit.

16  AR00565; AR05560 (ICE Data).

17        82.    And on April 26th, the day with my largest losses, I purchased dailies over-the-

18  counter ("OTC") via brokers in addition to my ICE trading.  OTC trades do not contribute to the

19  index price.  As such, it does not make sense that I would perform any of my trading via OTC

20  markets if I wanted to affect the index price, particularly for trades in the same direction as my

21  ICE trades that were allegedly designed to manipulate the index, as was the case with my April

22  26th OTC trading.  AR00565; AR05556 (Barclays Trade Data); AR05560 (ICE Data).

23        83.    FERC also implies that my April 2007 PV trading activity was tied to an email that

24  was sent by Karen Levine to Monal Dhabliwala on April 2, 2007 (BARC0496996; AR05780).

25  However, it is clear from the face of the email that it is not addressed to me and I am not copied.  I

26  have no recollection of seeing that email, and have no reason to believe that I would have seen it,

27  at the time that it was sent.  Indeed, I was not aware of this email until I began reviewing FERC's

28

1  findings and did not see it until it became necessary for my defense against FERC's allegations.

2  AR00566-7.

3  **November 30, 2006 Instant Message (BARC0634367; AR00679)**

4       84.    FERC alleges that a line in an instant message conversation with a Casey Crowell,

5  a friend who was a trader at Mirant, on November 30, 2006 demonstrates both that Barclays was

6  engaged in manipulative trading and that I understood and participated in this manipulation.

7  AR00137-9; Motion to Affirm at 10.  I have had the opportunity to further refresh my recollection

8  regarding this communication and the contextual trading, and can attest that this is incorrect and

9  FERC is misinterpreting the communication in question.

10       85.    Traders at Barclays and other banks often communicated by instant message.

11  These communications were very informal ways to have ongoing and free-flowing discussions

12  with other traders, brokers, and individuals in the market.  These communications could be very

13  fast-paced, and it was not always clear what someone was responding to.  While serious subjects

14  could be discussed over instant message, these communications could also be joking, sarcastic, or

15  consist of nothing more than traders bragging to one another about their abilities.  I am the first to

16  acknowledge that I used dumb, poorly-worded, or ill-advised language when communicating over

17  instant message with fellow traders, friends, and counter-parties.  But I did not trade with a

18  manipulative intent, and so any communication that FERC alleges supports my supposed intent to

19  manipulate the market is nothing more than a misinterpretation or misunderstanding.  Brin Tr. at

20  189:9-11; AR00547.

21       86.    The November 30, 2006 IM is a good example of the free-flowing and informal

22  nature of these instant message communications, and in retrospect it is clear that I did not know

23  what I was talking about when making certain speculative guesses about the market and Barclays'

24  positions.  AR00568-74.

25       87.    I had only joined Barclays as an analyst in July 2006, and was a very inexperienced

26  trader in November 2006, at the time of the communication in question.  As previously explained,

27  I did not receive my own trading book until the spring of 2007.  During my subsequent review of

28

1   this conversation, it is painful to read how inexperienced I was at the time and my lack of

2   understanding of the trades that I was executing and that were occurring in the market.  I even note

3   at the beginning of the conversation that I had not traded for "a few months" prior to my trading

4   on November 30th.  Brin Tr. at 39:23-25; 43:19-22; AR00542.

5          88.    FERC wrongly interprets this IM as proof of my intent to manipulate the ICE

6   index.  I was actually not clear on what I was doing, let alone what Scott or any others on the desk

7   were doing, which is why I later wrote that I thought the positions that I was discussed were a

8   mistake.  Brin Tr. at 332:9-12; 340:9-20.  AR00568-74.

9          89.    As I testified when questioned by FERC, I do not specifically recall what is being

10  discussed throughout this communication, but I think it is clear, as I testified, that the

11  communication demonstrates that I did not have a strong grasp of Barclays' positions or of what

12  was happening in the market at the time.  I repeatedly state that I made mistakes in my trading for

13  that day, which I believe is consistent with my status as an inexperienced dailies trader who was

14  trading for the first time in a few months.  As I testified, Scott did not tell me that he wanted me to

15  trade dailies in a specific direction, and in November 2006 I would not have been familiar with

16  Barclays' overall financial position.  I was focused on flattening the daily physical positions.  Brin

17  Tr. at 330:19-21; 331:14-332:17; 334:24-335:25; 336:20-23; AR00572-4.

18         90.    Regarding some of the specific things that I said during this communication, I

19  began by telling Casey that I "traded today for the first time in a few months, man I'm an idiot."  I

20  believe that this confirms that I was still learning how to trade and in fact had not traded at all in a

21  long time. Brin Tr. at 331:20-332:1; 336:20-23; AR00569-70.

22         91.    I then say that I'm trading "SC Dec position, KL and Smitty dont want to take on

23  that size anymore so Im gonna give it a whirl till good balance offers come out."  This meant that I

24  was getting ready to flatten Scott's December Mid-C Peak physical position and that I would

25  attempt to do this at the best price, which it appears I thought would be in the balance of the month

26  trades, not the dailies market.  These trades (referred to as "BOM," "balance," or "balmos") were

27  trades to deliver physical electricity for each of the days remaining in the month, hoping that the

28

DECLARATION OF DANIEL BRIN IN SUPPORT OF DEFENDANTS' OPPOSITIONS TO PLAINTIFF'S
MOTION TO AFFIRM CIVIL PENALTIES
-25-

index price would rise or fall relative to the BOM trade, depending on a trader's view of the market.  I may have indicated that I wanted to flatten Scott's position using BOM trades, not the dailies that FERC is alleging were used to manipulate the market.  In fact, it is my understanding that BOM trades are not used to calculate the ICE daily index at all.  Casey confirmed that I would be flattening using BOM trading by saying: "you gonna trade some balmo's.  y0ou da man."  Brin Tr. at 349:15-17; 352:6-354:20.

92.     In this conversation I also told Casey:  "i suck miscounted in one hub and bought when i should have sold in another" and that this shows that I was "smart."  This last comment is a clear example of sarcasm.  The sarcastic nature of this comment makes it hard for me to recall which other parts of the communication might have been sarcastic and which were serious questions about the market.  The trading data that I have reviewed supports my statement that I made a mistake trading, because it appears that I did accidentally purchase in the wrong hub at one point that day, which resulted in Barclays incurring a small loss.  I believe that this simply shows my inexperience with and misunderstanding of the market.  Casey later continued the sarcastic and informal nature of the conversation by telling me that I'm "not so bright" and asking if I got "burned" by my trading.  Brin Tr. at 348:21-349:12; AR00569-70; AR05556 (Barclays Trade Data); AR05559 (ICE Data).

93.     Later in the conversation, I told Casey "no not too bad, its weird bc some hubs he is oppiste fin/phys, im doing phys so i am trying to drive price in fin direction."  Much has been made of this one line, and I want to clarify what I interpret it to mean.  First, I did not mean that I thought I was actually driving price, or that it was permissible to intend to "drive price" in *any* direction.  I am not sure how you could even do that.  If I had meant that I was driving price, I would not have said "its weird" at the beginning of the statement.  What I think was really going on here, and what I have told FERC in filings and in my deposition is that I thought it was "weird" to be trading physical opposite to Barclays' financial positions, and "weird" that the physical trades I transacted during a trading session that went into the index might somehow "drive price", but not that I was actually driving price or that it was acceptable or my intent to do so.  Further, in

1  re-reading this communication today, it strikes me how proper punctuation may have affected the

2  context of this one line.  As I have said previously, instant messages were very informal

3  communications, littered with typos, poor grammar, and incorrect punctuation.  In re-reading this

4  instant message, I believe many exchanges that may come across as statements by me were

5  actually questions.  For example, consider how the context may change when reading the

6  following as a question (emphasis added): "no not too bad, its weird bc some hubs he is oppiste

7  fin/phys, im doing phys so i am trying to drive price in fin direction[**?**]"  In this context, my lack

8  of knowledge is clearer and I am working through my understanding of how opposite positions

9  may be traded and affect each other, not making a statement regarding some alleged scheme.  I

10 believe that this goes to show that the informality and carelessness behind instant messages

11 sometimes alter the context of a conversation, leaving them open for incorrect inferences.  Brin Tr.

12 at 189:9-11; 330:25-331:2; AR00568-74.

13      94.     It seems to me that Casey agrees with my question, and confusion, in my

14 "fin/phys" line because in the next sentence he responded, "yeah, we do that here.  I don't really

15 get it too much.  Wby be long fin, and short phys."  To me that means he is saying Mirant (where

16 he worked at the time) had positions set up similar to Barclays where the physical and financial

17 positions may be in different directions.  If he thought that I was describing a method of trading to

18 literally "drive" the ICE daily index price in a manipulative fashion, I do not believe that he would

19 have admitted that Mirant traded in the same manipulative way.  AR00568-74.

20      95.     About a minute later, I replied "i think it is a mistake, or sc does it when he hates

21 guy on other side and wants to just run it against him."  I could have meant that there was

22 "mistake" either with how Scott's positions were reported or with how I was interpreting the

23 positions or Barclays' trading.  Casey continued, speculating, "unless your fin. is much bigger.

24 but if you have conviction the mkt is going one way, seems counter-productive."  I then replied,

25 "oh yeah it is much bigger on one side" and "i agree with you."  Casey then asked "and then, if

26 your phys is small, how can move the market?"  Finally, I then stated that "the most confusing

27 thing so far is all the options he does, HR and just outright power, all over the place for cals and

28

1   qs, hard to figure out how to valye and how to keep straight."   All this uncertainty just shows that

2   I was having a hard time discerning Barclays' positions and the market generally. This exchange

3   between Casey and me does not demonstrate an intent to manipulate the market nor was it ever my

4   intent to do so.  As I testified, I believe that during this conversation, including the specific

5   communication that FERC alleges demonstrates my intent to manipulate the ICE daily index, is a

6   discussion between two inexperienced traders who did not always understand what they were

7   doing speculating about how one might go about building a position, not proof that I or anyone at

8   Barclays was manipulating the electricity markets.  Brin Tr. at 331:17-23; 332:13-14; 336:20-23;

9   AR00568-74.

10         96.     I did testify before FERC that it was possible to affect the ICE daily index by

11  trading dailies, but that is simply because I understand that the ICE daily index is calculated in

12  part with data from the purchases and sales on ICE.  I was simply stating a truism, not

13  demonstrating that at the time of the November 30, 2006 communication I had a keen

14  understanding of the market and intended to manipulate it to benefit financial positions that I was

15  not even fully aware of.  A review of the conversation also shows that Casey states that one would

16  need a very large physical position in order to materially impact the index, one that was much

17  larger than the position that I recall trading at the time.  Brin Tr. at 16:21-22; 81:20-22; AR00572-

18  3.

19         97.     I also now understand that it is not uncommon to have a physical position that is in

20  the opposite direction of a longer-term financial position.  For example, if a trader wants to gather

21  market intelligence about how a financial position might move against your expectations it makes

22  sense to trade a physical position opposite from that financial position.  If a trader has a long

23  financial position that is settling at the end of the month, he might want to be short the physical at

24  that same hub so that he can be a purchaser in ICE dailies so that when purchasing he will see who

25  the sellers are and in what size and with what level of urgency and price sensitivity.  When you are

26  short the index you have to purchase electricity in order to flatten, and by purchasing electricity

27  you would see who is selling, and can adjust your positions as needed based on this market

28

1  information. Brin Tr. at 331:18-20; 332:13-17; 337:1-8; AR00573.

2      98.     This communication actually indicates that Barclays did not have a coordinated

3  scheme to manipulate the ICE daily index in the manner alleged by FERC, as it is clear that I was

4  confused by trading and Barclays' positions and that I was making a number of mistakes in my

5  trading.  As I testified during my deposition, the only intent that I had in connection with my

6  trading was to be as profitable as possible.  Brin Tr. at 331:17-23; 332:13-14; 336:20-23;

7  AR00568-74.

8      99.     I have also reviewed my dailies trading data for November 30, 2006 to further put

9  this IM into context, even though the IM was referencing my intent to trade balmos in December

10 2006.  On November 30, 2006 I traded dailies at Mid-C Off-Peak for December 2006.  This is not

11 an alleged manipulation month, which makes sense given my trading that day.  For example, I hit

12 bids to sell ranging from $63 to $61.50, while other market participants were selling at offers as

13 low as $61.00.  Moreover, it appears that other market participants were selling at $61.50 as well.

14 I believe that this shows that I did not sell in order to manipulate the market.  AR05556 (Barclays

15 Trade Data); AR05559 (ICE Data).

16                    **Trading on June 10, 2008 at Mid-C Peak**

17     100.    In its OTSC, FERC alleges that June 2008 in the Mid-C Peak market was a month

18 in which Barclays manipulated the market, supposedly trading to lower the price of electricity on

19 the ICE daily index to benefit the bank's swap position on 25 days in that month.  AR00106.  I

20 believe one of my most profitable days trading on ICE during any alleged manipulation month

21 was June 10, 2008 at Mid-C Peak.  I have reviewed the trading data for that day, and believe it

22 would be helpful to discuss my trading, as I have previously done on days where I lost money, to

23 demonstrate that I traded in generally the same fashion at all times – sometimes I profited and

24 sometimes I lost money.  AR05556-58 (Barclays Trade Data); AR05559-61 (ICE Data).

25     101.    On June 10, 2008, Barclays was long 2,025 megawatts of physical electricity,

26 meaning that the cash traders had to sell 2,025 megawatts of electricity in order to flatten the

27 position.  The data for this day shows that I was the only cash trader that traded, so I was

28

responsible for selling Barclays' entire position.  AR05558 (Barclays Trade Data); AR05561 (ICE Data).

102.     I began the day by entering a reserve quantity offer at $32 to try and sell 500 megawatts of electricity.  I submitted my $32 reserve quantity offer very early in the trading session.  The previous trading session at Mid-C Peak, on June 9, 2008, had a low price of $15 and a high price of $39 – I submitted my offer towards the higher end of this spread.   My reserve offer was lifted by other market participants and completely filled within a few minutes.  AR05558 (Barclays Trade Data); AR05561 (ICE Data); ICE Orders Data.

103.     After this, I submitted another reserve quantity offer to try and sell 500 megawatts of electricity.  Since I correctly anticipated that the market was rising and my previous reserve quantity offer was filled quickly, I decided to increase the price for this reserve quantity offer to $33.  AR05558 (Barclays Trade Data); AR05561 (ICE Data); ICE Orders Data.

104.     It appears that when I submitted this $33 reserve quantity offer, there were bids of $31, $30, $29, $28, $26, $24, $22, $21, and $20 available to me that I could have hit if I wanted to lower the index in accordance with FERC's alleged scheme.  There were no bids of $33 or higher available.  I could have hit the $31 bid and then continued to hit the remaining lower bids.  However, I decided that I thought my price was a more accurate reflection of the true price of electricity, so I submitted a reserve offer for $33.  This reserve offer was lifted by other market participants and completely filled within a couple of minutes.  AR05558 (Barclays Trade Data); AR05561 (ICE Data); ICE Orders Data.

105.     For the remainder of the day, I continued to seek trades at what I considered the most profitable prices, regardless of whether I was a price-taker or market-maker.  On the day, approximately 85% of my sales were market-making, nearly all of which were executed through reserve quantity orders.  In addition to my flattening duties, which required me to sell, I also thought June 10, 2008 was a good opportunity to day trade, so I made some purchases as well.  In addition to successfully flattening Barclays' physical position, it appears I made a profit of over $90,000 on June 10, 2008 at Mid-C Peak.  AR05558 (Barclays Trade Data); AR05561 (ICE Data);

1  ICE Orders Data.

2         106.    A detailed look at my trading on June 10, 2008 at Mid-C Peak demonstrates that I

3  was not trading with intent to manipulate the market.  Indeed, I traded in the same fashion that I

4  did in the days when I lost money, allegedly in furtherance of the manipulative scheme that FERC

5  has advanced throughout its investigation.  But the simple truth is that I always tried to profit by

6  trading in the only way I knew how based on my experience and my view of the market,

7  sometimes I did profit, but other times I lost money.  As my trading on June 10, 2008 shows, I

8  always sought out what I believed to be the best price and repeatedly declined opportunities to

9  trade in a way that might have fit with FERC's alleged scheme.  AR05558 (Barclays Trade Data);

10  AR05561 (ICE Data); ICE Orders Data.

11                                **FERC's Investigative Process**

12         107.    FERC's investigation and the public disclosure of its false allegations have harmed

13  both my personal and professional reputation.  I have fought FERC's allegations because I know

14  them to be false, but throughout this process I have been unable to fully tell my side of the story or

15  conduct the kind of factual investigation needed to clear my name.  I expected to receive my day

16  in court after FERC's investigation was complete.

17         108.    I first became aware that FERC was investigating Barclays' trading behavior in

18  2007. I don't recall when exactly I learned the specific nature of FERC's investigation, but I do

19  recall that I was not told by my managers or Barclays' compliance department to change how I

20  was trading after the bank received notice of FERC's investigation and conducted a preliminary

21  review of FERC's allegations.  I specifically recall this because I asked my superiors if our trading

22  was proper and if I should change my strategies for trading dailies.  I was told that my trading was

23  fine, that I could continue to trade dailies and that I did not have to change anything.  This made

24  sense to me because I knew that Barclays had a robust compliance department, and I had not heard

25  from the compliance department or any of my managers that my trading was, or could be

26  interpreted as being, manipulative.  Indeed, I was taught that I should never trade in a

27  manipulative manner, and in my experience Barclays went to great lengths to ensure that no

28

1  manipulative trading occurred.  Brin Tr. at 381:13-22.

2       109.    I was surprised that we were being investigated by FERC because I was unaware of

3  any concerns about how anyone on the desk was trading.

4       110.    I do not know how FERC's investigation began, but I have been informed that

5  FERC received calls on its enforcement hotline in 2007 regarding Barclays' electricity trading.  I

6  cannot confirm this because I have not been permitted to review transcripts of these calls or hear

7  the actual calls.

8       111.    I was deposed by FERC for two days in September 2010 and was permitted to

9  submit three responses defending myself against FERC's allegations during the course of FERC's

10  investigation, but I have not been questioned, interviewed, or had the opportunity to testify

11  regarding my innocence to a judge, the Commission itself, or a neutral decision maker.

12       112.    My deposition occurred almost four years after the trading and communications

13  that FERC asked about occurred, and I did not recall much of what I was being asked.  I recall that

14  many of the questions I was asked involved trades for which I was not able to view the data or

15  communications that might have been taken out of context.  In the time since my deposition, I

16  have had the opportunity to spend additional time reviewing the communications and trades at

17  issue, to the extent possible given my limited access to the full set of trading data, and my

18  recollection has been refreshed with respect to certain communications.

19       113.    I believe, based on my review of FERC's submissions and filings, that FERC has

20  interviewed other traders and potential witnesses who might have testified to my innocence, but I

21  have not been able to review the transcripts of these interviews or confirm whether they took

22  place. I was not permitted to be present at these interviews or ask questions that might have led to

23  testimony that could have been helpful to my defense.

24       114.    Based on my review of FERC's filings, FERC is basing its allegations against me

25  on a number of instant message communications with other traders and brokers, but I have not

26  been allowed to ask those traders about those conversations.  I was also not a party to a number of

27  the instant message communications that FERC uses to support its allegations, and if I was not a

28

1    participant in the communication it is highly unlikely that I saw it at the time that it was sent.

2        115.    I believe that if I am given the opportunity to seek the testimony of the traders and

3    brokers that I was talking to in the communications that FERC alleges are evidence of

4    manipulation, they will confirm that I was not trading with any manipulative intent and that the

5    communications were harmless discussions about the market and questions posed by an

6    inexperienced trader (which I was at the time).

7        116.    I have also been unable to review the full set of trading analysis that FERC has

8    used to support its findings.  For example, I have not seen FERC's "preliminary econometric

9    model" and I have not had access to the complete set of ICE trading data for the relevant months.

10   I believe that if I am able to review this data I will be able to more fully refute FERC's allegations

11   against me.

12       117.    In sum, I never traded with any manipulative intent, I do not believe that the

13   evidence submitted by FERC demonstrates that I traded with manipulative intent, and I do not

14   believe that Scott, Karen, or Ryan traded with any kind of manipulative intent.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   I declare under penalty of perjury that the foregoing is true and correct.

2   Executed this **30th** day of January, 2016 in **Longs, SC**, United States.

3

4   _____

5                          Daniel Brin

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28